## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CONFERENCE OF STATE BANK SUPERVISORS,<br>1129 20th Street, N.W.<br>Washington, D.C. 20036 | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. _____ |
| v. | ) ) | |
| OFFICE OF THE COMPTROLLER<br>OF THE CURRENCY,<br>400 7th Street SW,<br>Washington, D.C. 20219 | ) ) ) ) ) | |
| and | ) ) | |
| THOMAS J. CURRY,<br>COMPTROLLER OF THE CURRENCY,<br>400 7th Street SW,<br>Washington, D.C. 20219 | ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff CONFERENCE OF STATE BANK SUPERVISORS ("CSBS") brings this Complaint for declaratory and injunctive relief against the OFFICE OF THE COMPTROLLER OF THE CURRENCY and THOMAS J. CURRY, COMPTROLLER OF THE CURRENCY ("Comptroller Curry") (collectively, the "OCC"), alleging as follows:

## INTRODUCTION

1.      CSBS, the nationwide organization of state banking regulators in the United States, brings this action challenging the OCC's recent decision to create a new special-purpose national bank charter for financial technology ("fintech") and other nonbank companies.

2. Although the OCC has not formally defined "fintech," or what constitutes a "fintech" company, the term is generally understood to encompass any of a very broad array of technology-driven financial services providers. Fintech companies range from start-up ventures to well-established conglomerates. The term covers an almost unimaginably wide variety of services, from the traditional (*e.g.*, payment processing) to the more cutting edge (*e.g.*, crowd funding and digital currencies, such as bitcoins). Although the OCC's decision primarily focuses on fintech companies, the OCC has declared that it is empowered to create a charter for nonbank financial services providers regardless of the extent to which they are technology-driven.

3. State authorities (including CSBS's members) have been successfully overseeing and regulating nonbank companies—including those viewed as fintechs—for many years. In addition to supervising state-chartered banks, most state banking departments regulate a variety of nonbank financial services providers, including money transmitters, mortgage lenders, consumer lenders and debt collectors. Among other prudential requirements, these companies are required to meet state safety and soundness requirements and conform to both state and federal consumer-protection and anti-money-laundering laws.

4. More recently, however, the explosive growth of the nonbank financial services industry has drawn the interest and attention of the OCC. The OCC contends that the number of fintech companies in the United States and United Kingdom has reached more than 4,000, with investment in the sector growing from $1.8 billion to $24 billion worldwide in just the last five years. Regardless of the accuracy of the OCC's calculations, it is without question that the OCC's actions will have significant economic consequences—for example, the largest 100 money transmitters alone transferred more than $800 billion in funds in 2014.

5.      The OCC's interest in nonbanks culminated in Comptroller Curry's announcement in December 2016 that the OCC has decided to create a new national bank charter for nonbank companies, which would pull chartered nonbank fintech companies into the national banking regulatory system, potentially preempting and replacing the licensing, regulation, and supervision responsibilities of state authorities.

6.      By creating a national bank charter for nonbank companies like fintechs, however, the OCC has gone far beyond the limited authority granted to it by Congress under the National Bank Act ("NBA") and other federal banking laws. Those laws authorize the OCC only to charter institutions to carry on either the "business of banking" or certain special purposes expressly authorized by Congress.  It is well settled by court precedent, federal banking statutes, and industry custom that carrying on the "business of banking" under the NBA requires, at a minimum, engaging in receiving deposits.  Yet the OCC has, through its latest effort, created, without express statutory authorization, a new charter for nonbank companies that would not be engaged in deposit-taking and, thus, would not carry on either the business of banking or any expressly authorized special purpose.

7.      Because the OCC has acted beyond its statutory authority, its creation of a national bank charter for non-depository companies, and the regulation upon which the OCC relies in doing so, are contrary to the NBA and violate the Administrative Procedure Act ("APA"), and therefore cannot stand.

8.      Additionally, the OCC has created this sweeping new nonbank charter without following proper notice and comment procedures, instead opting merely to publish a high-level white paper and a supplement to the Comptroller's Licensing Manual and seeking public "feedback" regarding the mechanics of its new charter.  Notwithstanding the significance of the

fintech and non-depository industries to the financial markets and the consequences of this new charter, the OCC has declined to pursue publicly vetted regulations.

9.      Instead, the OCC has indicated that it will, as part of the chartering process, determine which (otherwise inapplicable) federal banking laws will be applied to each charter holder and will incorporate those laws through private operating agreements individualized to the business model of each applicant.  The OCC does not intend to publicly disclose such operating agreements, and the OCC's negotiations with each charter holder will be secret.  The OCC's failure to follow proper rulemaking procedures in effecting such a fundamental change in national bank regulatory policy likewise violates the APA.

10.      Further, because the OCC made its decision to offer these special-purpose charters without adequately considering and addressing the myriad policy implications and concerns raised by the public or conducting an adequate cost-benefit analysis, and because the OCC has not offered a reasoned explanation for its decision, its actions should be deemed not only contrary to law, but also arbitrary, capricious, and an abuse of discretion.

11.      Finally, the OCC's creation of this nonbank charter program will allow chartered entities to operate outside the bounds of existing state regulation, thus creating conflicts between state and federal law that will trigger significant preemption issues.  Yet the OCC's nonbank charter program cannot preempt state law without clear evidence of Congressional intent to authorize the OCC to do so.  Because Congress has not granted the OCC the requisite authority to charter these nonbank entities, much less expressed the intent that the OCC's nonbank charter program should preempt state law, the OCC's program violates the Supremacy Clause and the Tenth Amendment of the U.S. Constitution.

12.     CSBS brings this action seeking declaratory and injunctive relief declaring the

OCC's creation of this nonbank charter to be unlawful and enjoining the OCC from pursuing it.

