# EXHIBIT B

**Remarks**

**By**

**Thomas J. Curry**
**Comptroller of the Currency**

**Regarding**

**Special Purpose National Bank Charters for Fintech Companies**

**Georgetown University Law Center**

**December 2, 2016**

It's an honor to be here at Georgetown University this morning. Today I will discuss the OCC's thinking about making a special purpose national bank charter available to financial technology companies that provide banking products and services. I want to thank Dean Treanor, Dr. Chris Brummer, and everyone here at Georgetown University Law Center for hosting us. I know how much effort goes into events like these, and I appreciate everyone who helped put this event together. Georgetown Law and the Institute of International Economic Law have long promoted thoughtful exploration of topics crucial to good government, making it the perfect place for today's conversation.

Over the past year, no topic in banking and finance has drawn more interest than innovative financial technology, and for good reason. The number of fintech companies in the United States and United Kingdom has ballooned to more than 4,000, and in just five years investment in this sector has grown from $1.8 billion to $24 billion worldwide.

But, there is more going on than just technological advances. Customer needs and expectations also are changing in dramatic ways. More than 85 million young adults in America are entering the financial world with the majority of their financial lives still ahead. They want

technologies and services that provide better, faster, more accessible products and services, and they are willing to switch providers or use multiple providers to get what they want. These consumers expect to be able to transact basic banking and financial business anywhere, anytime, from the palm of their hands.

What excites me most about the changes occurring in financial services is the great potential to expand financial inclusion, reach unbanked and underserved populations, make products and services safer and more efficient, and accelerate their delivery. To live up to that potential, innovators must demonstrate real responsibility—whether innovating within or outside the federal banking system.

At the Office of the Comptroller of the Currency, we are making certain that all institutions with federal charters have a regulatory framework that is receptive to responsible innovation along with the supervision that supports it. Since last year, we have conducted extensive research and discussions with technology companies, banks, community and consumer groups, academics, and other regulators. We articulated clear principles to guide the development of a framework for responsible innovation,[1] sought public comment,[2] and held a public forum in June to discuss the issues surrounding responsible innovation.[3]

Recognizing the need for a non-supervisory forum for banks and fintechs to interact with the OCC, in October, I established an Office of Innovation,[4] which is now headed by acting

---

[1] See "Supporting Responsible Innovation in the Federal Banking System: An OCC Perspective." March 2016 (https://occ.gov/publications/publications-by-type/other-publications-reports/pub-responsible-innovation-banking-system-occ-perspective.pdf).

[2] See https://occ.gov/topics/bank-operations/innovation/innovation-comments.html.

[3] See https://occ.gov/topics/bank-operations/innovation/innovation-forum-videos.html.

[4] See News Releases 2016-35, "OCC Issues Responsible Innovation Framework." October 26, 2016 (https://www.occ.gov/news-issuances/news-releases/2016/nr-occ-2016-135.html).

Chief Innovation Officer, Beth Knickerbocker. Once it is fully staffed, the office will be the central point of contact and clearinghouse for requests and information related to innovation. Its staff will conduct outreach and provide technical assistance, and will hold office hours in cities with significant interest in financial innovation to make candid regulatory advice more accessible and to facilitate open conversations. Its staff will promote training among agency employees to improve our capabilities and understanding of these important issues, and lead our collaboration with other regulators, foreign and domestic. We plan to have the new office up and running in the first quarter of 2017. Establishing this office and our framework are important parts of our responsible innovation efforts. I know these efforts will make a significant difference for the federal banking system, and I look forward to sharing our progress.

Our next step, which I am announcing here today, is that the OCC *will* move forward with chartering financial technology companies that offer bank products and services and meet our high standards and chartering requirements. We have published a paper today discussing several important issues associated with the approval of a national bank charter, and we are seeking stakeholder comment to help inform our path forward. Your comments will help us ensure that the agency's chartering decisions promote the safety and soundness of the federal banking system, increase financial inclusion, and protect consumers from abuse. I hope the professors and legal minds studying here will take the opportunity to read the paper and provide your thoughts.

We have decided to move forward and to make available special purpose national charters to fintech companies for a few basic reasons. First and foremost, we believe doing so is in the public interest. Fintech companies hold great potential to expand financial inclusion, empower consumers, and help families and businesses take more control of their financial

matters. Fintechs, while not without some risks, also can potentially deliver these products and services in a safer and more efficient manner. Preferences and needs of consumers, communities, and business are changing. And chartering companies that are finding new and better ways of satisfying those needs is another step toward supporting responsible innovation that is good for consumers, good for the federal banking system, and good for the country.

Second, we believe that companies that offer banking products and services should have the *choice* to become *national* banks if they wish to do so. Merely making a charter available, does not create a *requirement* to seek one. Nor does it displace the other choices a fintech company may have—for example, seeking a state bank charter in a state that makes one available or to continue operating outside the banking system. A company's choice to pursue a national charter should be driven by the company's business model and strategy on how best to serve their intended customers. The ability to choose a federal charter or state charter exists today for banks, and that choice is essential to the dual banking system just as it was in 1863 when the OCC was chartered. Preventing this class of companies from having that same option hurts the nation's dual banking system and could make the federal banking system less capable of adapting to the evolving business and customer needs of tomorrow. Providing a national charter to those responsible innovators who seek one and meet our high standards can help promote economic growth across the country and recognizes that technology-based products and services are the future of banking and the economy.

