# EXHIBIT C



# Exploring Special Purpose National Bank Charters for Fintech Companies

Office of the Comptroller of the Currency
Washington, D.C.

December 2016

## *Preface by the Comptroller of the Currency*

When President Abraham Lincoln signed the law creating the national banking system and the Office of the Comptroller of the Currency (OCC), the very notion of establishing a national bank charter was itself innovative. Our country's leaders provided the Comptroller with the authority to grant a national charter because they recognized the public value of a robust, unified, and nationwide system of banks.

The national banking system became a source of strength for the nation and our economy. National banks and, later, federal savings associations became anchors of their communities and the predominant providers of financial services for consumers and businesses. The system flourished because it enabled and encouraged national banks and federal savings associations to adapt to the changing needs of their customers and the market.

More than 150 years later, we have a diversified and evolving financial services industry. New technology makes financial products and services more accessible, easier to use, and much more tailored to individual consumer needs. At the same time, consumer preferences and demands are evolving, driven by important demographic changes: for example, the entry of 85 million millennials into the financial marketplace in the United States. Responding to those market forces are thousands of technology-driven nonbank companies offering a new approach to products and services. Five years ago these services either were available only from traditional banks or not available at all. Initially, many of these nonbank providers of financial services viewed themselves as competitors of banks. Now, some financial technology—or fintech—companies are considering whether to become banks.

These industry developments raise fundamental policy questions. Is the nation better served when banking products are provided by institutions subject to ongoing supervision and examination? Should a nonbank company that offers banking-related products have a path to become a bank? And, what conditions should apply if a nonbank company becomes a national bank?

I challenged staff at the OCC to explore these important questions when I asked them to examine the agency's authority to grant special purpose national bank charters to fintech companies and the conditions under which we might do so. This paper summarizes that work, describes the OCC's legal authority to grant a special purpose charter, and articulates what the OCC considers to be necessary conditions if the OCC is to exercise that authority. It makes clear that if we decide to grant a national charter to a particular fintech company, that institution will be held to the same high standards of safety and soundness, fair access, and fair treatment of customers that all federally chartered institutions must meet.

Public comment will help inform our consideration of these issues. We welcome your feedback on all of the issues raised in this paper and on the specific questions included at the end.

## *Introduction*

The OCC's chartering authority includes the authority to charter special purpose national banks. In fact, many special purpose national banks are operating today—primarily trust banks and credit card banks. A question raised by technological advances in financial services and evolving customer preferences is whether it would be appropriate for the OCC to consider granting a special purpose national bank charter to a fintech company. For a number of reasons, the OCC believes it may be in the public interest to do so.

First, applying a bank regulatory framework to fintech companies will help ensure that these companies operate in a safe and sound manner so that they can effectively serve the needs of customers, businesses, and communities, just as banks do that operate under full-service charters. Second, applying the OCC's uniform supervision over national banks, including fintech companies, will help promote consistency in the application of law and regulation across the country and ensure that consumers are treated fairly. Third, providing a path for fintech companies to become national banks can make the federal banking system stronger. The OCC's oversight not only would help ensure that these companies operate in a safe and sound manner, it would also encourage them to explore new ways to promote fair access and financial inclusion and innovate responsibly. Fintech companies vary widely in their business models and product offerings. Some are marketplace lenders providing loans to consumers and small businesses, others offer payment-related services, others engage in digital currencies and distributed ledger technology, and still others provide financial planning and wealth management products and services.

If the OCC decides to grant a charter to a particular fintech company, the institution would be held to the same rigorous standards of safety and soundness, fair access, and fair treatment of customers that apply to all national banks and federal savings associations. The OCC acknowledges, however, that to approve a fintech charter the agency may need to account for differences in business models and the applicability of certain laws. For example, a fintech company with a special purpose national charter that does not take deposits, and therefore is not insured by the Federal Deposit Insurance Corporation (FDIC), would not be subject to laws that apply only to insured depository institutions.

Where a law does not apply directly, the OCC may, nonetheless, work with a fintech company to achieve the goals of a particular statute or regulation through the OCC's authority to impose conditions on its approval of a charter, taking into account any relevant differences between a full-service bank and special purpose bank. In this way, the OCC could advance important policy objectives, such as enhancing the ways in which financial services are provided in the 21st century, while ensuring that new fintech banks operate in a safe and sound manner, support their communities, promote financial inclusion, and protect customers.

This paper explores these and other issues related to the OCC's consideration of charter applications from fintech companies. The OCC welcomes comments about how it can foster responsible innovation in the chartering process while continuing to provide the robust oversight that its mandate requires.

