# EXHIBIT D



January 13, 2017

Office of the Comptroller of the Currency (OCC)
Legislative and Regulatory Activities Division
400 7th Street SW, Suite 3E-218
Mail Stop 9W-11 Washington, DC 20219

Re: Exploring Special Purpose National Bank Charters for Fintech Companies

Dear Comptroller Curry,

The Conference of State Bank Supervisors appreciates the opportunity to comment on the white paper, titled *Exploring Special Purpose National Bank Charters for Fintech Companies*, announcing the Office of the Comptroller of the Currency's (hereinafter "OCC" or "Comptroller") intention to "move forward with chartering financial technology companies that offer bank products and services."

CSBS is the nationwide organization of state banking and financial services regulators from all 50 U.S. states, the District of Columbia, Guam, Puerto Rico, and the U.S. Virgin Islands. For more than a century, CSBS has given state bank and financial services regulators a national forum to coordinate bank and nondepository supervision and to develop regulatory policy. As the chartering, licensing and supervisory authorities for over 75% of the banks in the United States and over 20,000 nondepository financial services providers, State regulators are charged with protecting consumers, ensuring safety and soundness, and encouraging economic prosperity in their states.

As stated in our November 2016 comment letter to the OCC[1], state bank regulators oppose the creation of a special purpose national bank charter for financial technology (fintech) and other nondepository companies because:

1. The OCC lacks statutory authority to issue such a charter;
2. Such a charter will distort the marketplace for financial services, with a federal agency arbitrarily picking winners and losers;
3. The issuance of such a charter creates tremendous uncertainty and risks pertaining to access to critical government resources, including the payments system and the federal safety net; and
4. The preemptive effect of this charter nullifies the states' ability to protect consumers.

This comment letter will provide an overview of the reasons underlying our opposition to the OCC creating a special purpose national bank charter for fintech and other nondepository companies (hereinafter "special purpose national nonbank charter" or "special purpose national nonbank"). Additionally, we have attached a Legal and Policy Assessment that provides a more in-depth discussion of the unlawful and invalid nature of a special purpose national nonbank charter, the many unsettling policy implications resulting from the Comptroller acting outside the confines of its statutory chartering authority, the many legal uncertainties and policy issues stemming from the unlawful nature of a special

---

[1] CSBS's previous comment letter on the OCC's proposed rule establishing a framework to govern receiverships for uninsured national banks is available at: CSBS Comment Letter on Proposed Rule on Receiverships for Uninsured National Banks.

purpose nonbank charter, and the dangerous consequences stemming from the preemption of state laws through such a charter.

# I.   The OCC's proposed special purpose "fintech" charter is inconsistent with the letter and intent of the National Bank Act.

The OCC claims, citing its chartering regulations, that it has the authority to charter a special purpose bank to conduct any activity within the business of banking so long as it engages in receiving deposits, lending money, or paying checks. Consequently, the OCC claims to have the statutory authority to charter a special purpose national nonbank—that is, a special purpose bank that does not engage in deposit-taking and only engages in lending money or paying checks. However, as CSBS has set out in previous comments to the OCC and reiterates with this letter, the OCC lacks any statutory authority to charter a special purpose national nonbank.

## A.   *Special purpose national nonbanks cannot lawfully be formed under any type of special purpose bank charter.*

Courts have held and Congress has made clear that the Comptroller is prohibited from chartering a national bank that does not engage in deposit-taking, unless the charter is for a special purpose bank expressly authorized in statute.[2] The special purpose banks expressly authorized by Congress are trust banks, bankers' banks, and credit card banks. Since Congress has not expressly authorized the Comptroller to issue a special purpose nonbank charter, any attempt to grant a special purpose national bank charter to such an institution would be unlawful and invalid.

## B.   *Special purpose national nonbanks cannot lawfully be formed under a full-service bank charter.*

According to the white paper, the Comptroller proposes that these newly chartered entities would have "the same charter as a full-service national bank." However, since a special purpose national nonbank would not be engaged in deposit-taking, the Comptroller is prohibited from granting it a full-service national bank charter.[3] Full-service national banks are chartered to engage in the "business of banking". Engaging in the "business of banking" under the National Bank Act, as a matter of law[4] and as a matter of common sense, requires engaging in deposit-taking. Thus, any attempt to grant a full-service national bank charter to a special purpose national nonbank would be unlawful and invalid.

## C.   *Special purpose national nonbank charters would be unlawful and invalid.*

Therefore, since (1) the granting of a special purpose nonbank charter has not been expressly authorized by Congress, and since (2) a special purpose nonbank would not engage in deposit-taking, the

---

[2] For a more in-depth analysis of the applicable precedent and applicable federal statutes, see Part I.B.2. of the Assessment.

[3] While the Comptroller may claim that a special purpose nonbank would receive a full-service charter and voluntarily refrain from receiving deposits, such a legal machination does not escape the rule that a charter recipient must exercise the power to receive deposits for the Comptroller to have the authority to grant a full-service national bank charter. Additionally, such a chartering structure places an improper reliance on the OCC's enforcement authority to bolster its chartering authority, as discussed in Part I.B.2. of the Assessment, and will have numerous unsettling policy implications, as discussed in Part II of the Assessment.

[4] *See Independent Bankers Ass'n of America v. Conover*, 1985 U.S. Dist. LEXIS 22529, at *34 -*36 (M.D. Fla. Feb. 15, 1985) (*IBAA v. Conover*).

Comptroller lacks the authority to charter a special purpose nonbank. Accordingly, regardless of what the Comptroller's regulations provide, any attempt by the Comptroller to charter a special purpose nonbank would be unlawful and invalid.[5] State regulators urge the Comptroller to avoid taking the unlawful action contemplated in the white paper, for the creation of a national nonbank charter would be an unauthorized and unprecedented expansion of the Comptroller's chartering authority, distorting the purpose for which the national banking system was established.

## II.     The OCC's proposed "fintech" charter destabilizes banking's legal and regulatory structure.

### A.  *Most federal banking laws will not apply to the OCC's proposed special purpose nonbanks.*

The special purpose national nonbank that the OCC proposes to charter would not be subject to the clear majority of federal banking laws. For instance, these special purpose nonbanks would be exempt from many of the statutes and regulations that apply to insured depository institutions, including prompt corrective action requirements, source of strength requirements, restrictions on management interlocks, generally applicable prudential safeguards, community reinvestment act requirements, and uniform accounting standards. This notable absence of generally applicable federal banking laws covering special purpose nonbanks clearly evidences that Congress has not contemplated the creation of a special purpose national nonbank charter.

The OCC has intentionally structured the special purpose nonbank charter to evade the application of certain federal banking laws. For instance, a special purpose nonbank is specifically designed to avoid being classified as a "bank" for purposes of the Bank Holding Company Act. Evading this Act means that special purpose nonbanks would not be subject to consolidated supervision by the Federal Reserve and the parent companies of special purpose nonbanks would not be subject to the anti-tying rules, restrictions on proprietary trading, and restrictions on affiliations with commercial companies.

Even under the National Bank Act—the enabling statute that purportedly authorizes the grant of nonbank charters—the treatment of special purpose nonbanks is uncertain. For instance, the scope of the incidental powers granted to a special purpose nonbank cannot be clearly delineated, given that the currently authorized incidental powers were permitted on the basis that they would be exercised by institutions that exercise all the express powers granted under the National Bank Act. There is similar uncertainty surrounding how branching requirements will apply.

Furthermore, whether a special purpose nonbank would be required to be a Federal Reserve member and the consequences of membership for a special purpose nonbank are also unclear. Moreover, it is uncertain whether a special purpose nonbank would be eligible for access to Federal Reserve services, including gaining access to the payments systems and the discount window. As discussed more fully in Part II.B. of the Assessment, state regulators believe it would be unwise to provide unfettered access to Federal Reserve services, particularly the payments systems, to special purpose national nonbanks because they refrain from engaging in the business of receiving deposits.

---

[5] The chartering of a special purpose nonbank would not be the first time that the OCC has attempted to charter a special purpose institution which it lacks the authority to charter. For a discussion of the history of the OCC's special purpose chartering authority and Congressional reactions to the OCC's unlawful chartering attempts, see Part I.B.1. of the Assessment.

### B. The OCC proposes an ad-hoc, confidential regulatory framework that will create an unlevel playing field.

Even more unsettling is the regulatory and supervisory framework proposed by the OCC to compensate for the legal chasm in which special purpose nonbanks will operate. In the white paper, the OCC states that it will incorporate otherwise inapplicable rules or impose equivalent requirements by entering into operating agreements with charter recipients which are enforceable under the OCC's enforcement authority. In the absence of generally applicable federal banking laws to govern the operations of special purpose nonbanks, the OCC will have absolute discretion as to whether and to what extent otherwise inapplicable rules will be made applicable through operating agreements.

The white paper makes clear that the operating agreements will be completely individualized to the business model of the charter recipient. This lack of transparency and certainty leaves the general public and potential applicants completely in the dark as to the rules and requirements in key areas such as the Community Reinvestment Act, capital, liquidity, and other "baseline supervisory expectations." Furthermore, charter recipients and the industry generally will have no assurance that rules will be applied and enforced in a uniform, impartial manner, and, because the operating agreements will not be made publicly available, no means of verifying any assurances given.

