# EXHIBIT E


Office of the
Comptroller of the Currency

**COMPTROLLER'S LICENSING MANUAL**
**DRAFT SUPPLEMENT**

# Evaluating Charter Applications From Financial Technology Companies

March 2017

# Contents

**Contents** ............................................................................................................ **i**

**Introduction** ...................................................................................................... **1**

  Purpose............................................................................................................ 1

  Scope................................................................................................................ 2

**Initial Steps Toward an SPNB Charter** ........................................................... **3**

  Applicable Licensing Procedures; Initial Contact With the OCC .................... 3

  Prefiling Communications With the OCC ......................................................... 3

  Activities of the Proposed SPNB...................................................................... 4

  Filing Procedures—Publication and Public Comment; Confidentiality............. 5

**Chartering Standards** ....................................................................................... **6**

  Standards and Policy Considerations............................................................... 6

  Evaluating an Application ................................................................................ 7

  Coordination With Other Regulators; Continuation of Remedies..................... 8

  Requirements for Organizing Group, Management, and Directors.................... 8

**Business Plan** .................................................................................................... **9**

  Overview.......................................................................................................... 9

  Supplemental Guidance on Business Plan ....................................................... 9

**Chartering Decision** ........................................................................................ **13**

  Preliminary Conditional Approval.................................................................. 13

  Final Approval ............................................................................................... 16

**Appendices**....................................................................................................... **17**

# Introduction

## Purpose

The Office of the Comptroller of the Currency (OCC) has determined that it is in the public interest to consider applications for a special purpose national bank (SPNB) charter from financial technology (fintech) companies that engage in banking activities and that meet the OCC's chartering standards. The OCC has reached this decision for a number of reasons.[1]

First, in the modern economy, where technology companies already are delivering key financial services to millions of Americans, an SPNB charter provides a framework of uniform standards and supervision for companies that qualify. Applying this framework to fintech companies will help ensure that these companies, like other banks that operate under federal charters, conduct business in a safe and sound manner while effectively serving the needs of consumers, businesses, and communities.

Second, an SPNB charter supports the dual banking system by providing fintech companies the option of offering banking products and services under a federal charter and operating under federal law, while ensuring essential consumer protections. This is the same choice available to companies that deliver banking products and services in traditional ways.

Third, providing a path for fintech companies to become national banks can make the financial system stronger by promoting growth, modernization, and competition. Moreover, the OCC's supervision of fintech companies will deepen the expertise the OCC already has acquired in emerging technologies for banking services—through, for example, its supervision of technology service providers. This enhanced "window" into developing technologies and financial innovations positions the OCC to better evaluate and respond to the risks that accompany the delivery of those technologies. Finally, as *this Comptroller's Licensing Manual* Supplement (Supplement) explains, the chartering process will enable the OCC to encourage fintech companies to use innovative ways to promote financial inclusion.

---

[1] The OCC made this determination based on its work assessing the role of innovation in banking. In March 2016, the OCC published a paper to provide its perspective on responsible innovation in the financial services industry, outline principles guiding its approach to financial innovation, and solicit feedback on nine questions and other topics presented in the paper. See Supporting Responsible Innovation in the Federal Banking System: An OCC Perspective. On June 23, 2016, the OCC held a forum to discuss issues regarding responsible innovation. The forum included participants from the banking industry, fintech companies, academia, and community and consumer groups. On October 26, 2016, the OCC announced the decision to establish an Office of Innovation and implement a framework supporting responsible innovation. See OCC Issues Responsible Innovation Framework. Then, on December 2, 2016, the OCC announced that fintech companies may qualify for SPNB charters under certain circumstances. The OCC published a paper discussing issues related to chartering special purpose national banks and solicited public comment to help inform its path forward. See Exploring Special Purpose National Bank Charters for Fintech Companies. In developing this *Comptroller's Licensing Manual* Supplement, the OCC has carefully considered the comments it received.

# Scope

The OCC has regulations and policies that govern its review and decision making with respect to chartering national banks. Consistent with administrative law terminology, these materials frequently refer to chartering as a "licensing" process. This Supplement explains how the OCC will apply the licensing standards and requirements in its existing regulations and policies to fintech companies applying for an SPNB charter.[2]

While the term "special purpose national bank" is used elsewhere in the OCC's rules and policies to refer to a number of types of special purpose national banks, for purposes of this Supplement, "SPNB" means a national bank that engages in a limited range of banking activities, including one of the core banking functions described at 12 CFR 5.20(e)(1), but does not take deposits within the meaning of the Federal Deposit Insurance Act (FDIA) and therefore is not insured by the Federal Deposit Insurance Corporation (FDIC). This Supplement applies specifically to the OCC's consideration of applications from fintech companies to charter an SPNB and does not apply to other types of special purpose banks described in current OCC Licensing Policy.[3]

The OCC recognizes that fintech companies that want to operate in the regulated space will choose different ways of doing so, and the SPNB charter is one option of many. Some may operate under state bank or state trust bank charters in states that offer those options. Some may apply for, or seek to acquire, full-service national bank charters; others may qualify to be another type of special purpose national bank. Still others may wish to continue, or initiate, partnerships with banks by providing technology-related services and expertise. This Supplement is not intended to discourage these other ways of conducting business but rather to clarify the OCC's expectations for a particular segment of financial service providers— that is, fintech companies seeking an SPNB charter.

The OCC anticipates that the activities of fintech companies interested in a national bank charter may vary significantly. As noted above, national bank charters are varied and include full-service charters and other special purpose national bank charters, such as trust charters. National bank charter applicants are held to the same chartering standards and procedures whether seeking to become a full-service national bank, a national trust bank, or an SPNB. Moreover, while references to "full-service bank," "trust bank," and "SPNB" are convenient ways to distinguish among national banks based on their business models, these designations do not signify a difference in the character of the national bank charter. In each of these cases, an applicant that receives OCC approval for a charter becomes a national bank subject to the laws, regulations, and federal supervision that apply to all national banks.

