## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONFERENCE OF STATE BANK SUPERVISORS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civ. Act. No. 17-CV-00763 (JEB) |
| OFFICE OF THE COMPTROLLER | ) |
| OF THE CURRENCY, | ) |
| | ) |
| and | ) |
| | ) |
| KEITH A. NOREIKA, | ) |
| COMPTROLLER OF THE CURRENCY, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION AND FAILURE TO STATE A CLAIM

Jennifer Ancona Semko (Bar No. 481119)
Steven M. Chasin (Bar No. 495853)
Graham Cronogue (*pro hac vice*)
BAKER & McKENZIE LLP
815 Connecticut Avenue NW
Washington, DC 20006
Tel: +1 202 835-4250
Fax: +1 202 416-7055
jennifer.semko@bakermckenzie.com
steven.chasin@bakermckenzie.com
graham.cronogue@bakermckenzie.com

Matthew F. Kluchenek (*pro hac vice*)
BAKER & McKENZIE LLP
300 East Randolph Street, Suite 5000
Chicago, IL 60601
Tel: +1 312 861-8803
matt.kluchenek@bakermckenzie.com

John Gorman
Margaret Liu
CONFERENCE OF STATE BANK SUPERVISORS
1129 20th Street, NW
Washington, DC 20036
Tel: +1 202 296-2840
bgorman@csbs.org
mliu@csbs.org

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 5

LAW AND ARGUMENT ...................................................................................................... 7

I.   CSBS'S STATE MEMBERS HAVE ALLEGED A COGNIZABLE HARM TO THEIR SOVEREIGNTY, THUS ESTABLISHING ARTICLE III STANDING ............ 7

    A.   Alleged Interference With State Sovereignty Is Sufficient Injury for Standing ..... 8

    B.   Because CSBS Sufficiently Establishes Injury, the Remaining Elements of Standing Follow ................................................................................................. 12

II.   OCC'S PROMULGATION OF SECTION 5.20(e)(1) AND ITS NONBANK CHARTER DECISION CONSTITUTE FINAL AGENCY ACTION ........................... 12

    A.   Finality is Determined at the Time of the Complaint and is Not Defeated by an Agency's *Post-Hoc* Statements ............................................................................ 13

    B.   The Nonbank Charter Decision Satisfies the *Bennett* and *Ceiba-Geigy* Tests. .... 14

        1.   The Nonbank Charter Decision Marks the Consummation of OCC's Decision-Making, is Not "Tentative or Interlocutory," and Reflects the Agency's Definitive Legal Position on a Purely Legal Question of Statutory Authority ............................................................... 14

        2.   The Nonbank Charter Decision Creates Legal Rights That Did Not Previously Exist, Has Legal Consequences, and Imposes an "Immediate and Significant Practical Burden." ....................................... 17

    C.   The Nonbank Charter Decision is Final from a Pragmatic Perspective. ............. 18

III.   THIS DISPUTE IS RIPE BECAUSE THERE IS A PRESUMPTION OF REVIEWABILITY OF PURELY LEGAL CLAIMS, AND THERE WILL NOT BE A MORE "CONCRETE SETTING" FOR THIS DISPUTE IN THE FUTURE. ................ 19

IV.   CSBS'S CHALLENGE TO SECTION 5.20(e)(1) IS TIMELY. .................................... 21

    A.   CSBS's Challenge is Not Time-Barred Because the Nonbank Charter Decision Necessarily Relies upon Section 5.20(e)(1) for its Legal Validity. ..................... 22

    B.   Because OCC Revisited Section 5.20(e)(1) Within the Statutory Period, CSBS's Claims Are Timely Under the "Reopening" Doctrine. .......................... 23

    C.   CSBS's Challenge is also Timely under the Constructive Reopening Doctrine. . 24

    D.   CSBS Could File a Petition for Amendment/Rescission of Section 5.20(e)(1). .. 25

V.    THE TERM "BUSINESS OF BANKING" IS NOT AMBIGUOUS IN THE
      CONTEXT OF THIS CASE........................................................................... 25

      A.    OCC Misconstrues Step One of the *Chevron* Analysis. ....................................... 25

      B.    The Statutory Context of the NBA—including the Interplay Between the NBA,
            FRA, FDIA and BHCA—Reflects Congress's Intent that a National Bank
            Must Engage in Deposit Taking to Carry on the "Business of Banking."............ 26

            1.    Pursuant to the NBA, FDIA, and FRA, to be lawfully entitled to
                  commence the "business of banking," a national bank must be
                  "engaged in the business of receiving deposits."....................................... 28

            2.    The "business of banking" must be interpreted consistently with
                  the BHCA definition of a "bank," which  encompasses only
                  deposit-taking institutions.................................................................... 30

            3.    Other statutory provisions in the NBA and FRA confirm
                  Congress's intent that carrying on the "banking business" means
                  engaging in deposit taking. .......................................................... 34

      C.    The Legislative History and Historical Context of the NBA Support the
            Conclusion that a National Bank's Exercise of the Power of "Receiving
            Deposits" Is Indispensable to Carrying on the "Business of Banking."............... 34

      D.    OCC fails to address this overwhelming support for CSBS's interpretation........ 36

VI.   COURTS HAVE REPEATEDLY STRUCK DOWN OCC'S ATTEMPTS TO
      CHARTER ENTITIES THAT WOULD NOT CARRY ON THE "BUSINESS OF
      BANKING," AND OCC HAS BEEN REQUIRED TO OBTAIN SPECIFIC
      CONGRESSIONAL AUTHORITY BEFORE DOING SO............................................. 37

      A.    OCC's Effort to Charter Trust Banks Not Engaged in the "Business of Banking"
            Was Rejected by a Federal Court, and OCC Could Not Charter These Banks
            Until Specific Authority Was Granted in an NBA Amendment........................... 38

      B.    OCC's Power to Charter Banker's Banks, Another Special-Purpose Bank,
            Derives From Specific Statutory Authority. ......................................................... 39

      C.    A Federal Court and Congress Have Both Rejected OCC's Prior Efforts to
            Issue National Charters to "Nonbank Banks.".................................................... 40

      D.    Credit Card Banks Are Narrow-Focus Banks That Take Deposits and Are
            Specifically Exempted from the BHCA's Definition of a "Bank" and, as Such,
            Do Not Require Additional Statutory Chartering Authorization in the NBA. ..... 42

      E.    *Nationsbank* and Similar Cases are Inapplicable Because They Address the
            *Outer* Limits of the Business of Banking, Not the *Inner* Limits. ......................... 44

VII.    OCC UNREASONABLY EQUATES THE "BUSINESS OF BANKING" WITH THE
        DEFINITION OF "BRANCH"..........................................................................................46

        A.    Conflating a "national bank" with a "branch" of a national bank ignores the
              plain statutory language of the NBA. ..................................................................47

        B.    OCC's interpretation expands its power through statutes designed to limit it. ....48

        C.    *Clarke v. Securities Industry Association* does not support OCC's position........49

VIII.   CSBS HAS STATED A TENTH AMENDMENT CLAIM BECAUSE IT ALLEGES
        THAT OCC LACKS CONGRESSIONAL AUTHORITY TO PREEMPT STATE
        LAW BY ISSUING NATIONAL BANK CHARTERS TO NON-DEPOSITORY
        INSTITUTIONS. ......................................................................................................51

IX.     OCC'S CREATION OF AN ENTIRELY NEW CATEGORY OF NONBANK
        CHARTER—PARTICULARLY ONE FALLING SQUARELY OUTSIDE ITS
        STATUTORY AUTHORITY—REQUIRED PROPER NOTICE AND COMMENT. .. 54

CONCLUSION..................................................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abuelhawa v. United States*,
   556 U.S. 816 (2009)...............................................................................................27

*Adamski v. McHugh*,
   2015 U.S. Dist. LEXIS 99980 (D.D.C. July 31, 2015)..........................................21

*Alaska v. United States Dep't of Transp.*,
   868 F.2d 441 (D.C. Cir. 1989)..................................................................................8

*American Land Title Ass'n v. Clarke*,
   743 F. Supp. 491 (W.D. Tex. 1989)..................................................................21, 45

*American Library Ass'n v. Fed. Comm. Comm'n.*,
   401 F.3d 489 (D.C. Cir. 2005)..................................................................................7

*American Petroleum Inst. v. Envt'l Prot. Agency*,
   683 F.3d 382 (D.C. Cir. 2012)................................................................................19

*American Road & Transp. Builders Ass'n v. Envt'l Prot. Agency*,
   554 Fed. Appx. 18 (D.D.C. Jan. 31, 2014) ............................................................22

*Ark Initiative v. Tidwell*,
   895 F. Supp. 2d 230 (D.D.C. 2012) ........................................................................12

*Arnold Tours Inc. v. Camp*,
   472 F.2d 427 (1st Cir. 1972)...................................................................................45

*AT&T v. Equal Emp't. Opportunity Comm'n.*,
   270 F.3d 973 (D.C. Cir. 2001)..........................................................................13, 16

*Atlantic Cleaners & Dyers, Inc. v. United States*,
   286 U.S. 427 (1932)................................................................................................33

*Attias v. CareFirst, Inc.*,
   865 F.3d 620 (D.C. Cir. 2017).................................................................................11

*Atwater v. D.C. Dep't of Consum. & Reg. Affairs*,
   566 A.2d 462 (D.C. 1989) .......................................................................................46

*Bank of Augusta v. Earle*,
   38 U.S. 519 (1839)..................................................................................................35

iv

*Belmont Abbey College v. Sebelius*,
  878 F. Supp. 2d 25 (D.D.C. 2012) ........................................................................10

*Bennett v. Spear*,
  520 U.S. 154 (1997)...............................................................................13, 14, 17

*Bimini Superfast Operations LLC v. Winkowski*,
  994 F. Supp. 2d 106 (D.D.C. 2014) ..................................................14, 17, 18

*Board of Governors of the Fed. Reserve Sys. v. Dimension Financial Corp.*,
  474 U.S. 361 (1986)................................................................................................41

*Bowen v. Public Agencies Opposed to Social Security Entrapment*,
  477 U.S. 41 (1986) ..................................................................................................8

*Brown* v. *Gardner*,
  513 U.S. 115 (1994)..........................................................................................26, 27

*Ohio ex rel. Celebrezze v. United States Dept. of Transp.*,
  766 F.2d 228 (6th Cir. 1985) ..........................................................................8, 9

*Cement Kiln Recycling Coal. v Envt'l Prot. Agency*,
  493 F. 3d 207 (D.C. Cir. 2007)..........................................................................20

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984)...............................................................................................25

*Ciba-Geigy Corp. v. Envt'l Prot. Agency*,
  801 F.2d 430 (D.C. Cir. 1986)..................................................................13, 14, 19

*CITA-Wireless Ass'n v. Fed. Comm. Comm'n.*,
  466 F.3d 105 (D.C. Cir. 2006).............................................................................23

*City of Dania Beach, Fla. v. Fed. Aviation Admin.*,
  485 F. 3d 1181 (D.C. Cir. 2007) .........................................................................15

*Clarian Health West, LLC v. Burwell*,
  206 F. Supp. 3d 393, 408, 410 (D.D.C. 2016) .............................................54, 55

*Clark v. Suarez Martinez*,
  543 U.S. 371 (2005)...............................................................................................26

*Clarke v. Sec. Indus. Ass'n*,
  479 U.S. 388 (1987)........................................................................................ *passim*

*Colo. Nat'l Bank v. Bedford*,
  310 U.S. 41 (1940)................................................................................................27

*Columbia Falls Aluminum Co. v. Env't'l Prot. Agency*,
　　139 F. 3d 914 (D.C. Cir. 1998) .......................................................23

*Conservation Law Foundation v. Pritzker*,
　　37 F. Supp. 3d 234 (D.D.C. 2014) .................................................11

*Wyoming ex rel. Crank v. United States*,
　　539 F.3d 1236 (10th Cir. 2008) ..................................................9, 10

*CSBS v. Conover*,
　　710 F.2d 878 (D.C. Cir. 1983) ..................................................51, 53

*CSBS v. Lord*,
　　532 F. Supp. 694 (D.D.C. 1982) ....................................................9

*CSI Aviation Services v. Dep't of Transp.*,
　　637 F. 3d 408 (D.C. Cir. 2011) .................................................13, 14

*Cty of Santa Clara v Trump*,
　　2017 U.S. Dist. LEXIS 62871 (N.D. Cal April 25, 2017) .......................19

*Curtis v. Leavitt*,
　　15 N.Y. 9 (1857) ....................................................................35

*Empire Health Found. v. Burwell*,
　　209 F. Supp. 3d 261 (D.D.C. 2016) ...............................................18

*EPIC v. Dept. of Homeland Sec.*,
　　653 F. 3d 1 (D.C. Cir. 2011) .......................................................54

*ETSI Pipeline Project v. Missouri*,
　　484 U.S. 495 (1988)..................................................................27

*FDA v. Brown & Williamson Tobacco Corp.*,
　　529 U.S. 120 (2000)..............................................................27, 37

*First Nat'l Bank v. Missouri*,
　　263 U.S. 640 (1924)..................................................................48

*Flintkote Co. v. Gen. Accident Assur. Co. of Can.*,
　　410 F. Supp. 2d 875 (N.D. Cal. 2006) ...........................................19

*Friedman v. Fed. Aviation Admin.*,
　　841 F. 3d 537 (D.C. Cir. 2016) ....................................................14

*Garrelts v. Smithkline Beecham Corp.*,
　　943 F. Supp. 1023 (N.D. Iowa 1996) .............................................52

*General Dynamics Land Sys. v. Cline,*
    540 U.S. 581 (2004)................................................................................33

*Hardaway v. District of Columbia Housing Authority,*
    843 F.3d 973 (D.C. Cir. 2016) ...........................................................11

*Hawaii v. Trump,*
    859 F.3d 741 (9th Cir. 2017)(*per curiam*) ...........................................8

*Hibbs v. Winn,*
    542 U.S. 88 (2004)..........................................................................29, 34

*Ind. Bankers Ass'n of America v. Smith,*
    534 F.2d 921 (1976).............................................................................47

*Ind. Comm. Bankers of Am. V. Fed. Res. Bd.,*
    820 F.2d 428 (D.C. Circ. 1987) .....................................................42, 43

*Indep. Bankers Ass'n of Am. v. Conover,*
    1985 U.S. Dist. LEXIS 22529 (M.D. Fla. Feb. 15, 1985) ............... *passim*

*Indep. Ins. Agents of Am., Inc. v. Hawke,*
    211 F.3d 638 (D.C. Cir. 2000)..........................................26, 27, 34, 46

*Jindal v. United States Dep't of Educ.,*
    2015 U.S. Dist. LEXIS 23356 (M.D. La. Feb. 26, 2015) ............9, 10, 12

*Kennecott Utah Copper Corp. v. DOI,*
    88 F.3d 1191 (D.C. Cir. 1996)............................................................24

*Leonardi v. Chase Nat'l Bank,*
    81 F.2d 19 (2d Cir. 1936) ...................................................................47

*M&M Leasing Corp. v. Seattle First Nat'l Bank,*
    563 F.2d 1377 (9th Cir. 1977) ...........................................................45

*Makua v. Rumsfeld,*
    136 F. Supp. 2d 1155 (D. Haw. 2001)...........................................13, 19

*Massachusetts v Envt'l Prot. Agency,*
    549 U.S. 497 (2007)...........................................................2, 8, 9, 12

*McNary v. Haitian Refugee Center, Inc.,*
    498 U.S. 1479 (1991)..........................................................................25

*Mendoza v. Perez,*
    754 F. 3d 1002 (D.C. Cir. 2014) ................................................ 21, 54-55

vii

*Mercantile National Bank v. Mayor,*
    121 U.S. 138 (1887)............................................................................35

*Metropolitan Life Ins. Co. v. Massachusetts,*
    471 U.S. 724 (1985)............................................................................52

