# EXHIBIT B

# Introduction

This booklet of the *Comptroller's Licensing Manual* supports the Office of the Comptroller of the Currency's (OCC) supervisory activity with respect to the granting of charters to national banks and federal savings associations (collectively, banks).[1] Before establishing a national bank or a federal savings association (FSA), each organizing group must apply to, and obtain approval from, the OCC. New banks may be chartered for full-service or special purpose operations, such as trust banks, credit card banks, bankers' banks, community development (CD) banks, cash management banks, and other banks that limit their activities.

Each organizer and proposed director is responsible for understanding the chartering process and the role of a bank director. Each organizer and proposed director should review this booklet to become familiar with the chartering process.

National banks and FSAs are chartered under different legal authorities. As such, laws, regulations and rulings applying to each charter are sometimes different, although many laws and requirements apply to both charter types. The application process for both charters is similar, but differences in the process or factors the OCC considers when reviewing charter applications for the two charter types are highlighted in this booklet, as appropriate. National banking associations are owned by shareholders who own stock issued by the national bank. An FSA may also be organized as a stock entity (stock FSA) or may have a mutual form of organization (mutual FSA), in which the equity interest in the FSA is attributed to the FSA's members (members generally include depositors, but also may include borrowers).

Each bank is different and may present unique issues. The OCC's supervisory activity includes a licensing component, through which the OCC ensures that the corporate structure of banks is established and maintained in accordance with principles of safety and soundness and consistent with applicable laws and regulations. Accordingly, the OCC applies the guidance in this booklet consistent with the supervisory goals for each bank. The booklet

- describes OCC policies and procedures used in the charter application process, along with detailed guidance and instructions.
- discusses the factors that the OCC considers in deciding a proposed bank's application.
- describes the application process, including the prefiling process, filing and review of the application, the decision, and the organization phase of the new bank.
- provides information about the ongoing supervision of a federally chartered bank and issues applicable to a special purpose bank.

This booklet consists of an introduction, a key policies section outlining specific factors for chartering banks, a section on the application process, and a procedures section. A glossary

---

[1] This booklet also covers special purpose banks such as trust banks, credit card banks, and community development (CD) banks, which may be subject to specific regulations or guidance, as described in the "Bank Supervision Process" booklet of the *Comptroller's Handbook*. For information on national trust banks and FSA trust banks, refer to OCC Bulletin 2007-21, "Supervision of National Trust Banks, Revised Guidance: Capital and Liquidity" (as of June 7, 2012, this guidance also applies to FSAs).

bank proposes branch locations, separate branch applications are required, with separate requirements for public notice. Organizers should contact the OCC for guidance concerning additional filings that may be required.

The organizing group should file an interagency application for deposit insurance with the FDIC when it submits its charter application to the OCC, if the proposed bank will offer insured deposits. All FSAs must be FDIC-insured.[12]

A bank holding company (BHC) or savings and loan holding company (SLHC), or a company that would become a BHC or SLHC because of its ownership of a proposed bank, must obtain approval from the Board of Governors of the Federal Reserve System (Federal Reserve Board) to acquire a newly established bank before the OCC will grant final approval.[13]

## Organizing Group's Role and Responsibilities

A strong organizing group generally includes persons with diverse business and financial interests and community involvement. The business plan and other information supplied in the application must demonstrate an organizing group's collective ability to establish and operate a successful bank in the economic and competitive conditions of the market the bank will serve. A poor business plan reflects adversely on the organizing group's ability, and the OCC may deny such applications.

The organizing group must be composed of five or more persons.[14] Normally, all of the organizers serve as the bank's initial board of directors.

The organizers should

- ensure that the group consists of persons with diverse business and financial interests and community involvement and includes persons with some relevant banking or financial services experience.
- have a personal history that reflects responsibility, honesty, and integrity.
- exhibit substantial personal and financial commitment to the proposed bank relative to their individual and collective financial strength.
- select a capable CEO and, early in the organization process, other executive officers who have the necessary experience to successfully implement the proposed business plan and enhance the proposed bank's likelihood of success.
- develop a business plan that

---

[12] Refer to 12 CFR 5.20(e)(3).