## PARTIES

13.     Plaintiff CSBS is the nationwide organization of state banking and financial

services regulators from all 50 U.S. states, the District of Columbia, Guam, Puerto Rico, the U.S.

Virgin Islands, and American Samoa.  CSBS is a 501(c)(3) corporation incorporated and

headquartered in Washington, DC.

14.     For more than a century, CSBS has given state bank and financial services

regulators a national forum to coordinate bank and non-depository supervision and to develop

regulatory policy.  As the chartering and supervisory authorities for more than 75% of the banks

in the United States and the licensing and regulatory authorities for more than 20,000 non-

depository financial services providers, CSBS's state regulator members are charged with

protecting consumers, ensuring safety and soundness of the institutions under their authority, and

encouraging economic prosperity in their states.

15.     Plaintiff CSBS has standing to bring this action because (1) its members would

otherwise have standing to sue in their own right; (2) the interests CSBS seeks to protect are

germane to its purpose; and (3) neither the claims asserted nor the relief sought requires the

participation of individual members in this lawsuit.  *See Friends of the Earth, Inc. v. Laidlaw

Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  Indeed, courts have previously

recognized CSBS's associational standing to challenge actions of the OCC.  *See Conference of

State Bank Supervisors v. Lord*, 532 F.Supp 694, 695 (D. D.C. 1982); *aff'd sub nom. Conference

of State Bank Supervisors v. Conover*, 710 F.2d 878 (D.C. Cir. 1983).

16.     Defendant Office of the Comptroller of the Currency is a bureau of the United States Department of the Treasury and functions as the primary supervisor of federally chartered national banks.  Its offices are located at 400 7th Street S.W., Washington, DC 20219.

17.     Defendant Thomas J. Curry is the current Comptroller of the Currency and is named in his official capacity.

## JURISDICTION AND VENUE

18.     This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 500-596, 701 *et seq*., the National Bank Act, 12 U.S.C. § 1, *et seq.* and 12 U.S.C. § 21, *et seq.*, and the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1).

## FACTUAL BACKGROUND

### *The Role of the OCC and CSBS in the U.S. Dual-Banking System*

20.     The OCC and the members of CSBS each play an important role in this country's dual-banking system.  For more than 150 years, commercial banks in the United States have had the option to organize as a national bank chartered by the OCC, or as a state bank with a charter issued by one of CSBS's members, a state government.

21.     The choice of a national or state charter determines which agency or agencies supervise the bank.  Nationally chartered banks are regulated primarily by the OCC, while state-chartered banks are regulated primarily by their state chartering authority, in conjunction with the Federal Deposit Insurance Corporation ("FDIC") or the Federal Reserve System.

22.     Historically, the choice of a national or state bank charter has determined such matters as a bank's powers, capital requirements, lending limits, and other restrictions.

23.     Significantly, courts have exempted national banks from the application of a number of state laws and regulations that conflict with the NBA.  For example, courts have held that the NBA preempts the application of certain important categories of state law, including state licensing laws, state administrative supervision and enforcement laws, and state usury laws. These state laws, which face a clear threat of preemption under the OCC's unauthorized nonbank charter plan, provide vital protections to the economies, communities and citizens of every state.

24.     As recent history has shown, however, broad preemption of state law with respect to nationally chartered banks is not good public policy.  State government officials have unique expertise in the banking practices and market conditions in their communities, which makes them uniquely situated to recognize and act upon consumer financial protection issues.  Due to their proximity to the consumers and communities they are charged with protecting, state regulators are also uniquely locally accountable relative to centralized federal agencies.

25.     Disregard for state regulatory expertise can have serious consequences—for example, although states adopted many years ago anti-predatory and other lending laws designed to protect consumers, federal preemption of those state laws in the mid-1990s and early 2000s contributed significantly to the mortgage crisis that followed.  It would therefore not be good public policy for the OCC to assert authority to preempt state licensing laws, administrative supervision and enforcement laws, usury laws, and potentially other categories of state law with respect to nonbank financial services companies.

26.     Additionally, for more than a century, state banking regulators have led the way in promoting and implementing innovation, being the first to introduce such new ideas as interest-bearing checking accounts, home equity loans, and automated teller machines—innovations that were subsequently adopted in the national banking system.

27.     The U.S. dual-banking system functions best when there is a balanced state and federal regulatory structure—as was intended by the dual federal system established in the U.S. Constitution and upon which this country was founded.

***The OCC's Limited Power to Charter National Banking Associations for "Carrying on the Business of Banking"***

28.     The NBA, enacted in 1863 and substantially revised in 1864, created the national banking system and established the OCC as a bureau within the Treasury Department with responsibility for supervising these federally chartered banks.  *See* 12 U.S.C. § 1, *et seq.*; 12 U.S.C. § 21, *et seq.* (Title LXII of the Revised Statutes).

29.     The OCC is responsible for ensuring federally chartered banks' safety and soundness, compliance with federal banking laws, and compliance with federal laws regarding fair access to financial services and fair treatment of customers.  12 U.S.C. § 1(a).  The OCC is authorized to "prescribe rules and regulations to carry out the responsibilities of the office."  12 U.S.C. § 93a.

30.     The NBA is a general law enabling the chartering of national banks.  Under the NBA, national banks are formed for "carrying on the business of banking," 12 U.S.C. § 21, and are granted the powers necessary to pursue this purpose. 12 U.S.C. § 24.  Upon substantial compliance with all organizational requirements, the OCC is empowered to grant a national bank charter to associations to commence and carry on the "business of banking."  12 U.S.C. §§ 26-27; *see, e.g., Texas & P.R. Co. v. Potorff*, 291 U.S. 245, 254 (1934).