Third, having a clear process, criteria, and standards for fintechs to become national banks ensures regulators and companies openly vet risks and that the institutions that receive charters have a reasonable chance of success, appropriate risk management, effective consumer protection, and strong capital and liquidity. Through the chartering process, the OCC can fully

explore how the proposed bank's policies, procedures, and practices are designed to protect individuals and small business customers. Many fintechs will choose to partner with existing banks or provide services to banks and other financial companies, but some will seek to become a bank. In those cases, it will be much better for the health of the federal banking system and everyone who relies on these institutions, if these companies enter the system through a clearly marked front gate, rather than in some back door, where risks may not be as thoughtfully assessed and managed.

The OCC has the authority to grant special purpose national bank charters to fintech firms that conduct at least one of three core banking activities—receiving deposits, paying checks, or lending money. But, that authority is not to be taken lightly, which is why I have asked staff to develop and implement a formal agency policy for evaluating applications for fintech charters. The policy, informed by the comments we receive on our white paper, will articulate specific criteria for approval as well as issues that we should consider and conditions that should be met *before* granting such charters. Such policy helps ensure that we evaluate future fintech applications in a thoughtful and transparent manner and that we have necessary guard rails in place to ensure approvals consider safety and soundness, financial inclusion, consumer protection, community reinvestment, and corporate responsibility. Today's paper specifically asks for comment on what types of activities and expectations the OCC should require for entities seeking a special purpose national bank charter that demonstrates their commitment to financial inclusion that supports fair access to financial services and fair treatment of customers.

In addition to sharing our reasons for moving forward on fintech charters, I want to spend a little time discussing concerns some have already expressed. Issues fall in two equally

important categories—consumer protection and financial inclusion, and regulatory fairness and supervisory rigor.

Individuals and businesses should have access to useful and affordable financial products and services that meet their needs, and that are provided in a fair and responsible manner, no matter the source of those products and services. I understand and share the concerns about the applicability of laws meant to protect consumers, expand financial inclusion, and promote community reinvestment. For instance, there are certain laws, including the Community Reinvestment Act, that only apply to deposit-taking institutions insured by the FDIC. Consequently, thousands of fintech companies that provide bank-like services today and are not insured by the FDIC are not encouraged to meet the credit needs of the communities they serve through the application of CRA. *On the other hand*, the OCC has the unique ability to *impose* requirements in some or all of these areas through the chartering process to require companies seeking national charters to support financial inclusion in meaningful ways, as appropriate for the business model and activity of a particular company.

As a former state regulator, I also understand worries about the application of state law to national banks. That concern is not exacerbated by granting special purpose charters. State law applies to special purpose national banks in the same way and to the same extent as traditional national banks. Examples of state laws that generally apply to national banks include laws on anti-discrimination, fair lending, debt collection, taxation, zoning, criminal laws, foreclosure, and torts. In addition, any other law that only *incidentally* affects national banks' federally authorized powers to lend, take deposits, and engage in other federally authorized activities also still apply. The OCC has taken the position that state laws aimed at unfair or deceptive treatment of

customers also *apply* to national banks. The state laws that typically do not apply are those that impose licensing requirements on a company in order to engage in certain types of business.

The second issue we've heard relates to regulatory fairness and supervisory rigor. The worry here is that by providing a special purpose national bank charter we are somehow tipping the balance of competition by allowing special purpose banks to compete with full-service banks without assuming any of the responsibility.

But, the reality today is that the 4,000 fintech companies out there are already competing with national *and* state banks, without regard to any of the national bank responsibilities and under a patchwork of supervision. Granting national charters to the companies who desire and warrant one doesn't weaken the competitive position of existing banks or the dual banking system. In some ways, it levels the playing field because statutes that by their terms apply to national banks would apply to *all* special purpose national banks, even uninsured ones. This would include, for example, statutes and regulations on legal lending limits and limits on real estate holdings. And as far as providing "lighter touch" supervision, I have made it clear that if the OCC grants a national charter in this area, the institution will be examined regularly and held to the high standards the OCC has established for all federally chartered institutions.

These are important issues we must carefully consider as we implement our decision to entertain charter applications from fintech companies. I look forward to hearing from many of our stakeholders through their comments on our paper. I know folks will not be shy about providing their thoughts.

In closing, I want to thank all of the lawyers, licensing and policy experts, and examiners on our team for their work in putting these thoughts to paper and helping us move forward today

in this important, new direction. I especially want to acknowledge Karen Solomon, our Deputy Chief Counsel, for her leadership in this effort. I hope everyone appreciates the transparent and deliberate manner we have followed in considering this decision and all of our work on responsible innovation. We recognize that our decision will affect the federal banking system for many years to come, and I believe that effect will be a positive one. Dean Treanor, thank you again, and thanks to everyone here at Georgetown for inviting me here to share this announcement. I deeply appreciate your interest in this subject and look forward to the rest of our conversation.