## Background

### The OCC's responsible innovation work to date

In August 2015, the OCC began an initiative to better understand innovation occurring in the financial services industry and to develop a framework supporting responsible innovation. To gain a broad perspective, the OCC conducted extensive research and had discussions with fintech companies, banks, community and consumer groups, academics, and other regulators. This work led to the publication of a white paper in March 2016 that outlined clear principles to guide the development of a framework to support responsible innovation in the federal banking system.[1] In October 2016, the OCC announced plans to implement its framework for responsible innovation, including the establishment of an Office of Innovation to serve as the central point of contact and clearinghouse for requests and information related to innovation.[2] The office also will conduct outreach and provide technical assistance and other resources for banks and nonbanks on regulatory expectations and principles.

## Chartering authority

The OCC has authority to grant charters for national banks and federal savings associations under the National Bank Act and the Home Owners' Loan Act, respectively.[3] That authority includes granting charters for special purpose national banks. A special purpose national bank may limit its activities to fiduciary activities or to any other activities within the business of banking. A special purpose national bank that conducts activities other than fiduciary activities must conduct at least one of the following three core banking functions: receiving deposits, paying checks, or lending money.[4]

Special purpose national bank charters have been in use for some time. The most common types of these charters are trust banks (national banks limited to the activities of a trust company) and credit card banks (national banks limited to a credit card business).[5] Though the focus of this paper is on fintech companies in particular, there is no legal limitation on the type of "special purpose" for which a national bank charter may be granted, so long as the entity engages in

---

[1] "Supporting Responsible Innovation in the Federal Banking System: An OCC Perspective" can be found at https://www.occ.gov/publications/publications-by-type/other-publications-reports/pub-responsible-innovation-banking-system-occ-perspective.pdf.

[2] "Recommendations and Decisions for Implementing a Responsible Innovation Framework" can be found at https://www.occ.gov/topics/bank-operations/innovation/recommendations-decisions-for-implementing-a-responsible-innovation-framework.pdf.

[3] See 12 USC 1 et seq. and 1461 et seq. The OCC also has authority, under the International Banking Act, 12 USC 3102, to license a foreign bank to operate a federal branch or agency in the United States.

[4] See 12 CFR 5.20(e)(1). This paper focuses on the national bank charter, because it has more flexibility than the federal savings association charter. Federal savings associations are subject to asset and investment limitations and are required to have deposit insurance. See 12 CFR 160.30 and 5.20(e)(3).

[5] The OCC also has chartered other special purpose national banks including bankers' banks, community development banks, and cash management banks.

fiduciary activities or in activities that include receiving deposits, paying checks, or lending money. As the next section describes, the OCC has the legal authority to construe these activities to include bank-permissible, technology-based innovations in financial services.

## Features and attributes of a national bank charter

### Corporate structure

A national bank charter is a federal form of corporate organization that authorizes a bank to conduct business on a nationwide basis and subjects the bank to uniform standards and rigorous federal oversight. All national banks, including special purpose national banks, are organized under, and governed by, the National Bank Act. The corporate organization and structure provisions of the National Bank Act (e.g., classes of shares, voting rights, number of directors, and term of office) govern the corporate structure of a special purpose national bank.

### Bank-permissible activities

A special purpose national bank may engage only in activities that are permissible for national banks. Bank-permissible activities are identified in statutes, in the OCC's regulations, and in legal opinions and corporate decisions that the OCC regularly publishes.[6] The OCC and the courts that have considered the scope of bank-permissible activities also recognize that the business of banking develops over time as the economy and business methods evolve.[7]

Consistent with legal precedent, the OCC views the National Bank Act as sufficiently adaptable to permit national banks—full-service or special purpose—to engage in new activities as part of the business of banking or to engage in traditional activities in new ways.[8] For example, discounting notes, purchasing bank-permissible debt securities, engaging in lease-financing transactions, and making loans are forms of lending money. Similarly, issuing debit cards or engaging in other means of facilitating payments electronically are the modern equivalent of paying checks. The OCC would consider on a case-by-case basis the permissibility of a new activity that a company seeking a special purpose charter wishes to conduct.

---

[6] See OCC Interpretations and Actions at https://www.occ.gov/topics/licensing/interpretations-and-actions/index-interpretations-and-actions.html.

[7] See generally NationsBank of North Carolina, N.A. v. Variable Life Annuity Co., 513 U.S. 251 (1995); M&M Leasing Corp. v. Seattle First National Bank, 563 F.2d 1377 (9th Cir. 1977), cert. denied, 436 U.S. 987 (1978); OCC Conditional Approval No. 267 (January 12, 1998) (certification authority and repository and key escrow are part of the business of banking); OCC Interpretive Letter No. 494 (December 20, 1989) (allowing national banks to purchase and sell financial futures for their own account).