As fully discussed in Part II.A of the Assessment, the inevitable result of the OCC's proposed supervisory framework will be an unlevel playing field to the disadvantage of traditional, full-service banks. Equally important, due to the ad-hoc, opaque nature of the operating agreements, the OCC will have the unchecked power to favor certain applicants over others, thereby picking winners and losers. Most startups do not have profitable business plans, and only a limited number of established financial technology firms have annual profits. These are not the companies who will enjoy the benefits of the proposed charter. Additionally, the lack of transparency and absence of objective requirements in the proposed supervisory framework for special purpose nonbanks will have a deleterious effect on the ability of new financial innovation to emerge going forward. In short, the special purpose nonbank charter proposed by the OCC will benefit large incumbent firms with established business model and create a barrier to entry for the vast majority of emerging fintech firms.

### C. Special purpose nonbanks may be exempt from the OCC's enforcement authority under federal securities laws.

The treatment of special purpose nonbanks under federal securities laws, although not discussed in the white paper, is an issue of major importance. As discussed in more detail in Part III.D. of the Assessment, while special purpose nonbanks will enjoy exemptions under several federal securities laws, there are serious questions as to whether the enforcement authority delegated to the Comptroller under such laws is sufficient to enable the Comptroller to apply and enforce these laws to institutions that refrain from engaging in the business of receiving deposits.

### D. Special purpose national nonbanks will not be subject to federal consumer financial laws to the same extent as full-service banks.

Lastly, the applicability of federal consumer financial law to special purpose nonbanks chartered by the Comptroller while relatively less uncertain is telling in that it demonstrates how the Comptroller will generally apply and enforce otherwise inapplicable laws through the proposed operating agreements. The white paper discusses how only a handful of federal consumer financial laws will apply to special purpose nonbanks, namely, those that apply to nondepository covered persons. However, as discussed more fully in Part III.E. of the Assessment, the Comptroller fails to acknowledge and apparently refuses to utilize the broader authority granted to the OCC under the Dodd-Frank Act to apply and enforce the totality of

federal consumer financial law under its general enforcement authority. State regulators believe that the OCC's failure to use its enforcement authority to its fullest extent in the consumer protection context does not bode well for the uniform application and robust enforcement of otherwise inapplicable federal banking, securities, and consumer protection laws.

## III.   The OCC's proposed "fintech" charter eliminates states' consumer protection authority.

State regulators have witnessed OCC preemption determinations hurt consumers through the preemption of anti-predatory lending laws, adjustable rate mortgage restrictions, and state oversight of national bank operating subsidiaries. This consistent effort by the OCC to preempt state consumer protection laws created the legal foundation for the mortgage crisis and prevented states from having the opportunity to respond to lending practices that hurt consumers. Congress recognized this in the Dodd-Frank Act, repealing the OCC's preemption of state supervision of national bank operating subsidiaries, requiring the CFPB to determine whether OCC preemption determinations are tenable, and lowering the agency deference available to the OCC on preemption challenges. Unilateral chartering decisions by the OCC defies the requirements imposed on the OCC by Congress.

In addition to supervising approximately 4,790 state-chartered banks, most state banking departments also regulate a variety of nondepository financial services providers, including money transmitters, mortgage lenders, and consumer lenders. Based on the OCC's description of the "fintech" charter, any of these 20,000 plus companies would qualify for a national bank charter because they pay checks or lend money. Time and again, Congress has made the conscious decision to reserve the licensure and supervision of institutions engaged in these nondepository activities to the states, choosing to pass activity-based laws like the Electronic Funds Transaction Act, not federal chartering laws.

States require nondepositories to meet safety and soundness requirements and conform to both state and federal consumer protection laws through a state licensing process. Multi-state nondepository companies are examined on a collaborative basis with multi-state teams, reducing regulatory burden and improving allocation of resources among states. As proposed, and without any discussion, a special purpose national bank charter will preempt this regulatory framework for any charter recipient.

## IV.   Conclusion

State bank regulators appreciate the opportunity to comment on the OCC's white paper announcing their intention to charter a special purpose nonbank through an unprecedented expansion of their chartering authority. As discussed above and in the attached Legal and Policy assessment, state regulators have several significant concerns with how the OCC's existing statutory chartering authority could provide any valid basis for the OCC to charter a special purpose nonbank engaged exclusively in nondepository core banking functions. Additionally, state bank supervisors believe significant risks and costs are likely to result from an expansive, unprecedented use of the OCC's chartering authority. Contrary to the OCC's assertions, a level-playing field between the proposed charter type and the financial services industry is not feasible given the lack of both transparency and impartiality inherent in the proposed chartering framework.

As fellow chartering and regulatory authorities, the members of CSBS take great pride in our long history of promoting the strength and vitality of the dual-banking system. As state regulators continue to work with each other and our federal regulatory counterparts to foster a regulatory and supervisory environment that promotes innovative practices in the delivery of financial services, we encourage the Comptroller to

respect the balance of federal and state authority in the regulation of financial services and to avoid undermining the effectiveness and impairing the vitality of the dual-banking system.


Sincerely,

John W. Ryan
President & CEO


Attachment: CSBS Legal and Policy Assessment



# CSBS Legal and Policy Assessment

CSBS has attached this legal and policy assessment to our comment letter to discuss, in greater detail, our perspective as to how the Comptroller's unauthorized expansion of its chartering authority will create a multitude of hazards for consumers, the financial services industry, and the broader regulatory community.

In Part I, CSBS discusses the unprecedented and unauthorized nature of the special purpose charter proposed in the white paper in the context of the history and limits of the Comptroller's chartering authority. Part II discusses the unsettling policy implications that State regulators believe are prompted by the Comptroller's proposed expansion of its chartering authority, including the inevitability of an unlevel playing field in favor of the proposed special purpose charter. In Part III, CSBS discusses the tremendous legal uncertainty surrounding the treatment of the proposed type of special purpose charter under federal banking law, federal securities law, and federal consumer protection law. Lastly, in Part IV, State bank regulators share our perspective on the dangers of preempting state laws, including state consumer protection law.

## I.     Statutory Limits of the OCC's Chartering Authority

In the OCC's white paper, the Comptroller has asserted the authority to charter a new type of special purpose institution, which would not carry on the business of banking and which has not been specifically authorized by Congress. This Part will demonstrate that the Comptroller has no statutory authority under the NBA or other federal banking laws to approve any new type of special purpose charter, and the Comptroller has no authority to issue any regulation that would expand the limits of the chartering authority established by Congress. In the sections that follow, we set out that (1) the Comptroller lacks the requisite statutory authority to charter institutions whose activities are limited to lending money and/or paying checks or functionally similar activities (hereinafter "special purpose nonbank charters" or "special purpose nonbanks"), and (2) due to this insufficient statutory authority, the Comptroller has no power to bootstrap his chartering authority through an unauthorized, unprecedented, and arbitrary reliance on the agency's enforcement authority.

### A.   *National banks must be chartered either to carry on the business of banking, or to engage exclusively in a special purpose activity expressly authorized by Congress.*

1. <u>Full-service national banks may be formed only to engage in the business of banking which includes, at minimum, engaging in deposit-taking.</u>

Since the enactment of the National Bank Act (NBA) in 1863, the Comptroller has been authorized to charter "associations for carrying on the business of banking" (hereinafter "full-service national banks"). In the NBA, the phrase "business of banking" not only refers to the enumerated and incidental powers of national banks, but also serves to limit what constitutes a valid exercise of the Comptroller's chartering authority.[1] While the business of national banks has evolved and fluctuated over time, it remains as true

---

[1] *See* 12 U.S.C. §§ 21, 26-27.

today as it did in 1863 that an institution cannot carry on the "business of banking" under the NBA unless it is endowed with and actually exercises the power to receive deposits.

Unlike the many other enumerated powers of national banks, the receiving of deposits has always been recognized as the minimum essential element of, and the necessary condition to carry on, the "business of banking" under the NBA. A private company could conceivably carry on every other activity within the business of banking without obtaining a bank charter. However, when such a company supplements any of those activities by engaging in the business of receiving deposits, the entire character of the institution's business is transformed, for its business thereby becomes intimately connected with the public interest and, accordingly, it is required to obtain a bank charter.[2]

Most importantly, as a necessary condition for "carrying on the business of banking", granting the power to receive deposits to a national bank is a necessary condition for the valid exercise of the Comptroller's chartering authority, in the absence of a specific grant of congressional authority for chartering a special purpose national bank.

2. Special purpose national banks may be formed only to engage in special purpose activities expressly authorized by Congress.

When, as today, the Comptroller has attempted to charter institutions that intend to refrain from receiving deposits, it has been held that specific statutory authorization is required to charter such institutions. Courts have declared that the Comptroller is not empowered by the NBA to charter nondepository institutions that do not carry on the business of banking, unless specifically authorized by Congress. As detailed in this Part, Congress, through narrowly-drawn amendments to the NBA and the Bank Holding Company Act (BHC Act), has specifically authorized the Comptroller to charter certain special purpose institutions that could not otherwise be chartered by the Comptroller because they do not carry on the "business of banking", including trust banks, bankers' banks, and credit card banks.

3. A new type of special purpose charter not expressly authorized by Congress may not be created through the grant of a full-service charter.

In the white paper, the OCC asserts the authority to grant charters to any activity within the business of banking as long as they conduct at least one of the following three core banking functions: receiving deposits, paying checks, or lending money. According to the OCC, it has statutory authority to charter special purpose nonbanks, that is, institutions which refrain from accepting deposits and exclusively engage in the nondepository core banking functions of paying checks or lending money (or functionally similar activities). Presumably, the OCC bases this asserted authority on the false premise that the authority to charter full-service national banks to carry on the business of banking implies the authority to charter special purpose national banks, including special purpose nonbanks. Put differently, the Comptroller incorrectly asserts that an implicit grant of special purpose chartering authority can be derived from its traditional, full-service chartering authority.