---

[2] See 12 CFR 5.20(l) (directing applicants for a special purpose charter to adhere to established charter procedures with modifications appropriate for the circumstances as determined by the OCC). See also OCC *Comptroller's Licensing Manual*, "Charters."

[3] For example, this Supplement would not apply to a fintech company that intends to engage in fiduciary activities and otherwise meets the requirements of a trust bank.

# Initial Steps Toward an SPNB Charter

## Applicable Licensing Procedures; Initial Contact With the OCC

The OCC uses its existing chartering standards and procedures as the basis for processing applications for all national banks. This Supplement describes the OCC's approach to key aspects of the chartering process for fintech companies. It is not a comprehensive guide to all of the procedures and requirements relevant to filing an application for an SPNB charter. Fintech companies considering applying for an SPNB charter should carefully review the following materials:

- 12 CFR 5: The OCC's Rules, Policies, and Procedures for Corporate Activities are found in 12 CFR 5, and regulations on organizing a national bank are set forth in 12 CFR 5.20. These regulations are applicable to all national banks.[4]
- The *Comptroller's Licensing Manual*, including the "Charters" and "Background Investigations" booklets. The policies in the *Comptroller's Licensing Manual* are generally applicable to all national banks, and prospective applicants are strongly encouraged to read the manual.
- The "Interagency Charter and Federal Deposit Insurance Application," Business Plan Guidelines.
- The OCC's *The Director's Book*.

Fintech companies seeking an SPNB charter should make an initial inquiry concerning a charter application through the OCC's Office of Innovation, innovation@occ.treas.gov. The Office of Innovation (Office) is the primary point of contact within the OCC for all inquiries by fintech companies, including questions and preliminary inquiries related to chartering. If a fintech company is interested in further discussions regarding an SPNB charter, the Office will schedule an exploratory meeting with the appropriate OCC staff, including the OCC Licensing Division (OCC Licensing).[5] The meeting will include a discussion of the company's business model, this Supplement, and the OCC's expectations.

## Prefiling Communications With the OCC

Applying for a national bank charter is an iterative process, and the OCC finds it mutually beneficial for the applicant and the OCC to maintain an open dialogue throughout the process. After the exploratory meeting, the OCC will begin to identify aspects of the proposed charter that present novel or complex issues.

---

[4] See 12 CFR 5.20(c) (describing the procedures and requirements governing the OCC's review and approval of an application to establish a national bank as applicable to a special purpose national bank).

[5] An exploratory meeting is intended to provide the opportunity for a potential applicant to ask questions, clarify concerns, and become acquainted with the regulatory environment. See *Comptroller's Licensing Manual*, "Charters."

An OCC Licensing contact will be assigned. This contact will assemble other appropriate staff—including examiners, subject matter experts, legal staff, and staff from the Office—to informally discuss with the organizers the proposal, the chartering process, and the requirements that accompany a national bank charter.

The prefiling stage may include one or more formal prefiling meetings with OCC Licensing and other appropriate staff. The number and frequency of meetings will depend on the novelty and complexity of the applicant's proposal.

Before the initial formal prefiling meeting, organizers should provide the OCC with an overview of the fintech charter proposal, including a discussion of the business plan and the relevant market, as well as any novel policy or legal issues and any unique aspects of the proposal.[6] Applicants should also include information about the qualifications of the organizers and proposed senior management. In addition, the OCC will request informational submissions for review in advance of the submission of an application, such as a draft business plan.

The OCC will expect an SPNB applicant whose business plan includes lending or providing financial services to consumers or small businesses to demonstrate a commitment to financial inclusion. As described below, the OCC will condition its preliminary approval of an SPNB charter on the applicant's implementation of a Financial Inclusion Plan (FIP). Accordingly, an applicant will be expected to include an FIP within its business plan and publish it for comment.

## Activities of the Proposed SPNB

**Bank-permissible activities:** All activities of a national bank, including an SPNB, are limited to those that are permissible for national banks under a statute,[7] regulation,[8] or federal judicial precedent, or that the OCC has determined to be permissible.[9]

---

[6] The term "organizers" generally refers to the individuals or group applying for the new bank charter. See *Comptroller's Licensing Manual,* "Charters," for a more detailed discussion of organizers.

[7] 12 USC 24 expressly permits numerous specific activities for all national banks, including discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; receiving deposits; buying and selling exchange, coin, and bullion; lending money on personal security; and obtaining, issuing, and circulating notes. Section 24(Seventh) more generally authorizes national banks to engage in activities that are part of, or incidental to, the business of banking. 12 USC 92a authorizes national banks to engage in fiduciary activities.

[8] Numerous activities are expressly authorized throughout OCC regulations, including, for example: establishing and operating a messenger service (12 CFR 7.1012), acting as a finder (12 CFR 7.1002), sales of equipment convenient for a customer's use of electronic banking services (12 CFR 7.5001), providing electronic bill presentment services (12 CFR 7.5002), offering electronic stored value systems (12 CFR 7.5002), and producing and selling software that performs a service the bank could perform directly (12 CFR 7.5006).

[9] The OCC and the courts that have considered the scope of bank-permissible activities also recognize that the business of banking develops over time as the economy and business methods evolve. See, e.g., *NationsBank of North Carolina, N.A. v. Variable Life Annuity Co.*, 513 U.S. 251 (1995); OCC Interpretive Letter No. 494 (December 20, 1989) (allowing national banks to purchase and sell financial futures for their own account). The

**Core banking activities:** Under 12 CFR 5.20(e)(1), a special purpose national bank that conducts activities other than fiduciary activities must conduct at least one of the following three core banking activities: taking deposits, paying checks, or lending money.[10] This Supplement covers entities other than traditional trust companies or full-service national banks that accept deposits and therefore must be insured by the FDIC. Accordingly, the OCC anticipates that SPNBs likely will elect to demonstrate that they are engaged in paying checks or lending money.