*Nat'l Ass'n of Broadcasters v. Fed. Comm. Comm'n.,*
    789 F.3d 165 (D.C. Cir. 2015)...........................................................11

*Nat'l Ass'n of Mfrs. v. Dep't of Interior,*
    134 F. 3d 1095 (D.C. Cir. 1998).........................................................23

*Nat'l Envtl. Dev. Ass'ns. Clean Air Project v. Envt'l Prot. Agency,*
    752 F. 3d 999 (D.C. Cir. 2014)...........................................................16

*Nat'l Res. Def. Council v. Envt'l Prot. Agency,*
    571 F.3d 1245 (D.C. Cir. 2009)..........................................................24

*Nat'l State Bank v. Smith,*
    591 F.2d 223 (3d Cir. 1979)........................................................11, 38

*Nat'l Whistleblower Center v. Health and Hum. Servs.,*
    839 F. Supp. 2d 40 (D.D.C. 2012)......................................................10

*National Ass'n of Greeting Card Pub. v. United States Postal Serv.,*
    607 F.2d 392 (D.C. Cir. 1979)............................................................22

*National Park Hospitality Ass'n v. Department of Interior,*
    538 U.S. 803 (2003)............................................................................21

*National Sec. Counselors v. Cent. Intel. Agency,*
    931 F. Supp. 2d 77 (D.D.C. 2013).......................................................54

*National State Bank v. Smith,*
    No. 76-1479, 1977 U.S. Dist. LEXIS 18184 (D.N.J. Sept. 16, 1977) ..............................38, 39

*Nationsbank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.,*
    513 U.S. 251 (1995)..........................................................4, 28, 44, 45

*Natural Resources Defense Council v. Envt'l Prot. Agency,*
    513 F.3d 257 (D.C. Cir. 2008)............................................................22

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,*
    514 U.S. 645 (1995)............................................................................51

*New York Stock Exchange v. Bloom,*
    562 F. 2d 736 (D.C. Cir. 1977)...........................................................20

*New York v. Fed. Comm. Comm'n.*,
486 U.S. 57 (1988)................................................................................52

*New York v. FERC*,
535 U.S. 1 (2002).............................................................................51, 52

*NLRB Union v. Fed. Labor Relations Auth.*,
834 F.2d 191 (D.C. Cir. 1987)..............................................................22

*North Carolina St. Bd. of Regis. for Prof'l. Eng'rs. v. FTC*,
615 F. Supp. 1155 (E.D.N.C. 1985).......................................................20

*Oconus DOD Emp. Rotation Action Grp. v. Cohen*,
140 F. Supp. 2d 37 (D.D.C. 2001).................................................13, 16

*Olson v. U.S.*,
953 F. Supp. 2d 223 (D.D.C. 2013)........................................................21

*Oulton v. German Sav. & Loan*,
84 U.S. 109 (1872)................................................................................36

*Owens v. Sudan*,
No. 14-5105, 2017 U.S. App. LEXIS 13695 (D.C. Cir. July 28, 2017)................................21

*Pattison v. Syracuse Nat'l Bank*,
80 N.Y. 82 (1880)..................................................................................34

*Peoples Nat. Bank v. Office of Comptroller*,
362 F. 3d 333 (5th Cir. 2004) ...............................................................16

*Pineland State Bank v. Proposed First Nat'l Bank*,
335 F. Supp. 1376 (D.N.J. 1971) ..........................................................47

*Public Citizen v. Nuclear Regulatory Com.*,
901 F.2d 147 (D.C. Cir. 1990)........................................................22, 25

*Sabre, Inc. v. Dep't of Transp.*,
429 F.3d 1113 (D.C. Cir. 2005) ......................................................20, 21

*Sackett v. Envt'l Prot. Agency*,
566 U.S. 120 (2012)..............................................................................16

*Selden v. Equitable Tr. Co.*,
94 U.S. 419 (1876)................................................................................36

*Sierra Club v. Envt'l Prot. Agency*,
551 F. 3d 1019 (D.C. Cir. 2008)...............................................23, 24, 25

ix

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*,
   531 U.S. 159 (2001)...................................................................................52

*Southwest Airlines Co. v. U.S. Dep't. of Transp.*,
   832 F. 3d 270 (D.C. Cir. 2016) ...............................................................13, 16

*Spokeo, Inc. v. Robins*,
   136 S.Ct. 1540 (2016)................................................................................11

*Strom v. Goldman, Sachs & Co.*,
   202 F.3d 138 (2d Cir. 1999)......................................................................35

*Sullivan v. Stroop*,
   496 U.S. 478 (1990)...................................................................................27

*Susan B. Anthony List v Driehaus*,
   134 S. Ct. 2334 (2014)...............................................................................19

*Teva Pharms. USA, Inc. v. Sebelius*,
   595 F.3d 1303 (D.C. Cir. 2010)................................................................19

*Texas Office of Pub. Util. Counsel v. Fed. Comm. Comm'n.*,
   183 F.3d 393 (5th Cir. 1999) ...............................................................10, 20

*Texas v. Equal Emp't Opportunity Comm'n.*,
   827 F.3d 372 (5th Cir. 2016) ......................................................................9

*Texas v. United States*,
   787 F. 3d 733 (5th Cir. 2015) ...................................................................54

*U.S. v. Cleveland Indians Baseball Co.*,
   532 U.S. 200 (2000)...................................................................................33

*United States v. Shimer*,
   367 U.S. 374 (1961)...................................................................................52

*Warren v. Shook*,
   91 U.S. 704 (1875).....................................................................................36

*Weaver v. Federal Motor Carrier Safety Admin.*,
   744 F. 3d 142 (D.C. Cir. 2014)..................................................................22

*Wheaton College v. Sebelius*,
   703 F. 3d 551 (D.C. Cir. 2012)..................................................................11

*Whitman v. American Trucking Assns., Inc.*,
   531 U.S. 457 (2001)...................................................................................15

x

*Whitney v. National Bank of New Orleans & Trust Co.*,
  379 U.S. 411 (1965) ........................................................................................3, 26, 32

*Williams v. Taylor*,
  529 U.S. 420 (2000) ..................................................................................................27

*Yates v. United States*,
  135 S. Ct. 1074 (2015) ..............................................................................................33

*Zukerberg v. DC Bd. of Elections & Ethics*,
  999 F. Supp. 2d 79 (D.D.C. 2013) ...........................................................................21

**Statutes and Regulations**

12 U.S.C. § 21 ...............................................................................................................28, 34

12 U.S.C. § 22 .......................................................................................................34, 38, 50

12 U.S.C. § 24(Seventh) ....................................................................................28, 38, 45

12 U.S.C. § 26 ....................................................................................................................28

12 U.S.C. § 27 .......................................................................................................... 28, 37-39

12 U.S.C. § 30 ....................................................................................................................47

12 U.S.C. § 36 ............................................................................................................. 46-47

12 U.S.C. § 81 ....................................................................................................................47

12 U.S.C. § 93a ..................................................................................................................48

12 U.S.C. § 222 ...........................................................................................................29, 31

12 U.S.C. § 378 ..................................................................................................................34

12 U.S.C. § 501a ................................................................................................................29

12 U.S.C. § 1813 ................................................................................................................31

12 U.S.C. § 1815 ................................................................................................................29

12 U.S.C. § 1841 .................................................................................................... *passim*

12 U.S.C. 1843 ...................................................................................................................32

12 U.S.C. § 1972 ................................................................................................................32

28 U.S.C. § 2401(a) ...........................................................................................................21

12 C.F.R. 5.20(e)(1) ........................................................................................ *passim*

12 C.F.R. 5.20(l)(2) ........................................................................................17

Competitive Equality in Banking Act of 1987,
    Pub. L. No. 100-86, 101 Stat. 552 ............................................................ *passim*

Financial Institutions Regulatory and Interest Rate Control Act of 1978,
    Pub. L. 95-630, 92 Stat. 3641 ...............................................................38

Internal Revenue Act of 1866, ch. 184, 14 Stat. 98 (1866) ...........................35

S.A.F.E. Mortgage Licensing Act, Pub. L. 110–289, §1501 et. seq., 122 Stat. 2810
    (2008)(12 U.S.C. § 5101 *et. seq.*) ..........................................................53

**Other Authorities**

U.S. Const. amend. X.........................................................................5, 51, 52

*Lowry National Bank*,
    29 Op. Att'y Gen. 81 (1911)............................................................48, 49

Fein, Melanie, FEDERAL BANK HOLDING COMPANY LAW § 5.05[3][e] (2017) ............................37

Jeffries, Tara, *OCC's Fintech Charter Plan Receives Tepid Reviews*, MORNING
    CONSULT (Jan. 18, 2017)......................................................................6

Magee, H.W., *A Treatise on the Law of National and State Banks* (2d Ed. 1913)......................34

Malloy, Michael P., *Banking Law and Regulation*, Section 2.02 (2015) ....................30

Morse, John T. Jr., *A Treatise on the Law Relating to Banks and Banking*, xxvi-
    xxvii (2d ed. 1879) .........................................................................35, 36

Symons, Edward L. Jr., *The "Business of Banking" in Historical Perspective*,
    51 Geo. Wash. L. Rev. 676, 718 (1983) ...............................................33

## **INTRODUCTION**

The Conference of State Bank Supervisors ("CSBS"), the nationwide organization of state banking regulators in the United States, challenges the Office of Comptroller of the Currency and Comptroller Keith Noreika's (collectively, "OCC") decision to create a new special-purpose national bank charter for financial technology ("fintech") and other nonbank companies (the "Nonbank Charter Decision").   CSBS contends that OCC lacks the requisite statutory authority under the National Bank Act ("NBA") to encroach upon the regulation of nonbanks by issuing national bank charters to institutions that do not take deposits, and therefore do not engage in the "business of banking," as that term is defined under the NBA and related federal banking laws. OCC's actions allow chartered nonbanks to operate outside the bounds of existing state regulation, undermining the states' abilities to enforce their own laws and interfering with state sovereignty.

In December 2016, OCC formally announced a decision to begin chartering nonbanks after more than a year of study and deliberation. Compl. ¶¶ 52-55. It subsequently published a supplement to its Licensing Manual, which crystalized its position that it had the authority to issue national banking charters to institutions that neither take deposits nor are insured by the Federal Deposit Insurance Corporation ("FDIC"), and explicitly invited interested parties to initiate the application process. *Id*. ¶¶ 67-71. In an effort to distance itself from these actions, OCC relies upon unsworn assertions of counsel and a speech made months *after* the Complaint was filed to suggest that the future of the nonbank charter is uncertain.  But the Court must evaluate standing, finality, and ripeness at the time Complaint is filed—and an agency cannot defeat these showings via *post-hoc* characterizations.

OCC portrays this case as premature, but that is incorrect.  The case presents a well-defined, purely legal issue that is presumptively reviewable. Moreover, CSBS is entitled to "special solicitude" in the standing analysis because it brings this action on behalf of its sovereign

state members. *Massachusetts v EPA*, 549 U.S. 497, 520 (2007).  Courts repeatedly have held that mere conflict or tension between federal and state law constitutes sufficient injury for standing, and CSBS's allegation that the OCC's decision will interfere with the states' ability to enforce their consumer-protection and other laws is sufficient. CSBS has also sufficiently alleged a procedural injury resulting from OCC's failure to afford proper notice and comment before taking steps that affect substantive rights.

CSBS has also sufficiently alleged "final agency action." It is indisputable that 12 C.F.R. §5.20(e)(1) is final.  As for the Nonbank Charter Decision, the agency has "made up its mind" to move forward, and its actions reflect the agency's definitive legal position on a purely legal question of statutory authority.  Viewing finality pragmatically, as the Court must, it is clear that OCC is not retreating from the underlying statutory interpretation that CSBS challenges here. The Court can and should test that underlying legal premise now—there is no point in either OCC or its charter applicants devoting resources to *ultra vires* charters that will be invalidated. And because this case presents a purely legal question, no further factual development is needed, and ripeness is presumed.

Nor is there merit to OCC's argument that CSBS's challenge to Section 5.20(e)(1) is time-barred.  First, OCC's assertion that the statute of limitations must be strictly construed relies on bad law.  In any event, OCC's reliance upon Section 5.20(e)(1) in making its more recent Nonbank Charter Decision, and its "reopening" of the issues underlying the regulation, permit CSBS to bring this action.   And as a practical matter, CSBS still has the right to file a petition to rescind the regulation, which also would render its challenge timely.

OCC's contention that CSBS has failed to state a claim is also unsupported.  When all the traditional tools of statutory construction are taken into account, the proper interpretation of the

"business of banking" is clear and unambiguous. The Court must consider the statutory context of the term, including a regulatory regime that encompasses not only the NBA, but also other federal banking statutes.  Read together, these statutes reflect Congress' intent that the "business of banking" necessarily includes the taking of deposits.

First, the NBA expressly bars OCC from issuing a national bank charter unless the entity can *lawfully* engage in the business of banking—and to lawfully engage in the business of banking an entity must comply with the Federal Reserve Act ("FRA") by becoming an "insured bank" under the Federal Deposit Insurance Act ("FDIA").  Since the FDIA requires that a national bank take *deposits* before it can become an insured bank, an association cannot lawfully engage in the business of banking unless it receives deposits—unless Congress expressly exempts it from this requirement.

Additionally, any interpretation of the "business of banking" in the NBA must be consistent with the Bank Holding Company Act's ("BHCA") definition of "bank," given the complementary regulatory role of these statutes and the agencies that oversee them. *Whitney v. National Bank of New Orleans & Trust Co.*, 379 U.S. 411 (1965).  OCC cannot approve a charter that would have the effect of violating the BHCA—and the BHCA defines a "bank" as an organization that, at a minimum, engages in the business of receiving deposits and whose deposits are insured.  OCC's interpretation improperly allows a nonbank to become an OCC-chartered national bank that escapes regulation under the BHCA.

The legislative history and historical context of the NBA further support the conclusion that a national bank must exercise the power of receiving deposits.  Courts repeatedly interpreted deposit taking as indispensable to the business of banking during the years before and after the enactment of the NBA, and members of Congress referenced the central role of deposit taking

3

during the debates surrounding the passage of the Act.  OCC looks to an irrelevant 1866 tax statute that a contemporary scholar recognized was "valueless" outside of the tax context.

OCC mistakenly relies upon cases like *Nationsbank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251 (1995), to established alleged ambiguity.  But that case did not consider, much less determine, whether OCC possesses the authority to charter a bank that does not exercise the power to receive deposits.  Rather, the Court addressed the entirely separate question of whether OCC could permit an already chartered, full-service and insured bank to engage in *additional* banking activities beyond those that qualified it to receive a national bank charter.  Thus, the case addressed the *outer* limits of the "business of banking," not the *inner* limits that are at issue here.

Ultimately, OCC has the power to charter a national bank only if it is organized to carry on the "business of banking" (which, under current law, requires taking deposits, at a minimum) *or* where Congress has provided specific authorization to charter an entity to carry on a special purpose.  Where OCC has exceeded the limits of its chartering authority, the courts have struck down those efforts.  *See*, *.e.g.*, *Indep. Bankers Ass'n of Am. v. Conover*, 1985 U.S. Dist. LEXIS 22529, at *11 (M.D. Fla. Feb. 15, 1985). In some instances, Congress has adopted targeted legislation providing a limited expansion of OCC's chartering authority— in the case of trust banks, for example.  Had Congress believed OCC possessed broad authority to issue a charter to organizations not engaged in the business of banking, there would have been no need for such legislation.  In fact, decades ago Congress declined to expand OCC's authority to charter "nonbank banks" and, instead, passed certain amendments to the BHCA closing a loophole that previously allowed nonbanks to escape regulation under that statute.