[13] There are exceptions to this requirement under the Bank Holding Company Act for certain national trust banks or national credit card banks. These exceptions are discussed in the "Special Purpose Banks" section of this booklet.

[14] Refer to 12 CFR 5.20(d)(7), and, for national banks, 12 USC 21.

traditional products and services, operate within a small geographic area lacking intense competition, and have a management team implementing a proven business strategy would be noncomplex and, generally, would not require higher capital.

As appropriate, the OCC focuses on the consolidated company risk profile when reviewing an application filed by a sponsoring organization. The OCC's risk assessment also may include significant affiliated entities when the OCC considers it appropriate.

The FDIC has capital requirements for obtaining federal deposit insurance. Applicants should contact the FDIC to determine the FDIC's requirements if the bank will be FDIC insured.

### Key Capital Considerations

Organizers must address key considerations in supporting the proposed capital level, including the following:

- On- and off-balance-sheet composition, including credit risk, concentration risks, market risks, and risks associated with any nontraditional products, services, or operating characteristics.
- Plans and prospects for growth, including management's past experience in managing growth.
- Stability or volatility of sources of funds.
- Access to capital sources.
- If sponsored by a holding company, the sponsor's track record when implementing plans and confronting emerging risks or needs.

### Raising Capital

The organizing group and founders (refer to the "Glossary" section of this booklet) must lead the bank's efforts to raise capital in the marketplace by raising capital that is sufficient to

- pay for all organization costs.
- enable the bank to compete effectively in the market area.
- support the proposed bank's business plan until the bank can achieve and sustain profitable operations.
- address uncertainties in the marketplace.

When the organizing group files its application with the OCC, it should describe how it plans to raise capital. Before soliciting and selling stock of the proposed bank, the organizers must accomplish all of the following:

- Submit a completed application, including a business plan.
- Receive the OCC's determination that the application is complete. This determination is based on the review conducted by OCC Licensing staff using the Charter Application Checklist and does not mean the OCC has evaluated the application's merits.

review process. However, organizers should tailor the contents of the application to be consistent with the special purpose business line of the proposed charter.

Depending on the nature of the proposed activities, the OCC's review of a special purpose proposal may require additional scrutiny.

==Special purpose bank proposals to date include those banks whose operations are limited to certain activities, such as credit card operations, fiduciary activities, community development, or cash management activities. Proposals for bankers' banks also fall into this category. The OCC will consider other special purpose bank proposals, provided the application meets the evaluative decision factors common to all bank charter applications.==

## Credit Card Banks

Credit card banks are institutions whose primary business line is the issuance of credit cards, the generation of credit card receivables, and activities incidental to that line of business. Some credit card banks may have other lines of business but they are not generally material to the bank.

A holding company or individual shareholders may control an insured bank that engages exclusively or predominantly in credit card activities. This bank may legally offer additional banking services, but generally the board has adopted a business plan focusing on credit cards and related products and services. These banks are generally "banks" under the BHCA or "savings associations" under HOLA, so a company that owns one is a BHC subject to the activity and geographic limitations of the BHCA, or an SLHC subject to the activity limitations of the Savings and Loan Holding Company Act.[43] Companies that own these credit card banks generally are subject to supervision and oversight by the Federal Reserve Board.

Some credit card national banks, however, are not "banks" as that term is defined under the BHCA if they meet certain requirements under law. The Competitive Equality Banking Act of 1987 (CEBA) created the BHCA exemption for these national banks (CEBA credit card banks). There is no similar exception for FSAs under the Savings and Loan Holding Company Act. The company that owns a national credit card bank that complies with the specific exceptions noted in the CEBA does not become a BHC solely by virtue of owning the bank, so the parent company is not subject to the activity and geographic limitations that generally apply to BHCs under the BHCA. Thus, nonbank holding companies, commercial entities, or banks that wish to have a subsidiary credit card bank usually own these CEBA credit card banks. However, a BHC that wants to operate a credit card bank in a state in which it would not be able to establish a de novo BHCA bank also could own a CEBA credit card bank in that state. This type of bank must meet all of the requirements for the credit card bank exemption created by the CEBA amendment to the BHCA (12 USC 1841(c)(2)(F)).

---

[43] Refer to 12 USC 1467a, "Regulation of Holding Companies," which is part of HOLA.