31.     Although the term "business of banking" is not expressly defined in the NBA, the legislative history of the Act shows that its principal author and other legislators identified the power to engage in receiving deposits as an essential function of the banking business at the time of the NBA's adoption.  Consequently, several provisions of the NBA, unmodified since the

Act's passage in the 1860s, identify deposit-taking as an indispensable function of the business of banking.  For instance, the NBA requires incorporators to identify the place where the national bank's "operations of discount and deposit are to be carried on" and refers to such operations as "the general business of each national bank association."  12 U.S.C. §§ 22, 81.  In addition, of the enumerated powers granted to national banks, the power to receive deposits is the least qualified, most general power.  12 U.S.C. § 24 (Seventh).

32.     Further, historically, the term "business of banking" has been understood to include, at a minimum, receiving deposits.  As the United States Supreme Court and other courts have long recognized, the "business of banking, as defined by law and custom, consists . . . in receiving deposits payable on demand." *Mercantile National Bank v. Mayor*, 121 U.S. 138, 156 (1887); *see also United States v. Philadelphia National Bank*, 374 U.S. 321, 326 (1963) ("[c]ommercial banks are unique among financial institutions in that they alone are permitted by law *to accept demand deposits*.") (emphasis added).  Courts have held that the converse is therefore also true—a financial company or other firm that does not receive deposits is not engaged in the "business of banking" within the meaning of the NBA.  *See*, *e.g.*, *Independent Bankers Assn. of America v. Conover*, No. 84-1403-CIV-J-12, 1985 U.S. Dist. LEXIS 22529 at *32, Fed. Banking L. Rep. (CCH) P86, 178 (M.D. Fla. Feb. 15, 1985)

33.     In other federal banking laws, Congress likewise has recognized that the acceptance of demand deposits (along with the making of commercial loans) is an historic core activity of banks and the very essence of the "business of banking"—for example, as reflected in the definition of "bank" provided in the Bank Holding Company Act ("BHCA"), 12 U.S.C. § 1841, *et seq.*, a complementary statute to the NBA.

34.     Specifically, Section 2(c)(1) of the BHCA defines a "bank" to include an institution that is "an insured bank as defined in Section 3(h) of the Federal Deposit Insurance Act" or an institution that "*both* . . . (i) accepts demand deposits or deposits that the depositor may withdraw by check or similar means for payment to third party or others; *and* (ii) is engaged in the business of making commercial loans." 12 U.S.C. § 1841(c)(1) (emphasis added).

35.     In addition, upon becoming members of the Federal Reserve System, the Federal Reserve Act ("FRA") requires national banks to become "insured bank[s]" under the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 222.  To become an insured bank, a national bank must be eligible to apply for deposit insurance, which requires being "engaged in the business of receiving deposits."  12 U.S.C. §§ 1813 and 1815.

36.     Further reflecting Congress' intent that carrying on the business of banking must require engaging in receiving deposits, it is a criminal offense for nonbanks or unauthorized individuals to engage in the "banking business," which Congress has defined as "the business of receiving deposits subject to check or to repayment upon presentation of a pass book, certificate of deposit, or other evidence of debt, or upon request of the depositor . . .." *See* 12 U.S.C. § 378.

37.     Read together and in a manner consistent with the NBA and the overall federal banking regime, these federal statutory provisions should be interpreted to reflect Congress' understanding that engaging in deposit-taking is indispensable to "carrying on the business of banking."

### The OCC's Narrow Authorization to Issue Special-Purpose Charters to Specific Categories of Special Purpose National Banks

38.     For more than a century after the enactment of the NBA, the OCC's chartering authority was limited to full-service national banks organized for the purpose of "carrying on the business of banking," which required engaging in receiving deposits.

39.     Indeed, when the OCC has attempted to issue a charter to entities that would not carry on the "business of banking," the courts have struck down those efforts, concluding that the OCC is not empowered by the NBA or other law to charter institutions that do not take deposits (and make loans) unless specifically authorized to do so by Congress.

40.     For example, in 1977, a federal district court rejected the OCC's efforts to charter a national bank whose activities would be limited to the fiduciary services provided by a trust company—holding that the OCC lacked authority to charter an institution that would not engage in the business of banking, including receiving deposits. *National State Bank v. Smith*, No. 76-1479 (D. N.J. Sept. 16, 1977), *rev'd on other grounds*, 591 F.2d 223 (3d Cir. 1979).

41.     In response to this defeat, the OCC requested from Congress an amendment to the NBA that would specifically authorize the Comptroller to charter national trust banks. Congress adopted the requested amendment in 1978 as part of the Financial Institutions Regulatory and Interest Rate Control Act ("FIRIRCA"), 12 U.S.C. § 27(a).  Congress thereby gave the OCC specific authorization to create national trust banks, the first type of special-purpose chartering authority conferred upon the OCC.

42.     In the following decade, a federal district court once again blocked the OCC's efforts to issue special-purpose charters beyond its authority, granting an injunction prohibiting the OCC from issuing special-purpose charters to "nonbank banks"—institutions that either did not accept demand deposits or make commercial loans. *Independent Bankers Assn. of America v. Conover*, 1985 U.S. Dist. LEXIS 22529.

43.     Following the OCC's defeat in *Conover*, Congress declined to adopt legislation extending to the OCC the special-purpose chartering authority it had attempted to assert with respect to "nonbank banks."  To the contrary, Congress took steps to codify the *Conover* ruling

by amending the BHCA (via the Competitive Equality in Banking Act of 1987) ("CEBA") to make it clear that financial institutions that do not accept deposits are not "banks." *See* 12 U.S.C. § 1841(c).

44. Ultimately, in only two circumstances has the OCC been permitted to charter a national bank: (1) where the entity is organized to carry on "the business of banking" including, at a minimum, engaging in receiving deposits, or (ii) where Congress has, after an opportunity for consideration, granted specific statutory authority to the OCC to charter an entity to carry on a special purpose.