[8] See, e.g., 12 CFR 7.5002 (OCC regulation authorizing national banks to use electronic means to conduct activities they are otherwise authorized to conduct, subject to appropriate safety and soundness and compliance standards and conditions).

## Rules and standards applicable to a special purpose national bank

In general, a special purpose national bank is subject to the same laws, regulations, examination, reporting requirements, and ongoing supervision as other national banks. Statutes that by their terms apply to national banks apply to all special purpose national banks, even uninsured national banks. These laws include, for example, statutes and regulations on legal lending limits and limits on real estate holdings.[9]

Other laws that apply to special purpose banks include the Bank Secrecy Act (BSA), other anti-money laundering (AML) laws, and the economic sanctions administered by the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC). In addition, special purpose national banks generally are subject to the prohibitions on engaging in unfair or deceptive acts or practices under section 5 of the Federal Trade Commission Act and unfair, deceptive, or abusive acts or practices under section 1036 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank). The OCC's chartering regulation and licensing policies and procedures also would apply to a special purpose national bank. The established charter policies and procedures are set forth in 12 CFR Part 5 and the "Charters" booklet of the *Comptroller's Licensing Manual* and are discussed in the Chartering process section below.[10]

A special purpose national bank also has the same status and attributes under federal law as a full-service national bank.[11] State law applies to a special purpose national bank in the same way and to the same extent as it applies to a full-service national bank. Limits on state visitorial authority also apply in the same way. A special purpose national bank would look to the relevant statutes (including the preemption provisions added to the National Bank Act by Dodd-Frank), regulations (including the OCC's preemption regulations), and federal judicial precedent to determine if or how state law applies. For example, under these statutes, rules, and precedents, state laws would not apply if they would require a national bank to be licensed in order to engage in certain types of activity or business. Examples of state laws that *would* generally apply to national banks include state laws on anti-discrimination, fair lending, debt collection, taxation, zoning, criminal laws, and torts. In addition, any other state laws that only incidentally affect national banks' exercise of their federally authorized powers to lend, take deposits, and engage in other federally authorized activities are not preempted. Moreover, the OCC has taken the position that state laws aimed at unfair or deceptive treatment of customers apply to national banks.[12]

Many other federal statutes apply to any bank, financial institution, or other type of entity based on the activities in which the entity engages. For example, banks that engage in residential real

---

[9] See 12 USC 84 and 12 CFR 32 (lending limits) and 12 USC 29 and 12 CFR 7.1000 (limits on holding real estate).

[10] See 12 CFR Part 5 and the "Charters" booklet of the *Comptroller's Licensing Manual* (September 2016), https://www.occ.gov/publications/publications-by-type/licensing-manuals/charters.pdf.

[11] A special purpose national bank has the same charter as a full-service national bank. It limits its activities through the bank's articles of association or through OCC-imposed conditions for approving the charter.

[12] The OCC looks to the substantive content of the state statute and not its title or characterization to determine whether it falls within this category.

estate lending must comply with the Truth in Lending Act, Real Estate Settlement Procedures Act, Home Mortgage Disclosure Act, Equal Credit Opportunity Act, Fair Credit Reporting Act, Fair Housing Act, Servicemembers Civil Relief Act, and Military Lending Act.

Some statutes, however, apply to a national bank only if it is FDIC-insured and, therefore, would not apply to an uninsured special purpose national bank. For example, certain provisions in the Federal Deposit Insurance Act (FDIA), such as section 1831p-1 (safety and soundness standards) and section 1829b (retention of records), only apply to insured depository institutions.[13] In addition, if a national bank is not insured, the provisions in the FDIA governing the receivership of insured depository institutions would not apply. The OCC recently issued a proposed rule that would address this regulatory gap by establishing a framework for the receivership of an uninsured national bank under the receivership provisions in the National Bank Act.[14] The proposed rule primarily focuses on uninsured national trust banks, but specifically contemplates application to other special purpose national banks. The Community Reinvestment Act (CRA) is an example of another law that only applies to insured institutions.[15]

As discussed in the Chartering process section below, the OCC could impose requirements on an uninsured special purpose bank as a condition for granting a charter that are similar to certain statutory requirements applicable to insured banks, if it deems the conditions appropriate based on the risks and business model of the institution.[16]

## Coordination among regulators

The OCC is the primary prudential regulator and supervisor of national banks. Depending on the structure of the bank and the activities it conducts, other regulators will have oversight roles as well. A fintech company considering a special purpose national bank charter likely would need to engage with other regulators in addition to the OCC. The OCC traditionally coordinates with other banking regulators on charter-related activities and would continue to coordinate and communicate where appropriate with other regulators in the case of an application by a fintech company for a special purpose national bank charter.