**B.  OCC's special purpose chartering authority is limited in scope and distinct from its full-service chartering authority.**

The OCC's framing of its chartering authority fundamentally misconstrues the relationship between its full-service chartering authority and its special purpose chartering authority. This rationale neglects the very essence of the agency's full-service chartering authority and the historical development of its special purpose chartering authority. Since the OCC has repeatedly neglected to outline the nature and limits of

---

[2] *See* 12 U.S.C. 378.

its special purpose chartering authority, an overview of the history of the Comptroller's special purpose chartering authority follows.

The historical overview below demonstrates that (1) the OCC's special purpose chartering authority is a separate and distinct grant of explicit chartering authority and cannot be implied from the OCC's full-service chartering authority, and (2) the Comptroller lacks the special purpose chartering authority to charter special purpose nonbanks except for trust banks, bankers' banks, and credit card banks. After outlining the historical development of the OCC's authority to charter special purpose national banks, we will discuss how the Comptroller lacks the authority to use its full-service chartering authority to create a new type of special purpose charter for institutions which do not accept deposits, unless specifically authorized by Congress.

1. <u>The historical development of the OCC's special purpose chartering authority demonstrates its distinct legislative origin and limited nature.</u>

For over a century, the Comptroller's chartering authority was limited to the authority to charter full-service national banks organized for the purpose of "carrying on the business of banking", including the acceptance of deposits. At various points since the mid-1970s, the OCC has attempted to charter institutions that would not carry on the business of banking. Instead, such institutions were chartered to engage in activities that either were not within the business of banking as originally defined in the National Bank Act of 1864 (such as the fiduciary activities of national trust banks) or activities that did not include receiving of deposits from the general public (such as the activities of bankers' banks and credit card banks). The Comptroller's attempts to charter such institutions gave rise to several legal controversies regarding the minimum essential characteristics of the "business of banking" under the NBA. Those earlier controversies have reemerged today as the Comptroller unlawfully asserts in the white paper the authority to charter special purpose nonbanks.

Two federal courts struck down the OCC's attempts to charter institutions that were not engaged in the business of banking, holding that the OCC's chartering of special purpose institutions exceeded the limits of its chartering authority.[3] As a consequence of these legal defeats, the OCC persuaded Congress to authorize or ratify the chartering of special purpose national banks through targeted, narrowly drawn amendments to the NBA or BHC Act.[4] These carefully-targeted legislative grants of authority empowered the Comptroller to charter narrowly defined categories of special purpose national banks that do not carry on the business of banking. Congress' carefully limited grants of chartering authority for special purpose national banks make clear that the OCC's authority to charter special purpose institutions is completely separate and distinct from the Comptroller's traditional authority to charter full-service national banks that accept deposits and engage in "the business of banking."

---

[3] *See Independent Bankers Ass'n of America v. Conover*, 1985 U.S. Dist. LEXIS 22529, at \*34 -\*36 (M.D. Fla. Feb. 15, 1985) (*IBAA v. Conover*) (special purpose "nonbank banks" were held unlawful). See also *National State Bank of Elizabeth v. Smith*, No. 76-1479 (D.N.J. September 16, 1977) (special purpose trust banks were held unlawful prior to Congress' specific grant of statutory authorization for such institutions), rev'd on other grounds, 591 F.2d 223 (3d Cir. 1979)

[4] *See* Financial Institutions Regulatory and Interest Rate Control Act of 1978 (FIRIRCA), Pub. L. No. 95-630, § 1504, 92 Stat. 3641 (1978) (codified at 12 U.S.C. § 27(a) (national trust banks); Garn-St. Germain Depository Institutions Act of 1982, Pub. L. No. 97-320, § 404, 96 Stat. 1511 (1982) (codified at 12 U.S.C. § 27(b)(1)) (bankers' banks); Competitive Equality in Banking Act of 1987 (CEBA), Pub. L. No. 100-86, § 101, 101 Stat. 552, 554 (1987), codified at 12 U.S.C. § 1841(c) (credit card banks).

       a.   *National trust banks and credit card banks were originally unlawfully chartered and subsequently ratified by Congress.*

The creation of the OCC's special purpose chartering authority for national trust banks is illustrative of this pattern. In 1977, the Comptroller issued to City Trust Services a certificate of authority (i.e. charter) to carry on the business of banking as a national bank despite the fact that City Trust's articles of association declared that its activities would be limited to the fiduciary services provided by a trust company.[5] When the proposed charter was challenged, a federal district court held that the charter was invalid because the Comptroller lacked authority to charter an institution that would engage only in fiduciary activities and would not engage in the business of banking, including the acceptance of deposits.[6]

Following this defeat, the Comptroller requested an amendment to the NBA that would specifically authorize the Comptroller to charter national trust banks.[7] Congress adopted the requested amendment in 1978 and thereby gave specific authority for the creation of national trust banks, the first type of special purpose chartering authority conferred upon the OCC.[8] Similar events, in which the OCC exceeded its statutory chartering authority and persuaded Congress to ratify new types of special purpose charters, took place with respect to credit card banks. In each case, Congress gave the OCC a carefully-limited authority to charter a narrowly-defined category of limited-purpose financial institutions, as shown by 12 U.S.C. 27(a), 27(b), 1841(c)(2)(D), and 1841(c)(2)(F).

Today, the Comptroller is once again attempting to usurp the legislative prerogatives of Congress by asserting an unfounded authority to charter a new, broadly-defined class of special purpose national nonbanks for fintech and other nondepository institutions. The OCC has taken this unlawful action in spite of the fact that Congress has not only not authorized, but actually intended to prohibit the chartering of special purpose national nonbanks, whether for fintech companies or any other nondepository.[9]

       b.   *Nonbank banks were unlawfully chartered and subsequently prohibited by Congress.*

In the 1980s, the Comptroller was rebuffed by a federal court and by Congress when the Comptroller made a similar attempt to issue national bank charters to special purpose institutions that only engaged in lending and did not accept deposits. A federal district court struck down the Comptroller's attempt as unlawful in *Independent Bankers Ass'n of America v. Conover*.[10] In that case, the court held that the Comptroller lacked the authority to charter such special purpose "nonbank banks" because those special purpose institutions (1) did not accept deposits and thus would not carry on the business of banking and (2) were not otherwise specifically authorized by the NBA or federal banking law.

In 1987, with the passage of CEBA, Congress effectively ratified the court's decision by redefining the term "bank" in the BHC Act to include any institution that either (1) accepts deposits subject to withdrawal on demand or by check and also makes commercial loans, or (2) accepts deposits that are insured by the Federal Deposit Insurance Corporation. The term "bank," as so defined, does not include a special purpose institution that makes loans but does not accept deposits.

---

[5] *See National State Bank of Elizabeth v. Smith*, supra note 3.
[6] *See id.*
[7] *See IBAA v. Conover*, at *34, supra note 3.
[8] *See* 12 U.S.C. 27(a), enacted as part of FIRIRCA, supra note 4.
[9] *See IBAA v. Conover*, supra note 3. See also CEBA, supra note 4.
[10] *See IBAA v. Conover*, supra note 3.

As indicated above, the first basis for the court's decision in *Independent Bankers Ass'n of America v. Conover* was that the Comptroller may not validly approve a full-service national bank charter unless the power to receive deposits is conferred and exercised by the chartered institution, because the acceptance of deposits is required in order to carry on "the business of banking" under the National Bank Act. That holding finds clear, indisputable support in applicable judicial precedents and federal banking statutes.[11] The second basis for the court's decision—that the Comptroller could not approve limited purpose charters for "nonbank banks"—relied on the canon of statutory interpretation known as *expressio unius est exlusio alterius* (the expression of one or more items of a class implies that those not identified are to be excluded). Applying that canon, the court reasoned that, since Congress included specific grants of authority in the NBA and the BHC Act that enable the Comptroller to issue special-purpose charters for trust companies and banker's banks, Congress must have intended to prohibit the OCC from chartering other types of special-purpose national banks that were not expressly authorized.[12]

After *IBAA v. Conover*, Congress did not confer the requisite special purpose chartering authority for "nonbank banks" that the OCC had unsuccessfully asserted.[13] On the contrary, as noted above, Congress precluded the Comptroller from chartering special purpose "nonbank banks" by enacting the Competitive Equality in Banking Act of 1987 (CEBA), which closed the "nonbank bank" loophole and made clear that