Consistent with judicial precedent, the OCC views the National Bank Act, which is the primary statutory source of national banks' authority to conduct various types of business, as sufficiently adaptable to permit national banks to engage in new activities as part of the business of banking or to engage in traditional activities in new ways.[11] For example, discounting notes, purchasing bank-permissible debt securities, engaging in lease-financing transactions, and making loans are forms of lending money. Similarly, issuing debit cards or engaging in other means of facilitating payments electronically may be considered the modern equivalent of paying checks.

In some cases, the activities proposed for an SPNB may include activities that have not previously been determined to be part of, or incidental to, the business of banking or to fall within an established core banking function. If so, the company should discuss in prefiling meetings with the OCC the permissibility of the activities and their status as core banking activities. The OCC may ask the company to prepare a legal analysis supporting its view that its proposed activities are permissible and fall within one of the core banking categories. In connection with the chartering process, the OCC will conduct an independent legal analysis to determine whether the activities are permissible for an SPNB. As described in section V, the OCC publishes conditional approvals of charter applications; the approval typically would include the OCC's legal analysis supporting its decision. Publication will occur at the conclusion of the charter decision process.

## Filing Procedures—Publication and Public Comment; Confidentiality

After the prefiling phase, the organizers for an SPNB charter should file the charter application, including the business plan and the appropriate Interagency Biographical Report on all identified insiders. For additional information on filing the application, organizers should refer to the "Charters" booklet of the *Comptroller's Licensing Manual*. The filing procedures for an SPNB will be substantially the same as those applicable to any other

---

OCC expressly recognizes this proposition in 12 CFR 7.5002, which states that a national bank may provide through electronic means any activity, function, product, or service that it is otherwise authorized to perform.

[10] See 12 CFR 5.20(e)(1)(i).

[11] See, e.g., 12 CFR 7.5002.

national bank.[12] An applicant for a national bank charter must publish notice of its charter in the community in which the proposed bank will be located as soon as possible before or after the filing date.[13] A public comment period runs for 30 days after the publication of the public notice.[14] The OCC maintains a public file of the application and makes it available to any person requesting it; the public file is also available on the OCC's public website.[15] Portions of the business plan of an SPNB, such as the FIP section, will be included in the public file. Applicants may request that confidential treatment be afforded to certain portions of the application, for example, portions containing proprietary information.[16]

# Chartering Standards

## Standards and Policy Considerations

Under the OCC's governing statutes and regulations, in evaluating an application to establish a national bank, including an SPNB, the OCC is guided by the following principles:

- Maintaining a safe and sound banking system
- Encouraging a national bank to provide fair access to financial services by helping to meet the credit needs of its entire community
- Ensuring compliance with laws and regulations
- Promoting fair treatment of customers, including efficiency and better service[17]

The OCC's regulations and policies also set forth additional considerations, including whether the proposed bank can reasonably be expected to achieve and maintain profitability[18] and whether approving its charter will foster healthy competition.[19]

Once a firm submits a proposal, the OCC determines whether it satisfies the chartering standards in the OCC's regulations and policies. The OCC will not approve proposals that are contrary to OCC policy or other established public policy. For example, proposals to provide financial products and services that have predatory, unfair, or deceptive features or

---

[12] For details see 12 CFR 5 and *Comptroller's Licensing Manual,* "Charters."

[13] See generally 12 CFR 5.8. Given the fact that many fintechs will operate online, the OCC will consider the operations of the SPNB in determining where publication of this notice would be appropriate.

[14] See 12 CFR 5.10.

[15] See 12 CFR 5.9(a) and (b).

[16] See 12 CFR 5.9(c).

[17] See 12 USC 1(a) and CFR 5.20(f)(1). See also *Comptroller's Licensing Manual*, "Charters."

[18] See 12 CFR 5.20(f)(2).

[19] *Comptroller's Licensing Manual*, "Charters."

that pose undue risk to consumer protection, compliance, or safety and soundness would be inconsistent with the OCC's chartering standards and will not be approved.[20]

Further, the OCC will not approve proposals that would result in an inappropriate commingling of banking and commerce. As noted earlier, under its chartering standards the OCC considers whether a given proposal is consistent with maintaining a safe and sound banking system and will foster healthy competition. Proposals that inappropriately commingle banking and commerce could introduce into the banking system risks associated with non-banking related commercial activities, interfere with the efficient allocation of credit throughout the U.S. economy and foster anti-competitive effects and undesirable concentrations of economic power, and would thus be inconsistent with the OCC's chartering standards. Proposals from companies that implicate such concerns will not be approved. The OCC also will collaborate with other regulators as necessary to avoid the inappropriate mixing of banking and commerce.

## Evaluating an Application

The OCC will evaluate an application from a fintech company for an SPNB charter to determine whether it meets the standards and policy considerations noted above. In evaluating whether these are met, the OCC will consider, among other things, whether the proposed bank

- has organizers and management with appropriate skills and experience.
- has adequate capital to support the projected volume and type of business and proposed risk profile.
- has a business plan that articulates a clear path and a timeline to profitability.
- includes in its business plan, if applicable, an FIP that has an appropriate description of the proposed goals, approach, activities, and milestones for serving the relevant market and community.

The OCC's evaluation may identify specific controls or requirements that are necessary for the success of the applicant's business plan or to ensure the OCC's chartering standards are met. The OCC will impose special conditions in connection with the charter approval to achieve these goals.[21] Moreover, the OCC imposes certain standard conditions on all de novo charters, including the requirement that a bank obtain a supervisory non-objection letter from the OCC if it deviates significantly from its approved business plan. For a detailed discussion of conditions associated with approvals, see the "Chartering Decisions" section of this Supplement.

---

[20] See, e.g., OCC Bulletin 2013-40, "Deposit Advance Products: Final Supervisory Guidance" (December 26, 2013); OCC Advisory Letter 2000-7, "Abusive Practices" (July 25, 2000).

[21] An SPNB that does not take deposits will not be subject to certain requirements that apply only to insured depository institutions; for example, the safety and soundness standards contained in 12 CFR 30 of the OCC's regulations. The OCC has the authority to impose special conditions requiring the applicant to comply with standards that generally apply only to insured banks.