4

Even if the "business of banking" were ambiguous, OCC's interpretation fails because it is not based on a permissible construction of the statute. OCC ignores the statutory interplay and historical background surrounding the requirements for the establishment of a national bank and, instead, relies upon statutory provisions related to the establishment of, and restrictions on, bank *branches*. This interpretation nullifies any distinction between a "national banking association" and a mere "branch" of such an association. It also improperly expands OCC's chartering power through statutes that were designed to limit it. Further, the Supreme Court case upon which OCC heavily relies, *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987), offers no support for its interpretation.

OCC's attempt to wrest control over nonbank financial services providers by administrative fiat also violates the Tenth Amendment. When a federal agency seeks to expand its power into areas traditionally occupied by states, courts require a clear showing that Congress, acting through the agency, has approved such a result. OCC has no such approval, nor does it even argue that it has balanced state considerations, as required.

## BACKGROUND

CSBS's members have been successfully overseeing and regulating nonbank companies— including nonbank lenders, payments providers, and financial services companies—for many years. Compl. ¶¶ 3, 20-27. Among other things, States require these nonbanks to meet state safety and soundness requirements and conform to state consumer-protection and other laws. *Id.* at ¶ 3. OCC's plan to intrude upon this traditional area of state concern was marked by a long deliberative process, as detailed in the Complaint. Compl. ¶¶ 38-76. Nearly fourteen years after the promulgation of Section 5.20(e)(1), OCC's deliberations began in earnest in September 2016, when it implemented targeted revisions to its 2009 Licensing Manual. OCC Brief, Ex. B. These revisions memorialized OCC's belief that it has broad authority to issue charters to national banks

5

that do not receive deposits. *Cf.* Excerpted language from 2009 Licensing Manual (Ex. A hereto) and 2016 Licensing Manual (Ex. B hereto)(broadening definition of chartering authority to include "other banks that limit their activities" and modifying mandatory nature of deposit insurance). In December 2016, then-Comptroller Curry formally announced that OCC had "decided to move forward" and "*will* move forward with chartering financial technology companies . . ." Compl. Ex. B at 3.

In January 2017, OCC staff confirmed that "OCC will accept applications after it has considered comments and published a policy statement." *See* Tara Jeffries, *OCC's Fintech Charter Plan Receives Tepid Reviews*, MORNING CONSULT (Jan. 18, 2017)(quoting agency official)(Ex. C hereto).  In March 2017, Comptroller Curry restated OCC's position that the law does not "require that a bank take deposits to qualify for a national bank charter." *See* Curry Remarks at LendIt USA at 5 (Ex. D hereto).  He reiterated that OCC "*will be issuing charters* to fintech companies engaged in the business of banking" after publishing a formal agency policy in the form of "a supplement to our existing Licensing Manual that will clarify our approach to evaluating applications from fintech companies." *Id*. (emphasis added).

OCC issued the promised supplement to the Licensing Manual in March 2017.  The supplement removed any doubt that OCC "has determined that it is in the public interest to consider applications for a special purpose national bank (SPNB) charter from financial technology (fintech) companies that engage in banking activities and that meet OCC's chartering standards." Compl. Ex. E at 1.  It provides clear guidance for applicants by defining the scope of the charter as including "a national bank that engages in a limited range of banking activities, including one of the core banking functions described at 12 C.F.R. 5.20(e)(1), but does not take deposits . . .." *Id*. at 2. Tellingly, the supplement repeatedly directs fintechs to schedule pre-filing

exploratory meetings with OCC. *Id*. at 3.  Although issued in "draft," the Manual Supplement

document contains unconditional, unqualified language, with no indication that a "final" version

would be issued.

After CSBS filed its Complaint, OCC ostensibly pivoted.  In a July 2017 speech, Acting

Comptroller Noreika referenced the instant litigation and protested that OCC "has no imminent or

concrete plans to use section 5.20 to charter an uninsured special purpose fintech national bank."

*See* OCC Brief, Ex. A at 10.  But, in nearly the same breath, he confirmed OCC's intent to move

forward in two ways: by encouraging fintechs to review the updated Licensing Manual, from

which the requirement of deposit-taking was specifically removed; and by encouraging fintechs to

"contact the OCC's Office of Innovation for an initial discussion."  *Id*. at  10.

## LAW AND ARGUMENT

## I.    CSBS'S STATE MEMBERS HAVE ALLEGED A COGNIZABLE HARM TO THEIR SOVEREIGNTY, THUS ESTABLISHING ARTICLE III STANDING.

CSBS has sufficiently alleged standing based upon the effect of Section 5.20(e)(1) and the

Nonbank Charter Decision on its member states' sovereignty and ability to enforce state licensing

and consumer protection laws. This is particularly true when the Court, as it must, measures

CSBS's standing at the time the Complaint was filed, takes CSBS's allegations as true for

purposes of this motion, and grants it the benefit of all inferences derived from the facts alleged.

OCC argues that CSBS has not demonstrated standing because neither "Section 5.20(e) nor OCC's

public statements . . . had any cognizable real-world effect on anyone," and that the alleged harms

are "inchoate" and "hypothetical." OCC Brief at 10, 11.[1]  This overlooks not only an entire body

_____

[1] CSBS has associational standing because (1) at least one of its members has standing to sue; (2) the interests it seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of an individual member. *See American Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005).  OCC does not challenge CSBS's satisfaction

of case law predicating standing on federal interference with state laws but also the "special

solicitude" afforded states in the standing analysis. *See Massachusetts v. EPA*, 549 U.S. 497, 518-

520 (2007).

### A.      Alleged Interference With State Sovereignty Is Sufficient Injury for Standing.

"A state has an interest in its 'exercise of sovereign power over individuals and entities

within the relevant jurisdiction,' which 'involves the power to create and enforce a legal code.'"

*Hawaii v. Trump*, 859 F.3d 741, 765 (9th Cir. 2017)(*per curiam*)(quoting *Alfred L. Snapp & Son,*

*Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)). Thus, a state has standing to sue the

federal government where it alleges "a judicially cognizable interest in the preservation of its own

sovereignty, and a diminishment of that sovereignty by the alleged [federal] interference." *Bowen*

*v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 51 n.17 (1986)

(quotations omitted). On this basis, courts repeatedly have found that states have suffered a

cognizable injury when federal law threatens to interfere or conflict with, or preempt, a state

statute.

The D.C. Circuit held nearly thirty years ago that states had a "sovereign interest in law

enforcement … sufficient to support standing" when they challenged agency rules governing

unfair advertising of airfares. *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 n.1 (D.C. Cir.

1989). The agency claimed—just as OCC does here—that its rules preempted state statutes,

specifically state consumer-protection law. *Id*. at 442-443. The court found that the alleged

"preemptive effect" of the agency rules constituted injury to meet "the standing requirements of

Article III." *Id.* at 444. In reaching this conclusion, the court relied, in part, upon *Ohio ex rel.*

*Celebrezze v. US Dept. of Transp.*, 766 F.2d 228 (6th Cir. 1985), in which the Sixth Circuit found

of the second and third prongs, nor could it.  *See CSBS v. Lord*, 532 F. Supp. 694, 695-96 (D.D.C.
1982), *aff'd CSBS v. Conover*, 710 F.2d 878, 881 n.3 (D.C. Cir. 1983).

that the state plaintiff had standing "to vindicate its own law," which was "endangered and rendered uncertain by" the agency's position. *Id.* at 233.

Since *Alaska* and *Ohio*, the Supreme Court has shifted the calculus even further in favor of state standing, observing that states are entitled to "special solicitude" in the standing analysis where, as here, they are suing to protect their sovereign interests vis á vis the federal government. *See Massachusetts*, 549 U.S. at 520. The Court has reasoned that "[i]t is of considerable relevance that the party seeking review here is a sovereign State and not . . . a private individual." *Id.* at 518 (observing that "States are not normal litigants for the purposes of invoking federal jurisdiction."). Courts repeatedly have afforded this "special solicitude" to state plaintiffs in suits challenging the reach of federal action. *See*, *e.g.*, *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1241-42 (10th Cir. 2008)(finding that Wyoming had standing to challenge agency decision because it "interferes with Wyoming's ability to enforce its legal code."); *Jindal v. United States Dep't of Educ.*, 2015 U.S. Dist. LEXIS 23356, *5- 7 (M.D. La. Feb. 26, 2015); *Texas v. EEOC*, 827 F.3d 372, 378, 379 (5th Cir. 2016) (finding that Texas had standing to challenge EEOC guidance, "considering Texas's unique position as a sovereign state defending its existing practices and threatened authority"), *withdrawn on other grounds*, 838 F.3d 511 (5th Cir. 2016).

Like the state plaintiffs in the above cases, CSBS on behalf of its member states alleges agency action that creates a direct conflict between federal and state law and a resulting encroachment on state sovereignty. Compl. ¶¶ 94, 96 (alleging that Section 5.20(e)(1) and the Nonbank Charter Decision "impede the states' ability to continue their existing regulation of financial services companies within their borders and to enforce state laws designed to protect the consuming public and ensure the safety and soundness of nondepository companies" and create "conflicts with state law and threatens to preempt state sovereign interests."). Just as in *Alaska,*

*Wyoming,* and *Ohio*, OCC has expressly acknowledged the intended preemptive effect of its actions. *See*, *e.g.*, December 2016 White Paper (Compl. Ex. C) at 5 and OCC Summary of Comments (Compl. Ex. F) at 5.

But importantly, at the motion to dismiss stage, CSBS need not *prove* preemptive effect. This Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Belmont Abbey College v. Sebelius*, 878 F. Supp. 2d 25, 32 (D.D.C. 2012)(internal quotation omitted); *Jindal*, 2015 U.S. Dist. LEXIS 23356 at *20 ("[The loss of the sovereign right to control education] is the injury which Governor Jindal alleges, and the Court is obliged at this stage of the proceedings to presume the allegations, as pled, true. Hence, as pled, the *Complaint* sets forth injury sufficient to satisfy the constitutional standing inquiry.")(emphasis in original). Additionally, this Court has recognized that a "lesser standard" is required to show standing at the motion to dismiss stage. *Nat'l Whistleblower Center v.HHS*, 839 F. Supp. 2d 40, 46 (D.D.C. 2012)(internal quotation omitted).

OCC claims that injury is impossible where it "has yet to take any relevant action," contending (without direct cited authority) that there can be no injury "unless and until a 5.20(e)(1) Charter is issued." OCC Brief at 10, 12. This argument is meritless, and OCC's failure to act upon its purported authority under Section 5.20(e)(1) is not dispositive. Both the D.C. Circuit and other courts have refused to dismiss complaints on standing grounds simply because a federal agency opts not to actually enforce a regulation or decision conflicting with state law. *See, e.g., Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 409 (5th Cir. 1999)(applying D.C. Circuit precedent that does "not find a lack of standing simply because an agency has refused to enforce its own regulations.")(citing *Alaska*, 868 F.2d at 444). Further, the existence of conflict or

tension between the federal and state laws supplies the requisite injury to state sovereignty. Thus, the Nonbank Charter Decision—and the conflict or tension between federal and state law that it triggers—is itself actual injury.

But "[a]n allegation of actual injury is not essential." *Nat'l State Bank v. Smith*, 591 F.2d 223, 229 (3d Cir. 1979). "[I]ntangible injuries can nevertheless be concrete." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1549 (2016). And "a plaintiff can establish standing by satisfying . . . the 'substantial risk' test." *Attias v. CareFirst, Inc*., 865 F.3d 620, 2017 U.S. App. LEXIS 13913 at *11 (D.C. Cir. 2017)(quotation omitted). Under this test, a substantial threat or fear of enforcement by the government is adequate. *Attias* at *12; *see also Nat'l Ass'n of Broadcasters v. FCC*, 789 F.3d 165, 181 (D.C. Cir. 2015)(rejecting agency's argument that injury was unduly speculative). Thus, even if CSBS has not shown actual injury through OCC's "invasion" of the states' "legally protected interest" in their sovereignty, *Spokeo*, 136 S. Ct. at 1548, they have standing based on a "substantial risk" this harm will occur. *Attias*, 2017 U.S. App. LEXIS 13913 at *11.

OCC's post-Complaint statements and belated equivocation about the status of the Nonbank Charter Decision do not undermine the alleged injury because "the Court must evaluate whether [plaintiff] had standing to sue based on the facts as they existed when [it] filed its Complaint . . . and cannot consider Defendants' subsequent actions." *Conservation Law Foundation v. Pritzker,* 37 F. Supp. 3d 234 (D.D.C. 2014); *Hardaway v. District of Columbia Housing Authority*, 843 F.3d 973 (D.C. Cir. 2016)("critically for this case, the standing inquiry focuses on whether the plaintiff has demonstrated an injury at the outset of the litigation"); *Wheaton College v. Sebelius*, 703 F. 3d 551 (D.C. Cir. 2012)(reversing district court decision that defendant agency's post-complaint, non-binding promises of future rulemaking defeated standing:

"Dismissal for lack of standing was erroneous because standing is assessed at the time of filing, and the [plaintiffs] clearly had standing when these suits were filed.").

**B.    Because CSBS Sufficiently Establishes Injury, the Remaining Elements of Standing Follow.**

Because OCC's encroachment on state sovereignty is a sufficient allegation of injury, the remaining elements of standing—causation and redress—naturally follow. Clearly, Section 5.20(e)(1) and the Nonbank Charter Decision are the cause of the injury alleged here—it is not "self-inflicted" by CSBS. *See Jindal*, 2015 U.S. Dist. LEXIS 23356, at *20. Likewise, there can be no question that the declaratory relief sought in this action would redress the injury.

CSBS also separately has standing to assert the procedural injury alleged in Count III, which alleges deprivation of procedural protections under the APA such as the right to proper notice and comment.  "Standing for a procedural injury is special . . . because a person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Ark Initiative v. Tidwell*, 895 F. Supp. 2d 230, 239 (D.D.C. 2012).  CSBS need not prove that, had it received these procedures, the Nonbank Charter Decision "would have been altered." *See Id*. In sum, CSBS has shown, especially in light of the "special solicitude" due its members, that its "stake in the outcome of the controversy" is sufficiently adverse to OCC to establish standing for each of its asserted claims. *See Massachusetts*, 549 U.S. at 517, 520.

**II.    OCC'S PROMULGATION OF SECTION 5.20(e)(1) AND ITS NONBANK CHARTER DECISION CONSTITUTE FINAL AGENCY ACTION.**

OCC does not—and cannot—dispute that its promulgation of Section 5.20(e)(1) constitutes final agency action. However, OCC argues that its Nonbank Charter Decision is "nothing more than a collection of non-final policy papers and solicitations for input from the public" that do not rise to the level of final agency action.  OCC Brief at 13. Contrary to OCC's assertions, the

Nonbank Charter Decision *does* constitute final agency action because it satisfies both prongs of

the Supreme Court's test established in *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The

decision also satisfies the D.C. Circuit's three-factor test derived from *Ciba-Geigy Corp. v. EPA*,

801 F.2d 430 (D.C. Cir. 1986), which applies to "pre-enforcement challenges" and is

"complementary to *Bennett." See CSI Aviation Services v. DOT*, 637 F. 3d 408, 411 (D.C. Cir.

2011). Moreover, in evaluating finality, the Court must (1) take CSBS's allegations as true,

(*Oconus DOD Emp. Rotation Action Grp. v. Cohen*, 140 F. Supp. 2d 37, 43-44 (D.D.C. 2001)),

and (2) "apply the finality requirement in a 'flexible' and 'pragmatic' way." *Ciba–Geigy*, 801 F.2d

at 435-36.

### A.    Finality is Determined at the Time of the Complaint and is Not Defeated by an Agency's *Post-Hoc* Statements.

As with standing, finality must be determined at the time the complaint is filed. *See AT&T*

*v. EEOC*, 270 F.3d 973, 976 (D.C. Cir. 2001) (only "the facts in existence *at the time the suit was*

*filed*" matter)(emphasis in original)(citation omitted). It is true that, in some instances, courts

"have looked to the way in which the agency subsequently treats the challenged action."