45. Currently, Congressional authorization exists to charter only three categories of special-purpose national banks: trust banks, banker's banks, and credit card banks. *See* 12 U.S.C. § 27(a) and (b); 12 U.S.C. §§ 1841(c)(2)(D) and (F). This specific legislative authorization would not have been necessary if the OCC already possessed the broad authority to charter institutions not engaged in the "business of banking" under existing law.

46. Indeed, although legislation has previously been proposed that would have provided the OCC with the authority to charter non-depository institutions, this legislation has never been enacted. The failure to enact such proposed legislation underscores the conclusion that the OCC may not charter non-depository institutions on a generalized basis without specific Congressional authority, which has not been granted here. *See* FFSCC Charter Act of 2011, H.R. 1909, 112th Cong. (2011); Consumer Credit Access, Innovation and Modernization Act, H.R. 6139, 112th Cong. (2012).

*The OCC's December 2016 Decision to Grant Special-purpose "Fintech" Charters*

47. In March 2016, the OCC issued a "white paper" announcing that it had begun an initiative to study innovation in the federal banking system, to include, among other things,

evaluation of the opportunities and risks presented by rapid advances in financial technology. *See* "Supporting Responsible Innovation in the Federal Banking System: An OCC Perspective," dated March 2016 (available at https://www.occ.gov/publications/publications-by-type/other-publications-reports/pub-responsible-innovation-banking-system-occ-perspective.pdf).

48.     In September 2016, the OCC communicated to the public that it was considering as part of its innovation initiative the creation of a special-purpose bank charter for fintechs.  *See* Proposed Rulemaking, *Receiverships for Uninsured National Banks*, 81 Fed. Reg. 62,835 (Sept. 13, 2016) (to be codified at 12 C.F.R. pt. 51).  The proposed rulemaking noted that the OCC was "considering how best to implement a regulatory framework that is receptive to responsible innovation, such as advances in financial technology," as well as "considering whether a special-purpose charter could be an appropriate entity for the delivery of banking services in new ways." *Id*. at p. 62,837.

49.     Although this proposed rulemaking did not itself authorize a special-purpose charter for fintechs, the connection to a potential special-purpose charter was clear, and it triggered significant public concern.  This included a letter from CSBS noting that state banking regulators were opposed to a potential national charter for fintech companies for a variety of reasons.  CSBS made clear its view that the OCC lacked statutory authority to issue these nonbank charters and that such charters "would distort the marketplace for financial services and undermine State laws and regulations governing financial services."  *See* Letter from CSBS to Comptroller Curry dated November 14, 2016 (attached hereto as Exhibit A).

50.     Also in September 2016, the OCC issued substantial revisions to its existing "Charter" booklet of the Comptroller's Licensing Manual, which further paved the way for the issuance of future nonbank charters.  *See* OCC Bulletin 2016-29 regarding Revised

Comptroller's Licensing Manual Booklet (available at https://www.occ.treas.gov/news-issuances/bulletins/2016/bulletin-2016-29.html).

51.     Notwithstanding public concern raised in response to the September 2016 proposed rulemaking, the OCC finalized the *Receivership for Uninsured National Banks* rule without change and with no meaningful response to the public feedback it received.

52.     The OCC's consideration of the issue culminated in Comptroller Curry's announcement on December 2, 2016, that the OCC had decided to create a new special-purpose charter for fintech and nonbank companies (the "Nonbank Charter Decision"), stating that "the OCC *will* move forward with chartering financial technology companies that offer bank products and services and meet our high standards and chartering requirements."  *See* "Remarks by Thomas J. Curry, Comptroller of the Currency, Regarding Special-purpose National Bank Charters for Fintech Companies," at Georgetown Law Center dated Dec. 2, 2016 at p. 3 (emphasis in original) (available at https://occ.gov/news-issuances/speeches/2016/pub-speech-2016-152.pdf) (attached hereto as Exhibit B).

53.     Comptroller Curry's remarks left no doubt that the OCC's decision to offer special-purpose charters to fintech companies was final and not tentative or interlocutory: "We *have decided to move forward* and to make available special-purpose national charters to fintech companies . . . "  *Id* at p. 3 (emphasis added).

54.     When addressing the basis for the OCC's newfound chartering authority, Comptroller Curry asserted that the OCC "has the authority to grant special-purpose national bank charters to fintech firms that conduct *at least one* of three core banking activities—receiving deposits, paying checks *or* lending money."  *Id*. at p. 5 (emphasis added).

55.     It is clear that in his statement of authority Comptroller Curry was not referencing any provision of the NBA or other statute but, instead, a regulation promulgated by the OCC itself in 2003, 12 C.F.R. § 5.20(e)(1) (stating that the OCC may charter a special-purpose bank that limits its activities to "any other activities within the business of banking," provided that the special-purpose bank conducts "*at least one of* the following three core banking functions: Receiving deposits; paying checks; *or* lending money.") (emphasis added).

56.     The Comptroller stated that the OCC would be developing a "formal agency policy" for evaluating applications for nonbank charters and that the OCC had published on the same day a white paper discussing the issue and seeking stakeholder feedback to help inform the development of the forthcoming policy.  *See* Comptroller Remarks at pp. 3, 5.

57.     The white paper, entitled "Exploring Special-purpose National Bank Charters for Fintech Companies," invited comments through January 15, 2017 (available at https://www.occ.gov/topics/bank-operations/innovation/comments/special-purpose-national-bank-charters-for-fintech.pdf) (attached hereto as Exhibit C).  It outlined certain general "baseline" supervisory requirements for charter holders, such as a robust business plan, effective governance structure, and capital and liquidity requirements to be determined on a case-by-case basis in the issuance of each charter.  *Id*. pp. 8-13.