*Federal Reserve*: With rare exceptions, all national banks, including insured and uninsured trust banks and other special purpose national banks, are required to be members of the Federal

---

[13] While certain provisions of the FDIA do not apply to uninsured national banks, the OCC can address unsafe or unsound practices, violations of law, unsafe or unsound conditions, or other practices under its other supervisory and enforcement authorities. The FDIA's principal enforcement section, 12 U.S.C. 1818, generally would apply to any national banking association, including an uninsured national bank. See 12 USC 1818(b)(5).

[14] The proposed rule was published in the Federal Register at 81 Fed. Reg. 62835 (September 13, 2016) and is available at https://www.occ.gov/news-issuances/news-releases/2016/nr-occ-2016-110a.pdf.

[15] 12 USC 2901 et seq. See also 12 CFR Part 25 (OCC CRA regulations).

[16] Such conditions are conditions imposed in writing by the OCC in connection with any action on any application, notice, or other request under 12 USC 1818(b)(1). As such they are enforceable under 12 CFR 1818.

Reserve System.[17] National banks become member banks by subscribing for the stock of the appropriate Federal Reserve Bank.[18] Since most special purpose national banks would be member banks, the statutes and regulations that apply to member banks also would apply to them.[19] These statutes and regulations are administered by the Board of Governors of the Federal Reserve System (Federal Reserve Board) and the Federal Reserve Banks.

In addition, the Federal Reserve Board administers and interprets the scope and requirements of the Bank Holding Company Act (BHCA). If a fintech company interested in operating as a special purpose national bank has or plans to have a holding company that would be the sole or controlling owner of the bank (and investors would, in turn, own shares in the holding company), the BHCA could apply. A national bank is a "bank" for purposes of the BHCA if (A) it is either (i) an FDIC-insured bank or (ii) a bank that both accepts demand deposits and engages in the business of making commercial loans and (B) it does not qualify for any of the exceptions from the definition of "bank" in the BHCA.[20]

*Federal Deposit Insurance Corporation*: A fintech company that proposes to accept deposits other than trust funds would be required to apply to, and receive approval from, the FDIC. Generally, a bank must be engaged in the business of receiving deposits other than trust funds for the FDIC to consider granting deposit insurance.[21] For example, some national trust banks engage only in fiduciary and related activities and do not engage in the business of receiving deposits other than trust funds. As a result, they are not FDIC-insured.[22] If the OCC chartered another type of special purpose national bank that did not receive deposits other than trust funds, such as a fintech company, that new bank also would not be eligible for FDIC insurance.

*Consumer Financial Protection Bureau*: A special purpose national bank that engages in an activity that is regulated under a federal consumer financial law, as defined by Dodd-Frank, may also be subject to oversight by the Consumer Financial Protection Bureau (CFPB). A special purpose national bank that is an insured depository institution generally would be supervised by either the CFPB or the OCC for purposes of all federal consumer financial laws based on its

---

[17] See 12 USC 222. National banks located in territories and insular possessions of the United States are not required to be member banks. See 12 USC 466.

[18] See 12 USC 282; 12 CFR 209.2(b).

[19] For example, the Federal Reserve Act imposes quantitative and qualitative restrictions on a member bank's transactions with its affiliates. 12 USC 371c, 371c-1. These restrictions are implemented by the Federal Reserve Board. See 12 CFR Part 223.

[20] See 12 USC 1841.

[21] See 12 USC 1815(a). The FDIC's regulations provide that an institution is engaged in the business of receiving deposits other than trust funds if it maintains one or more non-trust deposit accounts in the minimum aggregate amount of $500,000. 12 CFR 303.14(a).

[22] There are several FDIC-insured trust banks. Currently, four national trust banks have FDIC insurance.

asset size.[23] Under Dodd-Frank, the CFPB would supervise an uninsured special purpose national bank engaged in certain activities for compliance with federal consumer financial law.[24]

## *Baseline supervisory expectations*

All national banks are required to meet high supervisory standards. Consistent with the OCC's mission, these standards include safety and soundness requirements, as well as requirements to provide fair access to financial services, treat customers fairly, and comply with all applicable laws and regulations. The OCC tailors these standards based on the bank's size, complexity, and risks. As a national bank, a special purpose national bank also would be expected to meet these high standards, tailored to its size, complexity, and risks.

The OCC has identified the following baseline supervisory expectations for any entity seeking a national charter. These baseline expectations stress the importance of a detailed business plan, governance, capital, liquidity, compliance risk management, financial inclusion, and recovery and resolution planning. As with other applicants seeking a national bank charter, applicants for a special purpose charter are strongly encouraged, prior to filing an application, to meet with the OCC to discuss these baseline expectations in detail and how the expectations (and any others arising from the particular proposal) apply to their proposed bank. Those meetings enable the OCC to work with the applicant to develop and tailor supervisory standards to each applicant based on the applicant's circumstances including its size, business model, complexity and risk profile.