---

[11] *See IBAA v. Conover*, at *25-*26, supra note 3 (citing *Mercantile National Bank v. Mayor*, 121 U.S. 139 (1887); U.S. v. *Philadelphia National Bank*, 374 U.S. 321 (1963)). *See e.g.*, *Opinion of the Attorney General* (March 31, 1915) ("The power to receive deposits, expressly granted to every national bank is, of course, indispensable to the conduct of the business of banking: and the extent of its exercise is in a degree the measure of the success of the bank."); *Warren v. Shook*, 91 U.S. 704 (1875) ("Having a place of business where deposits are received *and* paid out on checks, *and* where money is loaned upon security, is the substance of the business of a banker."); *People v. Utica Insurance Co.*, 15 Johns. 538 (1819) ("The principal attributes of a bank are the right to issue negotiable notes, discount notes *and* receive deposits.").
The court also held that the BHC Act and the NBA should be read together *in pari materia* because they constitute a "joint regulatory scheme". Specifically, the court found that the definition of "bank" in the BHC Act should be construed as a limit on the Comptroller's full-service chartering authority which would prohibit the Comptroller from using this authority to charter an institution which refrained from either receiving deposits or making loans. *See IBAA v. Conover*, at *32, supra note 3; 12 U.S.C. 1841(c)(1) (defining "bank" for purposes of the BHC Act). *See also*, 12 U.S.C. § 22 (requiring organization certificate to specify "place where its operation of discount and deposit are to be carried on."); 12 U.S.C. 378 (prohibiting all persons other than chartered depository institutions from accepting deposits).
[12] For similar decisions striking down unauthorized actions of the Comptroller under the same canon of statutory constructions, see *First National Bank in St. Louis v. Missouri*, 263 U.S. 640 (1923) (holding, prior to the enactment of the McFadden Act in 1927, that the Comptroller could not give to national banks a general power of establishing branches in view of the narrowly-defined grants of branching authority made by Congress); *Independent Ins. Agents of America v. Hawke*, 211 F.3d 638 (D.C. Cir. 2000) (holding that the Comptroller could not give national banks a broad power to act as insurance agents in view of the narrowly-defined grants of insurance agency authority made by Congress).
[13] Earlier iterations of CEBA in the 1980s would have authorized the Comptroller to charter "consumer banks," but the pertinent language was omitted prior to enactment by Congress. More recently, legislation has been proposed which would provide the OCC with the authority to charter special purpose nondepository institutions, but such legislation has never been enacted by Congress. See FFSCC Charter Act of 2011, H.R. 1909, 112th Cong. (2011); Consumer Credit Access, Innovation, and Modernization Act, H.R. 6139, 112th Cong. (2012). Nevertheless, the fact that proposed legislation was introduced in order to authorize the OCC to charter a special purpose nonbank underscores the need for Congressional authorization with respect to the special purpose nonbank charter currently under consideration.
*See* also, Peter J. Wallison, *Reform Bills Don't Go Far Enough*, American Enterprise Institute, Oct. 22, 1999 (stating that, absent further legislative reform, "*IBAA v. Conover* would prevent the Comptroller from chartering federal banks as nonbank banks").

financial institutions that do not accept deposits are not "banks."[14] In fact, despite the many major financial services reforms promulgated by Congress in the years and decades that followed, including many amendments to the NBA and the BHC Act, Congress has never given the OCC a general authority to charter special purpose nonbanks.

### c. *Despite being unlawful and prohibited, the OCC rehabilitated the nonbank bank charter through an invalid regulation.*

In the absence of Congressional authorization, the Comptroller decided instead, in 2003, to amend its chartering regulations to enable the chartering of a nondepository institution that ". . . limits its activities . . . to any other activities within the business of banking."[15] When CSBS and other organizations objected to this unauthorized expansion of the Comptroller's chartering authority, the Comptroller added in the final rule the following requirement: "A special purpose bank that conducts activities other than fiduciary activities must conduct at least one of the following three core banking functions: Receiving deposits; paying checks; or lending money."[16] This unprecedented and unauthorized regulatory expansion of the OCC's special purpose chartering authority continued to lie dormant until the OCC issued its white paper announcing the OCC's intention to create a new special purpose national bank charter for a wide range of nondepository institutions, including fintech firms.

### d. *The historical development of the OCC's special purpose chartering authority demonstrates that the OCC's chartering regulations are invalid.*

Several conclusions can be drawn from the historical development of the Comptroller's chartering authority. First, carrying on the "business of banking" under the NBA—and thereby qualifying for a full-service national bank charter—requires, at a minimum, being empowered to and actually exercising the power to receive deposits. Second, the OCC's authority to charter special purpose national banks is separate and distinct from its authority to charter full-service national banks to carry on the business of banking. The OCC's authority to charter special purpose national banks has been carefully limited by Congress through a series of specific, narrowly drawn legislative authorizations for trust banks, bankers' banks and credit card banks. Finally, Congress has never conferred upon the OCC any type of broad power to grant special purpose nonbank charters for institutions that only lend money or pay checks without accepting deposits.

Based on these conclusions, it is clear that the regulation on which the OCC now relies, 12 C.F.R. 5.20(e)(1)(i), to charter a special purpose nonbank exceeds the statutory bases of the OCC's chartering authority. The chartering regulation does not implement a statute enabling the chartering of special purpose nonbanks—because no such statute exists. Thus, the regulation has no basis in the OCC's special purpose chartering authority. Furthermore, the chartering regulation is not a rational implementation of the OCC's statutory authority to charter full-service banks, because it enables the OCC to charter an

---

[14] *See* CEBA, supra note 4 (amending 12 U.S.C. 1841(c)). There is considerable evidence in the several hearings held on the issue of nonbank banks, that advocates of closing the nonbank bank loophole considered the CEBA amendments to make permanent the ruling of the court in *IBAA v. Conover*. See, e.g., Sen. Rept. No. 99-15 (statements of the Federal Reserve Board, Conference of State Bank Supervisors, Independent Bankers Association of America, National Conference of State Legislatures, U.S. League of Savings Institutions, Association of Bank Holding Companies, the National Small Business Association, and the National Federation of Independent Businesses).

[15] *See* Rules, Policies, and Procedures for Corporate Activities; Bank Activities and Operations; Real Estate Lending and Appraisals, 68 Fed. Reg. 6363, 6371 (Feb. 7, 2003) (proposed rule).

[16] *See* Rules, Policies, and Procedures for Corporate Activities; Bank Activities and Operations; Real Estate Lending and Appraisals, 68 Fed. Reg. 70122, 70126 (Dec. 17, 2003) (final rule).

institution to refrain from engaging in deposit-taking—a function which is indispensable to the business of banking. Thus, Section 5.20(e)(1)(i) is in excess of statutory authority and, accordingly, invalid.

2.   <u>The OCC intends to use its enforcement authority in an unauthorized manner to create an unlawful and invalid special purpose nonbank charter.</u>

National banks are authorized and created by the Congress pursuant to the NBA. While authority has been delegated to the Comptroller to grant corporate charters to national banks, Congress retains absolute authority over the National Bank Act and the specific statutory conditions under which the business of national banks may be carried on. The OCC has no authority to issue regulations or orders that expand the powers or immunities of national banks beyond the limits established by Congress.[17] In view of the white paper's assertion of a broad power to grant special purpose charters to national nonbanks, the Comptroller is clearly attempting to usurp authority that has not been granted to him by Congress. The Comptroller has no prerogative to create a special purpose chartering system that lacks any basis in the National Bank Act and other federal statutes and is contrary to the long history of the national banking system.

As mentioned above, the OCC's white paper claims that the authority to charter full-service national banks includes an implicit authority to charter special purpose nonbanks that voluntarily agree to refrain from engaging in deposit-taking or other aspects of the "business of banking." Specifically, the OCC asserts that a special purpose national bank operates under the same charter as a full-service national bank but "voluntarily" agrees to limit its activities by entering into an operating agreement with the OCC. The OCC contends that such an operating agreement is enforceable based on the OCC's general enforcement authority under the Federal Deposit Insurance Act (FDIA).[18]

In addition to the deeply alarming policy implications created by this unlawful method of chartering special purpose nonbanks, discussed more fully in Part II, the OCC's reliance on its enforcement authority to expand the statutory limits of its chartering authority ignores judicial precedent that forbids this method of chartering and contradicts the clear intent of Congress in enacting the enforcement authority upon which the OCC now relies.

a.   <u>*Requiring a full-service national bank to refrain from engaging in deposit-taking has been held to be unlawful and invalid.*</u>

In *IBAA v. Conover*, after the court concluded that engaging in deposit-taking was essential to the chartering of national banks under the National Bank Act (except for the specially authorized categories of trust banks and bankers' banks), the Comptroller argued, as it does today, that ". . . even if associations must have the power to accept demand deposits and make commercial loans, the charters [issued] to nonbank banks qualify fully. They are full charters, and [the Comptroller] has placed no conditions on them. If the nonbank banks have relinquished any of their powers, they have done so through voluntary agreement . . . ".[19] The court specifically rejected this argument and held that the OCC cannot condition the approval of a charter to carry on the business of banking by arranging for the applicant to agree to refrain from exercising a power essential to carrying on the business of banking (namely, deposit-taking). According to the court, it was immaterial that the proposed limits on permissible bank activities were

---

[17] *See*, e.g., *Cuomo v. Clearing House Ass'n*, 557 U.S. 519 (2009); *First National Bank of Logan v. Walker Bank & Trust Co.*, 385 U.S. 252 (1966); *First National Bank in St. Louis v. Missouri*, 263 U.S. 640 (1923); *Independent Ins. Agents of America v. Hawke*, 211 F.3d 638 (D.C. Cir. 2000).
[18] *See* 12 USC § 1818(b)(1),(5).
[19] *See IBAA v. Conover*, at *38, supra note 3.

contained in operating agreements rather than the approved charters, because, as the court stated, "the substantive effect is the same as if the charters contained terms limiting them."[20]

The court's reasoning is consistent with a fundamental principle of corporate law, which holds that a corporation's authority to amend its charter does not allow the corporation to add provisions that would not be permissible in its original charter.[21] Thus, amendments to corporate charters are generally void if they could not have lawfully been made part of the original charters. Such a principle is intended to prevent usurpations of power by chartering authorities or chartered institutions. For a chartering authority to condition the approval of a charter on the recipient agreeing not to fulfill the purpose for which the charter was granted is an unlawful and blatant attempt to circumvent the statutory limits on the power of the chartering authority itself.