# Coordination With Other Regulators; Continuation of Remedies

Depending on the structure of the proposed SPNB, regulators in addition to the OCC may have oversight and supervisory roles over a particular bank. In considering applications for SPNB charters, the OCC will coordinate as appropriate with other regulators with jurisdiction over the proposed SPNB, to facilitate simultaneous consideration of any applications or approvals that may be required by those regulators.

The OCC does not permit companies that are the subject of a formal investigation or enforcement action by another regulator to avoid the consequences of that investigation or enforcement action by seeking a national bank charter. A pending investigation or enforcement action may be grounds for denial of a charter application. At a minimum, after consultation with the other regulator, the OCC will ensure that a company's obligation to remediate or pay penalties for any violations or deficiencies cited or identified by another regulator is carried forward and enforced through conditions imposed on an approval of an SPNB charter.[22]

# Requirements for Organizing Group, Management, and Directors

OCC regulations and licensing policy provide guidance regarding the qualifications of organizers, management, and directors, as well as the respective roles of each.[23] These criteria and qualifications are generally applicable to SPNBs, although the OCC may tailor certain criteria as appropriate. As with all banks, organizers, managers, and directors are critical to the success of an SPNB. The OCC expects them to be well qualified, with diverse experience in relevant areas. Although the OCC would expect some members of the organizing group, the proposed board of directors, and management to have experience in regulated financial services, other relevant experience will depend on the specific products or services offered by the proposed SPNB. For example, it may be important for one or more of the organizers, managers, or directors of a proposed bank with novel technology-based products or services to have experience with those activities.

---

[22] See, e.g., section 612 of the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010 (Pub. L. No. 111-203, 124 Stat.1376) which prohibits, subject to exceptions, the conversion of a state bank or thrift to a national charter, or national bank or thrift to a state charter, if the converting institution's original regulator has subjected the institution to a formal enforcement action or memorandum of understanding with respect to a significant supervisory matter.

[23] See 12 CFR 5; the "Charters" and "Background Investigations" booklets of the *Comptroller's Licensing Manual*, and the OCC's *The Director's Book*.

# Business Plan

## Overview

All applicants for a national bank charter must submit a business plan to the OCC.[24] Having a comprehensive proposed business plan, including the bank's financial projections, analysis of risk, and planned risk management systems and controls, is critical to the OCC's decision whether to approve a charter proposal. Proposals from companies without an established business record are subject to a higher degree of scrutiny to evaluate whether the proposed bank has a reasonable likelihood of long-term success.

Detailed information about the elements of the business plan appears in the Interagency Business Plan Guidelines.[25] The Business Plan Guidelines, which are applicable to all national banks, describe the general elements of a business plan, including: description of the business; marketing plan; management plan; records, systems, and controls; the financial management plan; monitoring and revising the plan; alternative business strategies; and financial projections. The OCC recognizes, however, that applicants for an SPNB charter may have structures and business models that differ from those of traditional, full-service national banks. Thus, in addition to the generally applicable information in the Business Plan Guidelines, applicants should consider the supplemental guidance below on specific parts of the business plan.

Applicants are also encouraged to contact the OCC with questions regarding the content of their business plans.[26]

## Supplemental Guidance on Business Plan

### *(1) Risk Assessment*

An applicant's business plan should include a risk assessment that identifies and discusses the particular risks the organizers expect the proposed bank to face given its business model. Such risks may include, for example, concentration risk, compliance risk, reputation risk, strategic risk, and operational risk, including cybersecurity risk. The risk assessment should set out the degree of risk the bank would generally assume (its "risk appetite") and how it would effectively manage the identified risks. The risk assessment factors in the target

---

[24] See 12 CFR 5.20(h). This regulation details specific items that should be addressed in a business plan, including earnings prospects, management, capital, community service, and safety and soundness.

[25] In addition to the Business Plan Guidelines, *Comptroller's Licensing Manual,* "Charters," provides additional information regarding the business plan. The *Comptroller's Handbook* and other resource materials should also be referenced for additional information related to specific products and services, and OCC expectations for all areas of operating a bank, including, for example, audit requirements, information technology, and corporate and risk governance.

[26] As noted in "Initial Steps Toward an SPNB Charter" in this Supplement, charter applicants may request confidential treatment of certain portions of their business plan. The FIP will be included in the public file.

markets' economic and competitive conditions, including the proposed products, services, and customers; the targeted geography (*e.g.*, regional, nationwide); and any regulatory considerations regarding serving those markets. These regulatory considerations include risks related to Bank Secrecy Act/Anti-Money Laundering (BSA/AML), consumer protection, and fair lending requirements. The risk assessment should also address the internal and system controls to monitor and mitigate risk, including management information systems, in accordance with the bank's established risk appetite.

*(2) Records, Systems, and Controls*

This section describes the bank's system for customer record keeping and transaction processing and the internal controls that will enable the bank to protect customer data and process transactions in an accurate and efficient manner. This section also describes the bank's compliance management programs. This section should include

- a description of the bank's information technology program, including
  - a general description of internal controls ensuring transaction and data integrity, security, and auditability;
  - overviews of the operational architecture, security framework, and resiliency structures;[27] and
  - a description of the framework that provides for effective cyber-risk governance, including continuous monitoring and management of cyber risk; strategies for cyber resilience; and processes for maintaining awareness of cybersecurity postures enterprise-wide.

- a description of the compliance management program, which should support a culture of compliance that includes a top-down, enterprise-wide commitment to understanding and adhering to applicable laws and regulations, including, but not limited to: the BSA, other AML statutes, Office of Foreign Asset Control economic sanctions obligations, statutes prohibiting discrimination or unfair or deceptive acts or practices, and other applicable consumer protection laws and regulations.

- a description of a structured plan to provide for independent testing of the business activities, systems and controls, and compliance management requirements, including but not limited to plans for independent audits.