*Southwest Airlines Co. v. U.S. Dept. of Transp.*, 832 F. 3d 270, 275 (D.C. Cir. 2016)(citations

omitted). But this subsequent treatment matters when the agency does "more than simply *say* it

would give further consideration" to its prior, challenged decision. *Id*. at 276 (emphasis in

original). Thus, consideration of facts emerging after the Complaint is filed will be appropriate

only where the agency "put its money where its mouth is." *Id*. Merely "issu[ing] a post-hoc

statement characterizing a prior action . . . as non-final," however, is insufficient. *Id*. at 276; *see*

*also Makua v. Rumsfeld*, 136 F. Supp. 2d 1155, 1161 (D. Haw. 2001)(holding that the agency's

issuance of an environmental assessment and finding was a final agency action at the time the

complaint was filed, "*even if Defendants have now withdrawn that action.*")(emphasis added).

13

**B.      The Nonbank Charter Decision Satisfies the *Bennett* and *Ceiba-Geigy* Tests.**

In *Bennett*, the Supreme Court held that agency action is final if it satisfies two conditions: "First, the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." 520 U.S. at 177-78. The D.C. Circuit also applies the so-called *Ciba-Geigy* factors "complementary to *Bennett*," to cases involving a "pre-enforcement challenge." *CSI Aviation Services*, 637 F. 3d at 411. These factors consider: (1) whether the agency has "taken a 'definitive' legal position concerning its statutory authority"; (2)  whether "the case presented 'a purely legal' question of 'statutory interpretation'"; and (3) whether "the [challenged decision] imposed an immediate and significant practical burden on [plaintiff or the regulated entity]." *Bimini Superfast Operations LLC v. Winkowsk*i, 994 F. Supp. 2d 106, 114  (D.D.C. 2014)(quoting *Ciba-Geigy*, 801 F.2d 435-37). As explained below, each of these measures favors finality here.

**1.      The Nonbank Charter Decision Marks the Consummation of OCC's Decision-Making, is Not "Tentative or Interlocutory," and Reflects the Agency's Definitive Legal Position on a Purely Legal Question of Statutory Authority.**

The Complaint contains ample allegations reflecting that OCC has "made up its mind" to move forward with the Nonbank Charter Decision. *See*, *e.g.*, *Friedman v. FAA,* 841 F. 3d 537, 543 (D.C. Cir. 2016). OCC consummated its decision-making with the publication of its March 2017 Licensing Manual Supplement, which made explicit that its nonbank charter is for companies that do not take deposits and are not FDIC-insured. Compl ¶ 68 and Ex. E at 1. The supplement was based on more than a year of OCC study and deliberation, culminating with  Comptroller Curry's December speech formally announcing that OCC had "*decided to move forward*," and that his staff had been instructed to "develop and implement" the plan. Compl. Ex. B at 3. OCC staff

14

subsequently stated that applications would be accepted after the publication of a policy statement. *See* Ex. C hereto. This was followed by an additional speech by Comptroller Curry restating OCC's legal position that deposit-taking was not required to qualify an institution for a national bank charter and that OCC "will be issuing charters" once a supplement to the Licensing Manual was published. *See* Ex. D hereto. That supplement was issued in March 2017 and expressly stated that OCC "*has determined* that it is in the public interest to consider applications for a [SPNB] charter from financial technology (fintech) companies that engage in banking activities and that meet OCC's chartering standards." Compl., Ex. E at 1(emphasis added). The supplement not only reiterated OCC's legal position regarding the scope of its chartering authority but directed potential applicants to schedule pre-filing exploratory meetings with OCC." *Id*. at 3.

These actions and statements demonstrate that OCC had made up its mind to move forward with the Nonbank Charter Decision by the time this action was filed. Although ostensibly issued in "draft" form, the Manual Supplement contains unconditional, unqualified language, with no indication or legal requirement that a more "final" version would be forthcoming.  Nothing else in the document suggests that the OCC's conclusion on this point is "tentative, open to further consideration, or conditional on future agency action." *See City of Dania Beach, Fla. v. FAA*, 485 F. 3d 1181, 1188  (D.C. Cir. 2007). The specific *procedures* OCC may use to implement its decision are irrelevant to the central premise of CSBS's challenge: that OCC has exceeded its statutory authority. "The bite in the phrase 'final action' is not in the word 'action'. . . . It is rather in the word 'final,' which requires that the action under review 'mark the consummation of the agency's decision making process.'"  *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 478 (2001)(citations omitted).

Nor does Acting Comptroller Noreika's July 2017 speech—post-dating the Complaint by almost three months, and delivered shortly before OCC filed its Motion to Dismiss—defeat finality. This speech is a quintessential example of an agency "simply *say[ing],*" *see Southwest*, 832 F.3d 276 (emphasis in original)—rather than *doing*. OCC has not, as the D.C. Circuit phrased it, "put its money where its mouth is." *See id.* It has not acted to actually rescind any aspect of the Nonbank Charter Decision or withdrawn its Manual Supplement. Nor has OCC sought a stay of this action, implicitly reflecting the agency's intent to keep the Nonbank Charter Decision intact. Indeed, the only representations as to the agency's future actions are in the form of speeches by the interim Comptroller and unsworn representations by OCC's counsel in its brief. In fact, Comptroller Noreika has admitted that OCC would continue to hold pre-filing meetings with fintech companies seeking an SPNB charter. OCC Brief, Ex. A at 9.

The notion that the Decision *might* be subject to change in the future is irrelevant. The D.C. Circuit has stated that "[a]n agency action may be final even if the agency's position is 'subject to change' in the future." *Nat'l Envtl. Dev. Ass'ns. Clean Air Project  v. EPA*, 752 F. 3d 999, 1006-7 (D.C. Cir. 2014)(*citing Appalachian Power Co. v. EPA,* 208 F.3d 1015, 1022 (D.C. Cir. 2000)("[A]ll laws are subject to change . . . [t]he fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment." (citation omitted)); *Sackett v. EPA*, 566 U.S. 120, 127 (2012)("The mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal.").[2]

___

[2]  OCC's cited cases don't support its position. *AT&T v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001), considered the agency's steps towards filing a lawsuit, which is not relevant here.  As noted above, *Oconus*, 140 F. Supp. 2d at 43-44, actually underscores the importance of taking Plaintiff's finality allegations as true. *Peoples Nat. Bank v. Office of Comptroller*, 362 F. 3d 333 (5th Cir. 2004), turns on the plaintiff foregoing an administrative appeal, not an issue here.

These facts also support the first two *Ceiba-Geigy* factors. First, with the release of the draft Manual Supplement, and as reflected in its prior actions and pronouncements, OCC took a "definitive legal position" concerning its statutory authority to promulgate and rely upon Section 5.20(e)(1) and create the nonbank charter. *See Bimini Superfast Operations*, 994 F. Supp. 2d at 114. Regardless of *how* OCC implements its decision, at the time the Complaint was filed OCC had demarcated its position, and it has not taken meaningful steps to retreat from it. Likewise, this case "presents a purely legal question of statutory interpretation." *Id.* The sole question that determines the validity of the Nonbank Charter Decision is whether OCC has the statutory authority to grant a national bank charter to an institution that would not be chartered for an expressly authorized special purpose and would not take deposits within the meaning of the FDIA—and therefore is neither an "insured bank" for the purposes of the FDIA nor a "bank" for the purposes of the BHCA. No factual development is necessary to answer this question, nor does the answer turn on the particular manner in which OCC implements its decision.

> **2.      The Nonbank Charter Decision Creates Legal Rights That Did Not Previously Exist, Has Legal Consequences, and Imposes an "Immediate and Significant Practical Burden."**

The second prong of *Bennett* is satisfied because "rights . . . have been determined" and "legal consequences . . . flow" from OCC's assertion of authority to issue nonbank charters. *See Bennett*, 520 U.S. at 177-78. OCC's unwavering, unretracted determination that engaging in the "business of banking"—and consequently, eligibility for a national bank charter—does not require taking deposits, is a definitive legal position from which legal consequences flow.

In fact, tangible legal rights already have been created, irrespective of whether OCC has decided to accept or act upon charter applications pursuant to its Nonbank Charter Decision, because OCC has already established *other* regulatory means for creating a nonbank charter of the type contemplated by Section 5.20(e)(1). More specifically, through a recent regulation permitting

changes in charter purpose, 12 C.F.R. 5.20(l)(2) (adopted January 23, 2017 amidst the Nonbank

Charter Decision), OCC could permit an existing, chartered full-service bank or special purpose

bank to apply to change the purpose of its charter to that of a nonbank charter created under

Section 5.20(e)(1). OCC would face no impediment to allowing a conversion to this form of

charter, without ever accepting an actual application under its Nonbank Charter Decision.

Undoubtedly, the pre-filing meetings currently being encouraged and held with fintech companies

afford ample opportunities to explore this and other possible "back-door" routes to a nonbank

charter. Thus, the availability of this change-of-purpose application under Section 5.20(l)(2)

further demonstrates that legal consequences already flow from the legal position OCC has taken

regarding the purported broad scope of its chartering authority.

        These facts also support the third *Ceiba-Geigy* factor, as the Nonbank Charter Decision

places "an immediate and significant practical burden" on CSBS's member states. *See Bimini*

*Superfast Operations*, 994 F. Supp. 2d at 114. The Nonbank Charter Decision is an assertion of

federal jurisdiction in a manner that implicates state sovereignty, burdening the states by

interfering with the enforcement of their own laws.  There are practical burdens for charter

applicants as well, who may invest significant time and resources into pursuing a charter—only to

have it revoked upon a finding that OCC lacked statutory authority to grant it.

        **C.**     **The Nonbank Charter Decision is Final from a Pragmatic Perspective.**

        Finally, in light of the "pragmatic" approach the Court must take, this is not a case for

dismissal to "let the administrative gears keep grinding." *See Empire Health Found. v. Burwell*,

209 F. Supp. 3d 261, 263 (D.D.C. 2016). First, CSBS's challenge is to statutory authority.

Whatever the final details of the Nonbank Charter Decision and the mechanics of its

implementation, it is clear that OCC will not retreat from its underlying statutory interpretation

that it has the authority to regulate nonbanks. That fundamental decision is final; thus, the central

18

premise of CSBS's challenge will not change. Second, OCC argues that only the actual grant of a charter will constitute final agency action. OCC Brief at 17. If true, the Nonbank Charter Decision could remain unreviewable for some time. That makes little sense from a pragmatic or policy perspective, particularly in that it forces an applicant to expend money seeking a charter and forces organizers to tie up capital in an institution that may ultimately be invalid.

## III.   THIS DISPUTE IS RIPE BECAUSE THERE IS A PRESUMPTION OF REVIEWABILITY OF PURELY LEGAL CLAIMS, AND THERE WILL NOT BE A MORE "CONCRETE SETTING" FOR THIS DISPUTE IN THE FUTURE.

OCC erroneously argues that, even if Article III standing is met, the case is not prudentially ripe. But the Supreme Court recently has cast doubt on the appropriateness of analyzing prudential ripeness, once constitutional standing is satisfied. *See Susan B. Anthony List v Driehaus*, 134 S. Ct. 2334, 2347 (2014); *Cty of Santa Clara v Trump*, 2017 U.S. Dist. LEXIS 62871, *68-69 (N.D. Cal April 25, 2017). *If* this court considers prudential ripeness, it must evaluate (1) the fitness of the issue for decision and (2) the hardship to the parties of withholding court consideration. *Ciba-Geigy Corp. v. EPA*, 801 F. 2d at 434. Notably, however, the D.C. Circuit "has frequently suggested that hardship is not a *sine qua non* of ripeness." *Teva Pharms. USA, Inc. v. Sebeliu*s, 595 F.3d 1303, 1310 (D.C. Cir. 2010)(citing cases).

Ripeness "is evaluated at the commencement of a lawsuit, and is not subsequently defeated through changed circumstances." *Flintkote Co. v. Gen. Accident Assur. Co. of Can.*, 410 F. Supp. 2d 875, 882 (N.D. Cal. 2006). "If ripeness existed at the commencement of this action, Defendants cannot avoid judicial scrutiny by withdrawing the [challenged decisions] and arguing that the case

is no longer ripe." *Makua*, 136 F. Supp. 2d at 1161.[3]  Thus, OCC's post-complaint equivocation has no bearing on  ripeness here.

    This matter is fit for review—indeed, the D.C. Circuit has made clear that "a purely legal claim in the context of a facial challenge [to a rule or regulation] is *presumptively reviewable*." *Cement Kiln Recycling Coal. v EPA*, 493 F. 3d 207, 242 (D.C. Cir. 2007)(internal quotation omitted)(emphasis added); *see also Sabre, Inc. v. DOT*, 429 F.3d 1113, 1120 (D.C. Cir. 2005)(applying the presumption to "a purely legal question of statutory construction."). This presumption applies here. CSBS challenges OCC's interpretation of the National Bank Act and related federal banking statutes and requests judicial review to "requir[e] the [agency] to stay within the limits prescribed by [Congress.]"  *See Sabre*, 429 F.3d at 1121. Plaintiff's challenge presents "a purely legal question of statutory construction," where there is no need for "further factual development." *See id.*

    Additionally, "[a]bsent institutional interests favoring the postponement of review, a petitioner need not show that delay would impose individual hardship to show ripeness." *Sabre*, 429 F.3d at 1119-1120. Here, like the defendant agency in *Sabre*, the "[OCC] has failed to offer plausible reasons why it has an institutional interest in postponing review." *Id*. Courts repeatedly have found challenges by states brought to vindicate their sovereignty to be ripe. *See, e.g., North Carolina St. Bd. of Regis. for Prof'l. Eng'rs. v. FTC*, 615 F. Supp. 1155, 1162 n. 7 (E.D.N.C. 1985); *Texas Office of Pub. Util. Counsel v. FCC*, 183 F. 3d 393, 448 (5th Cir. 1999)(noting "one does not have to await the ultimate impact of the threatened injury to obtain preventive relief," and

---

[3] OCC cites *American Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012), but the facts of that case are unique, and even that court observed that "[a]ll of this is not to say an agency can stave off judicial review of a challenged rule simply by initiating a new proposed rulemaking that would amend the rule in a significant way.  If that were true, a savvy agency could perpetually dodge review."

concluding the court "should be able to resolve a question such as jurisdiction and

authority")(internal quotation omitted).

Defendants' cited cases are not to the contrary and are readily distinguishable. *New York*

*Stock Exchange v. Bloom*, 562 F. 2d 736, 741 (DC Cir. 1977) does not involve a state challenge to

federal encroachment; rather, it centers around an informal opinion that on its face "reflected [its]

tentative nature." *Zukerberg v. DC Bd. of Elections & Ethics*, 999 F. Supp. 2d 79, 84 (D.D.C.

2013), made the "common sense" point that "a law that has not yet been passed, is not yet binding,

and may never 'have its effects felt' at all cannot be considered final." *American Land Title Ass'n*

*v. Clarke*, 743 F. Supp. 491, 498 (W.D. Tex. 1989), involved a challenge to OCC interpretative

letters; among other reasons for finding the case unripe, the Court observed that plaintiffs could

"obtain judicial review by suing directly a national bank who causes them harm by engaging in

title insurance activities." And the D.C. Circuit itself has repeatedly distinguished *National Park*

*Hospitality Ass'n v. Department of Interior*, 538 U.S. 803 (2003), noting, for instance, that "the

Court seemed to find the regulation's impact [there] murky and remote." *Sabre*, 429 F.3d at 1120.