58.     Although the white paper solicited "feedback" on the mechanics of implementing nonbank charters, it did not invite comment on the question of whether the OCC should grant such charters in the first place, or whether the OCC possessed valid statutory authority to do so. *Id*. pp. 15-16.  For example, the white paper posed such questions as what criteria the OCC should consider when establishing capital and liquidity requirements, whether the OCC should seek a financial inclusion commitment from a charter holder that would not engage in lending,

and what information and assistance a prospective fintech applicant might find useful during the application process.  *Id.*

59.     The OCC's Nonbank Charter Decision and white paper met with significant public concern and criticism.

60.     Notably, U.S. Senators Sherrod Brown (Ranking Member, Senate Committee on Banking, Housing, and Urban Affairs) and Jeffrey A. Merkley issued a letter to Comptroller Curry expressing concern that "[o]ffering a new charter to non-bank companies seems at odds with the goals of financial stability, financial inclusion, consumer protection, and separation of banking and commerce that the OCC has upheld under your tenure."

61.     The Senators also questioned whether the OCC had the ability to issue charters to non-depository institutions, noting that that Congress has given the OCC "a very narrowly-defined authority" to charter entities that are not engaged in the business of banking, limited to bankers' banks, credit card banks, and trust banks.  The Senators urged the OCC to refrain from issuing the special-purpose charters because "[i]t is up to Congress to take action on these important matters."

62.     A diverse group of more than 25 entities expressed opposition to the nonbank charter—including consumer groups, banking and financial industry trade associations, state government officials and others.  Several questioned the OCC's statutory authority to issue national bank charters to nonbank fintech companies.  Many urged the OCC to seek Congressional approval for the charter and, if the charter were to be pursued, to develop generally applicable regulations pursuant to the APA that would clarify such important questions as the OCC's expectations for capital, liquidity, supervision and examination, and whether the

new charter holders would have direct access to the Federal Reserve's clearing and payment system and its discount window.

63.     Still others expressed concern about potential consumer harm, preemption of state laws, and competitive advantage available to nonbank charter holders if they are not held to the same supervision and regulation as other banks.  Concerns were also raised that the nonbank charter could jeopardize the longstanding U.S. policy of limiting affiliations or combinations between banks and commercial enterprises.

64.     Many critics noted that the OCC had not adequately explained which nonbank companies would be eligible for a charter, how "fintechs" are defined, and how those companies would be supervised and regulated.

65.     CSBS itself submitted a 27-page explanation of its opposition to the Nonbank Charter Decision, expressing its views that:

- The OCC lacks statutory authority to issue these nonbank charters;

- Such a charter will distort the marketplace for financial services, with a federal agency arbitrarily picking winners and losers;

- The issuance of such a charter creates tremendous uncertainty and risks pertaining to access to critical government resources, including the payments system and the federal safety net; and

- The potentially preemptive effect of the charter nullifies the states' ability to protect customers.

See Letter from CSBS to Comptroller Curry dated January 13, 2017 (attached hereto as Exhibit D).

66.     On March 10, 2017, members of the U.S. House of Representatives Committee on

Financial Services sent a letter to Comptroller Curry likewise expressing concern regarding a

rushed decision, urging the Comptroller not to take further action, and vowing to examine any

further action taken by the OCC and, if appropriate, act to overturn that action.

***The OCC's Implementation of the Nonbank Charter Program***

67.     Notwithstanding these numerous and significant concerns and the questions raised

about its statutory authority, the OCC continued to move forward with the implementation of its

Nonbank Charter Decision.  On March 15, 2017, the OCC published a "draft" supplement to the

Comptroller's Licensing Manual, entitled "Evaluating Charter Applications From Financial

Technology Companies," ("Manual Supplement") (available at

https://www.occ.treas.gov/publications/publications-by-type/licensing-manuals/file-pub-lm-

fintech-licensing-manual-supplement.pdf ) (attached hereto as Exhibit E).

68.     The Manual Supplement makes explicit that the new nonbank charter is intended

for companies that do not take deposits.  Specifically, the Manual Supplement states that the

charter will be available to a company that "engages in a limited range of banking activities,

including *one of* the core banking functions described at 12 CFR 5.20(e)(1), but *does not take

deposits* within the meaning of the Federal Deposit Insurance Act (FDIA) and therefore is not

insured by the Federal Deposit Insurance Corporation (FDIC)."  Manual Supplement p. 2

(emphasis added).

69.     As in the prior white paper and other public pronouncements by the OCC, the

agency reiterated its reliance upon its own regulation (12 C.F.R. § 5.20(e)(1)) as authority for its

ability to charter companies that do not take deposits, so long as they either pay checks or lend

money. *Id*. p. 5.

70.     Indeed, the Manual Supplement reflects the potentially startling breadth of the nonbank charter, noting that "[i]n some cases, the activities proposed for an SPNB may include activities that have not previously been determined to be part of, or incidental to, the business of banking or to fall within an established core banking function.  If so, the company should discuss in prefiling meetings with the OCC the permissibility of the activities and their status as core banking activities."  *Id*. p. 5.

71.     The Manual Supplement provides information regarding application procedures, general chartering standards, and the requirements of the nonbank company's business plan.  It specifically invites interested applicants to initiate the application process by making an initial inquiry to the OCC's Office of Innovation to schedule a meeting.  *Id*. p. 3.

72.     Separately on March 15, 2017, the OCC published a "Summary of Comments and Explanatory Statement," apparently in an attempt to respond to the significant volume of concerns expressed in response to its December 2016 white paper.  *See* "OCC Summary of Comments and Explanatory Statement: Special Purpose National Bank Charters for Financial Technology Companies" dated March 2017 (available at https://www.occ.treas.gov/topics/bank-operations/innovation/summary-explanatory-statement-fintech-charters.pdf ) (attached hereto as Exhibit F).