### Robust, well-developed business plan

A well-developed business plan is a key component of any charter proposal.[25] The OCC expects a company seeking any type of national bank charter to clearly articulate why it is seeking a national bank charter and provide significant detail about the proposed bank's activities. The business plan is a written summary of how the proposed bank will organize its resources to meet its goals and objectives and how it will measure progress. As such, the business plan should be comprehensive, reflecting in-depth planning by the organizers, Board of Directors, and management.

---

[23] The CFPB has exclusive supervisory authority and primary enforcement authority over special purpose national banks that are insured depository institutions and have assets greater than $10 billion. See 12 CFR 5515. The OCC generally has exclusive supervisory and enforcement authority over special purpose national banks that are insured depository institutions and have assets of $10 billion or less. See 12 USC 5516, 5581(c)(1)(B).

[24] See 12 USC 5514. Section 5514(a) defines the "scope of coverage" for the CFPB's supervisory authority over nondepository covered persons, which does not include all activities governed by a federal consumer financial law. Instead, the "scope of coverage" set forth in subsection (a) includes specified activities (e.g., offering or providing: origination, brokerage, or servicing of consumer mortgage loans; payday loans; or private education loans) as well as a means for the CFPB to expand the coverage through specified actions (e.g., a rulemaking to designate "larger market participants"). 12 USC 5514(a).

[25] See the "Charters" booklet of the *Comptroller's Licensing Manual* for more information on business plan requirements.

The plan should clearly define the market the proposed bank plans to serve and the products and services it will provide.[26] In addition, it should realistically forecast market demand, economic conditions, competition, and the proposed bank's customer base. The plan also must demonstrate a realistic assessment of risk, describing management's assessment of all risks inherent in the proposed products and services, including risks relating to BSA/AML requirements, consumer protection, fair lending requirements, and the design of related risk management controls and management information systems. Additionally, the plan should describe the experience and expertise of proposed management, including the Board, to manage the proposed bank.

The business plan should cover a minimum of three years and provide a full description of proposed actions to accomplish the primary functions of the proposed bank. The description should provide enough detail to demonstrate that the proposed bank has a reasonable chance for success, will operate in a safe and sound manner, and will have adequate capital to support its risk profile. The OCC expects a proposed bank's business plan to outline the plans for initial and future capital contributions, as well as to provide specific information on how the proposed bank intends to maintain and monitor appropriate capital levels. The plan should also identify external sources available to bolster capital levels, if needed. Additionally, the business plan should include comprehensive alternative business strategies to address various best-case and worst-case scenarios (e.g., financial performance, revenue growth, market share). The business plan also should include the organizing group's knowledge of and plans for serving the community, if applicable.

## Governance structure

The OCC expects the governance structure for any proposed special purpose national bank to be commensurate with the risk and complexity of its proposed products, services, and activities, as it is for other national banks. The OCC sets high standards for governance and for risk management systems that identify, monitor, manage, and control risk in national banks. The OCC expects national banks to have the expertise, financial acumen, and risk management framework to promote safety and soundness oversight. The Board of Directors must have a prominent role in the overall governance structure by participating on key committees and guiding the risk management framework. Board members also must actively oversee management, provide credible challenge, and exercise independent judgment.

## Capital

The OCC's evaluation of a bank's capital is important, not only to assess the strength of an individual bank, but also to evaluate the safety and soundness of the entire federal banking system. Bank capital, among other things, helps to ensure public confidence in the stability of individual banks and the banking system; supports the volume, type, and character of the business conducted; and provides for the possibility of unexpected loss.

Minimum and ongoing capital levels need to be commensurate with the risk and complexity of the proposed activities (including on- and off-balance sheet activities). The OCC's evaluation of capital adequacy (initial and ongoing) consider the risks and complexities of the proposed

---

[26] For example, the business plan for a proposed bank that will engage in payments activities should address how the bank proposes to access various payment systems.

products, services, and operating characteristics, taking into account both quantitative and qualitative factors. Key qualitative elements that influence the determination of capital adequacy include the scope and nature of the bank's proposed activities, quality of management, funds management, ownership, operating procedures and controls, asset quality, earnings and their retention, risk diversification, and strategic planning. In addition to assessing the quality and source of capital, the OCC also considers on- and-off balance sheet composition, credit risk, concentration, and market risks.