In attempting to enlarge its special purpose chartering authority through an unauthorized reliance on its alleged authority to enforce operating agreements, the Comptroller would allow applicants to organize national banks for a purpose that the Comptroller cannot itself sanction (namely, to engage exclusively in a nondepository business outside the categories that Congress has expressly authorized). The Supreme Court has recently and strongly warned the OCC that it cannot expand its supervisory authority by asserting enforcement powers that have not been granted by Congress and impair the historic public safety and consumer protection functions of the states.[22]

> b. *Requiring a full-service national bank to enter into an operating agreement to refrain from engaging in deposit-taking would constitute an unauthorized use of the OCC's enforcement authority.*

Since, as outlined above, the OCC lacks any statutory authority to charter special purpose nonbanks, the OCC places considerable reliance on Section 8 of the FDI Act to create a new, unauthorized type of special purpose charter. Specifically, the OCC claims that it will grant a full-service national bank charter to a prospective special purpose nonbank and then, in the chartering process, condition the approval of the charter on the applicant entering into an "operating agreement" with the OCC in which the applicant commits to "voluntarily" limit its activities to certain nondepository core banking functions, such as lending money and/or paying checks. This agreement, according to the OCC, is enforceable as a "condition imposed in writing" under Section 8(b)(1) and is authorized with respect to uninsured national banks under Section 8(b)(5).[23]

This framing of the OCC's special purpose chartering authority is premised upon an interpretation of the OCC's enforcement authority which defies the legislative intent underlying the relevant provisions of Section 8 of the FDI Act. The reference to "uninsured associations" in Section 8(b)(5) of the FDI Act was added in 1982 with the passage of the Garn-St. Germain Depository Institutions Act, based on Congress's concerns regarding the Comptroller's lack of explicit enforcement authority with respect to the newly sanctioned but carefully limited categories of special purpose national banks—namely, trust banks and bankers' banks. Based on the clear legislative intent underlying Section 8(b)(5), the FDI Act's principal enforcement provision was extended to cover special purpose national banks to fill an existing gap in the OCC's enforcement authority relative to its newly created special purpose chartering authority, and not to

---

[20] *See* id.
[21] *See Henry v. Markesan State Bank*, 68 F.2d 554 (C.C.A. 8th Cir. 1934). See generally *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. 420 (1837).
[22] *See Cuomo v. Clearing House Ass'n, supra.*
[23] *See* 12 USC § 1818(b)(1),(5).

authorize the OCC to create new types of special purpose charters not specifically authorized by Congress.

# II.    Policy Issues with the Proposed Supervisory Framework.

As described in Part I, because the Comptroller lacks any statutory authority to charter special purpose nonbanks, the Comptroller intends to use its enforcement authority in an unauthorized manner to expand its special purpose chartering authority beyond the carefully defined limits established by Congress. In addition to the unlawful and invalid nature of a special purpose national nonbank charter, many significant policy considerations counsel strongly against the OCC attempting to create new types of special purpose charters which Congress has not specifically authorized. As discussed in this Part, the OCC's proposed system of regulating special purpose nonbanks through individualized operating agreements not only highlights the benefits of the activities-based focus of State law but also creates great concerns about the near impossibility of maintaining and assuring a level playing field, assuring the protection of consumers, and upholding a safe and sound financial system.

## A. *The OCC's proposed approach of regulation by operating agreement creates an opaque legal and regulatory framework inconsistent with federal banking law.*

### 1.    Significant federal banking laws would not apply to the proposed special purpose nonbank.

As stated above, the business of national banks has been considered so intimately connected with the public interest that Congress prescribes, through statute, the conditions under which it may be carried on. However, because the OCC now intends to exceed the confines of its statutory authority by chartering a broad range of special purpose nonbanks, there is an almost complete absence of generally applicable rules prescribing the conditions under which the business of such special purpose nonbanks may be conducted. For instance, special purpose nonbanks would be exempt from many of the rules that apply to insured depository institutions, including prompt corrective action requirements, source of strength requirements, restrictions on management interlocks, generally applicable prudential safeguards, community reinvestment act requirements and uniform accounting standards.

Furthermore, if such special purpose nonbanks are not members of the Federal Reserve System (FRS) they will be exempt from major prudential policies, including restrictions on affiliate transactions, restrictions on insider loans, and generally applicable safety and soundness standards. The fact that such institutions would not be covered by most federal banking laws should not be surprising as Congress did not confer upon the Comptroller the requisite authority to charter special purpose nonbanks and thus did not contemplate their existence in enacting federal banking laws.

### 2.    The OCC's proposed approach of incorporating otherwise inapplicable rules by agreement on an ad-hoc, confidential basis creates an unlevel playing field.

To fill these major gaps, the OCC gives its assurance that it can "impose requirements . . . that are similar to certain statutory requirements applicable to insured banks" by incorporating such requirements into the operating agreement entered into with the special purpose nonbank. However, the OCC gives no assurance that such requirements will be uniform across special purpose nonbanks or comparable to the requirements applicable to full-service national banks. Indeed, the white paper states that the OCC will only incorporate otherwise "inapplicable" rules into an operating agreement for a special purpose national nonbank "if it deems the conditions appropriate based on the risks and business model of the institution". While state regulators agree that tailoring regulatory and supervisory requirements to the size, risk, and complexity of regulated institutions is an important priority, we also believe that the extent of the tailoring

planned by the OCC is so extreme and confidential as to raise serious concerns regarding equal treatment, fair competition, and administrative impartiality.

### 3. The lack of transparency regarding specific regulatory requirements nullifies any promise of a level playing field.

The OCC's white paper provides no meaningful standards or guidelines for determining the circumstances under which the OCC will, or will not, require special purpose national nonbanks to comply with the rules that apply to full-service national banks and competing state banks.

Even if the OCC were to commit to imposing similar requirements on similarly-situated applicants, such a commitment would be a poor substitute for generally applicable rules enacted by Congress and implemented through proper notice-and-comment rulemaking procedures. A special purpose nonbank applicant would have no assurance that the otherwise inapplicable rules incorporated through its operating agreement are incorporated to the same extent as in the operating agreements of other special purpose nonbanks. Such assurance is unobtainable because the OCC will not publicly disclose these operating agreements—despite arguably being required to do so under Section 8 of the FDI Act.[24] Moreover, this lack of transparency means that state regulators and consumers will have no means of verifying that special purpose nonbanks are lawfully entitled to exercise powers purportedly granted in these operating agreements.

Although the OCC may attempt to provide, by means of informal guidance, the requirements or standards that will apply to proposed special purpose nonbanks, any such bank would have no assurance that the OCC will not deviate from such ad hoc requirements or standards. Any such assurance would be illusory because the OCC would be acting outside the authority granted to it by Congress and could not be held accountable for deviations from its informal guidance to the same extent as it could for failing to comply with governing federal statutes.

For decades, the OCC has been criticized for a lack of transparency in its chartering process; to now graft onto that opaque process an informal, ad hoc standard-setting function in which the OCC negotiates every rule governing the operation of the proposed special purpose national nonbank precludes any possibility of maintaining a level playing field.[25] Special purpose national nonbanks, and the banking industry in general, will be required to merely trust, without any means for verification, that the OCC is actually maintaining a level playing field between special purpose nonbanks themselves as well as between special purpose nonbanks and full-service national banks.

### B. Activities-based state licensing encourages and enables financial innovation.

The lack of generally applicable law and the lack of uniformity and transparency in the OCC's regulatory and supervisory expectations underscore the benefits of maintaining the viability of the transaction-oriented focus embodied in State laws governing providers of financial services. In the regulation of financial services, three broad regulatory models are recognized: transactional regulation, institutional regulation, and individuated regulation.[26]

Transactional regulation generally regulates any persons that engage in a particular type of transaction (subject to *de minimis* exemptions) without regard to their status as a particular type of financial intermediary. State licensing of nonbank financial services providers is a type of transactional regulation.

---

[24] *See* 12 U.S.C. § 1818(u).
[25] *See* generally Scott, *In Quest of Reason: The Licensing Decisions of the Federal Banking Agencies*, 42 U. Chi. L. Rev. 235 (1975).
[26] *See* Governor Daniel K. Tarullo, *Pedagogy and Scholarship in a Post-Crisis World* (Oct. 21, 2016).

Banks—whether state or national and whether commercial or thrift—are generally subject to institutional regulation which imposes a uniform set of rules on institutions with substantially similar business models. Finally, individuated regulation is regulation that applies not because of the business model of the regulated institution, but rather because of the particular, unique characteristics of that institution. Institutions subject to individuated regulation include institutions designated systemically important and, as has been made apparent in the white paper, prospective special purpose nonbanks.

Transactional, activities-based regulation, such as state licensing, is generally more transparent, and more impartial and equitable than individuated regulation. The impartial nature of transactional regulation involved in state licensing of financial services is, in part, what has enabled the emergence of the tremendous financial innovations we are witnessing today. The degree of flexibility accorded state-licensed financial service providers with respect to their business models is precisely what has enabled such institutions to more effectively meet and adapt to the evolving needs of consumers of financial services. Additionally, the transactional focus of state licensing has maintained a level playing field in the financial services industry and thereby has ensured that emerging and innovative financial services providers are not excluded from the market by high barriers to entry erected by large, entrenched industry incumbents.