- a description of outsourcing and third-party risk management, including a description of any functions or services that will be outsourced and risk management processes that are commensurate with the level of risk and complexity of the third-party relationships. For additional guidance, applicants should review OCC Bulletin 2013-29, "Third-Party Relationships: Risk Management Guidance" (October 30, 2013).

---

[27] Applicants should review 12 CFR 30, appendix B, "Interagency Guidelines Establishing Information Security." These guidelines address standards for developing and implementing administrative, technical, and physical safeguards to protect the security, confidentiality, and integrity of customer information.

*(3) Financial Management*

An SPNB will be subject to the minimum leverage and risk-based capital requirements in 12 CFR 3, which apply to all national banks. However, these requirements, which measure regulatory capital levels relative to an entity's assets and off-balance-sheet exposures, may not be sufficient for measuring capital adequacy for some SPNBs. The risks posed by an SPNB with limited on-balance-sheet assets or nontraditional strategies may not be fully captured in its reported assets and off-balance-sheet exposures. As a result, additional approaches may be necessary to determine the minimum amount of capital needed to support the bank's activities. For example, for a proposed bank with limited on-balance-sheet assets, the OCC may consider other metrics related to activity—such as revenue—and the risks associated with the applicant's business plan when evaluating capital adequacy.

This section of the business plan should propose both minimum capital levels the bank will adhere to initially that are sufficient to support the proposed bank's business plan until the bank can achieve and sustain profitable operations and minimum capital levels the bank will adhere to after profitability that would be appropriate for its ongoing operations. This section should also discuss how the proposed bank would address adverse market conditions that could deplete capital, such as broad market volatility or volatility specific to a business line. Additional factors that applicants should consider include the following:

- On- and off-balance-sheet composition, including credit risk, concentration risk, market risk, operational risk, and compliance risk associated with nontraditional products, services, or operating characteristics.

- Proposed activities and anticipated volume (new accounts, transactions) and impact on capital.

- Plans and prospects for growth, including any material action necessary to address business activity that is either below or above expectations and management's past experience in managing growth.

- Stability or volatility of sources of funds and access to capital.

- Sufficient additional capital to implement the exit strategy laid out in the business plan.

Consistent with the process for chartering other special purpose banks,[28] preliminary conditional approval for a fintech company will include a condition specifying a minimum capital level the bank must be at or above at all times. This amount would be based on the OCC's analysis of quantitative and qualitative factors, including those described above. The OCC expects that capital in a fintech company with an SPNB charter would increase beyond

---

[28] The OCC tailors capital requirements for other special purpose banks. For example, the OCC typically imposes capital requirements on trust banks in addition to the minimum requirements calculated according to 12 CFR 3.

the initial minimum amount as the size, complexity, and corresponding risks of the firm evolve.

The financial management section should also address liquidity and funds management. Liquidity is a bank's capacity to readily meet its cash and collateral obligations at a reasonable cost without adversely affecting either daily operations or the bank's financial condition.[29] The OCC will consider the proposed bank's specific business model when evaluating the SPNB's liquidity profile and processes for monitoring and mitigating liquidity risk.

For other special purpose banks, the OCC has imposed requirements tailored to the bank's business model to ensure it maintains adequate liquidity. Such requirements include entering into a liquidity maintenance agreement with a parent company or maintaining a certain amount of high-quality liquid assets.

### (4) Monitoring and Revising the Plan

The Business Plan Guidelines provide that this section should include a discussion of how the board of directors will monitor adherence to the business plan and adjust or amend the business plan as appropriate to accommodate significant or material changes.[30] This is an ongoing requirement, and technology-dependent businesses will need to have mechanisms in place to accommodate new or evolving technologies.

### (5) Alternative Business Strategy; Contingency Plans; Recovery and Exit Strategies

Depending on the applicant's proposed business strategy and structure, the OCC may require an applicant to include an alternative business strategy detailing how the bank will manage potential scenarios when expectations—such as operating expenses, marketing costs, or growth rates—differ significantly from the original plan.[31]

While it will not always be necessary for a bank to develop an alternative business strategy, all applicants should discuss

- realistic contingency plans based on critical assumptions;

- recovery planning, including financial or other risk triggers, and a range of credible options to remain viable under stress; and

---

[29] For additional details regarding liquidity, applicants may refer to the "Liquidity" booklet (June 2012) of the *Comptroller's Handbook*.

[30] As discussed in the "Chartering Standards" section of this Supplement, significant deviations to the business plan may require OCC supervisory non-objection.

[31] If the bank's alternative business strategy would be considered a significant deviation from the approved business plan, the OCC would expect the applicant to obtain a supervisory non-objection before executing the strategy.

- exit strategies that provide a means for the bank to unwind in an organized manner.

*(6) Financial Inclusion Plan (FIP)*

As noted earlier in the "Chartering Standards" section of this Supplement, the OCC's chartering standards require consideration of whether the applicant will provide fair access to financial services and promote fair treatment of customers consistent with the safe and sound operations of the bank.[32] OCC regulations require that applicants include in their business plans an indication of the organizing group's knowledge of and plans to serve the community.[33] As discussed in detail in appendix B, "Financial Inclusion Plan Section of the Business Plan," the OCC expects an applicant for an SPNB charter whose business plan includes lending or providing financial services to consumers or small businesses to demonstrate a commitment to financial inclusion.

Applicants engaged in such activities should include in the business plan an FIP that describes the proposed goals, approach, activities, and milestones for serving the relevant market and community. The nature and scope of an FIP developed by an applicant for an SPNB charter will vary depending on the SPNB's business model and the products or services it intends to provide to consumers or small businesses.

The OCC expects that the commitment to meet financial inclusion objectives that support fair access to financial services and fair treatment of customers will be ongoing, and accordingly, the OCC will expect the SPNB to update its FIP as appropriate.

# Chartering Decision

As discussed in detail in the "Charters" booklet of the *Comptroller's Licensing Manual*, the OCC grants approval of a charter application in two steps: preliminary conditional approval and final approval. The period between the preliminary conditional approval and final approval is referred to as the organization phase.