## IV.    CSBS'S CHALLENGE TO SECTION 5.20(e)(1) IS TIMELY.

OCC argues that CSBS's challenge to Section 5.20(e)(1) is time-barred by the six-year

statute of limitations found in 28 U.S.C. § 2401(a). As a threshold matter, OCC's fundamental

premise for this argument—that Section 2401(a) "'is a jurisdictional condition" that "must be

strictly construed'" (OCC Brief at 22)(quoting  *Spannaus v. U.S. Dept. of Justice*, 824 F.2d 52, 55

(D.C. Cir. 1987))—has been rejected or questioned by the D.C. Circuit, including as recently as

July 2017. *See*, *e.g.*, *Owens v. Sudan*, No. 14-5105, 2017 U.S. App. LEXIS 13695 at *112 (D.C.

Cir. July 28, 2017); *Mendoza v. Perez*, 754 F. 3d 1002, 1018 n.11 (D.C. Cir. 2014); *see also Olson*

*v. U.S.*, 953 F. Supp. 2d 223, 232 (D.D.C. 2013). OCC is incorrect in its assertion that the statute

of limitations must be "strictly construed," and several well-established exceptions apply.

21

**A.    CSBS's Challenge is Not Time-Barred Because the Nonbank Charter Decision Necessarily Relies upon Section 5.20(e)(1) for its Legal Validity.**

The D.C. Circuit has long recognized an "application exception," enabling courts to entertain otherwise stale challenges to an agency's authority to promulgate a regulation if accompanied by a timely challenge to the regulation's application. *See*, *e.g.*, *Adamski v. McHugh*, 2015 U.S. Dist. LEXIS 99980, *15-17 (D.D.C. July 31, 2015)("'limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity.'")(quoting *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958)); *see also, NLRB Union v. FLRA*, 834 F.2d 191, 196 (D.C. Cir. 1987).

The D.C. Circuit takes a broad view of this exception. *See, e.g., Weaver v. Federal Motor Carrier Safety Admin.*, 744 F. 3d 142, 145 (D.C. Cir. 2014)("Contrary to the government's claim . . . the sort of 'application' that opens a rule to such a challenge is not limited to formal 'enforcement actions.'"). The exception can apply where, as here, plaintiff challenges, outside the limitations period, the statutory authority underlying an agency decision. *Natural Resources Defense Council v. Environmental Protection Agency*, 513 F.3d 257, 260 (D.C. Cir. 2008)(citing "established doctrine that parties claiming substantive invalidity of a rule for which direct statutory assault is time-barred are nonetheless free to raise their claims in actions against agency decisions applying the earlier rule"); *see also, American Road & Transp. Builders Ass'n v. EPA*, 554 Fed. Appx. 18, 19 (D.D.C. Jan. 31, 2014).

This approach is consistent with the well-established D.C. Circuit doctrine "that to the extent that an agency's action 'necessarily raises' the question of whether an earlier action was lawful, review of the earlier action for lawfulness is not time-barred." *Public Citizen v. Nuclear Regulatory Com.*, 901 F.2d 147, 151-152 (D.C. Cir. 1990)(quotation omitted); *see also, National Ass'n of Greeting Card Pub. v. USPS*, 607 F.2d 392, 425 n.59 (D.C. Cir. 1979)(court may

22

examine "prior agency action on which the validity of the later agency action under review depends"). Section 5.20(e)(1), as applied in the Nonbank Charter Decision, presently is affecting CSBS's member states, who are not time-barred from challenging its validity.

### B.    Because OCC Revisited Section 5.20(e)(1) Within the Statutory Period, CSBS's Claims Are Timely Under the "Reopening" Doctrine.

CSBS's challenge to Section 5.20(e)(1) is also timely under the "reopening" doctrine. This "well established" exception "arises where an agency conducts a rulemaking or adopts a policy on an issue at one time, and then in a later rulemaking restates the policy or otherwise addresses the issue again without altering the original decision." *CITA-Wireless Ass'n v. FCC*, 466 F.3d 105 (D.C. Cir. 2006). Put differently, "[o]nce an agency reopens an issue, whether by soliciting comments or indicating a willingness to reconsider, a new review period is triggered." *Columbia Falls Aluminum Co. v. EPA*, 139 F. 3d 914, 921 (D.C. Cir. 1998)(internal quotation omitted).

The reopening doctrine applies here because, as OCC concedes, the Nonbank Charter Decision was the first instance in which OCC has sought to apply its purported authority under Section 5.20(e)(1). OCC cannot dispute that it "reopened" the issue of its authority under Section 5.20(e)(1), having conceded that it "solicited public feedback . . . [and] reviewed more than 100 public comments that [it] received on the [Fintech] White Paper on topics such as consumer protection, regulatory and supervisory standards, and the separation of banking and commerce." OCC Brief at 7. The March 2017 Explanatory Statement further reflects OCC received input regarding its authority, considered it and ultimately did not change its decision. Compl. Ex. F at 14. Thus, OCC "opened the issue up anew . . . [and] its renewed adherence is substantively reviewable." *CITA*, 466 F.3d at 110 (internal quotation omitted).

**C.     CSBS's Challenge is also Timely under the Constructive Reopening Doctrine.**

"An agency [also] may be deemed to have 'constructively reopened' a previously unchallenged decision if its original rulemaking did not give adequate notice or incentive to contest the agency's decision." *Nat'l Ass'n of Mfrs. v. DOI*, 134 F.3d 1095, 1104 (D.C. Cir. 1998). Specifically, "changed circumstances can constructively reopen a rule by the change in the regulatory context." *Sierra Club v. EPA*, 551 F.3d 1019, 1025 (D.C. Cir. 2008)(internal quotation omitted). For example, "[a] constructive reopening occurs if the revision of accompanying regulations significantly alters the stakes of judicial review, as the result of a change that could have not been reasonably anticipated." *Id*. (internal quotations omitted). *See, e.g., Kennecott Utah Copper Corp. v. DOI*, 88 F.3d 1191, 1227 (D.C. Cir. 1996) ("Simply put, [the challenged regulations] may not have been worth challenging in 1986, but the 1994 Regulations gave them a new significance.") .

Here, as in *Sierra Club*, the Nonbank Charter Decision "changed the calculus for [the member states] in seeking judicial review, and thereby constructively reopened [Section 5.20(e)(1)]" for substantive challenge. 551 F.3d at 1026. Given the scant legal analysis accompanying the 2003 rulemaking, it was unsettled—until the Nonbank Charter Decision—how OCC interpreted or would implement Section 5.20(e)(1). For example, it was unclear how OCC defined the core banking functions, or whether OCC would require a national bank to engage in certain functions, at least to the extent necessary to be eligible for deposit insurance under the FDIA. OCC took *no* action to exercise its purported authority under Section 5.20(e)(1) for nearly fourteen years, and first made its legal position clear through its Nonbank Charter Decision. The Nonbank Charter Decision was thus a "sea change," which enables the states to challenge the validity of Section 5.20(e)(1). *See Nat'l Res. Def. Council v. EPA*, 571 F.3d 1245, 1266 (D.C. Cir. 2009).

Additionally, by OCC's own admission, the rapid growth of the fintech industry (to which the Nonbank Charter Decision is primarily, but not exclusively, directed) was not imaginable when Section 5.20(e)(1) was promulgated in 2003.  Indeed, the Comptroller cited the "balloon[ing]" of the fintech industry, rapid technological advances, and "dramatic" changes in customer needs as the impetus for the decision. *See* Curry Speech at 1. As a result, in 2003 the agency's future action, and the resulting degree of infringement on the states' jurisdiction over these businesses "could not have been reasonably anticipated." *See Sierra Club,* 551 F.3d at 1025. The constructive reopening doctrine therefore enables CSBS to substantively challenge Section 5.20(e)(1) now.

### D. CSBS Could File a Petition for Amendment/Rescission of Section 5.20(e)(1).

Finally, allowing an otherwise time-barred challenge to proceed "is supported by [the D.C. Circuit's] long-standing rule that . . . a claim that agency action was violative of statute may be raised outside a statutory limitations period, by filing a petition for amendment or rescission of the agency's regulations, and challenging the denial of that petition." *Public Citizen v. NRC*, 901 F.2d 147, 152 (D.C. Cir. 1990). Although CSBS has not filed such a petition, it is not required to do so now to invoke the benefit of this principle, because such a requirement "would be a waste of everyone's time and resources." *Id*.

## V. THE TERM "BUSINESS OF BANKING" IS NOT AMBIGUOUS IN THE CONTEXT OF THIS CASE.

### A. OCC Misconstrues Step One of the *Chevron* Analysis.

OCC relies primarily on the absence of  an express definition of the term "business of banking" within the NBA for its claim that the term is  "ambiguous" for purposes of *Chevron*. OCC Brief at 23. The analytical framework established by *Chevron* requires more than a mere search for express definitions, however. *Chevron* requires courts to give effect to Congress's

unambiguously expressed intent. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-843 (1984). In determining Congress's intent, the court must "exhaust traditional tools of statutory construction." *Sierra Club v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008). *See also McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 1 479, 496 (1991)("It is presumable that Congress legislates with knowledge of our basic rules of statutory construction."). To that end, the court must examine not only any relevant definitions but also employ such familiar tools as *in pari materia*, statutory context, legislative history, the rule against surplusage, *expressio unis*, and common sense. *See, e.g. Clark v. Suarez Martinez*, 543 U.S. 371, 402 (2005) ("before deferring to an agency's interpretation of a statute, so too should we exhaust those tools before deciding that a statute is ambiguous and that an alternative plausible construction of the statute should be adopted"); *Brown* v. *Gardner,* 513 U.S. 115, 118 (1994)("Ambiguity is a creature not of definitional possibilities but of statutory context"); *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C. Cir. 2000)("While the word 'incidental' may be a poster child for ambiguity, we find that it is not ambiguous in the context of general insurance activities."). These familiar tools establish that the only plausible reading is one that requires that a national bank receive deposits to carry on the "business of banking."

> **B.     The Statutory Context of the NBA—including the Interplay Between the NBA, FRA, FDIA and BHCA—Reflects Congress's Intent that a National Bank Must Engage in Deposit Taking to Carry on the "Business of Banking."**

The term "business of banking" cannot be considered in a vacuum. Congress has enacted a multi-faceted banking regulatory scheme that includes a variety of regulatory agencies and federal statutes—including not only the NBA, but also the Federal Reserve Act ("FRA"), Federal Deposit Insurance Act ("FDIA"), and Bank Holding Company Act ("BHCA"). As explained in more detail below, each of these statutes must be considered when assessing the intended meaning of the "business of banking," and these statutes cannot be read in harmony unless that term is understood

to require that national banks engage in receiving deposits. To interpret the NBA otherwise would upend the harmony across this regulatory regime by empowering OCC to create and charter a wholly separate class of national banks that would evade the congressionally-intended application of other banking statutes. *See Whitney National Bank v. Bank of New Orleans & Trust Co*., 379 U.S. 411 (1965)(holding that OCC cannot approve charter under the NBA if the charter would violate the BHCA).

Such a result also would violate the settled presumption that, absent congressional authorization to the contrary, terms in related statutes or the same administrative scheme must be interpreted in tandem, as symmetrical parts of a coherent regulatory regime. *See, e.g. Sullivan v. Stroop*, 496 U.S. 478, 484 (1990); *see also ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988)(agencies may not exercise authority "in a manner that is inconsistent with the administrative structure that Congress enacted into law"). "In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000); *Abuelhawa v. United States*, 556 U.S. 816, 819 (2009)("statutes are not read as a collection of isolated phrases")(citing *United States Nat'l Bank of Ore. v. Indep. Ins. Agents of Am.*, 508 U.S. 439, 455 (1993)). "The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *Id*. Thus, a court must ensure that the statutory provision is interpreted in harmony with related statutes dealing with the same general subject and the same general principle, so as to give effect to a joint regulatory scheme. *Sullivan*, 496 U.S. at 484. To that end, comparable words used in different statutes on the same subject are interpreted to have consistent meanings. *Williams v. Taylor*, 529 U.S. 420 (2000); *see also Brown v. Gardner*, 513 U.S. 115, 118 (1994)("Ambiguity is a creature not of definitional possibilities but

of statutory context."). A "broad statute when passed 'may have a range of plausible meanings,' but subsequent acts can narrow those meanings 'where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand.'"  *Hawke*, 211 F.3d at 643 (citations omitted).

Here, the NBA is only one of several banking statutes designed to address similar principles and reflect Congress's banking regulatory goals. *See, e.g.*, *Colo. Nat'l Bank v. Bedford*, 310 U.S. 41, 48 (1940)(recognizing that the NBA "correlated with the Federal Reserve Act, . . . has developed the present nationwide banking facilities"). Yet, OCC does not even attempt to show that it has express authorization to depart from this regime by chartering national banks that do not take deposits. To the contrary, OCC's primary argument is that the Court's inquiry is limited because "business of banking" is not expressly defined in the NBA, without fully addressing the conflicts its interpretation creates in the FRA, FDIA and BHCA.[4]  Because OCC tacitly admits that Congress has not expressly empowered it to contradict the general regulatory scheme, the Court should not permit it to do so. Instead, this Court must employ the only interpretation of the "business of banking" that ensures harmony among these related statutes.

### 1.    Pursuant to the NBA, FDIA, and FRA, to be lawfully entitled to commence the "business of banking," a national bank must be "engaged in the business of receiving deposits."

The interplay of the FRA, FDIA and the NBA makes clear that the business of banking must include the taking of deposits. First, the NBA requires that the applicant's articles of association contain provisions "not inconsistent with the law." 12 U.S.C. § 21. Once the articles of association are submitted, the Comptroller must then "examine into the condition" of the

---

[4] OCC also relies on *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251 (1995), to support its ambiguity argument, but that case addresses the *outer* limits of the authorized activities of national banks, which is not the issue before this Court. *See* Section VI (E).

association to ensure that it is "lawfully entitled to commence the business of banking." 12 U.S.C.

§ 26. If, upon examination, it appears that the association is "lawfully entitled to commence the

business of banking," then the certificate shall issue. 12 U.S.C. § 27(a). If, however, the

association has been formed for purposes "other than the legitimate objects contemplated by title

62 of the Revised Statutes," the Comptroller may withhold the certificate. *Id*. Finally, the NBA

caveats that the powers to which a national bank is entitled are "subject to law." 12 U.S.C. §

24(Seventh). These seemingly straightforward provisions of the NBA cannot be disregarded in the

Court's analysis. *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004)(a statute should be "construed so

that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or

insignificant").

   In order to comply with the NBA's requirement of "lawfully" engaging in the business of

banking, a national bank must become an "insured bank." This is because the Federal Reserve Act

("FRA") requires national banks to, upon "commencing business," become members of the

Federal Reserve System and an insured bank under the FDIA. *See* 12 U.S.C. § 222 ("[e]very

national bank in any State shall, upon commencing business . . . become a member bank of the

Federal Reserve System . . . and shall thereupon be an insured bank under the Federal Deposit

Insurance Act"). A national bank that fails to become (or cannot become) an FRS member and

insured bank, forfeits "all of the rights, privileges, and franchises of such association granted to it

under the National Bank Act." 12 U.S.C. § 501a.

   A national bank cannot become an insured bank unless it takes deposits. The FDIA

expressly requires that a national bank be "engaged in the business of receiving deposits" to be

eligible to be an "insured bank." 12 U.S.C. § 1815(a)(1). In other words, an association cannot

comply with the minimum requirements of a national bank under the FRA and the FDIA unless it

receives deposits. *See* 12 U.S.C. §§ 222 and 1815(a)(1). Therefore, absent specific congressional authorization, national bank must, *at a minimum*, be engaged in deposit taking in order to comply with federal law found in the FRA and FDIA and to be "lawfully entitled to commence the business of banking" under the NBA. Congress has provided such authorization for certain special purpose charters that do not receive deposits, see *infra* Section VI, but the nonbank charters at issue here are not among them.

      **2.**       **The "business of banking" must be interpreted consistently with the BHCA definition of a "bank," which  encompasses only deposit-taking institutions.**

The "business of banking" must require deposit-taking in order to give full effect to the BHCA and the NBA's joint regulatory scheme. Congress expressly defined a "bank" in the BHCA as a deposit-taking institution, and this Court should not read the NBA's definition of the comparable term "business of banking" to be in conflict.