73.     This "Summary of Comments and Explanatory Statement" fell far short of addressing the numerous criticisms of the Nonbank Charter Decision.  In particular, the OCC's response to questions about its chartering authority is limited to two short paragraphs that, once again, rely solely upon the OCC's own regulation (12 C.F.R. § 5.20(e)(1)) in support of its ability to issue national bank charters to non-depository companies.  *See* Summary of Comments and Explanatory Statement at pp. 14-15.

74.    The OCC invited feedback on its Manual Supplement.  As with its prior white paper, the Manual Supplement drew sharp criticism and elicited significant concerns.  Many commenters, recognizing that the OCC had not adequately addressed the concerns previously raised in response to the OCC white paper, re-submitted their prior letters.

75.    Similarly, CSBS reiterated its previously articulated concerns in response to the Manual Supplement, as well as a number of new concerns.  Among other things, CSBS criticized the *ad hoc* regulatory treatment of charter holders which, contrary to the OCC's contentions, would not be subject to most federal banking laws, which cover only insured banks.  CSBS also emphasized the unfair advantages to the nonbank charter holders, as compared to traditional, full service banks; the threatened erosion of the separation of banking and commerce; and the potential for significant consumer harm.  *See* Letter from CSBS to Comptroller Curry dated April 13, 2017 (attached hereto as Exhibit G).

76.    To date, the OCC has not responded to the concerns articulated by CSBS and other commenters in response to the Manual Supplement.

### *The OCC Lacks Statutory Authority to Charter Non-Depository Fintech Companies*

77.    The OCC's Nonbank Charter Decision exceeds the OCC's authority under the NBA.  Congress has never conferred upon the OCC the broad power to redefine the business of banking to exclude deposit taking, so as to enable the OCC to create new categories of charters for companies that do not engage in the business of banking.  In fact, each time the OCC has attempted to issue such charters, the federal courts have struck down its efforts.

78.    As previously noted, it is only upon specific authorization by Congress that the OCC has been allowed to issue special-purpose bank charters to institutions that do not, under existing law, engage in the business of banking.

79.     Applying fundamental principles of statutory construction, including *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of the other), the existence of these specific grants of Congressional authority necessarily demonstrates that the OCC does not have any authority to charter special-purpose national banks other than those expressly authorized by statute.  These specific statutory grants of special-purpose chartering authority would never have been necessary if the OCC possessed general authority to issue special-purpose charters.  In addition, to adopt a broad view of the OCC's chartering authority would render the specific grants of statutory chartering authority for bankers' banks, credit card banks, and trust banks redundant and mere surplusage, contrary to established canons of statutory construction.

80.     Past unsuccessful efforts in 2011 and 2012 to introduce legislation that would expand the OCC's chartering authority to include non-depository entities (the FFSCC Charter Act and Consumer Credit Access, Innovation and Modernization Act) are further evidence of Congress's recognition that such broad authority does not currently exist.

81.     In asserting that it has the power to issue nonbank charters, the OCC relies solely upon one of its own regulations, 12 C.F.R. § 5.20(e)(1), which states that the OCC may charter a special-purpose bank that engages in any activity within the business of banking, provided that it conducts "*one of* the following three core banking functions: Receiving deposits; paying checks; *or* lending money" (emphasis added).  But an agency regulation cannot itself expand the nature or scope of agency authority—only Congress can do that.

82.     Because Section 5.20(e)(1)—never before used by the OCC to support a chartering decision—would allow a bank charter to be issued to an organization that does not take deposits and is not engaged in the business of banking, it is patently inconsistent with the

NBA, BHCA, FDIA and FRA, as well as established court precedent.   Indeed, the OCC has

crafted Section 5.20(e)(1) so expansively that the agency could create an immeasurable variety

of special-purpose nonbank charters under the purported reach of the regulation.  There is no

Congressional authority for this far-reaching power, and Section 5.20(e)(1) cannot serve as a

valid basis for the OCC's Nonbank Charter Decision.

### *The OCC's Improper Rulemaking*

83.     Despite the substantive nature of the Nonbank Charter Decision, which

fundamentally alters national bank regulatory policy by unilaterally creating a completely new

and different type of special-purpose national bank charter, thereby triggering a wide range of

important public policy considerations, the OCC did not follow the required notice and comment

procedures for agency rulemaking or conduct a meaningful cost-benefit analysis.  Instead, the

OCC relied solely upon its white paper and Manual Supplement and invitations for informal

feedback.

84.     Nor has the OCC adopted comprehensive regulations related to this nonbank

charter program.  Rather, the OCC has stated that approval criteria, supervisory requirements,

acceptable activities of the charter holder, and applicable federal banking laws will be

determined on a case-by-case basis and embodied in individualized operating agreements that

will be confidential and shielded from any public scrutiny.

85.     Based on the way that the OCC has designed its nonbank fintech charter, most

federal banking laws and protections will be inapplicable to charter holders because most such

laws cover only "insured depository institutions," which holders of these charters will not be.

Thus, unlike other special-purpose banks created by federal statute, the laws governing the

activities of these nonbank charter holders will not be articulated in any federal statute, nor will

the rules governing the activities of such charters be reflected in any OCC or other federal banking agency regulations.

86.     It is improper and unlawful for the OCC to handle this matter of fundamental importance to the U.S. banking and financial systems outside the agency rulemaking process established by the APA.  The OCC has opted instead to approve nonbank charters pursuant to broadly worded policy statements that are subject to change at the whim of the agency and modification based on the type of business seeking a charter.  The OCC likewise will incorporate otherwise inapplicable federal banking laws and protections on a confidential, non-transparent, case-by-case basis.

87.     The process the OCC has pursued is no substitute for, and in fact violates, the notice and comment procedures required by the APA.