Special purpose national bank charter applicants whose business activities may be off-balance sheet would be subject to the OCC's minimum regulatory capital requirements, but the minimum capital levels required may not adequately reflect the risks associated with off-balance sheet activities.[27] To account for this gap, applicants are expected to propose a minimum level of capital that the proposed bank would meet or exceed at all times. For example, national trust banks typically have few assets on the balance sheet, usually composed of cash on deposit with an insured depository institution, investment securities, premises and equipment, and intangible assets. Because these banks do not make loans or rely on deposit funding, the OCC typically requires them to hold a specific minimum amount of capital, which often exceeds the capital requirements for other types of banks. Similarly, the OCC would consider adapting capital requirements applicable to a fintech applicant for a special purpose national bank charter as necessary to adequately reflect its risks and to the extent consistent with applicable law.

**Liquidity**

The OCC's evaluation of liquidity focuses on a bank's capacity to readily and efficiently meet expected and unexpected cash flows and collateral needs at a reasonable cost, without adversely affecting either daily operations or the financial condition of the bank. As with capital, minimum and ongoing liquidity (both operating and contingent obligations) for a special purpose national bank need to be commensurate with the risk and complexity of the proposed activities. In assessing the liquidity position of a proposed bank, the OCC considers a proposed bank's access to funds as well as its cost of funding. Some key areas of consideration include projected funding sources, needs, and costs; net cash flow and liquid asset positions; projected borrowing capacity; highly liquid asset and collateral positions (including the eligibility and marketability of such assets under a variety of market environments); requirements for unfunded commitments; and the adequacy of contingency funding plans. All aspects of liquidity should address the impact to earnings and capital, and incorporate planned and unplanned balance sheet changes, as well as varying interest rate scenarios, time horizons, and market conditions.[28]

---

[27] The OCC's capital requirements are set forth at 12 CFR Part 3.

[28] See the "Liquidity" booklet of the *Comptroller's Handbook* for more information. https://www.occ.gov/publications/publications-by-type/comptrollers-handbook/liquidity.pdf.

## Compliance risk management

The OCC expects all national banks to manage compliance risks effectively. A strong compliance infrastructure contributes to a national bank's safe and sound operation, as well as the provision of fair access to financial services, fair treatment of customers, and compliance with applicable laws.

An applicant seeking a special purpose national bank charter, like any applicant for a national bank charter, is expected to demonstrate a culture of compliance that includes a top-down, enterprise-wide commitment to understanding and adhering to applicable laws and regulations and to operating consistently with OCC supervisory guidance. In addition, the applicant would need appropriate systems and programs to identify, assess, manage and monitor the compliance process (e.g., policies and procedures, practices, training, internal controls, and audit), and a commitment to maintain adequate compliance resources.

Appropriate compliance risk management includes a well-developed compliance management system that is commensurate with the risks to the proposed bank and includes:

- a compliance program designed to ensure and monitor compliance with the requirements imposed by the BSA, other AML statutes, and related regulations, as well as OFAC economic sanctions obligations; and
- a consumer compliance program designed to ensure fair treatment of customers and fair access to financial services, as well as compliance with Section 5 of the Federal Trade Commission Act, the unfair, deceptive, or abusive acts or practices prohibitions of Dodd-Frank, and all other applicable consumer financial protection laws and regulations.

The OCC expects any applicant seeking a special purpose national bank charter to provide a sufficient description of the proposed bank's activities for the OCC to fully understand the BSA/AML and compliance risks the proposed bank faces, how it intends to assess, manage, and monitor these risks, and how it would comply with relevant laws, regulations, and requirements.

As with any national bank, the compliance risk management system appropriate for a specific bank should consider the nature of the company's business, its size, and the diversity and complexity of the risks associated with its operations. While this general standard is consistent across all national banks, applying the standard to a fintech company's business model could raise novel considerations. The OCC would consider and address in its evaluation of a fintech charter application whether and how innovative elements of a business model may affect the proposed bank's compliance risk profile.

## Financial inclusion

The OCC's statutory mission includes ensuring that national banks treat customers fairly and provide fair access to financial services.[29] This part of the OCC's mission is directly related to

---

[29] See 12 USC 1.

financial inclusion.[30] For insured depository institutions, this mission is advanced, in part, through the CRA framework, under which the OCC assesses an institution's record of helping meet the credit needs of its entire community, including low- and moderate-income neighborhoods, individuals, and underserved geographic areas. Special purpose national banks that are not insured depository institutions, however, are not subject to the CRA.[31]

Distinct from any direct CRA obligation, the OCC is guided by certain principles in determining whether to approve a charter application to establish a national bank. These principles include "encouraging" the national bank "to provide fair access to financial services by helping to meet the credit needs of its entire community" and "promoting fair treatment of customers including efficiency and better service."[32] The OCC expects an applicant seeking a special purpose national bank charter that engages in lending activities to demonstrate a commitment to financial inclusion that supports fair access to financial services and fair treatment of customers. The nature of the commitment would depend on the entity's business model and the types of loan products or services it intends to provide.