By contrast, the individuated regulation the Comptroller intends to impose on special purpose national nonbanks will be significantly less transparent and less impartial than the transactional, activities-based approach extant at the state level. The OCC's approach provides no assurance or method of verifying that such charters will be or are granted in an equitable, impartial manner. It is highly probable, as a former OCC senior official recently noted, that only the largest nonbank financial services providers will succeed in obtaining special purpose national nonbank charters,[27] fundamentally distorting the competitive environment for companies seeking to develop and offer innovative financial services. In the end, despite the OCC's assurance that the charter will technically be voluntary, it will be effectively mandatory and the Comptroller will have established his office as the ultimate and final arbiter of financial innovation as well as the self-appointed umpire, effectively picking winners and losers in the fintech industry.

# III.   Legal Uncertainty and Special Purpose Nonbank Charters.

Given that Congress has not granted to the OCC any authority to issue special purpose national nonbank charters, there is significant uncertainty surrounding the applicability of many federal laws to an institution operating under such a charter, including federal banking law, federal securities law, and federal consumer financial law. The white paper addresses a few of the applicable legal issues in a perfunctory manner, such as the discussion of membership in the FRS, access to Federal Reserve services, and the jurisdiction of the Consumer Financial Protection Bureau (CFPB). In this Part, we will provide the State regulators' perspective on these issues and many other legal uncertainties that the OCC has failed to address.

---

[27] *See* Zach Fox, *OCC's fintech charter unlikely to kill bank partnerships*, SNL Financial, (Dec. 2, 2016) (quoting former Deputy Comptroller of the Currency, Jo Ann Barefoot: "I do not expect a stampede of small fintechs into national bank charters . . . I don't think they would try and — even if they do — I don't think they would succeed.").

### A. *The uncertain scope of the incidental powers conferred through a special purpose national nonbank charter raises significant safety and soundness concerns.*

The general powers of full-service national banks are expressly delineated in various sections of Title 12 of the U.S. Code, primarily in 12 U.S.C. 24. Section 24(Seventh) expressly authorizes national banks:

> "[t]o exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of title 62 of the Revised Statutes."

In Section 24(Seventh), the "business of banking" is represented by the series of express powers mentioned. However, the first clause, the so-called incidental powers clause, grants banks the power to conduct activities incidental to the business of banking. The "incidental powers" concept has often been used by the Comptroller to justify new powers that might not intuitively be thought of as banking powers. In attempting to craft some sort of limiting principle as to what constitutes an incidental power, courts have generally held that an incidental power must either be "directly related to one or another of a national bank's express powers" or "convenient and useful in connection with the performance of one of [a] bank's established activities".[28] This requirement that a "functional equivalence" be identified between express statutory powers and claimed incidental powers, presents novel issues with respect to special purpose national nonbanks.

As discussed above, the Comptroller claims that a special purpose national nonbank receives the same charter as a full-service national bank, but, as a condition for approving the charter, agrees to refrain from exercising certain enumerated powers in Section 24(Seventh). The question thus arises as to whether a special purpose nonbank that is not authorized to exercise an express power within the business of banking would be authorized to exercise any incidental power that is directly related to the prohibited express power. For instance, if the OCC charters a special purpose national nonbank that agrees to refrain from exercising the express power to receive deposits, there would be no legal basis for such an institution to exercise any incidental power that is related to the express deposit-taking power that has been abdicated.

The legal uncertainty as to the scope of incidental powers that a special purpose national nonbank may exercise presents a serious safety and soundness concern that the OCC has not, to date, addressed. Many of the incidental powers authorized by the Comptroller and sanctioned by the courts since the passage of the NBA were granted on the premise that they would be exercised by a full-service national bank endowed with all the express powers and limitations contemplated by the NBA. State regulators believe that allowing special purpose national nonbanks to exercise incidental powers deemed functionally equivalent to express powers not conferred upon the institution would be irresponsible. State regulators request that the OCC clarify how it intends to ensure that special purpose national nonbanks will refrain from exercising incidental powers that have been permitted only for full-service national banks that operate with entirely different business models.

---

[28] *Compare* Arnold Tours, Inc. v. Camp, 472 F.2d 427 (1st Cir. 1972) *with* M & M Leasing Corp. v. Seattle First Nat'l Bank, 563 F.2d 1377 (9th Cir. 1977).

### B. The uncertain status of special purpose nonbanks in the Federal Reserve System raises significant public policy concerns.

Pursuant to the Federal Reserve Act, a special purpose national nonbank chartered by the OCC would generally be required to become a member of the FRS.[29] The membership of special purpose national nonbanks in the FRS would raise several legal and policy concerns, including whether membership is or should be required and whether such institutions would be subject to regulation by the FRS and would have access to services offered by the FRS, including the discount window and the payments system. These concerns are addressed in the sections that follow.

1. The OCC's proposal lacks clarity on the membership of special purpose nonbanks in the Federal Reserve System.

After stating that national banks are generally required to be members of the FRS, the OCC notes an exception to the membership requirement for national banks located in territories and insular possessions of the United States. While it is unclear whether this reference should be taken as an indication that the OCC intends to charter special purpose nonbanks in territories and insular possessions in order to avoid the membership requirement, such an arrangement would certainly present a number of complications. For instance, despite not being members in the FRS, national banks located in dependencies and insular possessions are generally subject to a reserve requirement under 12 U.S.C. § 143 requiring that such banks have on hand, at all times, an amount equal to 15 percent of the aggregate amount of its deposits.[30]

State regulators believe that the OCC should clarify whether it intends to charter special purpose nonbanks in territories and insular possessions of the United States to avoid the requirement that national banks be members of the FRS. Furthermore, State regulators request that the OCC clarify how a national nonmember bank located in a dependency or insular possession would comply with such a requirement, particularly, for an institution which refrains from engaging in a deposit-taking function.

2. The OCC's proposal lacks clarity on the access of special purpose nonbanks to the federal safety net and critical public resources.

In addition to the membership status of potential special purpose national nonbanks, the issue of whether such institutions qualify as "depository institutions" under the Federal Reserve Act will have very significant consequences due to the bearing that such a designation would have on their access to Federal Reserve services, including access to the Federal Reserve payments systems and access to the discount window. In general, special purpose national banks are prohibited from accessing or significantly limited in their access to such services. Congress intended for access to Federal Reserve services to be a privilege enjoyed by those engaged in the business of receiving deposits, not by nondepository institutions whose activities bear some resemblance to a deposit-taking function but who are ultimately dependent upon the deposit-taking services of institutions *truly* engaged in the business of banking.

The subsections that follow discuss whether a special purpose nonbank of the type contemplated in the white paper would have access to Federal Reserve services and the policy issues pertaining to allowing such institutions to gain access.

a. The uncertain degree of access afforded special purpose national nonbanks to the FRS payments system raises significant public policy concerns.

Although not susceptible to precise definition, the term "payments system" generally refers to the clearing and settlement services that are provided by the FRS through the regional Federal Reserve Banks, and by

---

[29] *See* 12 U.S.C. 222.
[30] *See* 12 U.S.C. § 143.

other clearing and settling organizations that interact with the FRS and carry on their activities under the guidance of the operating rules and procedures established by the Board of Governors of the FRS. Many significant functions are performed by the payments system, including the traditional clearing and settlement of paper checks through the FRS and regional clearinghouses, and the electronic clearance and settlement of the transfer of funds (principally large dollar transfers) through automated clearinghouses or electronic funds transfer services such as the FRS's FedWire.

Generally, direct access to the payments systems has been limited to "depository institutions", including member banks and nonmember banks. Since they do not accept deposits, nonbanks are generally not permitted to have direct access to the FRS payments services, but must instead use these services indirectly as customers of depository institutions. The term "depository institution" is defined in Section 19 of the Federal Reserve Act to mean, in relevant part, ". . . any insured bank as defined in section 3 of the Federal Deposit Insurance Act or any bank which is eligible to make application to become an insured bank under section 5 of such Act; . . .".[31] To be eligible to apply to become an insured bank, a bank must be "engaged in the business of receiving deposits". Given that the OCC seems to indicate in the white paper that it intends to charter a special purpose nonbank that does not accept deposits, such a special purpose nonbank would not be engaged in the business of receiving deposits and therefore would not be eligible to apply to become an insured bank. This ineligibility would entail that the special purpose nonbank would not be a "depository institution" and thus would not be permitted direct access to the FRS payments systems.

The legal barrier preventing special purpose national nonbanks from directly accessing the FRS payments systems due to their nondepository nature accords with legitimate regulatory concerns. Chief among such concerns is the principle that access to the payments systems should be limited to financial institutions that conduct their activities in such a manner as to ensure the proper functioning and safety and soundness of that system. Essential to the willingness of economic actors to accept payment in mediums other than cash is the confidence that, when requested, cash will be received in a timely manner. Were this confidence to be shaken by a disruption to the normal functioning of the payments system—for instance, if a payments systems participant were to default on their obligations or fall victim to a security breach which spread throughout the system—a severe disruption in the normal flow of commerce and finance could ensue.

The likelihood of such disruption is greatly amplified by permitting institutions to directly access the payments systems when they are not subject to the same heightened prudential and safety and soundness regulatory and supervisory framework to which depository institutions are subject. In light of the legal barriers to allowing nonbanks direct access to the FRS payments system and the strong policy rationales for limiting access, State regulators are opposed to allowing special purpose national nonbanks to directly access the FRS payments systems.

> b. *The proposed special purpose national nonbank's potential access to the discount*
> *window raises significant public policy concerns.*

As with access to the FRS payment systems, the issue as to whether a special purpose national nonbank would have access to the Federal Reserve discount window is a matter of significant consequence. The concern here is whether a special purpose national nonbank will enjoy the same discounting and borrowing privileges enjoyed by full-service banks under the normal lending authority of the Federal

---

[31] *See* 12 U.S.C. § 461(b)(1)(A)(i).