## Preliminary Conditional Approval

Following review of the application, the OCC determines whether to grant preliminary conditional approval or deny the application. A preliminary conditional approval determination indicates the OCC's permission to proceed with the organization of the bank according to the plan set forth in the application and specifies standard requirements and enforceable supervisory conditions. The OCC will include in a preliminary conditional approval of any SPNB charter with a business plan that includes lending or providing financial services to consumers or small businesses an enforceable condition that will require the SPNB to implement its FIP.

---

[32] See 12 USC 1(a) and 12 CFR 5.20(f)(1).

[33] See 12 CFR 5.20(h)(5).

A preliminary conditional approval decision is not an assurance that the OCC will grant final approval for a new bank charter. Granting preliminary conditional approval provides the organizers of the bank with assurances that the application has passed the first phase of OCC review before the organizers expend additional funds to raise capital, hire officers and employees, and fully develop policies and procedures, including those relating to financial inclusion. A national bank must generally open for business within 18 months of the OCC's preliminary conditional approval, unless the OCC grants an extension.[34]

## Standard and Special Requirements

The OCC imposes a number of standard requirements on a bank when it grants preliminary conditional approval. Standard requirements are requirements imposed on all de novo national banks. For example, these requirements include establishing appropriate policies and procedures and adopting an internal audit system appropriate to the size, nature, and scope of the bank's activities. The OCC may also place additional special requirements on SPNB charters with certain characteristics. While standard requirements apply to all de novo charters, special requirements are tailored to a particular applicant. A requirement for a bank to raise a higher amount of capital than proposed in the business plan is an example of a special requirement. The organizing group must satisfy standard and special requirements before the OCC grants final approval.[35]

## Standard and Special Conditions

In addition to the standard and special requirements discussed above, the OCC may also impose standard and special conditions that remain in place after the bank opens for business.[36]

The OCC imposes certain standard conditions on all categories of de novo charters, and those would apply to SPNBs. These standard conditions address a variety of issues, including ensuring that the bank does not significantly deviate from the business model proposed in its application without prior OCC non-objection and guaranteeing maintenance of minimum capital levels commensurate with the prospective risk of the bank's business plan.[37] It is a standard condition for an SPNB charter with a business plan that includes lending or providing financial services to consumers or small businesses that the SPNB implement its FIP.

---

[34] See 12 CFR 5.20(i)(5)(iv).

[35] For additional information regarding the organization phase, please refer to *Comptroller's Licensing Manual,* "Charters."

[36] Conditions imposed in connection with the approval of a national bank charter are considered "conditions imposed in writing" and enforceable under the OCC's enforcement authority at 12 USC 1818. The OCC regularly examines for compliance with such conditions.

[37] For more information about significant deviations from business plans, see appendix F, "Significant Deviations After Opening," of *Comptroller's Licensing Manual,* "Charters."

The OCC may also impose special conditions on an individual SPNB. Examples of such conditions include requiring the bank to have a resolution plan to sell itself or wind down, if necessary, and requiring the bank to adhere to specific commitments, such as a requirement to enter into an operating agreement. In addition, in the case of an uninsured bank, the OCC can impose special conditions similar to those in laws that apply by statute to insured banks only. Where a law does not apply directly, the OCC may work with a fintech company to achieve the goals of a particular statute or regulation through the OCC's authority to impose conditions on its approval of a charter, taking into account any relevant differences between a full-service bank and special purpose bank.[38]

In addition, the OCC will impose assessments on an SPNB through special conditions established at the time of preliminary approval. The OCC is funded through assessments and fees charged to the banks it supervises.[39] SPNBs will be subject to periodic assessments, just as other national banks are.[40] The OCC has modified the assessments it charges to other special purpose national banks, however, to account for the scope and activities of the bank and the amount and type of assets that the bank holds.[41] The OCC would determine assessments for an SPNB to account for similar factors.[42]

Conditions may be imposed directly in the preliminary approval letter, or the OCC may require as a condition of approval that the applicant enter into an operating agreement with the OCC. The operating agreement may impose safeguards to address certain aspects of a bank's operations, including growth, capital, or liquidity. As noted above, for all SPNBs engaged in lending or providing financial services to consumers or small businesses, implementation of an FIP will be a condition imposed through an operating agreement. The OCC publishes all conditional approvals, which disclose the existence of an operating agreement.[43]

---

[38] For more information about the conditions that may be imposed, see Comptroller's Licensing Manual, "Charters."

[39] See 12 USC 16, 481.

[40] See 12 CFR 8.

[41] Additional assessments are required of certain national banks. See, e.g., 12 CFR 8.2(c) and 8.6(c) (additional assessments imposed on independent credit card banks and independent trust banks).

[42] As it gains experience with fintech companies, the OCC may amend its rules to address assessments for fintech companies.

[43] An operating agreement is enforceable under 12 USC 1818. That section of the FDIA contains the OCC's general enforcement authorities; it expressly applies to uninsured national banks. See 12 USC 1818(b)(5).

# Final Approval

Receipt of final approval from the OCC means the OCC has issued a charter for the bank, and the bank can begin to conduct banking business.[44] After the OCC issues final approval and the SPNB opens for business, the OCC will supervise the SPNB, as all other national banks, under scheduled supervisory cycles, including on-site examination and periodic off-site monitoring. Any conditions imposed with the granting of a charter (e.g., operating agreement) will remain in place until removed or modified by the OCC and will be reviewed for compliance during the examination process.

Because this Supplement is focused on the licensing process for SPNBs, it does not provide extensive guidance regarding the OCC's supervisory expectations and the supervision of national banks. Key supervisory considerations, however, are highlighted in appendix A to this Supplement. For additional information on specific supervisory areas, applicants should refer to the booklets of the *Comptroller's Handbook,* available on the OCC's website.

---

[44] Final approval occurs once the organizers have completed all key phases of organizing the bank as determined by the OCC and received any other necessary regulatory approvals. See *Comptroller's Licensing Manual,* "Charters," for more detail.