The BHCA defines a "bank" as an organization that, at a minimum, engages in the business of receiving deposits and whose deposits are insured. Specifically, it must either (1) be an insured bank as defined in Section 3(h) of the FDIA or (2) accept demand deposits or deposits that may be withdrawn by check or similar means for payments to third parties or others; *and* engage in the business of making commercial loans. 12 U.S.C. §§ 1841(c)((1)(A) and (B). OCC argues that the BHCA's definition of "bank," and its deposit-taking requirement, should be disregarded because the BHCA serves a different "legislative purpose." OCC Brief at 37. To the contrary, Congress envisioned that the BHCA and NBA would operate in harmony to fulfill a common purpose of restricting entry into the banking system and maintaining the separation of banking and commerce.

Entry into the banking system is not a matter of right—the primary restriction on entry is the requirement to obtain a bank charter from a state authority or OCC. *See generally* Malloy,

Michael P., *Banking Law and Regulation*, Section 2.02 (2015). The BHCA's prohibition against a company acquiring a "bank" without prior approval by the Federal Reserve Board also constitutes a restriction on entry. *Id*. at 10.01; *See, e.g.*, *Indep. Bankers Ass'n of Am. v. Conover*, 1985 U.S. Dist. LEXIS 22529, at *11 (M.D. Fla. Feb. 15, 1985) ("After the Federal Reserve Board has approved and the association has completed its organization formalities, . . . the Comptroller gives the 'association a certificate . . .that such association . . . is authorized to commence" the business of banking"). Ultimately, it is through the definition of "bank" that the BHCA defines the banking industry, so as to keep it separate from all other commercial non-banking industries—and it is within the banking industry, so defined, that the NBA governs the chartering, regulation and activities of national banks.

The interpretation OCC advocates, and the nonbank charter it has created, are directly contrary to Congress's effort more than 30 years ago to close a statutory "nonbank bank loophole" that permitted nondepository institutions to escape regulation under the BHCA. When Congress passed the Competitive Equality in Banking Act of 1987 ("CEBA"), it added the "insured bank" prong to the definition of "bank" found in 12 U.S.C. § 1841(c) in order to close a loophole that would have allowed an organization to avoid the application of the BHCA.  Specifically, prior to CEBA, the BHCA defined a bank as "any institution . . . which (1) accepts deposits that the depositor has a legal right to withdraw on demand, *and* (2) engages in the business of making commercial loans." (emphasis added). This definition was intended to capture the minimum activities constituting the historic core of the business of banking, while permitting an implicit exemption for trust companies.[5]  Because it was framed in the conjunctive, however, it had the unintended effect of creating an implicit exemption for the chartering of "nonbank banks"—

---

[5] *See* S. Rep. No. 100-19, at 5 (1987). *See also Nonbank Banks; Hearing on H.R. 20 Before the House Comm. on Banking, Finance and Urban Affairs*, 99th Cong. 14 (1985).

national banks that refrained from *either* accepting demand deposits or making commercial loans. Ultimately, Congress closed the nonbank bank loophole by broadening the definition of "bank" to also include an "insured bank."

Cognizant that every national bank is required to become an insured bank (12 U.S.C. § 222), and that state banks are by definition insured banks (12 U.S.C. § 1813(a)(2)(A)), Congress intended that the new definition would function as a ban on the chartering of future nonbank banks. The inclusion of explicit exemptions for trust companies, credit card banks and other specific institutions, coupled with the providing of grandfather rights to existing nonbank banks, indicates an intention on the part of Congress to prohibit OCC from granting national bank charters to institutions that would not qualify as banks as redefined by CEBA.

Certain antitrust provisions of the federal banking laws further demonstrate that this Court should not read implicit exceptions into the BHCA. Congress has provided that certain anti-tying restrictions found in the BHCA should apply broadly to all "banks" as defined in the BHCA. 12 U.S.C. § 1972. For these purposes, Congress *also* specifically included those few special-purpose banks that were expressly exempted from the BHCA definition of "bank" (including, for example, trust banks and credit card banks). *See* 12 U.S.C. 1843(h). By expressly identifying these special-purpose banks, Congress ensured that the anti-tying provisions would apply equally to them. If, as OCC argues, the BHCA contains implicit exemptions for other "nonbanks" not specifically identified in the statute, then these nonbanks would fall outside the scope of the anti-tying restrictions, and OCC would be empowered to charter institutions that are immune from these antitrust provisions—a result Congress could not possibly have intended.

The Supreme Court has recognized the dual role that the NBA and BHCA play. *Whitney Nat'l Bank v. Bank of New Orleans & Tr. Co.*, 379 U.S. 411, 417-26 (1965)(reasoning that the

NBA and BHCA should be interpreted in harmony and that OCC cannot approve a charter when the structure or practical consequences would violate the BHCA's terms or clearly intended policies). Given this interplay between the two agencies and these two statutes, the prevailing definition of "bank" under the BHCA must be held to establish the "inner limits,"[6] *i.e.* the essential elements, of what constitutes the "business of banking" under the NBA. *Indep. Bankers Ass'n of Am. v. Conover*, 1985 U.S. Dist. Lexis 22529, *33 (M.D. Fla. 1985). Thus, any definition of the "business of banking" in the NBA that does not require the taking of deposits is plainly in conflict with the BHCA, which, after CEBA, provides only explicit exceptions from its coverage.

Although, in some circumstances, the meaning of terms across different statutes "may vary 'to meet the purposes of the law,'" (OCC Brief at 36), the well-established presumption in favor of a common meaning is weakened only in the limited circumstances where the statutory difference manifests a "*different intent*." *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)(emphasis added). Tellingly, each case cited by OCC involves circumstances in which employing a consistent definition to an identical term would have clearly undermined Congress's intent. *See, e.g.*, *U.S. v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213 (2000)(finding "no doubt" that an identical meaning would "set awry" the statutory scheme); *Yates v. United States*, 135 S. Ct. 1074, 1082 (2015) (explaining that identical definitions are not dispositive "[w]here the subject matter to which the words refer is not the same . . . the conditions are different, or the scope of the legislative power exercised in one case is broader than that exercised in another); *General Dynamics Land Sys. v. Cline*, 540 U.S. 581, 596 (2004) (certain words have "several commonly understood meanings among which a speaker can alternate in the course of an ordinary

---

[6] Symons, Edward L. Jr., *The "Business of Banking" in Historical Perspective*, 51 Geo. Wash. L. Rev. 676, 718 (1983).

conversation"). OCC has not established that such circumstances exist here. To adopt OCC's

argument would allow it to interpret the "business of banking" in a manner that would nullify any

separation of banking from commerce, undermine the intent of Congress in closing the nonbank

bank loophole, and defy the most fundamental principles of statutory construction.

3.      **Other statutory provisions in the NBA and FRA confirm Congress's intent that carrying on the "banking business" means engaging in deposit taking.**

Another provision of the NBA contemplates that national banks will take deposits, and that

provision would be rendered meaningless if a national bank did not engage in that activity.

Receiving deposits is so indispensable to the "business of banking" that the NBA expressly

requires that a certificate of authority to commence "banking" designate the "place where its

operations of discount and deposit are to be carried on." 12 U.S.C. § 22. Courts should not

interpret statutory phrases to render any terms redundant or unnecessary. *Hibbs*, 542 U.S. at 101;

*Hawke*, 211 F.3d at 644. Absent contrary congressional instruction, a "bank" necessarily must be

limited to an association that can comply with 12 U.S.C. Section 22 by taking deposits.

Section 21 of the Banking Act of 1933 echoes Congress's intention that carrying on the

"business of banking" must include the taking of deposits. Specifically, it is a criminal offense for

nonbanks or unauthorized individuals to engage in the "banking business." *See* 12 U.S.C. § 378.

This federal restraining law defines the "banking business" to mean engaging in "the business of

receiving deposits subject to check or to repayment upon presentation of a pass book, certificate of

deposit, or other evidence of debt, or upon request of the depositor . . .." *Id.*

C.      **The Legislative History and Historical Context of the NBA Support the Conclusion that a National Bank's Exercise of the Power of "Receiving Deposits" Is Indispensable to Carrying on the "Business of Banking."**

Terms like the "business of banking" and "bank" are commonly defined with reference to

the "history of banking from its earliest period" and the definitions used by "lexicographers of the

34

banking business." *See, e.g.*, *Pattison v. Syracuse Nat'l Bank*, 80 N.Y. 82, 94 (1880). These authorities divide banks into three classes, each of which requires taking deposits: banks of deposit; banks of deposit and discount; and banks of deposit, discount and circulation. *See e.g.,* H.W. Magee, B.L., *A Treatise on the Law of National and State Banks*, 23-24 (2d Ed. 1913). That Congress shared this understanding is confirmed by the repeated reference to national banks as banks of deposit, deposit and discount, or deposit, discount and circulation in the debates surrounding the passage of the NBA. *See* Cong. Globe, 38th Cong., 1st Sess. 1351, 1868, 1870, 1990, 2662, 2736-2738 (1864).

Prior to the enactment of the NBA, courts—including the Supreme Court—interpreted deposit taking as indispensable to the business of banking. *See*, *e.g.*, *Bank of Augusta v. Earle*, 38 U.S. 519, 584 (1839)("legitimate banking business" requires "receiving money on deposit"); *Curtis v. Leavitt*, 15 N.Y. 9, 56-57 (1857)(the two most important operations of banks are issuing and receiving deposits). Courts and administrators in the years immediately following enactment of the NBA likewise understood that "receiving deposits" is indispensable to carrying on the "business of banking." *See*, *e.g.*, *Mercantile National Bank v. Mayor*, 121 U.S. 138, 156 (1887)("business of banking, as defined by law and custom, consists . . . in receiving deposits payable on demand"); 30 Op. Att'y Gen. 341, 342 (1915)("The power to receive deposits, expressly granted to every national bank . . . is, of course, indispensable to the conduct of the business of banking"). In adopting the term "business of banking" without expressly defining it, Congress incorporated prior judicial interpretations that emphasized the indispensable nature of the deposit-taking power. *Strom v. Goldman, Sachs & Co*., 202 F.3d 138, 147 (2d Cir. 1999)(citation omitted).

**D.     OCC fails to address this overwhelming support for CSBS's interpretation.**

Against this statutory interplay, clear legislative intent, and case law, OCC offers an 1866 tax statute. *See* Internal Revenue Act of 1866, ch. 184, 14 Stat. 98 (1866).   Unlike the BHCA, FRA and FDIA, the tax statute is not part of the federal banking laws. It did not prescribe specific steps that a bank must take to "lawfully" conduct the business of banking. Rather, as a then-contemporary banking treatise recognized, the tax statute's definition of "bank" was designed for the "specific and narrow purpose of taxation." John T. Morse, Jr., *A Treatise on the Law Relating to Banks and Banking*, xxvi-xxvii (2d ed. 1879). "[I]n all questions arising beyond the control of the provisions of [the tax] act" this definition was (and remains) "valueless." *Id*. To achieve its revenue-generating purpose, the tax statute intentionally defined "bank" to include more than just those entities that fit the commonly understood definition "bank." *Id*.

OCC's stray quotation from *Oulton v. German Sav. & Loan*, 84 U.S. 109 (1872), does not change this analysis. *Oulton* involved a *savings and loan society* challenging the application of a *tax* statute levied on its *deposits*, and the Court did not consider whether deposits were a necessary component of the business of banking under the NBA. Shortly after *Oulton*, the Supreme Court clarified that deposit-taking is an indispensable element of banking. *Warren v. Shook*, 91 U.S. 704, 708 (1875) (defining the three core banking functions in the conjunctive and including receipt of deposits). The Supreme Court later confirmed the indispensable nature of deposit-taking, holding that a company that only "lent its own money, taking bonds and mortgages therefor" is not a "banker."  *Selden v. Equitable Tr. Co.*, 94 U.S. 419, 423 (1876).

**VI.     COURTS HAVE REPEATEDLY STRUCK DOWN OCC'S ATTEMPTS TO CHARTER ENTITIES THAT WOULD NOT CARRY ON THE "BUSINESS OF BANKING," AND OCC HAS BEEN REQUIRED TO OBTAIN SPECIFIC CONGRESSIONAL AUTHORITY BEFORE DOING SO.**

This is not the first time OCC has exceeded the limits of its chartering authority. Each time, the courts struck down those efforts, concluding that OCC is not empowered by the NBA to charter such institutions unless specifically authorized by Congress. Ultimately, OCC is permitted to charter a national bank only: (1) where the institution is organized to carry on "the business of banking," which, under current law, includes (at a minimum) taking deposits, or (2) where Congress has, after an opportunity for consideration, taken specific action to allow OCC to charter an entity to carry on a special purpose.

Currently, Congressional authorization exists to charter only three categories of special-purpose national banks: trust banks, banker's banks, and credit card banks. *See* 12 U.S.C. § 27(a) and (b); 12 U.S.C. § 1841(c)(2)(F). Specific legislative authorization was required for two of these categories—trust banks and banker's banks—because solely providing fiduciary services or correspondent banking services did not, under existing law, qualify as carrying on the business of banking. This would not have been necessary if OCC already possessed the broad authority it now claims. Because credit card banks have historically engaged in the minimum activities necessary to qualify as a "bank" under the BHCA[7] (and thus, engage in the "business of banking"), specific modifications to the chartering authority found in the NBA were not required.  This legislative history, and litigation surrounding OCC's prior chartering efforts, illustrate that the sweeping authority OCC claims to possess simply does not exist under the current regulatory regime. The Court should be "obliged to defer not to the agency's expansive construction of the statute, but to

---

[7] *See Citicorp*, 67 Fed. Res. Bull. 181, 182-83 (1981)(cited in *ICBA v. FRB*, 820 F.2d at 432); *see also* Fein, Melanie, FEDERAL BANK HOLDING COMPANY LAW § 5.05[3][e] (2017).

Congress' consistent judgment" that OCC "does not have the power" to charter nonbank banks.

*FDA v. Brown & William. Tobac. Corp*., 529 U.S. 120, 160 (2000).

### A. OCC's Effort to Charter Trust Banks Not Engaged in the "Business of Banking" Was Rejected by a Federal Court, and OCC Could Not Charter These Banks Until Specific Authority Was Granted in an NBA Amendment.

OCC's authority to charter one category of special-purpose national banks—trust banks—derives from a specific amendment to the NBA enacted in 1978, now codified in 12 U.S.C. § 27(a). Before this amendment, a federal court rejected OCC's attempt to charter a national bank whose activities would be limited to the fiduciary services provided by a trust company, holding that OCC lacked authority to charter an institution that would not engage in *any* of the general banking powers enumerated in Section 24(Seventh) of the NBA. *National State Bank v. Smith*, No. 76-1479, 1977 U.S. Dist. LEXIS 18184 (D.N.J. Sept. 16, 1977).

The *National State Bank* court reasoned that the Comptroller may not deprive a national bank of the general banking powers of deposit-taking and lending, since Section 24 mandates that a national bank "shall have" such powers, and Section 22 mandates that a national bank have "operations of discount and deposit." *Id*. at *21-24. The court further reasoned that, since general fiduciary duty activities were not part of the "business of banking" under the NBA, among other things, a national trust bank would not be organized to avail itself of the advantages of the NBA (as required by Section 22) and would not be formed for the "legitimate objects" contemplated by the NBA (as required by Section 27). *Id*. at *22, 28.

In response to this litigation, OCC was required to obtain from Congress an amendment to the NBA that specifically authorized the chartering of national trust banks. *See* Financial Institutions Regulatory and Interest Rate Control Act of 1978 ("FIRIRCA"), Pub. L. 95-630, 92

Stat. 3641 (amending 12 U.S.C. § 27(a)).[8]  Congress gave OCC specific authorization to create

national trust banks, the first type of special-purpose chartering authority conferred upon it. The

amendment was adopted while the *National State Bank* ruling was on appeal, and the Third Circuit

ultimately reversed the lower court's ruling based upon the retroactive application of the new

statutory provision, without addressing the validity of the lower court's decision at the time it was

made. *National State Bank*, 591 F.2d at 231-32.