***The OCC's Arbitrary and Capricious Rulemaking***

88.     The OCC's Nonbank Charter Decision also is arbitrary, capricious, and an abuse of discretion because it has failed to consider the many significant implications of creating a nonbank chartering program, nor has it offered a reasoned explanation for its actions.

89.     Among other things, the OCC has wholly failed to respond adequately to the many relevant and significant public comments received in response to its informal request for "feedback" regarding its December 2016 white paper.  This includes the many significant policy considerations that weigh strongly against the creation of this new special charter.

90.     As articulated in CSBS's letters in response to the white paper and Manual Supplement, as well in the public feedback of many others, the Nonbank Charter Decision triggers concerns that:

- Many significant federal banking laws would not apply to these special-purpose charter holders;

- The use of individualized, *ad hoc*, private agreements between the OCC and charter holders creates an uneven playing field among regulated entities;

- The lack of transparency regarding specific regulatory requirements nullifies any promise of a level playing field among regulated banks;

- The uncertain scope of the incidental powers conferred through the special-purpose charter raises significant safety and soundness concerns;

- The OCC has not explained how special-purpose charter holders will comply with the requirement that national banks become members of the Federal Reserve System, how they will be regulated by the Federal Reserve, and whether they will have access to the federal safety net and critical public resources;

- The nonbank charter is structured to evade the coverage of the BHCA and will enable the commingling of banking and commerce;

- Nonbank charter holders likely will be exempt from the enforcement authority of the Securities and Exchange Commission, and the OCC itself lacks the authority to enforce the federal securities laws with respect to non-depository institutions;

- Special-purpose charter holders will not be subject to federal consumer protection laws to the same extent as full-service banks; and

- The special-purpose charter undermines and potentially preempts existing state regulation of financial services providers; charter holders may be entitled to preemption of some state laws, to the detriment of consumers.

91.    The OCC has failed to acknowledge, much less analyze and address, most of these myriad concerns.

***Harm to CSBS's Member Regulators and the OCC's Attempt at Unauthorized Preemption***

92.    The Nonbank Charter Decision triggers significant risks to traditional areas of state concern, many of which are outlined above.

93.    The states have a vital interest in upholding the integrity and stability of the U.S. dual banking system and bank regulation.  The Nonbank Charter Decision threatens to disrupt this system.

94.    Specifically, the OCC's actions impede the states' ability to continue their existing regulation of financial services companies within their borders and to enforce state laws designed to protect the consuming public and ensure the safety and soundness of nondepository companies. This also creates difficulties for the states in detecting unlicensed activity within their borders. Similarly, companies facing or at risk of state enforcement actions could escape state enforcement authority by obtaining a national charter.

95.    Indeed, one reason that nonbank companies may seek a special purpose national charter from the OCC would be to avoid compliance with existing state laws.

96.    For the same reasons, the Nonbank Charter Decision creates conflicts with state law and threatens to preempt state sovereign interests by purportedly empowering nonbank charter holders to disregard state laws of vital importance to the states and their economies, communities, and citizens, including requirements for obtaining state licenses, submitting to state administrative supervision and enforcement, and complying with state usury laws.

97.     Under the Supremacy Clause and Tenth Amendment of the U.S. Constitution, such an invasion of state sovereign interests is permitted only if it is the clear and manifest purpose of Congress to supplant state law.

98.     Here, as noted above, Congress has not authorized the OCC to issue national bank charters to nonbank entities that do not engage in deposit taking.  Absent a clear expression of Congressional authority and intent to preempt state law, the states retain the power to regulate and supervise non-depository companies, and the Nonbank Charter Decision represents an unlawful and unconstitutional assertion of preemptive authority by the OCC.

## CLAIMS FOR RELIEF

## COUNT I

### The OCC's Nonbank Charter Decision Exceeds its Statutory Authority

99.     CSBS incorporates by reference the allegations of the preceding paragraphs.

100.     The NBA allows the OCC only to charter entities to (1) carry on the "business of banking," which requires, at a minimum, receiving deposits, or (2) carry on a special purpose expressly authorized by Congress.

101.     As a result, the OCC lacks the authority to charter non-depository entities without the express authorization of Congress.  The OCC's own regulations (specifically, 12 C.F.R. 5.20(e)(1)) are insufficient to expand the scope of the OCC's chartering authority beyond that delegated to the OCC by statute.

102.     Plaintiff is entitled to relief pursuant to 5 U.S.C. §§ 702 and 706(2)(A) and (C). The OCC's Nonbank Charter Decision exceeds the OCC's statutory authority, and this Court should declare the Nonbank Charter Decision unlawful and set it aside, as well as enjoin the

OCC from taking further action toward the creation or issuance of any of these nonbank special-purpose charters.

## COUNT II

### The OCC's Promulgation of 12 C.F.R. § 5.20(e)(1) Exceeds its Statutory Authority

103.    CSBS incorporates by reference the allegations of the preceding paragraphs.

104.    As previously noted, the NBA allows the OCC only to charter entities (1) to carry on the "business of banking," which requires, at a minimum, engaging in receiving deposits, or (2) to carry on a special purpose expressly authorized by Congress.

105.    In promulgating 12 C.F.R. § 5.20(e)(1), the OCC endeavored to unilaterally extend its authority to charter entities that do not carry on the "business of banking," such as non-depository entities, without the requisite Congressional authorization.  The OCC cannot through the promulgation of regulations expand the scope of its own chartering authority beyond that delegated to the OCC by statute.

106.    Plaintiff is entitled to relief pursuant to 5 U.S.C. §§ 702 and 706(2)(A) and (C). Because Section 5.20(e)(1) improperly exceeds the OCC's statutory authority, this Court should declare that regulation unlawful and set it aside, as well as enjoin the OCC from taking further action toward the creation or issuance of any charter pursuant to this invalid regulation.