The OCC's chartering regulation generally requires an applicant for a national bank charter to submit a business plan that demonstrates how the proposed bank plans to respond to the needs of the community, consistent with the safe and sound operation of the bank.[33] Although this element of the business plan is not mandatory for all special purpose banks, the OCC expects a special purpose bank engaged in lending to explain its commitment to financial inclusion in its business plan. In developing the financial inclusion component of its business plan, a proposed special purpose bank engaged in lending should consider the following elements:

- an identification of, and method for defining, the relevant market, customer base, or community;
- a description of the nature of the products or services the company intends to offer (consistent with its business plan), the marketing and outreach plans, and the intended delivery mechanisms for these products or services;
- an explanation of how such products and services, marketing plans, and delivery mechanisms would promote financial inclusion (e.g., provide access to underserved consumers or small businesses); and

---

[30] The problem of financially unserved and underserved sectors of society is a global issue. The World Bank has described "financial inclusion" to mean that "individuals and businesses have access to useful and affordable financial products and services that meet their needs—transactions, payments, savings, credit and insurance—delivered in a responsible and sustainable way." See the World Bank Financial Inclusion Overview page at http://www.worldbank.org/en/topic/financialinclusion/overview. Separately, recent final guidance from the Basel Committee on Banking Supervision addresses financial inclusion, focusing on unserved and underserved customers. See Guidance on the application of the Core Principles for Effective Banking Supervision to the regulation and supervision of institutions relevant to financial inclusion (September 2016) at http://www.bis.org/bcbs/publ/d383.pdf.

[31] See 12 USC 2902 (defining "regulated financial institution" to mean an "insured depository institution"). See also 12 CFR 25.12 (defining "bank" as a national bank with federally insured deposits).

[32] See 12 CFR 5.20(f)(1)(ii) and (iv).

[33] See 12 CFR 5.20(h)(5).

- full information regarding how the proposed bank's policies, procedures, and practices are designed to ensure products and services are offered on a fair and non-discriminatory basis. For example, the OCC may ask an applicant that plans to extend credit to provide the terms on which it plans to lend, including a description of the protections it plans to provide to individuals and small business borrowers.

As with other elements of the applicant's business plan, the OCC may require a company to obtain approval, or no-objection, from the OCC if it departs materially from its financial inclusion plans.

**Recovery and exit strategies; resolution plan and authority**

As noted above, the OCC expects a proposed bank's business plan to include alternative business and recovery strategies to address various best-case and worst-case scenarios. Simply put, the OCC expects business plans to articulate specific financial or other risk triggers that would prompt the Board and management's determination to unwind the operation in an organized manner. These strategies must provide a comprehensive framework for evaluating the financial effects of severe stress that may affect an entity and options to remain viable under such stress. The business plan must address material changes in the institution's size, risk profile, activities, complexity, and external threats, and be integrated into the entity's overall risk governance framework. Plans must be specific to that entity, aligned with the entity's other plans, and coordinated with any applicable parent or affiliate planning. A plan should include triggers alerting the entity to the risk or presence of severe stress, a wide range of credible options an entity could take to restore its financial strength and viability, and escalation and notification procedures. While the objective of these business and recovery strategies is to remain a viable entity, the OCC may also require a company to have a clear exit strategy.

## *Chartering process*

The OCC's standard process for reviewing and making decisions about charter applications would apply to applications from fintech companies for a special purpose national bank charter. Charter applications are reviewed and processed through the OCC's Licensing Department. The "Charters" booklet of the *Comptroller's Licensing Manual*[34] contains detailed information about that process, which consists of four stages:

- The prefiling stage, in which potential applicants engage with the OCC in formal and informal meetings to discuss their proposal, the chartering process, and application requirements. At this stage, applicants also prepare a complete application, including a business plan.
- The filing stage, in which the organizers submit the application. Organizers also must publish notice of the charter application as soon as possible before or after the date of the filing.
- The review and evaluation stage, in which the OCC conducts background and field investigations, and reviews and analyzes the application to determine whether the proposed bank: has a reasonable chance of success; will be operated in a safe and sound manner; will

---

[34] See the "Charters" booklet of the *Comptroller's Licensing Manual*.

provide fair access to financial services; will ensure compliance with laws and regulations; will promote fair treatment of customers; and will foster healthy competition.

- The decision stage, which includes three phases:
  - o The preliminary conditional approval phase, when the OCC decides whether to grant preliminary conditional approval;
  - o The organization phase, when the bank raises capital, prepares for opening, and the OCC conducts a preopening examination; and
  - o The final approval phase, when the OCC decides whether the bank has met the requirements and conditions for opening.