Reserve Banks. The issue, again, is whether these special purpose nonbanks will be members of the FRS, and, if not, whether they will be "depository institutions".

If a special purpose nonbank is either a member of the FRS or a nonmember "depository institution", then it will enjoy the same discounting and borrowing privileges traditionally enjoyed by full-service national member banks. However, as discussed above, the special purpose national nonbanks discussed in the white paper will most likely not be "depository institutions" under the Federal Reserve Act provided that the OCC requires such institutions to refrain from exercising a deposit-taking function. A special purpose nonbank which is not a member of the FRS and is not a depository institution will still be eligible to borrow from Federal Reserve Banks, but as a nonmember nonbank will be subject to the relatively more demanding collateral requirements applicable to nonbank entities.[32] State regulators believe that, for special purpose national nonbanks that refrain from deposit-taking, providing such institutions with the same borrowing and discounting privileges conferred upon member and nonmember depository institutions would be unwarranted and inequitable.

## C. The OCC's proposed special purpose nonbank charter is structured to evade the coverage of the Bank Holding Company Act.

The OCC has intentionally structured the special purpose nonbank charter to avoid being classified as a "bank" for purposes of the Bank Holding Company Act. Evading this Act means that special purpose nonbanks would not be subject to consolidated supervision by the Federal Reserve and the parent companies of special purpose nonbanks would not be subject to the anti-tying rules, restrictions on proprietary trading, and restrictions on affiliations with commercial companies. Accordingly, the OCC intends, without discussion, to simply violate the fundamental policy goals of Congress in enacting the BHC Act, namely to maintain a separation between banking and commerce.

### 1. The OCC's proposal runs afoul of the principle of separation of banking and commerce.

In originally establishing a wall between banking and commerce, Congress explicitly relied on the business of banking concept[33], precisely because economic neutrality ought to be required in the exercise of banking powers. If the OCC charters an institution which engages exclusively in nondepository core banking functions, the fact that the institution is characterized as, in itself, conducting the business of banking should warrant the separation of its credit granting and credit exchange functions from general commercial enterprises. However, because the novel charter type would be exempt from coverage under the BHCA, there would be no federal mechanism to ensure that its activities remain divorced from ownership or control by commercial enterprises.

Accordingly, if an institution that engages exclusively in nondepository core banking functions thereby engages in the business of banking under the NBA, then, state regulators believe, the fundamental principle mandating the separation of banking and commerce is in jeopardy. Thus, state regulators urge the Comptroller to avoid relying upon an expansive interpretation of its chartering authority to create novel, unprecedented charter types that dilute the very meaning of the business of banking and thereby undermine the wall established by Congress between banking and commerce.

### 2. The OCC's proposal creates the opportunity for regulatory capital arbitrage.

Since a special purpose nonbank would qualify as a depository institution under the generally applicable risk-based capital rules, bank holding companies would likely be able to arbitrage the capital

---

[32] *Compare* 12 U.S.C. § 347c (corporation, partnerships, and individuals) *with* 12 U.S.C. § 347 (member banks).
[33] *See* 12 U.S.C. § 1843(c)(8).

requirements by maintaining a special purpose nonbank as an unconsolidated subsidiary. If special purpose nonbanks are not consolidated with their parent holding company for reporting purposes, and the parent company only maintains a minority interest in the subsidiary, the parent holding company will only be required to maintain capital for its equity investment in the subsidiary despite being financially responsible for the totality of the subsidiary's liabilities. Alternatively, if the special purpose nonbank is consolidated with its parent holding company for reporting purposes, then it will be permitted to count the equity investments in its nonbank subsidiary (likely funded by debt issued and guaranteed by the parent) towards its own capital requirements, and thereby mask the double leverage inherent in the parent-subsidiary structure.

The largest bank and financial holding companies would experience the largest benefit from maintaining a special purpose nonbank as a subsidiary, since they generally employ the advanced approaches methodology for calculating risk-based capital. Specifically, since a special purpose nonbank would be a "regulated financial institution" for the purposes of the risk-based capital rule, an advanced approaches holding company would generally not be subject to the increased asset value correlation factor for wholesale exposures to unregulated financial institutions and large regulated financial institutions, and, accordingly, not be held to the same stringent capital requirements applicable absent the existence of a special purpose nonbank. Put simply, the creation of the special purpose nonbank charter will be a means for bank holding companies to reduce the quality and quantity of capital they are required to hold under the risk-based and leverage capital rules. The benefits of this arbitrage enabled through the structuring of transactions with special purpose nonbank charters will accrue to the greatest extent to the largest institutions. A similar type of arbitrage under the liquidity rules applicable to advanced approach institutions will also likely be made possible through the creation of special purpose nonbanks.

State bank regulators believe that maintaining a high quantity and quality of capital is the cornerstone of bank regulation and supervision—a belief edified through the experiences of the recent financial crisis. For this reason, we urge the OCC to refrain from creating new types of institutions which will enable the largest institutions to engage in regulatory arbitrage in a manner that would lead to a lower quality and quantity of capital.

### D. The OCC's proposal lacks clarity on the applicability of federal securities laws to special purpose nonbanks.

1. The proposed special purpose nonbanks will be exempt from the enforcement authority of the Securities and Exchange Commission.

Although the OCC discusses how it intends to collaborate with various federal banking regulators in the regulation and supervision of the proposed special purpose nonbanks, the OCC does not discuss how such an institution would be governed under the federal securities regulatory framework. To a varying degree, banks enjoy exemptions from federal securities laws and the authority to enforce federal securities laws is generally the responsibility of the institution's federal banking regulator rather than the Securities Exchange Commission. As discussed in this section, the fact that Congress did not contemplate the OCC chartering a special purpose nonbank creates uncertainty not only as to whether such institutions will be exempt from various requirements under federal securities laws but also as to which agency is responsible for the enforcement of federal securities laws.

A special purpose nonbank would likely qualify for the exemption for banks under the Securities Act of 1933, Securities Exchange Act of 1934, the Investment Company Act of 1940, and the Investment Advisers Act of 1940. The exemptions for banks in federal securities laws is generally predicated upon such institutions being subject to substantially similar registration, disclosure and antifraud rules by their

primary federal banking regulator and the requisite enforcement authority being delegated to these agencies to ensure compliance with these requirements.

  2.  <u>The OCC lacks the authority to enforce federal securities laws against special purpose nonbanks.</u>

Section 12(i) of the Securities Exchange Act delegates to the OCC "the powers, functions, and duties" vested in the SEC to administer and enforce various enumerated sections of the Act, including rulemaking powers, a delisting power, a trading suspension power, a power to issue orders, an investigatory power, and a litigating power.[34] However, based on the plain meaning of Section 12(i), this enforcement authority is not delegated to the OCC with respect to special purpose nonbanks. Specifically, Section 12(i) only delegates the powers, functions and duties of the SEC "[i]n respect of any securities issued by banks . . . the deposits of which are insured in accordance with the Federal Deposit Insurance Act."[35]

Accordingly, with respect to special purpose national nonbanks which refrain from receiving deposits, the Comptroller will lack the requisite authority to enforce the requirements of the Securities Exchange Act. Nevertheless, since they will qualify as "banks" under the federal securities laws, special purpose national nonbanks will be exempt from the requirements of that Act and the enforcement authority of the SEC. Thus, in addition to enjoying an exemption from the requirements of federal securities law and the jurisdiction of the SEC, special purpose national nonbanks that refrain from receiving deposits will also not be subject to the requirements of federal securities law imposed by or the enforcement authority delegated to the OCC.

State regulators believe that an exemption of this magnitude would be unprecedented and should counsel against the OCC using its chartering authority in such a manner as to create types of special purpose institutions clearly not contemplated by Congress. State regulators request that the OCC clarify how and on what legal basis the OCC will ensure compliance with the requirements of the Securities Exchange Act.

## E.  *The OCC's proposal lacks clarity on the applicability of federal consumer financial laws to special purpose nonbanks.*

  1.  <u>The proposed special purpose nonbanks would not be subject to federal consumer protection laws to the same extent as full-service banks.</u>

In outlining the extent to which the Consumer Financial Protection Bureau (CFPB) will oversee special purpose national nonbanks, the OCC discusses how federal consumer financial law will apply to such institutions. Specifically, the OCC notes that the "CFPB would supervise an uninsured special purpose national bank *engaged in certain activities* for compliance with federal consumer financial law" (emphasis added). The OCC qualifies the extent to which federal consumer financial law will apply to special purpose nonbanks because such institutions will not be subject to the entirety of federal consumer financial law, as would an insured depository institution, but rather only to the limited set of rules which apply to nondepository covered persons and only if they qualify as larger participants.[36]

---

[34] *See* 15 U.S.C. § 78l(i).
[35] *See* id.
[36] *See* 12 U.S.C. § 5514.

2. <u>The OCC is shirking its authority to apply federal consumer financial laws to special purpose nonbanks to the same extent as full-service banks.</u>

To avoid creating an unlevel playing field in favor of special purpose nonbanks, State regulators believe it is imperative that special purpose national nonbanks be required to comply with federal consumer financial law to the same extent as full-service national banks. In transferring authority to the CFPB, the Dodd-Frank Act expressly enabled the OCC to use its enforcement authority under Section 8 of the FDIA to subject special purpose national nonbanks to the requirements of federal consumer financial law to the same extent as full-service national banks.[37]

The fact that the OCC refrains from using its enforcement authority in this respect to ensure a level playing field between banks and nonbanks fails to instill any confidence that the Comptroller will be even-handed in the use of its enforcement authority in the operating agreements entered into in chartering special purpose nonbanks. Likewise, the OCC's abdication of its authority under 12 U.S.C. 5581 does not bode well for other federal and state laws the applicability of which is left to the discretion of the Comptroller, including state laws on anti-discrimination, fair lending, and debt collection.