# Appendices

## Appendix A: Supervisory Considerations

### *OCC Supervisory Framework*

The supervisory framework for SPNBs will incorporate core elements already in place for all national banks. These elements include a dedicated Assistant Deputy Comptroller (ADC), an assigned portfolio manager, a supervisory strategy tailored to the bank's business model, and a blend of on-site and off-site supervisory activities conducted by an experienced, knowledgeable examination team. In addition to the statutory examination requirements[45] and consistent with longstanding OCC de novo supervision policy,[46] newly chartered SPNBs will be subject to more frequent and intensive supervision in their early years of operation. The scope of supervision activities will follow a risk-based approach commensurate with the size and complexity of the institution, focusing on any elevated risks and unique supervisory challenges presented by a given SPNB. Examples of SPNB examination and supervision activities include frequent contact with the board of directors and bank management.

Similar to the OCC's supervision framework for existing special purpose national banks, SPNBs will be housed in a common portfolio, assigned individual portfolio managers, and overseen by an ADC for SPNB Supervision, who will be based in Washington, D.C., and report to the Deputy Comptroller for Thrift Supervision and Special Supervision.[47] Centralized oversight of SPNBs will provide for a consistent approach to supervision. Each bank will have an assigned portfolio manager who will serve as the primary point of contact and examiner-in-charge for the institution. The portfolio manager and the examination team will have subject matter expertise appropriate for the bank's business model. In addition, dedicated licensing and risk specialists, legal staff, and other subject matter experts will be assigned to each bank, as appropriate.

### *Rating Framework*

SPNBs will be subject to the same ratings framework as other national banks. As outlined in appendixes A-G of the "Bank Supervision Process" booklet of the *Comptroller's Handbook,* national banks are assessed in accordance with the Uniform Financial Institutions Rating System (UFIRS). Composite ratings are based on an evaluation of an institution's managerial, operational, financial, risk management, and compliance performance.

Under this uniform system, the OCC ensures that all national banks are evaluated in a comprehensive and uniform manner and that supervisory attention is focused appropriately

---

[45] SPNBs will be subject to the statutory examination cycle prescribed by 12 USC 1820(d) and 12 CFR 4.6.

[46] PPM 5400-9 (REV), "De Novo and Converted Banks."

[47] Using dedicated subject matter experts across the OCC, the supervisory office will obtain assistance to participate on examinations and advise on complex issues that SPNBs might present.

on those banks that exhibit financial and operational weaknesses or adverse trends. The UFIRS helps identify adverse trends or deteriorating financial institutions, as well as categorizing deficiencies. The rating system is commonly referred to as the CAMELS/ITCC, and it assesses components of a bank's performance as well as specialty areas that include: capital adequacy, asset quality, management, earnings, liquidity, sensitivity to market risk, information technology, trust, consumer compliance, and performance under the Community Reinvestment Act (if applicable). Each component is rated based on an evaluation of factors relevant to the specific area.

### Risk Management Framework

The OCC expects every national bank to have appropriate risk management systems to address all relevant risks in the bank. The structure, sophistication, and oversight of these systems should be commensurate with the complexity and volume of risk a bank assumes. Regardless of the bank's size or complexity, sound risk management systems should do the following:

- **Identify risk:** Banks must recognize and understand existing risks and risks that may arise from new business initiatives, including risks posed by third-party relationships, by external market forces, or by regulatory or statutory changes. Risk identification should be a continuing process and occur at both the transaction and portfolio levels.

- **Measure risk:** Banks must have effective risk management systems that measure risks accurately and timely. A bank that does not have an effective risk measurement system has limited ability to control or monitor risk levels.

- **Monitor risk:** Banks must monitor risk levels to ensure timely review of risk positions and exceptions to risk limits. Monitoring reports must be timely, accurate, and relevant, and should be distributed to appropriate individuals to ensure action, when needed.

- **Control risk:** Banks must establish and communicate risk limits through policies, standards, and procedures that define responsibilities and authority. These limits serve as a means to control exposures to the various risks associated with the bank's activities.

The OCC employs a risk-based supervisory philosophy focused on evaluating risk, identifying material and emerging problems, and ensuring that individual banks take corrective action before problems compromise their safety and soundness. This supervision-by-risk approach provides a consistent definition of risk and a system for assessing risks (known as the Risk Assessment System or RAS), and it integrates risk assessment into the supervisory process. The RAS is applicable to all risks identified across a bank and can include (although it is not limited to): credit risk, information technology systems and controls, operational risk, cybersecurity risk, liquidity and funds management, consumer compliance risk, and strategic and reputation risks. Following risk evaluations, the supervisory office tailors and conducts supervisory activities based on the risks identified, and periodic testing is completed in order to validate a bank's risk assessment.

### *Corporate Governance Framework*

The OCC expects the governance structure for any proposed SPNB to be commensurate with the risk and complexity of its proposed products, services, and activities, as it is for other national banks. The OCC sets standards for governance and for risk management systems that identify, measure, monitor, and control risk in national banks. The OCC expects national banks to have expertise, financial acumen, and a risk management framework that includes the three lines of defense. The three lines of defense model explains governance and roles among the bank's business units, support functions, and the internal audit function from a risk management perspective.

- First line of defense risk management activities take place at the frontline units where risks are created and owned.

- The second line of defense risk management activities occur in an area or function separate from the frontline unit, sometimes referred to as independent risk management (IRM). IRM oversees and assesses the frontline units' risk management activities.

- The internal audit function is often referred to as the third line of defense in this model. In its primary responsibility of providing *independent* assurance and challenge, the internal audit function assesses the effectiveness of the policies, processes, personnel, and control systems created in the first and second lines of defense. Internal audit (including co-sourcing and outsourced arrangements) must be an independent function and report directly to the Audit Committee of the board of directors.[48]

The board of directors must have a prominent role in the overall governance structure by participating on key committees and guiding the bank's risk management framework. Board members also must actively oversee management, provide credible challenge, and exercise independent judgment.