OCC contends that the *National State Bank* ruling should be disregarded because it ceased

to have any force and effect after the court's reasoning was superseded by the FIRIRCA

amendment. But the change in the law effected by the amendment does not call into question the

lower court's reasoning. By modifying the NBA to allow OCC to charter national trust banks,

Congress effectively acknowledged the *National State Bank* lower court's ruling. Had Congress

believed OCC had broad authority to issue a charter to organizations not engaged in the business

of banking, like the trust bank at issue, there would have been no need for this amendment.

### B.    OCC's Power to Charter Banker's Banks, Another Special-Purpose Bank, Derives From Specific Statutory Authority.

OCC's power to charter the second category of special-purpose banks—banker's banks—is

also derived from explicit Congressional authority granted in 1982 with the further amendment of

Section 27 of the NBA. Section 27(b) was added to the NBA as another very narrow addition to

the Comptroller's chartering authority. *See* Pub. L. 97-320, title IV, § 404(a), Oct. 15, 1982, 96

Stat. 1511. As with the NBA amendment to add chartering authority for trust banks, Congress

could have adopted language granting the Comptroller broader authority, but instead limited the

---

[8] A sentence was added to Section 27(a) stating that "A National Bank Association . . . is not illegally constituted solely because its operations are or have been required by the Comptroller of the Currency to be limited to those of a trust company and activities related thereto."

authority to chartering institutions carrying on the special purpose of providing correspondent banking services.

### C.  A Federal Court and Congress Have Both Rejected OCC's Prior Efforts to Issue National Charters to "Nonbank Banks."

In the decade following *National State Bank*, a court once again blocked OCC's efforts to issue special-purpose charters beyond its authority, granting an injunction prohibiting OCC from issuing such charters to "nonbank banks"—institutions that either did not accept demand deposits or make commercial loans. *Independent Bankers Assn. of America v. Conover*, No. 84-1403-Civ-J-12, 1985 U.S. Dist. LEXIS 22529 (M.D. Fl. Feb. 15, 1985). The court held that the activities mentioned in the definition of "bank" in the BHCA, as amended in 1970, "represent[] a recognition by Congress that the acceptance of demand deposits and the making of commercial loans constitute the historic core activities of banks and the essence of the business of banking." *Id.* at *31. The court likewise noted that it must "favor statutory construction which enables statutes to complement one another" and construe statutes on the same subject matter "together to give effect to a joint regulatory purpose." *Id.* at *33. As a result, the court concluded that the activities included in the definition of "bank" under the BHCA constitute the minimum, essential elements of the "business of banking" under the NBA and, accordingly, "a financial institution that is legally unable to engage in both activities cannot engage in the 'business of banking' within the meaning of the NBA." *Id.*

The court also relied on the history of the amendments to the NBA that authorized the chartering of trust companies and bankers' banks:

> It is clear that when Congress has wanted to expand the authority of the Comptroller to charter national associations that are not to be engaged in the business of banking, it has done so through specific amendments. If Congress had intended that the Comptroller have broad chartering authority over various types of financial institutions, there would have been no need for the trust company and bankers' bank amendments, and those amendments would not have been narrowly drawn.

40

*Id*. at *35. Following OCC's defeat in *Conover*, Congress declined to adopt legislation extending

to OCC the special-purpose chartering authority it had attempted to assert with respect to

"nonbank banks."[9] To the contrary, after discussing *Conover* at length during hearings on the

nonbank bank loophole[10] (*see* Section V(B), *supra*), Congress closed the loophole by amending

the definition of "bank" in the BHCA (via the Competitive Equality in Banking Act of

1987)("CEBA")) to broaden its coverage to include all banks engaged in deposit-taking and

thereby capture all full-service national banks.[11] *See* 12 U.S.C. § 1841(c)(broadening the definition

of "bank" to include "insured banks"—*i.e.* banks "engaged in the business of receiving deposits"

under the FDIA). Congress' aim of redefining "bank" so as to close the nonbank bank loophole

and foreclose the chartering of new nonbank banks was only achievable by establishing, as the

court did in *Conover*, that the prevailing definition of "bank" under the BHCA establishes the

"inner limits," or minimum content, of the business of banking under the NBA. Thus, Congress

effectively codified *Conover* by incorporating the court's conclusion that, to be engaged in the

"business of banking" under the NBA, an applicant must be a "bank" under the BHCA.

    OCC contends that *Conover* is "not good law" because it was merely a ruling on a motion

for preliminary injunction, which was later vacated when the case was voluntarily dismissed. OCC

---

[9] In alternative draft legislation, Congress considered whether to include an explicit exemption that would allow for the creation of "consumer banks," the equivalent of nonbank banks, but despite the advocacy efforts of the Comptroller, declined to do so.  *See Nonbank Banks; Hearing on H.R. 20 Before the House Comm. on Banking, Finance and Urban Affairs*, 99th Cong. 307 (1985).

[10] *See*, *e.g.*, S. Rep. No. 100-19, at 7 (1987)(stating the need for "prompt congressional action to close the nonbank bank loophole" because OCC "moved to vacate the district court injunction that prevents him from chartering new nonbank banks").

[11] *See e.g.*, H. Rpt. 100-261, at 119-20 (1987)(CEBA "closes the nonbank bank loophole . . . by redefining the term 'bank' . . . to include an FDIC-insured institution whether or not it accepts demand deposits or makes commercial loans."); *see also* S. Rep. No. 100-19, at 11 (1987).

Brief at 38. But the subsequent resolution of the case does not detract from the court's reasoning, nor does it change Congress's action (and inaction) in response to the litigation.

OCC also argues that, to the extent *Conover* relied in part upon the "intentional avoidance of regulation" as justification for its ruling, that rationale was later "discounted" by the Supreme Court in *Board of Governors of the Fed. Reserve Sys. v. Dimension Financial Corp.*, 474 U.S. 361, 374 (1986). But the very principle OCC seeks to draw from *Dimension Financial*—that the court should not factor in the intentional avoidance of regulation in construing the BHCA—has been superseded by the passage of CEBA and is inapplicable in analyzing the current statutory scheme. This is because Congress, through CEBA, took up the Court's invitation that any imperfection in the statutory scheme should be remedied by Congress, not agency regulation.

Finally, OCC asserts that *Conover* conflicts with two cases upon which OCC significantly relies, *NationsBank* and *ICBA v. FRB*, but for the reasons discussed below (Sections VI(D) and VI(E)), these cases have no bearing on the issue before the Court.

> ### D. Credit Card Banks Are Narrow-Focus Banks That Take Deposits and Are Specifically Exempted from the BHCA's Definition of a "Bank" and, as Such, Do Not Require Additional Statutory Chartering Authorization in the NBA.

A third category of special-purpose national banks (more accurately described as narrow-focus banks, for the reasons discussed below) is credit card banks. OCC is correct that there is no express reference to chartering authority for credit card banks in the NBA. But additional explicit authority is not necessary because credit card banks *do* engage in deposit-taking activities and are FDIC insured. *See*, *e.g.*, 12 U.S.C. §§ 1841(c)(2)(F)(contemplating that credit card banks accept "savings or time deposit[s]" and maintain one office "that accepts deposits"). As entities that engage in deposit-taking (and unlike the entities that would receive the charter at issue here), credit card banks carry on the "business of banking," as defined under existing law, and therefore fall squarely within OCC's chartering authority.

42

Credit card banks are perhaps more properly classified as narrow-focus banks, since they carry on the minimum essential activity necessary to carry on the "business of banking" (*i.e.* deposit-taking) but do not engage in the full scope of activities permissible for national banks. Narrow-focus banks are analogous to, but technically distinct from, special-purpose banks (such as trust banks). Because the latter need not engage in deposit-taking, and thus may not carry on the "business of banking," they require express statutory authorization in the NBA.

OCC's authority to charter credit card banks has been the subject of past litigation. *Indep. Cmty. Bankers Assoc. v. Bd. of Governors of the Fed. Reserve Sys.,* 820 F.2d 428 (D.C. Cir. 1987)("*ICBA v. FRB*"). OCC points to *ICBA v. FRB* as support for the assertion that the D.C. Circuit has endorsed its authority to issue a limited purpose national bank charter. OCC Brief at 28-30. But the cited holding in *ICBA v. FRB* is simply that a national bank that qualifies as a "bank" under the BHCA and, thus, is carrying on the "business of banking" under the NBA may limit its activities to less than the full scope of activities permissible for national banks. The court did *not* hold that a national bank may limit its activities to the point that it no longer qualifies as a "bank" carrying on the "business of banking," however.

The court was not faced with the question of whether deposit taking was required to be engaged in the "business of banking" because the credit card bank at issue indisputably took deposits thus qualifying as a "bank" under the BHCA, as well as to be "engaged in the business of receiving deposits" under the FDIA. *See ICBA v. FRB*, 820 F.2d at 439. OCC hides in a footnote of its brief (OCC Brief p. 29 n. 4) this particularly salient fact. Thus, OCC is absolutely correct that the bank's deposit-taking power was not central to the court's reasoning—given the that the bank's intended banking powers included deposit-taking, it was *already understood* to be engaged in the "business of banking," and that issue was not in dispute.

43

Even if the reasoning behind *ICBA v. FRB* were applied to OCC's adoption of Section 5.20(e)(1) and the Nonbank Charter Decision, they would be unlawful under the test laid out in the case. Specifically, the court held that "the restriction of a national bank's activities to less than the full scope of statutory authority conflicts with the purposes of the [NBA] only if it undermines the safety and soundness of the bank or *interferes with the bank's ability to fulfill its statutory obligations*." 820 F.2d at 440 (emphasis added). For all of the reasons set forth herein, to be *lawfully* entitled to commence the "business of banking" under the NBA, BHCA, FDIA and FRA, a national bank must be "engaged in the business of receiving deposits" as defined in the FDIA. Thus, the granting of a nonbank charter here would conflict with the purposes of the NBA because it "interferes" with the charter-holder's ability to "fulfill its statutory obligations" under these federal banking laws.

      E.      **_Nationsbank_ and Similar Cases are Inapplicable Because They Address the _Outer_ Limits of the Business of Banking, Not the _Inner_ Limits.**

Many of the cases cited by OCC have no bearing on whether the minimal requirements to receive a national bank charter are ambiguous, because each of these cases involved the wholly separate question of what an existing, properly chartered national bank can and cannot do. Specifically, OCC improperly conflates two distinct concepts: the threshold question of what powers a national bank must exercise in order to carry on the "business of banking," which implicates the *inner limits* of the term; and the separate question of the extent to which OCC can expand the scope of permissible banking activities not previously determined to be within the "business of banking," which implicates the *outer limits* of the term. The instant dispute requires an interpretation of the *inner* limits. As recognized in *Conover*, cases defining the *outer* limits of OCC's authority to expand and contract the powers that emanate from that national charter have no bearing on this determination. *See Conover*, 1985 U.S. Dist. LEXIS 22529, at *21 n.2.

The primary case upon which OCC relies, *Nationsbank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251 (1995), did not consider, much less determine, whether the already chartered national bank at the center of the case was properly chartered, much less whether it must take deposits. The Court did not address the central question here—namely, whether OCC possesses the authority to charter a bank that does not exercise the power to receive deposits. Rather, the Court considered whether OCC could permit a full-service *insured* national bank (*i.e.*, a bank that takes deposits) to also act as an agent in the sale of annuities. Accordingly, the ruling turned on the extent to which OCC could permit a national bank to engage in *additional* activities beyond those that qualified it to receive a national bank charter. *Id*. at 257-58. In so doing, the Court focused on OCC's discretion to define the *outer* limits of the business of banking— something that is not at issue here.  The Court did not analyze what core activities constitute the "business of banking;" rather, it considered whether the sale of annuities fell within the broader universe of permissible activities within the business of banking. *Id*. at 257-58.

OCC particularly relies upon a footnote in *Nationsbank*, 513 U.S. at 258 n.2, but even this language makes clear that the focus of the ruling is merely the outer limits of permissible banking activities. In describing the limits of its holding, the Court warned that the Comptroller's interpretation of the "business of banking" in this context "must be kept within reasonable bounds" and defined these "reasonable bounds" solely by reference to activities in which a national bank *cannot* engage. *See id.* The Court did not consider or assess the activities in which an entity *must* engage to carry on the "business of banking."  The holding that the "'business of banking' is not limited to the enumerated powers in § 24(Seventh) and that the [OCC] therefore has discretion to authorize activities beyond those specifically enumerated," 513 U.S. at 258 n.2, simply does not address the question at hand.

45

The same is true of the remaining cases cited by OCC. Several cases involve challenges to interpretive/approval letters issued by OCC or FRB permitting active institutions, operating under valid national bank charters, to engage in certain activities *in addition to* traditional banking functions. In this way, these cases only further define the *outer* limits of the "business of banking" clause but give no consideration to the *inner* limits. *See*, *e.g.*, *M&M Leasing Corp. v. Seattle First Nat'l Bank*, 563 F.2d 1377, 1382 (9th Cir. 1977)(equipment lease financing is within the business of banking); *Am. Ins. Ass'n v. Clarke* 743 F. Supp. 491, 492-99 (W.D. Tex. 1989)(municipal bond issuance); *Arnold Tours Inc. v. Camp*, 472 F.2d 427, 431 (1st Cir. 1972)  (operating a travel agency is not within the business of banking). Thus, although prior courts may have found some ambiguity with respect to the full panoply of activities in which a national bank may engage, there is no such ambiguity with respect to the centrality of receiving deposits. OCC cannot use these "outer limits" cases to redefine the purposes for which national banks may be formed and, thereby, the very character of the national banks themselves.

## VII.   OCC UNREASONABLY EQUATES THE "BUSINESS OF BANKING" WITH THE DEFINITION OF "BRANCH."

Even if the meaning of "business of banking" were ambiguous here (which it is not), OCC's interpretation fails because it is not "based on a permissible construction of the statute." *Hawke*, 211 F.3d at 646. OCC acknowledges that it bases its authority to promulgate Section 5.20(e)(1) and adopt the Nonbank Charter Decision upon its interpretation of 12 U.S.C. § 36(j)—a provision of the NBA that sets out the activities that, when conducted apart from its chartered premises, will cause an office of a national bank to be considered a branch. This is a new, and never before used, interpretation of a long-standing statute and is entitled to little deference.  *See Atwater v. D.C. Dep't of Consum. & Reg. Affairs*, 566 A.2d 462, 468 (D.C. 1989). OCC's assertion that the definition of "branch" in Section 36(j) constitutes the inner limits, or minimum

content, of the "business of banking" carried on by national banks, is indefensible. It nullifies any distinction between a "national banking association" and a mere "branch" of such an association, violates the legislative intent behind Sections 36 and 81, and is undermined, rather than supported, by the Supreme Court's holding in *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987).

### A. Conflating a "national bank" with a "branch" of a national bank ignores the plain statutory language of the NBA.

Using the branch banking provision in Section 36 to determine the conditions under which a national bank charter may be granted expands Section 36 well beyond its intended purpose and defeats Congress's plan of limiting the types of financial institutions that can qualify for a national bank charter. The plain language of the NBA makes a clear distinction between the branch of a national bank and the national bank itself. *See*, *e.g.*, 12 U.S.C. §§ 30 and 81.  Moreover, by its express terms, Section 36 establishes only the "conditions upon which a national banking association may retain and operate a branch." *See, e.g.*, *Pineland State Bank v. Proposed First Nat'l Bank*, 335 F. Supp. 1376, 1379 (D.N.J. 1971)(the definition of "branch" in 12 U.S.C. 36 "obviously . . . has no application to the creation or establishment of a new national bank"). Nothing in the text, structure, or legislative history of the NBA suggests Congress meant for this provision to define the minimum activities required for a national bank charter.