## COUNT III

### Failure to Follow Rulemaking Procedures Required by Law

107.    CSBS incorporates by reference the allegations of the preceding paragraphs.

108.    The OCC's Nonbank Charter Decision is a "rule" of general application that creates new rights, privileges, and duties within the meaning of 5 U.S.C. §§ 551(4) and 553.

109.    The OCC did not comply with the requirements of the APA in promulgating this rule.  5 U.S.C. §§ 551(5), 553.

110.    Plaintiff is entitled to relief pursuant to 5 U.S.C. §§ 702 and 706(2)(D).  Because OCC's Nonbank Charter Decision was reached without observance of the procedure required by law, this Court must declare the Nonbank Charter Decision unlawful and set it aside.

## COUNT IV

### Arbitrary and Capricious Action

111.    CSBS incorporates by reference the allegations of the preceding paragraphs.

112.    In making the Nonbank Charter Decision, the OCC not only acted beyond its statutory authority but also failed to consider the effect of its actions on the states' authority to regulate traditional areas of state concern.  The OCC likewise failed to consider the many significant concerns arising from the Nonbank Charter Decision, or to conduct an adequate cost-benefit analysis, and it did not offer a reasoned explanation for its decision.

113.    Under the APA, an agency cannot act in a manner that is arbitrary or capricious and is required to engage in "reasoned decision making" when adopting new rules.  5 U.S.C. § 706(2)(A).

114.    The OCC's Nonbank Charter Decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and this Court must declare the Nonbank Charter Decision unlawful and set it aside.

## COUNT V

### Preemption—Article VI, clause 2 (Supremacy Clause) and the Tenth Amendment of the U.S. Constitution

115.    CSBS incorporates by reference the allegations of the preceding paragraphs.

116.   Pursuant to the Tenth Amendment of the U.S. Constitution, the states retain the powers not delegated to the federal government—which include the police powers necessary to regulate financial services and protect consumers and the public interest from unsound and abusive financial practices.  Among other things, the states possess the power to regulate nonbank companies, like those that are eligible for the OCC's new nonbank charter.

117.   The OCC's nonbank charter program creates conflicts with state laws to the extent it purports to enable nonbank charter holders to disregard state laws previously applicable to them.

118.   Under the Supremacy Clause of the U.S. Constitution, federal law represents the supreme law of the land when it conflicts with state law, but only to the extent that Congress has clearly and manifestly manifested its intent to preempt state law.

119.   Because Congress did not intend to extend the OCC's national bank chartering authority to include the non-depository entities described in the OCC's Nonbank Charter Decision, Congress has not clearly and manifestly expressed an intent that the OCC's new nonbank charter program should preempt state law.

120.   Indeed, there is nothing in the NBA authorizing the OCC to create a charter for these nonbank entities, much less clearly and manifestly reflecting Congressional intent that the charter preempt state laws.

121.   For this reason, Plaintiff is entitled to relief pursuant to 28 U.S.C. § 2201, 2202 and 5 U.S.C. §§ 702, 706(2)(A) and (B), and this Court should declare the Nonbank Charter Decision unlawful and unconstitutional.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff CSBS prays for a judgment and order:

1.      Declaring that the Office of Comptroller of the Currency lacks statutory authority under the National Bank Act to create and issue special-purpose national bank charters to fintech and other nonbank companies that do not carry on the "business of banking," which includes, at a minimum, receiving deposits;

2.      Declaring that the Office of Comptroller of the Currency lacked statutory authority under the National Bank Act to promulgate 12 C.F.R. § 5.20(e)(1);

3.      Declaring that the OCC's Nonbank Charter Decision was improperly reached without following proper notice and comment procedures required by the Administrative Procedure Act;

4.      Declaring that the OCC's Nonbank Charter Decision was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

5.      Declaring that the Nonbank Charter Decision is an unconstitutional attempt to preempt otherwise applicable state law, in violation of the Supremacy Clause and Tenth Amendment to the U.S. Constitution;

6.      Declaring the Nonbank Charter Decision unlawful and setting it aside;

7.      Declaring the OCC's promulgation of 12 C.F.R. § 5.20(e)(1) unlawful and setting that regulation aside;

8.      Awarding injunctive relief prohibiting the OCC from pursuing and further implementing the Nonbank Charter Decision or creating or issuing any nonbank charter pursuant to 12 C.F.R. § 5.20(e)(1);

9.      Awarding Plaintiff its reasonable costs, including attorneys' fees, incurred in bringing this action; and

10.     Awarding any such other relief as the Court deems just and equitable.

Date:  April 26, 2017                              Respectfully submitted,

                                                   */s/ Jennifer Ancona Semko*
                                                   Jennifer Ancona Semko (Bar No. 481119)
                                                   John F. Kosmidis
                                                   Steven M. Chasin (Bar No. 495853)
                                                   Graham Cronogue
                                                   BAKER & McKENZIE LLP
                                                   815 Connecticut Avenue NW
                                                   Washington, DC 20006
                                                   Tel: +1 202 835-4250
                                                   Fax: +1 202 416-7055
                                                   jennifer.semko@bakermckenzie.com
                                                   john.kosmidis@bakermckenzie.com
                                                   steven.chasin@bakermckenzie.com
                                                   graham.cronogue@bakermckenzie.com

                                                   Matthew F. Kluchenek
                                                   BAKER & McKENZIE LLP
                                                   300 East Randolph Street, Suite 5000
                                                   Chicago, IL 60601
                                                   Tel: +1 312 861-8803
                                                   matt.kluchenek@bakermckenzie.com

                                                   John Gorman
                                                   Margaret Liu
                                                   CONFERENCE OF STATE BANK
                                                   SUPERVISORS
                                                   1129 20th Street, NW
                                                   Washington, DC 20036
                                                   Tel: +1 202 296-2840
                                                   bgorman@csbs.org
                                                   mliu@csbs.org