The OCC imposes a number of standard requirements on a bank when it grants preliminary conditional approval, such as the establishment of appropriate policies and procedures and the adoption of an internal audit system appropriate to the size, nature, and scope of the bank's activities. The OCC may impose additional conditions for a variety of reasons, including for example to ensure the newly chartered bank does not change its business model from that proposed in the application without prior OCC approval; to mandate higher capital and liquidity requirements; or to require the bank to have a resolution plan to sell itself or wind down if necessary. In addition, in the case of an uninsured bank, the OCC may impose requirements by way of conditions similar to those that apply by statute to an insured bank, to the extent appropriate given the business model and risk profile of a particular applicant. The OCC likely would impose additional conditions in connection with granting a special purpose national bank charter requested by a fintech company based on the fintech company's business model and risk profile.[35]

The OCC recognizes it also may need to tailor some requirements that apply to a full-service national bank to address the business model of a special purpose national bank. The OCC has experience in adapting legal requirements to different types of business models. For example, as noted above, the OCC has modified capital requirements for certain trust banks.[36] Similarly, the OCC would consider adapting requirements applicable to a fintech applicant for a special purpose national bank charter to the extent consistent with applicable law.

The OCC recommends that potential applicants carefully review the OCC chartering regulation and the "Charters" booklet of the *Comptroller's Licensing Manual* for a full description of the charter application process and requirements. The OCC also strongly urges groups or individuals interested in a special purpose national bank charter to engage with the OCC well in advance of filing an application to ensure they understand the requirements. In addition, interested parties

---

[35] An applicant may be required, as a condition of approval, to enter into an "operating agreement" with the OCC containing the substantive charter conditions. The special purpose charters section of the "Charters" booklet of the *Comptroller's Licensing Manual* has additional information on operating agreements and other documents used for some special purpose national trust banks.

[36] The OCC is funded through assessments and fees charged to the institutions it supervises. See 12 USC 16. Consistent with this authorization, the OCC has modified the assessments it charges an independent trust bank or a credit card bank to account for the scope and activities of the entity and the amount and type of assets that the entity holds. The OCC would determine assessments for a fintech special purpose national bank to account for similar factors.

are advised to consult the *Comptroller's Handbook* for additional information on how the OCC supervises and examines national banks.[37] The Office of Innovation also can be an important resource to fintech companies interested in exploring the possibility of a special purpose national bank charter. Contact information for the Licensing Department and the Office of Innovation may be found on the OCC's website.

## Request for comment

As the OCC considers the granting of special purpose national bank charters to fintech companies, it seeks feedback on all aspects of this paper. The OCC also solicits responses to the following questions. Respondents should provide written comments by January 15, 2017 (45 days from this paper's publication). Submissions should be sent to specialpurposecharter@occ.treas.gov.

1.  What are the public policy benefits of approving fintech companies to operate under a national bank charter? What are the risks?

2.  What elements should the OCC consider in establishing the capital and liquidity requirements for an uninsured special purpose national bank that limits the type of assets it holds?

3.  What information should a special purpose national bank provide to the OCC to demonstrate its commitment to financial inclusion to individuals, businesses and communities? For instance, what new or alternative means (e.g., products, services) might a special purpose national bank establish in furtherance of its support for financial inclusion? How could an uninsured special purpose bank that uses innovative methods to develop or deliver financial products or services in a virtual or physical community demonstrate its commitment to financial inclusion?

4.  Should the OCC seek a financial inclusion commitment from an uninsured special purpose national bank that would not engage in lending, and if so, how could such a bank demonstrate a commitment to financial inclusion?

5.  How could a special purpose national bank that is not engaged in providing banking services to the public support financial inclusion?

6.  Should the OCC use its chartering authority as an opportunity to address the gaps in protections afforded individuals versus small business borrowers, and if so, how?

7.  What are potential challenges in executing or adapting a fintech business model to meet regulatory expectations, and what specific conditions governing the activities of special purpose national banks should the OCC consider?

---

[37] *The Comptroller's Handbook* is a collection of booklets that contain the concepts and procedures established by the OCC for the examination of banks. It is available at www.occ.gov.

8. What actions should the OCC take to ensure special purpose national banks operate in a safe and sound manner and in the public interest?

9. Would a fintech special purpose national bank have any competitive advantages over full-service banks the OCC should address? Are there risks to full-service banks from fintech companies that do not have bank charters?

10. Are there particular products or services offered by fintech companies, such as digital currencies, that may require different approaches to supervision to mitigate risk for both the institution and the broader financial system?

11. How can the OCC enhance its coordination and communication with other regulators that have jurisdiction over a proposed special purpose national bank, its parent company, or its activities?

12. Certain risks may be increased in a special purpose national bank because of its concentration in a limited number of business activities. How can the OCC ensure that a special purpose national bank sufficiently mitigates these risks?

13. What additional information, materials, and technical assistance from the OCC would a prospective fintech applicant find useful in the application process?