State regulators believe that, for the Comptroller's commitment to "high supervisory standards" to be anything more than a hollow platitude, the OCC must use its enforcement authority under the Consumer Financial Protection Act to subject special purpose nonbanks to the requirements of federal consumer financial law to the same extent as full-service national banks. Any measure short of full incorporation of federal consumer financial law (verifiable through the public availability of the operating agreements between the OCC and special purpose nonbanks) ought to cast doubt as to the commitment of the Comptroller to maintaining a level playing field while also ensuring compliance with any purportedly applicable federal and state laws.

# IV.   Preemption of State Law

In the wake of the financial crisis, there is a plethora of evidence that broad preemption is simply not good public policy. Understanding local markets and business practices requires a strong presence in the community. While financial technologies are deployed on a national and international basis, consumer interaction still occurs at a local level that requires local oversight. The Constitution established a federalist system to balance local and national priorities, and the emergence of financial technology does not change the fact that a balanced State-federal regulatory structure is vital to the strength of our financial system.[38]

---

[37] *See* 12 U.S.C. § 5581(c)(2)(C).

[38] For more information on the traditional role of the States in licensing nondepository financial services providers and its constitutional underpinnings, see CSBS's previous comment letter on the OCC's proposed rule establishing a framework to govern receiverships for uninsured national banks, available at: <u>CSBS Comment Letter on Proposed Rule on Receiverships for Uninsured National Banks</u>.

### A. The proposed special purpose nonbank will entitle fintech and other nondepository companies to federal preemption to the detriment of consumers.

Experience has shown the States not to trust the OCC when it seeks to expand its power.[39] Policymakers needn't look further than the mortgage crisis for an illustration of the disastrous results of the OCC's preemption of locally identified needs and priorities.[40]

In 1982, the OCC nullified state restrictions on adjustable rate mortgages, eliminating the ability of states to respond to lending practices that hurt consumers.[41] This laid the groundwork for predatory lending practices, culminating in state action to protect consumers where federal regulators refused to act. In 1999, North Carolina became the first State to enact a comprehensive anti-predatory law. Other states followed suit as the devastating results of predatory mortgage lending became apparent through increased foreclosures and disinvestment.

Unfortunately, rather than supporting these anti-predatory lending laws, federal regulators preempted them. In 1996, the OCC's predecessor for federal thrifts – the Office of Thrift Supervision ("OTS") – preempted all state lending laws. The OCC followed suit in 2003 with a determination that the Georgia Fair Lending Act did not apply to national banks.[42] A 2004 rule followed, exempting all national banks from state lending laws, including anti-predatory lending laws like those of Georgia and North Carolina. At a hearing on the OCC's preemption rule, Comptroller Hawke acknowledged, in response to questioning from Senator Sarbanes, that one reason Hawke issued the preemption rule was to attract additional charters, which helps to bolster the budget of the OCC.[43]

These actions removed an extra layer of regulatory protection. State officials have a unique expertise in local banking practices and local markets, which makes them uniquely situated to recognize and act upon consumer financial protection issues. Licensure is one of the key tools available to state regulators under the police powers preserved to the States by the Constitution. However, in 2006, the OCC supported an interpretation of the National Bank Act that led to the preemption of state licensing laws for operating subsidiaries of national banks.[44]

As a result of 25 years of policy that swept state responses under the rug, the mortgage crisis emerged. National bank subsidiaries offered abusive products while state regulators were powerless to enforce laws state legislators enacted to stop harm. While the OCC and supporters of the national bank system have

---

[39] Past Comptrollers have gone as far as saying that national bank preemption "may operate in some cases to the disadvantage of consumers," and that losing market share [charters] "is a matter of concern to us." Jess Bravin & Paul Beckett, Friendly Watchdog: Federal Regulator Often Helps Banks Fighting Consumers, WALL ST. J., Jan. 28, 2002, at A1 (summarizing and quoting from an interview with Comptroller Hawke).

[40] See Di Maggio, Marco and Kermani, Amir and Korgaonkar, Sanket, *Partial Deregulation and Competition: Effects on Risky Mortgage Origination*, Columbia Business School Research Paper No. 15-47 (November 17, 2016) (finding "national banks' supply of loans with prepayment penalties and longer prepayment terms increased significantly" after state anti-predatory lending laws were preempted). Available at SSRN: https://ssrn.com/abstract=2591434 or http://dx.doi.org/10.2139/ssrn.2591434.

[41] See Conference of State Bank Supervisors v. Conover, 710 F.2d 878 (D.C. Cir. 1983).

[42] See Preemption Determination and Order, 68 Fed. Reg. 46264 (August 5, 2003) (preempting "the provisions of the [Georgia Fair Lending Act] affecting national banks' real estate lending" in response to a request from National City).

[43] See Senate Banking Committee Hearing, *Review of the National Bank Preemption Rules* (June 7, 2004).

[44] See Watters v. Wachovia Bank, N.A., 127 S.Ct. 1559 (2007).

suggested the cause was unregulated nonbank mortgage companies,[45] there can be no logical support for this argument when reviewing the evidence, which even includes abuses of financial technology.

Wachovia Mortgage Loan Trust, Series 2006-AMN1 is a mortgage backed security issued in 2006.[46] The loans backing the security were originated by American Mortgage Network ("AmNet"), "an indirect wholly owned subsidiary of Wachovia Bank and Wachovia Corporation."[47] AmNet originated Alt-A mortgages through branches and "over the Internet."[48] These Alt-A loans were originated with "reduced documentation programs," including a "'No Income/No Assets/No Employment' program, where there is no verification of income, assets or employment."[49] To CSBS's knowledge, the OCC never examined this company as an operating subsidiary of Wachovia Bank, N.A.

The lending "programs" used by AmNet would have been illegal under many state laws, and examination of nonbank subsidiaries would have revealed the predatory loans. However, the OCC's preemption determinations prevented the states from examining AmNet and stopping lending practices known to local governments as predatory and counter to sound financial dealings.

### B. The OCC's proposed special purpose nonbank charter will preempt the States' activities-based nondepository licensing and regulatory regimes.

Distressingly, the OCC white paper makes no reference to the state regulatory system and disingenuously suggests that entities potentially eligible for the special purpose nonbank charter are currently subject to no regulation. Equally disingenuous is the OCC's claim in the white paper that certain state laws will generally apply to national banks including laws on anti-discrimination, fair lending, and debt collection. Because the OCC is not, as a public servant, charged with the enforcement of these state laws, it is questionable whether they will "apply" as the OCC claims. In the end, these state laws will apply only at the discretion of the Comptroller which is a prerogative the OCC has tended to employ to defeat, rather than enforce, the application of state law.

In addition to supervising approximately 4,790 state-chartered banks,[50] most state banking departments also regulate a variety of nondepository financial services providers, including money transmitters, mortgage lenders, and consumer lenders. According to the OCC white paper, any of these 20,000 plus companies would qualify for a national bank charter because they send money or lend.[51] Like state banks, nondepositories licensed by state regulators are required to meet safety and soundness requirements and conform to both state and federal consumer protection laws. This is accomplished by licensing and subsequently examining nondepository companies on a regular basis. Examination of multi-state entities

---

[45] *See* Jesse Stiller, *Banking Modern America: Studies in Regulatory History* (2016).

[46] *See* Prospectus Supplement, Wachovia Mortgage Loan Trust, Series 2006-AMN1 (May 23, 2006). *Available at* https://www.sec.gov/Archives/edgar/data/1326845/000128269506000309/e65745_424b5.htm.

[47] *See* id. at S-30.

[48] *See* id. AmNet was later rolled into Wachovia Securities. *See* http://www.prnewswire.com/news-releases/american-mortgage-network-and-wachovia-third-party-lending-rebranded-to-create-vertice-51630642.html.

[49] *See* id. at 31.

[50] *See* FDIC Statistics on Depository Institutions as of Year End 2015. Available at https://www.fdic.gov/bank/statistical/.

[51] As of year end 2015, there were 20,440 state licensed entities on the Nationwide Multi-State Licensing System. *See 2015 Annual Report*, State Regulatory Registry. *Available at* http://mortgage.nationwidelicensingsystem.org/about/Documents/SRR_2015AR_Web.pdf.

is performed on a collaborative basis with multi-state teams, reducing regulatory burden and improving allocation of resources among states.[52]

As proposed, and without any discussion, a special purpose national bank charter will preempt this regulatory framework for any charter recipient. The only likely charter recipients will be those financial technology firms and nondepository companies with sufficient legal resources to navigate and comply with the OCC's opaque, unarticulated chartering requirements and supervisory standards. In the end, the proposed chartering and supervisory framework will benefit large, entrenched incumbents and create a larger barrier to entry for the vast majority of financial technology firms.

---

[52] *See* Multi-state Mortgage Committee Report to State Regulators (2015) *available at* https://www.csbs.org/news/presentations/annualreports/Documents/MMC%202015%20Annual%20Report_FINAL_0505.pdf; Multi-state MSB Examination Taskforce Report to State Regulators (2015) *available at* https://www.csbs.org/news/presentations/annualreports/Documents/2015%20MMET%20Annual%20Report.pdf.