### *OCC Communication*

The OCC is committed to ongoing communication with the banks it supervises and with other banking regulators. This includes formal and informal conversations, meetings, examination reports, and other written communications. At a minimum, the OCC must provide a bank's board of directors a report of examination (ROE) at least once each supervisory cycle. The ROE conveys the bank's overall condition, ratings, and risk assessment summary. It will also summarize examination activities and findings identified during the supervisory cycle.[49]

---

[48] For additional information on the audit function, see the "Internal and External Audits" booklet of the *Comptroller's Handbook*.

[49] Additional information about communication guidance can be found in the the "Bank Supervision Process" booklet of the *Comptroller's Handbook*.

# Appendix B: Financial Inclusion Plan Section of Business Plan

## *Overview and Process*

The OCC expects an SPNB covered by this Supplement whose business plan includes lending or providing financial services to consumers or small businesses to demonstrate a commitment to financial inclusion.[50]

As part of the prefiling process, the OCC expects a fintech company seeking an SPNB charter to provide information describing how it proposes to engage with its relevant market and community, including any underserved populations, and how it proposes to identify and address that community's financial needs.[51] The OCC recognizes that outreach to interested community and consumer groups may be particularly helpful in determining these community financial needs.

A fintech company's SPNB charter application should include in the FIP section of its business plan a description of its proposed goals, approaches, activities, and milestones for serving the relevant market and community.[52] The OCC recognizes that some applicants may have a business model incorporating financial inclusion as an integral aspect of the products and services they provide, and in those cases, the applicant should identify and discuss with the OCC the aspects of its business plan that address its financial inclusion goals, approach, activities, or milestones.

The OCC will include in a preliminary conditional approval of any SPNB charter with a business plan that includes lending or providing financial services to consumers or small businesses an enforceable condition that will require the SPNB to implement its FIP.

## *Developing the FIP*

The nature and scope of an FIP will vary depending on the applicant's business model and the products or services it intends to provide to consumers or small businesses. An FIP should describe:

- The products or services the SPNB intends to offer, including any financial products or services that will foster financial inclusion, whether defined by income, geography, or other criteria such as unserved or underserved populations.

---

[50] See 12 CFR 5.20(f)(1) and 5.20(h)(5); see also 12 USC 1 (providing that the OCC is "charged with assuring the safety and soundness of, and compliance with laws and regulations, fair access to financial services and fair treatment of customers" by the institutions it supervises).

[51] The prefiling process is discussed in more detail in this Supplement.

[52] As noted in this Supplement, portions of the business plan, including the FIP, will be included in the public file.

- Identification of, and method for defining, the SPNB's relevant market and community, including underserved populations or geographies, which may include, for example, low- and moderate-income individuals.

- Identification of, and method for defining, the financial services needs of the relevant market and community and how some of those needs could be met by the SPNB's products and services.

- Identification of milestones, including measurable goals, for the accomplishment of the SPNB's financial inclusion objectives and description of a reasonable approach for meeting those goals.

- Identification of terms and conditions under which the SPNB will provide lending or financial products and services to consumers or small businesses.[53]

### *Review of Financial Inclusion Factors*

The OCC will review the adequacy of the applicant's FIP and consider whether the SPNB has addressed factors that would support fair access to financial services and fair treatment of customers, such as the following:

- The SPNB's ability, efforts, and commitment to meet various community financial needs based on the applicant's financial condition and size, economic conditions in the relevant market and community, and other factors, including any expected participation by the SPNB in governmentally insured, guaranteed, or subsidized loan programs for housing, small business, community development, or small farms.

- How the SPNB's policies, procedures, and practices, including those described in its compliance management program, are designed to ensure products and services will be offered and provided on a fair and non-discriminatory basis, with full disclosure of terms and conditions to all customers, and in compliance with applicable laws and regulations.[54]

---

[53] The OCC has issued guidance cautioning national banks about lending activities that may be considered predatory, unfair, or deceptive or that may present safety and soundness and other risks. See, for example, OCC Advisory Letter 2000-7, "Abusive Lending Practices" (July 25, 2000) (identifying interest rates and fees that far exceed the true risk and cost of making loans as indicia of such lending practices); OCC Bulletin 2013-40, "Deposit Advance Products: Final Supervisory Guidance" (December 26, 2013) (clarifying the OCC's application of principles of safe and sound banking practices and consumer protection in connection with deposit advance products).

[54] Applicable laws vary, depending on the characteristics of the specific product or service, and may include the following laws and any implementing regulations: Truth in Lending Act, Equal Credit Opportunity Act, Credit Card Accountability Responsibility and Disclosure Act, Electronic Fund Transfer Act, and section 5 of the FTC Act.

- Investments, partnerships, ongoing outreach, and collaboration strategies, or expected participation in governmentally insured, guaranteed, or subsidized loan programs that the SPNB will use to achieve its financial inclusion objectives.

- Other factors that reasonably bear upon the extent to which the SPNB will help meet the credit and other financial services needs of the relevant market and community.

### *Implementation and Ongoing Communication*

The SPNB's commitment to meet its financial inclusion goals, approach, activities, and milestones that support fair access to financial services and fair treatment of customers is ongoing through the life of the charter. For this reason, the OCC will require that the SPNB update its FIP in appropriate circumstances. The FIP should address how the SPNB will continue serving the needs of the relevant market and community beyond the initial years after a charter is granted, including how the SPNB will do the following:

- Communicate, and receive public input, regarding its progress in executing on its FIP.

- Update or modify its FIP in appropriate circumstances, including significant deviations to its business plan, the products or services offered, or relevant markets and communities served.

- Obtain, consider, and address public input in connection with updates to its FIP, when appropriate.

After the OCC issues final approval and the SPNB opens for business, the OCC will approach supervision of the SPNB in a manner consistent with its scheduled supervisory cycle applicable to other national banks. Conditions imposed with the approving the charter, including the condition related to implementation of the FIP, will remain in place until removed or modified by the OCC and will be reviewed for compliance during the examination process.