Section 36's application should be limited to the activities of a branch of an existing national bank because the provision does not come into consideration unless and until a national bank has been properly chartered. *See* 12 U.S.C. § 36(a) and (c); *see also IBAA v. Smith*, 534 F.2d 921, 951-52 (1976)(to qualify as a "branch" under section 36, a facility must be "established" by a national bank). Because engaging in the lawful business of banking is a precondition to becoming a chartered national bank that can establish branches under Section 36, applying the definition of "branch" to the threshold decision to charter a national bank puts the proverbial cart before the

horse. *See Leonardi v. Chase Nat'l Bank*, 81 F.2d 19, 22 (2d Cir. 1936)(Sections 36 and 81 refer to the establishment of branch banks, not national banks).

**B.      OCC's interpretation expands its power through statutes designed to limit it.**

Using Section 36's definition of "branch" to deconstruct the "business of banking" and redefine what qualifies as a national bank would turn the intent of the NBA branching and locational restrictions on its head. In conflating the circumstances under which activities of a national bank would become subject to state laws regarding branching *restrictions* with the requirements for granting a national bank charter, OCC asks this Court to find that Congress used both Sections 36 and 81 to prevent the proliferation of national bank offices without regard to state laws and, at the same time, to foster the creation of nondepository national banks that would enjoy substantial immunity from state laws. Clearly, Congress did not intend such an absurd result.

Prior to the passage of Section 36 of the McFadden Act, the Attorney General held that a national bank is not, under its charter, authorized to establish branches, *see Lowry National Bank*, 29 Op. Att'y Gen. 81 (1911), a conclusion reiterated by the Supreme Court in 1924.  *First Nat'l Bank v. Missouri*, 263 U.S. 640, 659 (1924). Concerned about "unlimited branching," Congress promulgated Section 36 as a "limited exception to the otherwise applicable requirement of Section 81 that 'the general business of each national banking association shall be transacted in the place specified in its organization certificate . . .'"  *Clarke*, 479 U.S. at 388, 401. The broad definition of branch was not intended to mirror the requirements for issuing a lawful charter. Rather, to ensure that the specific exception permitting branching in Section 36 did not subsume the location restrictions in Section 81, Congress established the broadest possible definition of "branch" to include every statutory branching function, even if exercised separately from the other branching functions. 67 Cong. Rec. 2860 (Rep. Celler explaining that the definition of branch as intended to stop the proliferation of "teller windows" at which limited banking functions take place).

48

Congress has also limited the OCC's discretion to alter the definition of "branch" by specifically denying the OCC any rulemaking authority to implement Section 36. *See* 12 U.S.C. § 93a. This should, at a minimum, prohibit OCC from using Section 36 to bootstrap an expansion of its chartering authority, and this Court should not defer in any attempt to do so.

Finally, OCC's interpretation of the "business of banking" is unreasonable in that it would reopen the nonbank bank loophole in the BHCA, and thereby enable the complete circumvention of the NBA branching provision itself. Specifically, if the definition of "branch" established the minimum activities required to carry on the "business of banking," the OCC could charter nondepository national banks that, as subsidiaries of a holding company not subject to the BHCA, could effectively function as branches without being subject to the branching restrictions of Section 36 because they would not be "established" by a national bank. Congress surely did not intend that the definition of "branch" could be used in a manner that defeats the application of the branching statute itself. This undesirable consequence also underscores that the "business of banking" in this context is not ambiguous: its inner limits must be constituted by the definition of "bank" in the BHCA, rather than the definition of "branch" in Section 36.

### C. *Clarke v. Securities Industry Association* does not support OCC's position.

OCC's misplaced reliance on the Supreme Court's holding in *Clarke* brings the unreasonableness of its interpretation into full focus. As an initial matter, *Clarke* did not address the crucial question here—whether a national bank charter may be properly issued. Instead, the Court considered the definition of "branch" in the context of an already chartered, full-service national bank, and thus had no occasion to consider what constitutes the minimum essential elements required to carry on the "business of banking." *Id*. at 403. The Court considered only the entirely separate question of whether the restrictions on the location of a national bank's place of business apply to all activity within the "business of banking," or only those activities that are part

of the bank's "core banking functions." *Id*. Nevertheless, OCC relies on *Clarke* to define the "business of banking" as used in the NBA chartering provisions, first, by equating the term with a national bank's "general business" that is subject to the locational restrictions of Section 81 and, second, by equating a national bank's "general business" with the statutory branching functions identified in Section 36. *Clarke* actually prohibits drawing either connection.

First, the Court rejected plaintiff's argument, relied upon here by OCC, that the phrase "general business" in Section 81 should be read to be coterminous with the term "business of banking" as used in the NBA chartering provisions. *Id*. at 404-06. Relying on the *Lowry National Bank* Attorney General opinion, the Court reasoned that, since there is a "particular class of business incident to the banking business" that does not fall within a national bank's "general business" under Section 81, the phrase "general business" cannot be held to have the same meaning as the broader term "business of banking." *Id.* at 404-05. Accordingly, the Court held that the limitation on the locus of a national bank's "general business" covers only those activities that are part of the bank's core banking functions, not all activity within the "business of banking." *Id*. OCC cannot rely on *Clarke* as support for the notion that that the "general business" and the "business of banking" can be equated, when the court expressly held otherwise.

Second, the Court did not imply, as OCC claims, that the "general business" of a national bank is carried on through the exercise of any single statutory branching function. Rather, the Court held that the location restrictions on the "general business" of a national bank and its branches apply onto to certain core activities, not to all activities within the "business of banking." *Id*. at 409. Thus, any guidance that the Court's interpretation of the term "general business" would provide as to the meaning of the "business of banking" would apply only to the scope of the activities covered by the location restrictions, not the minimum activities necessary to carry on its

50

"general business," let alone the "business of banking." The Court was explicit about these limits by framing the question as "what activities banks can engage in without regard to the limitations imposed by state branching law," not "what activities banks could engage in at all." *Id.* at 403.

Even if the *Clarke* opinion could be read as having somehow established the minimum requirements to carry on a national bank's "general business," receiving deposits would still be necessary to carry on the "general business" referenced in Section 81. This is not only for the reasons stated herein, but also because of the reference in Section 81 to "place specified in its organization certificate," which is described in 12 U.S.C. § 22 as the "place where its operations of discount and *deposit* are to be carried on" (emphasis added)—once again reflecting that deposit-taking is indispensable to carrying on the "general business" of a national bank.

## VIII. CSBS HAS STATED A TENTH AMENDMENT CLAIM BECAUSE IT ALLEGES THAT OCC LACKS CONGRESSIONAL AUTHORITY TO PREEMPT STATE LAW BY ISSUING NATIONAL BANK CHARTERS TO NON-DEPOSITORY INSTITUTIONS.

OCC seeks to dismiss CSBS's Tenth Amendment claim, asserting that the NBA displaces conflicting state law. This argument misses the point. CSBS does not challenge *Congress's* authority to regulate national bank operations; it challenges *OCC's* authority to infringe upon traditional areas of state regulation (including the licensing and regulation of nonbank financial services providers) without authorization from Congress. Moreover, even where Congress has granted OCC power to preempt inconsistent state law, this authority cannot be used to "run afoul of federal laws governing the activities of national banks." *CSBS v. Conover*, 710 F.2d 878, 885 (D.C. Cir. 1983). Yet OCC has done exactly that. *See* Section V(B) *supra*.

The Supreme Court has "never assumed lightly that Congress has derogated state regulation." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995)(citations omitted). Before a federal agency may infringe upon a traditional

area of state concern, the court must determine if the agency is "acting within the scope of its congressionally delegated authority[,] . . . [for] an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it.'" *New York v. FERC*, 535 U.S. 1, 18 (2002)("*FERC*") (quotations omitted). The "best way to answer such a question—*i.e.*, whether federal power may be exercised in an area of pre-existing state regulation—'is to examine the nature and scope of the authority granted by Congress to the agency.'" *FERC*, 535 U.S. at 18 (citations omitted). The court "must interpret the statute to determine whether Congress has given [the agency] the power to act as it has, and . . . do so without any presumption one way or the other." *Id*.; *see also Garrelts v. Smithkline Beecham Corp.*, 943 F. Supp. 1023, 1042 (N.D. Iowa 1996) (explaining lack of deference). If the agency pushes the limits of its authority against the rights of states, there must be a clear indication that Congress intended to allow it to do so. *See Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001).

Second, the agency's preemption determination must be under "proper circumstances." *New York v. FCC*, 486 U.S. 57, 64 (1988). These proper circumstances arise only where the agency has a "broad grant of authority to reconcile conflicting policies" and adopted a "a reasonable accommodation of [those] conflicting policies." *United States v. Shimer,* 367 U.S. 374, 383 (1961). Third, the accommodation will not stand if "it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id*. As explained *supra* (Section I(A)) the Nonbank Charter Decision triggers significant risks to traditional areas of state concern; namely, licensing and oversight of nonbank financial services providers. *See, e.g.*, *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985)(citations omitted). OCC does not address the three preemption requirements.

52

OCC lacks congressional authorization to charter nonbanks that do not engage in deposit taking and, thus, violates the Tenth Amendment by authorizing such charters. OCC is entitled to no deference in its regulation of nonbank financial services providers (*FERC*, 535 U.S. at 18), and there must be a "clear indication" that Congress intended to allow OCC to act as it has. *Solid Waste Agency*, 531 U.S. at 172. Far from approving, Congress has rejected OCC's efforts to expand its chartering authority to nonbanks. *See* Section VI(C). Throughout the life of the dual banking system, Congress has taken significant steps to preserve States' traditional role in chartering, regulating and supervising State banks, *see, e.g.*, Section VII(B) (discussing Congress's actions limiting branching), and in licensing, regulating and supervising nondepository financial services providers, *see, e.g.*, S.A.F.E. Mortgage Licensing Act, Pub. L. 110–289, §1501 et. seq., 122 Stat. 2810 (2008)(12 U.S.C. § 5101 *et. seq.*).

Further, OCC does not argue that it has accommodated (much less reasonably so) any state interests. It merely catalogs the ways a purportedly *valid* federal regulation preempts conflicting state law. OCC's silence on this balancing confirms that it has given no thought to state interests and has provided no accommodation. OCC's actions only underscore why the accommodation requirement exists—to prevent an agency from "confer[ring] power upon itself." *See Louisiana Pub. Serv. Comm'n.*, 476 U.S. 355, 374-75 (1986) ("To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress. This we are both unwilling and unable to do.").

Finally, OCC's reliance upon *CSBS v. Conover* is misplaced. Although the ruling acknowledged the Comptroller's "power to preempt inconsistent state law," it also noted the limitations on that power. 710 F.2d 878, 885 (D.C. Cir. 1983). The Comptroller is not permitted to "authorize activities that run afoul of federal laws governing the activities of national banks." *Id.*

OCC has done exactly that by promulgating a regulation and adopting a chartering program that improperly expand OCC's chartering authority in a manner that conflicts with provisions of the NBA and other statutes that govern national banks. *See* Sections V(B) and V(C).

IX.    **OCC'S CREATION OF AN ENTIRELY NEW CATEGORY OF NONBANK CHARTER—PARTICULARLY ONE FALLING SQUARELY OUTSIDE ITS STATUTORY AUTHORITY—REQUIRED PROPER NOTICE AND COMMENT.**

In addition to challenging finality, OCC argues that the notice-and-comment requirement does not apply because its Nonbank Charter Decision fails to rise to the level of a "legislative"  or "substantive" rule.  But notice and comment is a "default" requirement under the APA—"rules that do not fit into any one of [the statutory exceptions—*i.e.*, interpretive rules, policy statements, and procedural rules] are typically deemed 'substantive' rules, and as such, must be subjected to notice-and-comment procedures." *Clarian Health West, LLC v. Burwell*, 206 F. Supp. 3d 393, 408, 410 (D.D.C. 2016)(internal quotation omitted). Exceptions to this requirement are "narrowly construed and only reluctantly countenanced." *Id*. at 410 (citing *State of N.J. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980)).

"Before exempting a rule from notice-and-comment procedures, the Court must assure itself that this is one of the 'limited situations where substantive rights are not at stake . . .'" *National Sec. Counselors v. CIA*, 931 F. Supp. 2d 77, 111 (D.D.C. 2013)(quotations omitted); *EPIC v. Dept. of Homeland Sec.*, 653 F. 3d 1, 6 (D.C. Cir. 2011)(TSA's decision to use certain imaging technology should have been subjected to notice and comment because the decision "substantively affects the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking," even though "the new policy imposes no new substantive obligations upon airline passengers"); *see also, e.g., Mendoza*, 754 F.3d at 1021-024 (letters providing special procedures for visa certifications "are necessarily legislative rules because they effect a substantive change in existing law or policy"); *Texas v. US*, 787 F. 3d 733, 766-67 (5th Cir.

54

2015) (notice and comment necessary under the D.C. Circuit's test because state "has a quasi-sovereign interest in not being forced to choose between incurring millions of dollars in costs and changing its laws" and the dispute involved the "substantive standards" by which the agency evaluates applications).

The Nonbank Charter Decision "'substantively affect[s] the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking.'" See *Mendoza*, 754 F. 3d at 1021, 2014 (quotation omitted).  It creates a sweeping new charter for nonbanks, allowing them to escape existing state regulation. OCC completely misses this. Its argument focuses on two documents, the December 2016 Whitepaper and March 2017 Draft Supplement and argues that certain wording in those documents is "far from . . . [that of] a legislative rule." OCC Brief at 20-21. OCC does not even attempt to show that it meets a "narrowly construed" exception—*i.e.*, an interpretive rule, policy statement, or procedural rule—that would remove the decision from the "default" substantive rule category. *See Clarian Health West,* 206 F. Supp. 3d at 410.

## **CONCLUSION**

For all of the foregoing reasons, Defendants' Motion to Dismiss should be denied.


Date:  September 13, 2017                              Respectfully submitted,

                                                                    */s/ Jennifer Ancona Semko*
                                                                    Jennifer Ancona Semko (Bar No. 481119)
                                                                    Steven M. Chasin (Bar No. 495853)
                                                                    Graham Cronogue (*pro hac vice* pending)
                                                                    BAKER & McKENZIE LLP
                                                                    815 Connecticut Avenue NW
                                                                    Washington, DC 20006
                                                                    Tel: +1 202 835-4250
                                                                    Fax: +1 202 416-7055
                                                                    jennifer.semko@bakermckenzie.com
                                                                    steven.chasin@bakermckenzie.com
                                                                    graham.cronogue@bakermckenzie.com

55

Matthew F. Kluchenek (*pro hac vice* pending)
BAKER & McKENZIE LLP
300 East Randolph Street, Suite 5000
Chicago, IL 60601
Tel: +1 312 861-8803
matt.kluchenek@bakermckenzie.com

John Gorman
Margaret Liu
CONFERENCE OF STATE BANK
SUPERVISORS
1129 20th Street, NW
Washington, DC 20036
Tel: +1 202 296-2840
bgorman@csbs.org
mliu@csbs.org

## <u>CERTIFICATE OF SERVICE</u>

In accordance with LCvR 5.3, I hereby certify that on September 13, 2017, a true and

correct copy of the foregoing Plaintiff's Opposition to Defendants' Motion to Dismiss for Lack of

Jurisdiction and Failure to State a Claim was served on all counsel of record through the Court's

CM/ECF system.

*/s/ Jennifer Ancona Semko*

Jennifer Ancona Semko
BAKER & McKENZIE LLP
815 Connecticut Avenue, N.W.
Washington, D.C, 20006
Tel: +1 202 835-4250
Fax: +1 202 416-7055
jennifer.semko@bakermckenzie.com

*Attorney for Plaintiff*