UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONFERENCE OF STATE BANK SUPERVISORS, <br><br> Plaintiff, <br><br> v. <br><br> OFFICE OF THE COMPTROLLER OF THE CURRENCY, <br><br> and <br><br> KEITH A. NOREIKA, in his official capacity as Acting Comptroller of the Currency, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 17-CV-00763 (JEB) |

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION AND FAILURE TO STATE A CLAIM

AMY S. FRIEND
Senior Deputy Comptroller and
  Chief Counsel
CHARLES M. STEELE
Deputy Chief Counsel
KAREN SOLOMON
Deputy Chief Counsel
GREGORY F. TAYLOR
Director of Litigation
DOUGLAS B. JORDAN
PETER C. KOCH
ASHLEY W. WALKER
GABRIEL A. HINDIN
MICHAEL K. MORELLI
Office of the Comptroller of the
  Currency
400 7th Street S.W.
Washington, D.C. 20219

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 3

I.   CSBS REMAINS UNABLE TO IDENTIFY ANY ACTUAL OR IMMINENT INJURY-IN-FACT AS REQUIRED TO PRESENT A JUSTICIABLE CASE OR CONTROVERSY ........................................................................................... 3

    A.   Plaintiff's Standing Is Not "Self-Evident" ...................................................... 3

    B.   CSBS Fails to Allege Injury-in-Fact Sufficient to Support Standing.............................. 5

        1.   CSBS Cannot Identify Any Specific Preemptive Action Taken by the OCC .............. 5

        2.   Section 5.20(e)(1) Does Not Create an Ongoing Conflict with State Law ................. 7

    C.   CSBS's Reliance on *Massachusetts v. EPA* Is Misplaced ............................................... 8

II.  CSBS DOES NOT STATE A BASIS FOR RELIEF FROM THE SIX-YEAR STATUTE OF LIMITATIONS THAT BARS A FACIAL CHALLENGE ......................................... 9

    A.   The Section 2401 Time Bar Is Jurisdictional ................................................... 9

    B.   CSBS Does Not Meet Any Exception to the Time Bar................................................. 10

III. CSBS FAILS TO ESTABLISH THE EXISTENCE OF A REVIEWABLE FINAL AGENCY ACTION........................................................................................... 12

    A.   Because None of the OCC's Public Statements Show That the OCC Has Reached a Final Decision, the First Part of the *Bennett* Test Is Not Satisfied................................ 12

        1.   No Final Decision to Accept Applications for 5.20(e)(1) Charters Has Been Made . 12

        2.   The Standard for Evaluating Finality in "Pre-Enforcement Challenges" Is Inapplicable in This Case........................................................................................... 14

    B.   None of the Alleged Agency Actions Has Determined Rights or Obligations or Have Legal Consequences, Defeating the Second Part of the *Bennett* Test ............................ 15

IV.    CSBS FAILS TO ESTABLISH THAT THE OCC'S INTERPRETATION OF THE
NATIONAL BANK ACT IS CONTRARY TO STATUTORY PLAIN MEANING OR
UNREASONABLE ........................................................................................................... 17

    A.    Under *Chevron* Step One, "Business of Banking" Is Ambiguous and Subject to the
OCC's Interpretive Authority Over the National Bank Act as Affirmed in Controlling
Case Law ................................................................................................................... 17

        1.    The Statutory Text and Case Law Establish that the Term "Business of Banking" Is
Ambiguous ........................................................................................................... 17

        2.    CSBS Errs in Its Assertion That the National Bank Act Must Be Construed *In Pari
Materia* with Other Statutes, Including the Bank Holding Company Act ................. 19

        3.    CSBS's Remaining Statutory Arguments Are Unpersuasive ..................................... 22

        4.    *Independent Bankers Association of America v. Conover* Is Defunct ........................ 24

    B.    Under *Chevron* Step Two, the OCC Reasonably Consulted the "Core Activities" that
Define a "Branch" and "the General Business of Each  National Banking Association"
as the Minimum Activities to Qualify for the "Business of Banking" ........................... 25

    C.    CSBS Cannot Establish That History Controls the Meaning of the National Bank Act
Chartering Provisions ................................................................................................. 26

    D.    CSBS's Tenth Amendment Claim Fails ..................................................................... 30

CONCLUSION .................................................................................................................... 31

# TABLE OF AUTHORITIES

## Cases

Page(s)

*Alaska v. U.S. Dep't of Transp.*,
  868 F.2d 441 (D.C. Cir. 1989) ............................................................................ 7

*Am. Ass'n of Cosmetology Sch. v. Devos*, __F. Supp.3d ___,
  2017 WL 2804886 (D.D.C. June 28, 2017) ............................................................. 4

*Am. Ins. Ass'n v. Clarke*,
  865 F.2d 278 (D.C. Cir. 1988) ..................................................................... 20, 21

*Ark Initiative v. Tidwell*,
  895 F. Supp. 2d 230 (D.D.C. 2012) ..................................................................... 8

*AT&T v. EEOC*,
  270 F.3d 973 (D.C. Cir. 2001) .......................................................................... 14

*Bank of Augusta v. Earle*,
  38 U.S. 519 (1839) ......................................................................................... 28

*Bennett v. Spear*,
  520 U.S. 154 (1997) .............................................................................. passim

*Bimini Superfast Operations LLC v. Winkowski*,
  994 F. Supp. 2d 106 (D.D.C. 2014) ................................................................... 15

*Bowler v. Hawke*,
  320 F.3d 59 (1st Cir. 2003) ............................................................................... 6

*Californians for Renewable Energy v. U.S. Dept. of Energy*,
  860 F. Supp. 2d 44 (D.D.C. 2012) ..................................................................... 4

*Chamber of Commerce of U.S. v. EPA*,
  642 F.3d 192 (D.C. Cir. 2011) ...................................................................... 3-4

*Ciba-Geigy Corp. v. EPA*,
  801 F.2d 430 (D.C. Cir. 1986) ........................................................ 12, 14, 15, 17

*City of Dania Beach v. FAA*,
  485 F.3d 1181 (D.C. Cir. 2015) ......................................................................... 8

*Clarke v. Sec. Indus. Ass'n*,
  479 U.S. 388 (1987) ............................................................................... 25, 26

*Cline v. Hawke*,
  51 Fed. Appx. 392 (4th Cir. 2002) ..................................................................... 6

*CSBS v Lord*,
  532 F. Supp. 694 (D.D.C. 1982) ......................................................................... 5

*CSI Aviation Servs. v. U.S. Dep't of Transp.*,
  637 F.3d 408 (D.C. Cir. 2011) .......................................................................... 15

*CTIA-The Wireless Corp. v. FCC*,
  466 F.3d 105 (D.C. Cir. 2006) .......................................................................... 11

*Curtis v. Leavitt*,
  15 N.Y. 9 (1857) ........................................................................................... 28

*Del. Dep't. of Natural Res. & Envtl. Control v. FERC*,
  558 F.3d 575 (D.C. Cir. 2009) ........................................................................... 8

*Greenwood Trust Co. v. Massachusetts*,
  971 F.2d 818 (1st Cir. 1992) ............................................................................ 22

*In re Cmty. Bank of N. Va.*,
    418 F.3d 277 (3d Cir. 2005) ........................................................................21-22
*Indep. Bankers Ass'n of Am. v. Conover*,
    1985 U.S. Dist. Lexis 22529 (M.D. Fla. Feb. 15, 1985) ........................................ 24
*\*Indep. Cmty. Bankers Ass'n of S.D. v. Bd. of Governors of the Fed. Reserve Sys.*,
    820 F.2d 428 (D.C. Cir. 1987) ........................................................................ 18, 24
*\*Indep. Ins. Agents of Am. v. Ludwig*,
    997 F.2d 958 (D.C. Cir. 1993) ........................................................................ 19, 20
*Indep. Ins. Agents of Am., Inc. v. Clarke*,
    955 F.2d 731 (D.C. Cir. 1992) ............................................................................... 20
*Jindal v. U.S. Dep't of Educ.*,
    2015 WL 854132 (M.D. La. Feb. 26, 2015) .......................................................... 7
*Kennecott Utah Copper Corp. v. U.S. Dep't of the Interior*,
    88 F.3d 1191 (D.C. Cir. 1996) ............................................................................... 11
*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................. 4
*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ................................................................................................. 8
*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014) ............................................................................. 9
*Mercantile Nat'l Bank v. Mayor of New York*,
    121 U.S. 138 (1887) ..........................................................................................28-29
*Nat. Ass'n of Life Underwriters v. Clarke*,
    736 F. Supp. 1162 (D.D.C. 1990) ........................................................................ 20
*\*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*,
    513 U.S. 251 (1995) ................................................................................ 18, 22, 24
*Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*,
    766 F.2d 228 (6th Cir. 1985) .................................................................................. 7
*Oulton v. German Sav. & Loan Soc.*,
    84 U.S. 109 (1872) ................................................................................................ 29
*Owens v. Republic of Sudan*,
    864 F.3d 751 (D.C. Cir. 2017) ............................................................................... 9
*P&V Enters. v. U.S. Army Corps of Eng'rs*,
    516 F.3d 1021 (D.C. Cir 2007) ............................................................................. 9
*Peavey v. United States*,
    846 F. Supp. 2d 10 (D.D.C. 2012) ........................................................................ 2
*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
    489 F.3d 1279 (D.C. Cir. 2007) ............................................................................. 4
*Selden v. Equitable Tr. Co.*,
    94 U.S. 419 (1876) ................................................................................................ 29
*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002) ............................................................................... 4
*Spannaus v. U.S. Dept. of Justice*,
    824 F. 2d 52 (D.C. Cir. 1987) ................................................................................ 9
*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................................................................. 4

*Texas v. EEOC*,
   827 F.3d 372 (5th Cir. 2016) ............................................................................... 7
*Texas v. EEOC*,
   838 F.3d 511 (5th Cir. 2016) ............................................................................... 7
*Trudeau v. F.T.C.*,
   456 F.3d 178 (D.C. Cir. 2006) ............................................................................. 2
*Warren v. Shook*,
   91 U.S. 704 (1875) ............................................................................................ 29
*Watters v. Wachovia Bank, N. A.*,
   550 U.S. 1 (2007) .............................................................................................. 30
*West Virginia ex rel. Morrisey v. U.S. Dep't of Health & Hum. Serv.*,
   827 F.3d 81 (D.C. Cir. 2016) ............................................................................. 7
*Whitney v. National Bank of New Orleans & Trust Co.*,
   379 U.S. 411 (1965) .................................................................................... 20, 21
*Wyoming ex rel. Crank v. United States*,
   539 F.3d 1236 (10th Cir. 2008) ......................................................................... 7

## **Statutes**

12 U.S.C. § 21 .......................................................................................... 17, 23
12 U.S.C. § 22(Second) ................................................................................ 23
12 U.S.C. § 23 .............................................................................................. 23
12 U.S.C. § 24(Seventh) ......................................................................... 17, 18
12 U.S.C. § 26 .............................................................................................. 17
12 U.S.C. § 27 ........................................................................................ 17, 22
12 U.S.C. § 36 ........................................................................................ 25, 26
12 U.S.C. § 81 .............................................................................................. 25
12 U.S.C. § 222 ...................................................................................... 23, 24
12 U.S.C. § 378 ............................................................................................ 23
12 U.S.C. § 1841(c)(1)(A)-(B) ..................................................................... 19
15 U.S.C. § 6714(a) ....................................................................................... 6
28 U.S.C. § 1605A(b) .................................................................................... 9
28 U.S.C. § 2104(a) ....................................................................................... 9
28 U.S.C. § 2401 ............................................................................................ 1
28 U.S.C. § 2401(a) ....................................................................................... 9
Internal Revenue Act of 1864, ch. 173, 13 Stat. 223, 251 (1864) ............... 29
Internal Revenue Act of 1866, ch. 184, 14 Stat. 98, 115 (1866) ................. 29

## **Regulations**

12 C.F.R. § 5.20(e)(1) ....................................................................................................... passim
12 C.F.R. § 5.20(l)(2) ............................................................................................................... 16
Economic Growth and Regulatory Paperwork Reduction Act of 1996 Amendments,
 82 Fed. Reg. 8082, 8083 (Jan. 23, 2017) ...................................................................................... 16
Rules, Policies, and Procedures for Corporate Activities; Bank Activities and Operations; Real
 Estate Lending and Appraisals,
 68 Fed. Reg. 70,122, 70,126 (Dec. 17, 2003) ........................................................................... 10

## **Other Authorities**

Cong. Globe, 38th Cong., 1st Sess. (1864) ............................................................................ 26, 27
H.W. Magee, B.L., *A Treatise on the Law of National and State Banks*,
 23 (2d Ed. 1913) ..................................................................................................................... 26

## INTRODUCTION

The Office of the Comptroller of the Currency ("OCC") respectfully files this Reply in Support of Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim (Dkt. No. 9) in response to the Opposition filed by Plaintiff Conference of State Bank Supervisors ("CSBS") on September 13, 2017 (Dkt. No. 14).  The OCC submits that, notwithstanding the arguments proffered by CSBS in its Opposition, the Court should grant the OCC's motion to dismiss.

First, the Opposition does not remedy the Complaint's failure to allege any existing or imminent injury-in-fact to CSBS or to its members caused by the OCC, as is necessary for CSBS to establish standing.  The OCC's 2003 interpretive regulation, 12 C.F.R. § 5.20(e)(1), does not affect or displace any state law.  Similarly, the OCC's public statements and draft policies that CSBS complains of express no present preemptive intent.  CSBS's attempts to demonstrate otherwise fall flat.  Finally, CSBS cannot identify any of its members that have been harmed or any state statutes or other laws that have been preempted.  In these circumstances, CSBS has not met its burden of establishing standing and this Court therefore lacks jurisdiction.

Second, CSBS fails to establish its entitlement to an exception from the running of the six-year statute of limitations set forth in 28 U.S.C. § 2401.  The best analysis in the circumstances here is that there has been no "final agency action" that triggers the limitations period because the challenged regulation created no rights, obligations, or other legal consequences.  CSBS's insistence to the contrary, that 12 C.F.R. § 5.20(e)(1) is a final reviewable action, leads to the conclusion that this facial challenge to the regulation is time barred.

Third, CSBS fails to rebut the OCC's arguments that the public statements and draft policy issued by the OCC in 2016-2017 do not represent "final agency action" suitable for

review.  No statement or draft policy issued by the OCC shows that the OCC has reached a final

decision to accept applications for charters for special purpose national banks ("SPNBs") that

will not take deposits and that will conduct activities other than fiduciary activities ("5.20(e)(1)

Charters").  None of the OCC's actions to date have determined rights or obligations, or had

legal consequences of any kind.  CSBS's alternative standard applicable to "pre-enforcement"

challenges has no application to the facts of this case.  Accordingly, because the OCC's

regulation, public statements, and draft policy remain unfit for review, the Complaint may also

be dismissed for failure to state a claim.  *See Peavey v. United States.*, 846 F. Supp. 2d 10, 13

(D.D.C. 2012) (stating that a court "need not accept as true . . . 'a legal conclusion couched as a

factual allegation,' nor an inference unsupported by the facts set forth in the Complaint" (*quoting*

*Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006)).  The allegations in the Complaint are

insufficient to allow the case to survive dismissal on any one of these threshold grounds.

     Finally, should the Court reach the merits, the Opposition fails to show a basis under a

*Chevron* analysis for invalidating the OCC's interpretation of the ambiguous National Bank Act

phrase "the business of banking."  First, controlling Supreme Court and D.C. Circuit authority

defer to the OCC's interpretation of the phrase as a matter of law.  CSBS's efforts to distinguish

that authority on the basis of immaterial facts are conclusory and unpersuasive.  The remainder

of CSBS's attempt to show that the phrase "business of banking" has a plain, unambiguous

meaning relies primarily upon a non-existent requirement that the National Bank Act be

interpreted to conform with later-enacted statutes, most prominently, the Bank Holding

Company Act.  Supreme Court and D.C. Circuit authority establishes, to the contrary, that the

National Bank Act and the Bank Holding Company Act are not subject generally to *in pari*

*materia* interpretation, and that the Comptroller and Federal Reserve have discrete roles to play

with respect to national banks and bank holding companies respectively.  CSBS's attempts to

show that the OCC's interpretation of the "business of banking" is unreasonable rely upon

mischaracterizations of the OCC's analysis.

## ARGUMENT

I.    **CSBS REMAINS UNABLE TO IDENTIFY ANY ACTUAL OR IMMINENT INJURY-IN-FACT AS REQUIRED TO PRESENT A JUSTICIABLE CASE OR CONTROVERSY**

The OCC's Memorandum in Support of Defendants' Motion to Dismiss for Lack of

Jurisdiction and for Failure to State a Claim ("OCC Mem.") demonstrated that CSBS had failed

to show the "irreducible constitutional minimum" of injury-in-fact, causation, and redressability

necessary to invoke the jurisdiction of this Court.  OCC Mem. at 9-13.  CSBS's Complaint fails

to allege a sufficiently tangible or imminent harm to the organization or to its members to

support standing under Article III.  *See id.* at 11-13.  The OCC acknowledges that CSBS might

one day be able to show such injury-in-fact, but only if the OCC actually approves a 5.20(e)(1)

Charter.  Until then, CSBS has shown that it is unable to identify with the requisite particularity

which of its members have been harmed or how the OCC's actions have caused that harm.  *Id.* at

12-13.

### A.  Plaintiff's Standing Is Not "Self-Evident"

Neither CSBS's Complaint nor its Opposition Brief ("Opp.") identifies a specific injury

to CSBS or any member of its association, in contravention of the requirements for associational

standing.[1]  Because neither CSBS nor its members are the objects of OCC action, their standing

---

[1] "When a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured.  Rather the petitioner must specifically 'identify members who have suffered the requisite harm.'"  *Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)); *see also Californians for Renewable Energy v. U.S. Dept. of Energy*, 860 F. Supp. 2d 44, 48 (D.D.C.

is not "self-evident." *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002).  "[S]tanding

is 'substantially more difficult to establish' where, as here, the parties invoking federal

jurisdiction are not 'the object of the government action or inaction' they challenge." *Pub.*

*Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289-90 (D.C. Cir. 2007)

(quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)).  "[A] petitioner whose

standing is not self-evident should establish its standing by the submission of its arguments and

any affidavits or other evidence appurtenant thereto at the first appropriate point in the review

proceeding.  In some cases that will be in response to a motion to dismiss for want of standing

. . . ." *Sierra Club*, 292 F.3d at 900.

The interpretive regulation, public statements, and draft policy that CSBS has placed at

issue are intended to construe the *OCC's* authority to charter national banks rather than to

impose the OCC's regulatory authority over state-chartered institutions or attempt to limit the

authority of CSBS's membership over the institutions that they regulate.  One of the primary

features of the nation's dual banking system is that state regulatory authority—including the

authority to charter banking institutions—resides in a parallel but separate realm.  *Cf. National*

*Banks and the Dual Banking System*, https://www.occ.treas.gov/publications/publications-by-

type/other-publications-reports/national-banks-and-the-dual-banking-system.pdf ("The 'dual

banking system' refers to the parallel state and federal banking systems that co-exist in the

United States.  The federal system is based on a federal bank charter, powers defined under

federal law, operation under federal standards, and oversight by a federal supervisor.  The state

---

2012).  Recent authority in this district has clarified that "a plaintiff-association must *identify*
injured parties at the pleading stage, not necessarily that they be named in the complaint." *Am.*
*Ass'n of Cosmetology Sch. v. Devos*, ___ F. Supp. 3d ___, 2017 WL 2804886 at *12 (D.D.C.
June 28, 2017).  CSBS makes no attempt to do this in either its Complaint or its Opposition
Brief.

system is characterized by state chartering, bank powers established under state law, and

operation under state standards, including oversight by state supervisors.").  Accordingly,

CSBS's standing is not self-evident; the OCC's interpretation of its chartering authority does not

directly affect or diminish the authority or functions of CSBS's members in their regulatory

sphere.  The OCC's actions do not preclude the states from chartering non-depository institutions

should they so choose.

**B.  CSBS Fails to Allege Injury-in-Fact Sufficient to Support Standing**

CSBS defends its position that the facts in the Complaint are sufficient to support

standing by arguing that: 1) states have a justiciable interest in ensuring that federal preemption

comports with federal law; 2) non-enforcement of a federal regulation or decision conflicting

with state law does not necessarily deny standing; and 3) intangible injuries such as a substantial

threat of government enforcement can establish standing.  Opp. at 8-11.  But the Complaint does

not show any such injury-in-fact.

*1.  CSBS Cannot Identify Any Specific Preemptive Action Taken by the OCC*

CSBS is still unable to identify any *specific* preemptive action taken (or imminently

threatened) by the OCC.  *See, e.g.*, *CSBS v. Lord*, 532 F. Supp. 694, 695-96 (D.D.C. 1982)

(holding that OCC regulation setting forth conditions under which national banks may offer or

purchase adjustable rate mortgages overrode inconsistent state law).  It is not enough for CSBS

to say that, based on a chartering decision by the OCC that has not yet occurred, an unidentified

state law might be subject to preemption.  Rather, the applicable case law requires CSBS to

allege more than a hypothetical or abstract harm in order to establish that it has standing to

invoke the jurisdiction of the Court.

For example, in *Bowler v. Hawke*, 320 F.3d 59 (1st Cir. 2003), the United States Court of Appeals for the First Circuit addressed the question of whether a Massachusetts state insurance statute and its accompanying regulations were preempted by federal law.  As prescribed by the governing federal statute, 15 U.S.C. § 6714(a), state officials filed a petition in the court of appeals to review and set aside an informal OCC opinion letter concluding that state law controlling insurance sales, solicitation, and cross-marketing activities was preempted by a new federal statute allowing national banks and their affiliates to offer insurance products.  The First Circuit raised the issue of jurisdiction *sua sponte* and subsequently held that the OCC opinion letter had insufficient preemptive effect upon state law to present a case or controversy.  The court concluded that the OCC's preemption opinion did not present a justiciable issue because, although the opinion expressed the agency's opinion on the issue, it "neither has legal effect nor presages future coercion by the OCC, which claims no entitlement to restrain the states from enforcing preempted law or to authorize third parties to engage in conduct forbidden by preempted law."  *Bowler*, 320 F.3d at 63; *but see Cline v. Hawke,* 51 Fed. Appx. 392, 395 (4th Cir. 2002) (finding case or controversy in a factual context paralleling *Bowler*; specifically stating that the "[p]reemption [l]etter causes banks to change their business plans and business practices and therefore conflict with the West Virginia laws.  West Virginia therefore suffers because it cannot enforce certain provisions of its insurance laws against national banks.").

The reasoning in *Bowler* applies *a fortiori* here, where, unlike the preemption letters in *Bowler* and *Cline*, the OCC policy proposals related to 5.20(e)(1) Charters do not purport to express a preemptive opinion, let alone to effect preemption through the force of law.  As discussed in the next subsection, Section 5.20(e)(1) does not preempt any state law and the collection of public statements and agency documents regarding OCC policy initiatives do not

6

have the force of law.  *Cf. West Virginia ex rel. Morrisey v. U.S. Dep't of Health & Human Servs.*, 827 F.3d 81, 84 (D.C. Cir. 2016) (stating that even if the court assumed a given federal government action "created a theoretical breach of State sovereignty," a state still must establish "a *concrete* injury-in-fact").  The non-existence of any preemptive effect or other harm distinguishes this case from those relied on by CSBS: *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443-44 (D.C. Cir. 1989) (federal agency orders and regulation had preemptive effect); *Texas v. EEOC*, 827 F.3d 372, 378, 379 (5th Cir. 2016) (federal enforcement guidance imposed increased regulatory costs on state), *opinion withdrawn by Texas v. EEOC*, 838 F.3d 511 (5th Cir. 2016); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1241-42 (10th Cir. 2008) (agency interpretation "interfere[d] with Wyoming's ability to enforce its legal code"); *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 232-33 (6th Cir. 1985) (formal federal position that state statute is preempted); *Jindal v. United States Dep't of Educ.*, No. 14-CV-534, 2015 WL 854132, at *3-5 (M.D. La. Feb. 26, 2015) (coercive actions by federal agency limiting state control over state education curriculum).  The OCC acknowledges that if it issues a 5.20(e)(1) Charter, the resulting national bank will be entitled to the protections of federal law, including preemption of conflicting state laws, like any other national bank.  OCC Mem. at 41. The prospect that a yet-to-be-identified state law may be preempted as the result of a *future* decision by the OCC to issue a national bank charter imposes no *present* or *imminent* harm.

　　*2.  Section 5.20(e)(1) Does Not Create an Ongoing Conflict with State Law*

　　Similarly, CSBS's argument that the adoption of Section 5.20(e)(1) creates an ongoing conflict with state law—notwithstanding that the OCC has not issued a 5.20(e)(1) Charter—fails to explain how the mere existence of the regulation creates such a conflict or constitutes a "threat of enforcement."  Opp. at 10-11.  The challenged provision interprets the National Bank Act to

authorize the chartering of a particular form of national bank, an activity beyond the scope of state authority.  The regulation does not address state law and does not purport to operate upon states at all.  Moreover, CSBS does not identify a particular state statute that is in conflict with the challenged national bank chartering provision set forth in Section 5.20(e)(1).

### C.  CSBS's Reliance on *Massachusetts v. EPA* Is Misplaced

Finally, CSBS's reliance on *Massachusetts v. EPA,* 549 U.S. 497 (2007), for the proposition that it is entitled to "special solicitude" regarding standing is unhelpful because it does not relieve it of the necessity of showing injury-in-fact.[2]  A showing of specific harm is still required.  As the Supreme Court made clear in the *Massachusetts* opinion, a distinct harm to state interests sufficient to support Massachusetts' standing had already occurred: environmental changes had "already inflicted significant harms," including "rising seas" that "have already begun to swallow Massachusetts' coastal land" causing harm to the state as a landowner. *Massachusetts v. EPA*, 549 U.S. at 521-22; *see also Del. Dept. of Natural Res. & Envtl. Control v. FERC*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009) ("This special solicitude [described in *Massachusetts v. EPA*] does *not* eliminate the state petitioner's obligation to establish a concrete injury, as Justice Stevens' opinion amply indicates.").  The allegations in CSBS's complaint do not identify any comparable concrete injury caused by the OCC.

---

[2] CSBS's claim to lowered standing requirements based on "procedural rights" also fails in the absence of existing injury.  A claim to procedural rights may lower the showing necessary to establish the causation and redressability requirements for standing, *see City of Dania Beach v. FAA*, 485 F.3d 1181, 1187 n.1 (D.C. Cir. 2015), but in such cases the plaintiff must still show that the procedure at issue protects against concrete injury, *see, e.g.*, *Del. Dept. of Natural Res. & Envtl. Control v. FERC*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009) (acknowledging "obligation to establish a concrete injury" in procedural rights cases); *Ark Initiative v. Tidwell*, 895 F. Supp. 2d 230, 237 (D.D.C. 2012) (noting alleged harm to environmental enjoyment).

## II.    CSBS DOES NOT STATE A BASIS FOR RELIEF FROM THE SIX-YEAR STATUTE OF LIMITATIONS THAT BARS A FACIAL CHALLENGE

In its opening brief, the OCC argued that CSBS's facial challenge to a regulatory amendment that became effective in January 2004 would be time-barred by 28 U.S.C. § 2104(a) to the extent that the 2003 amendment to Section 5.20 constituted "final agency action." OCC Mem. at 22. The OCC's arguments are prompted by CSBS's insistence that the regulatory amendment must be considered a final agency action. Opp. at 12. CSBS's continued adherence to this position is inconsistent with the law. The "exceptions" upon which CSBS relies do not forestall dismissal for want of jurisdiction.

### A.  The Section 2401 Time Bar Is Jurisdictional

CSBS incorrectly argues that the time bar is not jurisdictional, claiming that the case that stands for that proposition, *Spannaus v. U.S. Dept. of Justice*, 824 F. 2d 52 (D.C. Cir. 1987), has been "rejected or questioned" by the D.C. Circuit. Opp. at 21. While the D.C. Circuit has expressed some uncertainty as to the effect of intervening Supreme Court authority, *see Mendoza v. Perez*, 754 F.3d 1002, 1017 n.11 (D.C. Cir. 2014); *P&V Enters. v. U.S. Army Corps of Engineers*, 516 F.3d 1021, 1027 & n.2 (D.C. Cir. 2007), there is no indication that *Spannaus* has been overruled. Indeed, in a recent case cited by CSBS, the D.C. Circuit did not reject *Spannaus*, but rather declined to extend its holding to a statute of limitations in a more recently enacted statute, the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(b). *Owens v. Republic of Sudan*, 864 F.3d 751, 802-03 (D.C. Cir. 2017). If *Spannaus* were no longer good law, there would have been no need to distinguish it. Accordingly, the failure to meet the statute of limitations in 28 U.S.C. § 2401(a) remains a jurisdictional bar.

9

### B.   CSBS Does Not Meet Any Exception to the Time Bar

The correct analysis of the OCC's 2003 amendment to Section 5.20(e)(1) leads to the conclusion that the provision never became "final agency action" so as to be suitable for review. The amendment does not satisfy the second part of the *Bennett v. Spear* test because, as an interpretive regulation, the amendment did not "affect rights or obligations" or "cause legal consequences."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *see infra* pp. 15-17.  As stated in the preamble to the final rule, 68 Fed. Reg. 70,122, 70,126 (Dec. 17, 2003), the amendment provided a "clarification" of the minimum functions for a national bank and set forth an interpretation of the term "business of banking" in the National Bank Act.  Unlike a prescriptive regulation that governs the manner in which national banks conduct their business, the interpretation did not have an immediate legal impact.  The "legal consequences" necessary under *Bennett* would occur only if the OCC granted an application for a 5.20(e)(1) Charter relying on the regulation.  Under this analysis, the statutory limitations period has not begun to run.  A dismissal would be appropriate because the regulatory amendment would not be a final agency action fit for review.  *See infra* pp. 15-17.  Conversely, if the Court agrees with CSBS that the regulation constituted a final agency action in 2004, then the six-year statute of limitations for a facial challenge expired in 2010 and the Complaint is time-barred unless one of CSBS's four claimed "exceptions" applies.

Those exceptions to the application of the statute of limitations are easily resolved.  First, the OCC agrees that the statute of limitations will not bar CSBS from an as-applied challenge if the regulation is ever actually "applied," i.e., when a 5.20(e)(1) Charter is issued.  Opp. at 22-23. Because CSBS does not allege that the OCC has previously relied upon the challenged provisions of Section 5.20(e)(1) to approve a charter, CSBS cannot characterize its Complaint as

an as-applied challenge.  Second, the possibility that CSBS could obtain review by filing a

petition for amendment or rescission of the regulation, Opp. at 25, has no traction because, as

CSBS acknowledges, no such petition has been filed.

CSBS relies most heavily on the argument that the OCC "reopened" the window to file a

facial challenge to Section 5.20(e)(1) when the OCC took up the issue of whether to issue

5.20(e)(1) Charters to fintech companies.  This argument also fails.  "[A]n agency does not

reopen a rulemaking or policy determination 'merely [by] respond[ing] to an unsolicited

comment by reaffirming its position.'"  *CTIA-The Wireless Corp. v. FCC*, 466 F.3d 105, 110

(D.C. Cir. 2006) (second and third alterations in original) (quoting *Kennecott Utah Copper Corp.*

*v. U.S. Dep't of the Interior*, 88 F.3d 1191, 1213 (D.C. Cir. 1996)).  CSBS cannot identify any

place in the OCC's 2015-2017 public statements or draft policies where the OCC solicited

comments regarding its statutory authority or signaled a willingness to reconsider the validity of

its 2003 amendments to Section 5.20(e)(1).  As CSBS acknowledges, the OCC's solicitations of

comment went to questions such as "consumer protection, regulatory and supervisory standards,

and the separation of banking and commerce," Opp. at 23, that is, questions going not to the

correctness of the OCC's interpretation of the scope of its chartering authority, but rather to how

it should be applied.

Finally, whether or not the proposed issuance of 5.20(e)(1) Charters to fintechs was

foreseeable in 2003, the underlying validity of the interpretation is not so context-bound as to

trigger "constructive reopening."  Opp. at 24-25.  That the issue has arisen in the midst of an

unprecedented technological revolution is irrelevant; what is relevant is that the OCC articulated

a position in 2003 that, in the proper circumstances, it may charter an institution that does not

take deposits.  CSBS's arguments on the merits implicate statutory provisions that have not

changed since 2003 and decades-old case law.  The OCC's 2015-2017 public statements were not the "sea change" claimed by CSBS, but simply contemplation of how best to apply the unchanged text of the regulation.

## III.   CSBS FAILS TO ESTABLISH THE EXISTENCE OF A REVIEWABLE FINAL AGENCY ACTION

CSBS's arguments do not succeed in showing a final agency action under the APA that is sufficient to survive a motion to dismiss.  The two-part test for finality stated in *Bennett* is not met.  First, neither the OCC's public statements nor its draft policy document mark the consummation of its decision process.  OCC Mem. at 13-16.  Because the OCC has not determined that it will make 5.20(e)(1) Charters available, the first part of the *Bennett* test is not satisfied.  *Id.*  Second, none of the OCC's public statements or its draft policy, either alone or in combination with the 2003 amendment to the regulation, determine rights or obligations or have legal consequences by themselves.  *Id.* at 16-17.  For this reason, the second part of the *Bennett* test is also not satisfied.  Finally, the standard for evaluating finality in "pre-enforcement" challenges is inapplicable.  *See Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 434 (D.C. Cir. 1986).  Even under application of the *Ciba-Geigy* test, the Complaint should be dismissed.

### A.   Because None of the OCC's Public Statements Show That the OCC Has Reached a Final Decision, the First Part of the *Bennett* Test Is Not Satisfied

#### 1.   *No Final Decision to Accept Applications for 5.20(e)(1) Charters Has Been Made*

The first part of the *Bennett* test is not satisfied because, CSBS's mischaracterizations of the OCC's public statements to the contrary, the OCC has not reached a final decision to make 5.20(e)(1) Charters available.  In support of its argument, CSBS asks the Court to conclude that the OCC's Draft Supplement to its Licensing Manual is *not* a draft.  This conclusion is wholly unsupported.  The Draft Supplement is marked "draft" in the footer of every page.  *See* OCC Mem. at Ex. G.  Similarly, the Explanatory Statement, published at the same time as the Draft

Supplement, states, in conditional rather than final language, that the Draft Supplement was "issue[d] for public comment" and that it "explains how the OCC *would* evaluate applications from fintech companies" in the context of an "*envisioned* application process."  OCC Mem. at Ex. F at 1, 15 (emphasis added).  In short, both documents make plain that no final decision on acceptance of 5.20(e)(1) Charter applications has been made.  CSBS offers no reason for the Court to disbelieve what is apparent from the face of the documents.

Similarly, this Court should reject CSBS's decision to ignore the context surrounding former Comptroller Curry's December 2016 speech.  The OCC has never disputed that Comptroller Curry's speech addressed moving forward with chartering fintechs as national banks or that he asked OCC staff to develop a formal agency policy for evaluating applications.  OCC Mem. at Ex. D.  These comments, however, cannot be equated with a decision to issue 5.20(e)(1) Charters specifically (i.e., charters for banks that do not accept deposits).  Lost in CSBS's argument is the point that a 5.20(e)(1) Charter is not the only possible chartering option for a fintech.  Other options that CSBS does not challenge (such as a full-service charter, a trust bank, etc.) are available.  Former Comptroller Curry's speech at the LendIt USA conference on March 6, 2017, cited in CSBS's Opposition Brief, was similarly silent on the availability of 5.20(e)(1) Charters in particular.  Because there has been no final decision reached on issuing 5.20(e)(1) Charters prior to the commencement of this suit, *see* OCC Mem. at 14-16, there is no action for the OCC to rescind or statement for it to now withdraw in order to demonstrate lack of finality.

Finally, CSBS's efforts to discount the importance of the current Acting Comptroller's public statements also fail.  Acting Comptroller Noreika's statements simply confirm what was already true at the time this suit commenced.  *See* OCC Mem. at 16.  "[T]he OCC has not determined whether it will actually accept or act upon applications from nondepository fintech

companies" and may support fintech innovation through other types of charters instead.  *Id.* at Ex. A at 9.  CSBS also takes the Acting Comptroller's words out of context when it suggests that OCC meetings with the financial technology industry are proof of a final decision.  *See id.* Again, CSBS has not offered any basis to conclude that meetings with companies interested in financial technology mean that a chartering decision—let alone a decision to issue a 5.20(e)(1) Charter—has happened or is imminent.  The status quo since the filing of the litigation has not changed: the OCC has not concluded that it will accept applications for 5.20(e)(1) Charters.[3]

2.  *The Standard for Evaluating Finality in "Pre-Enforcement Challenges" Is Inapplicable in This Case*

It is incontrovertible that the OCC has not decided whether to accept applications for 5.20(e)(1) Charters.  Nevertheless, CSBS attempts to skirt the finality requirement by relying on a case that involves construing final agency action in a wholly different context: pre-enforcement challenges to prescriptive agency regulations.  Opp. at 14-19.  CSBS fails to explain why the three-factor test derived from *Ciba-Geigy* is appropriate outside the enforcement context and where the plaintiff is not the target of the policy at issue.  *Cf. Ciba-Geigy Corp.*, 801 F.2d at 436-37 ("Director of Pesticide Programs unequivocally stated EPA's position on . . . labeling changes . . . [S]tatement of position admit[ted] no ambiguity [and] gave no indication that it was subject to further agency consideration or possible modification. . . . [Agency] provided its final word on the matter '[s]hort of an enforcement action.'") (fourth alteration in original) (citations omitted)).  The present case does not involve enforcement of prescriptive requirements; rather, CSBS asks the Court to review an agency's general pronouncements and considerations of the

---

[3]  The primary case CSBS cites for the proposition that post-Complaint conduct cannot factor into determining existence of a final agency action is inapposite because it involves the reverse scenario, a plaintiff pointing to an agency action that took place after a complaint was filed as evidence of final agency action.  *See AT&T v. EEOC*, 270 F.3d 973, 976 (D.C. Cir. 2001).

potential scope of its licensing authority and activity. Unlike the plaintiff in *Ciba-Geigy*, neither CSBS nor its members are the object of OCC supervision and enforcement. *See supra* pp. 4-5. In these aspects, CSBS's other cited caselaw is also factually distinguishable. *Cf. CSI Aviation Servs. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011) (finding final agency action where the Department of Transportation "effectively declared the [plaintiff's] operations unlawful and warned the [plaintiff] 'to cease and desist from any further activity that would result in it engaging in indirect air transportation'"); *Bimini Superfast Operations LLC v. Winkowski*, 994 F. Supp. 2d 106, 118 (D.D.C. 2014) (holding that Customs and Border Control took "an action which imposes a clear legal obligation on Plaintiffs to cease their operations until their crewmembers are in compliance with federal immigration law"). For these reasons, application of the standards for "pre-enforcement challenges" is inappropriate in this case.

### B. None of the Alleged Agency Actions Has Determined Rights or Obligations or Have Legal Consequences, Defeating the Second Part of the *Bennett* Test

CSBS's argument that the OCC's actions are final and reviewable is weakened further by its internal inconsistency. CSBS treats as unitary the OCC's public statements during 2015-2017 and the 2003 amendment of Section 5.201(e)(1) when it suits it, but then later treats the actions as distinct and separate. *Compare, e.g.*, Opp. at 12 (treating regulation and public statements as distinct for purposes of finality); *with* Opp. at 24 (attributing to the public statements the legal question as to the OCC's legal authority to adopt the Section 5.20(e)(1) amendment). Taken together or separately, however, neither the public statements nor the OCC's amendment to Section 5.20(e)(1) satisfy the second part of *Bennett* because these agency actions have not affected rights or obligations or resulted in legal consequences. *See supra* p. 10.

CSBS attempts to conjure real-world effects from the challenged actions by vaguely contending that its members are harmed by the OCC's "assertion of federal jurisdiction . . . ,

15

interfering with enforcement of [state] laws." Opp. at 18. These assertions lack specificity or certainty. *See supra* pp. 5-7. Although an inchoate OCC chartering policy that is neither final nor effective cannot affect state supervisors, CSBS nevertheless speculates as to the future harm that might be incurred by individuals other than CSBS members. CSBS posits that potential 5.20(e)(1) Charter applicants may be inconvenienced by the possible outcome of future litigation if the Court dismisses the present case for lack of finality without deciding the merits. Opp. at 18, 19. CSBS's far-fetched invocation of the interests of potential applicants prejudges the merits of a hypothetical future case and assumes that sophisticated market participants cannot best evaluate potential risk and reward for themselves.

CSBS also raises the recently promulgated procedures for seeking approval for a change in charter purpose under 12 C.F.R. § 5.20(l)(2) to support its position. Opp. at 17-18. CSBS asserts that the regulation signifies a legal consequence of recent policy considerations and means that the OCC will issue a 5.20(e)(1) Charter by allowing an existing national bank to change the purpose of its charter instead of by issuing a *de novo* charter. This argument misses the point: Section 5.20(l)(2) makes no change to law or policy related to the minimum scope of activities required for a national bank. *See* 82 Fed. Reg. 8082, 8083 (Jan. 23, 2017) (stating that the purpose of Section 5.20(l)(2) is to formalize procedures for seeking approval for a change in charter purpose, which apply to existing categories of SPNBs). Likewise, the differences between the September 2016 version of the OCC's Licensing Manual and the February 2009 version identified by CSBS, Opp. at 5-6, also do not signify a change in law or policy. Again, the OCC has not made a final decision on whether to offer a 5.20(e)(1) Charter either as a *de novo* charter or when approving a change in charter purpose, and CSBS has not alleged any factual basis for such speculation.

16

Finally, even if the *Ciba-Geigy* test for "pre-enforcement challenges" did apply here, the case *supports* the OCC's argument for dismissal.  The OCC's recent statements, either alone or in combination with the 2003 regulatory amendment, do not impose "an immediate and significant practical burden" on CSBS or its members, as required under *Ciba-Geigy*, 801 F.2d at 435-37, or affect rights or obligations or cause legal consequences, as required under *Bennett*, 520 U.S. at 177-78.  What final decision will be reached by the current or future leadership of the OCC on the issuance of 5.20(e)(1) Charters is now unknown.  A "pragmatic" approach, as urged by CSBS, Opp. at 18, necessitates recognizing that both the indeterminate status of the OCC's decision making and the lack of present effect on CSBS or anyone else warrant dismissal for lack of final agency action.[4]

## IV.   CSBS FAILS TO ESTABLISH THAT THE OCC'S INTERPRETATION OF THE NATIONAL BANK ACT IS CONTRARY TO STATUTORY PLAIN MEANING OR UNREASONABLE

### A.  Under *Chevron* Step One, "Business of Banking" Is Ambiguous and Subject to the OCC's Interpretive Authority Over the National Bank Act as Affirmed in Controlling Case Law

#### 1.   *The Statutory Text and Case Law Establish that the Term "Business of Banking" Is Ambiguous*

Contrary to CSBS's suggestion, Opp. at 25, the OCC does not rely primarily upon the lack of a statutory definition in its analysis concluding that the term "business of banking" is ambiguous.  CSBS is correct that the term is undefined.  The OCC therefore reviewed the multiple statutory expressions of the term, found in 12 U.S.C. §§ 21, 24(Seventh), 26, and 27, and determined that there are no textual clues in the National Bank Act that point to the meaning of the term.  OCC Mem. at 24-25.  That statutory silence means that there is no text setting forth

---

[4] OCC relies upon its arguments in its Memorandum in Support with respect to ripeness and notice-and-comment.  *See* OCC Mem. at 17-21.

mandatory activities that must be performed in order for a bank to be engaged in "the business of banking" and that the term is inherently ambiguous.

In reaching the conclusion that the term has no plain meaning, the OCC was not writing on a blank slate: the Supreme Court in 1995 had concluded that the term "business of banking," as it appears in Section 24(Seventh), was ambiguous and that the Comptroller's reasonable interpretation would be given "controlling weight." *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 257 (1995) ("*NationsBank*"). The D.C. Circuit in 1987 similarly concluded that "[t]here is nothing in the language or legislative history of the National Bank Act that indicates congressional intent that the authorized activities for nationally chartered banks be mandatory." *Indep. Cmty. Bankers Ass'n of S.D. v. Bd. of Governors of the Fed. Reserve Sys.*, 820 F.2d 428, 440 (D.C. Cir. 1987) ("*ICBA v. FRB*").

CSBS attempts to limit both *NationsBank* and *ICBA v. FRB* to the particular facts of those cases, but the facts were simply not integral to the analysis that caused those courts to conclude that the term "business of banking" was ambiguous. While it is the case that *NationsBank* addressed the permissible "outer limits" of the "business of banking," *see* Opp. at 44-46, that context had no bearing upon the Court's deference to the Comptroller in interpreting the ambiguous term "business of banking." Deference to the Comptroller was not limited only to "outer limits" situations. Rather, the Court recognized that the term was subject to the Comptroller's reasonable determination of what the "business of banking" should include at the time the inquiry was made.

Similarly, in *ICBA v. FRB*, the factual context played no role in the D.C. Circuit's deference to the Comptroller's interpretation that the "business of banking" allowed for the chartering of a limited purpose national bank (CSBS's so-called "inner limits"). Opp. at 42-46.

18

Contrary to CSBS's attempts to distinguish the case, Opp. at 42, the D.C. Circuit placed no weight upon the fact, mentioned in passing, that the national bank intended to offer limited deposit-taking and other services to the "local community," as minimally permitted by a state statute.

2.  *CSBS Errs in Its Assertion That the National Bank Act Must Be Construed* In Pari Materia *with Other Statutes, Including the Bank Holding Company Act*

CSBS spends a significant portion of its Opposition Memorandum arguing that the "business of banking," as used in the National Bank Act, must include deposit-taking because the Bank Holding Company Act ("BHCA") defines a "bank" as either "[a]n insured bank" as defined in Section 3(h) of the Federal Deposit Insurance Act ("FDIA") or "[a]n institution . . . which . . . accepts demand deposits" and "is engaged in the business of making commercial loans." 12 U.S.C. § 1841(c)(1)(A)-(B).  Both aspects of the definition, CSBS argues, either presume or require that an entity will take deposits in order to be considered a "bank" for BHCA purposes.

More generally, CSBS's theory of statutory construction asserts that the terms of the National Bank Act must be read *in pari materia*, or at least harmoniously, with the terms of every other statute that relates to banking.  Opp. at 30.  Because the National Bank Act, enacted in the 19th century, predates every other federal banking statute, CSBS's theory would demand that the passage or amendment of banking statutes other than the National Bank Act would necessitate systematic reconsideration of existing interpretations of the National Bank Act. Governing case law holds to the contrary, that the National Bank Act is interpreted independently of the BHCA and other statutes.

In *Independent Insurance Agents v. Ludwig*, 997 F.2d 958, 962 (D.C. Cir. 1993), the D.C. Circuit rejected similar arguments that the OCC's interpretation of Section 92 of the National

Bank Act must be harmonized with a later-enacted provision of the BHCA.  Notwithstanding that Congress had intended that the BHCA amendment "parallel" Section 92, the D.C. Circuit deferred to the OCC's interpretation of Section 92 that was directly contrary to the Federal Reserve Board staff's interpretation of the "parallel" BHCA provision.  *Id.*  The D.C. Circuit rejected the notion that the 1982 amendment to the BHCA, as interpreted by the Federal Reserve Board, should "illuminate" the intention of the 1916 Congress.  *Id.*  The court of appeals cited approvingly the conclusion of the district court that "[t]he two provisions were enacted over sixty-five years apart and deal with two different types of banking institutions, each subject to a distinct set of laws and regulations administered by separate agencies."  *Id.* (quoting *Nat'l Ass'n of Life Underwriters v. Clarke,* 736 F. Supp. 1162, 1171 (D.D.C. 1990), *rev'd on other grounds by Indep. Ins. Agents of Am., Inc. v. Clarke*, 955 F.2d 731, 732 (D.C. Cir. 1992)).  The court also cited to an earlier case where it had rejected an argument that the OCC was obligated to follow the BHCA.  "[T]he Comptroller derived his authority solely under the [National Bank Act], and it was his responsibility to determine issues under that Act, not under the BHCA."  *Id.* (citing *Am. Ins. Ass'n v. Clarke*, 865 F.2d 278 (D.C. Cir. 1988)).

CSBS also errs in its heavy reliance on *Whitney v. National Bank of New Orleans & Trust Co.* 379 U.S. 411, 413 (1965) for the proposition that "the [National Bank Act] and BHCA should be interpreted in harmony and that [the] OCC cannot approve a charter when the structure or practical consequences would violate the BHCA's terms or clearly intended policies."  Opp. at 32-33.  The opinion does not support this position.  In the case, Whitney National Bank of New Orleans ("Whitney") planned to establish another national bank in another parish of Louisiana.  To do so, Whitney planned to organize itself as a bank holding company and sought approval of its plan from the Federal Reserve Board.  *Id.*  After the Federal Reserve approved the plan,

several of Whitney's competitors filed a declaratory judgment action seeking a determination that the Comptroller of the Currency had no power to issue a certificate of authority for the new bank because of state branching law made applicable by the BHCA. *Id.*

The Supreme Court held that the Federal Reserve Board and the OCC have distinct roles with respect to newly established national banks proposed to be owned by bank holding companies. The authorization for the new national bank "is the sole function of the Comptroller, requiring his appraisal of the bank's assets, directorate, etc., and his action is therefore necessary in addition to that of the Board approving the organization by the holding company." *Id.* at 417. Separately, "[t]he Bank Holding Company Act makes the Board's approval of a holding company arrangement binding upon the Comptroller." For that reason, the Court noted that the Comptroller might be stayed from issuing a certificate pending Board action, but only "in exceptional circumstances." *Id.* at 561 n.7; *see also Am. Ins. Ass'n*, 865 F.2d at 287-88 (*per curiam* on petitions for rehearing) (declining to find "exceptional circumstances" that would require OCC to comply with the BHCA). CSBS ignores the Court's key observation that "it is the ownership of [the new bank] by the holding company that is at the heart of the project, not the permission to open for business which is acted upon routinely by the Comptroller once the authority to organize is given by the Board." *Whitney*, 379 U.S. at 423. In other words, this case simply stands for the proposition that the BHCA and the National Bank Act govern different things. The BHCA's main purpose is to govern affiliations between "banks" as defined for BHCA purposes and other companies, in particular nonfinancial commercial companies.

*Id.* at 423.  The BHCA does not speak to the nature of the national banks the OCC can charter, something exclusively governed by the National Bank Act.[5]

> 3.   *CSBS's Remaining Statutory Arguments Are Unpersuasive*

> a.   CSBS Ignores Section 27's History and Structure in Arguing That Express Statutory Authority Is Necessary for Limited Purpose Banks

CSBS restates its argument, labelled "*expressio unius*" in the Complaint, that because Congress has expressly provided for certain types of special purpose national banks, the OCC can only charter those for which it has specific statutory authority.  Opp. at 37-45.  The OCC addressed in its Memorandum why this argument is unavailing: the statutory structure of 12 U.S.C. § 27 does not trigger an *expressio unius* application; the banker's bank and trust bank provisions were passed long after the general chartering language of Section 27, defeating any inference of a single congressional intent; *NationsBank* rejected a more plausible *expressio unius* argument; and courts have discounted application of the canon in the *Chevron* context.  OCC Mem. at 34- 36.  The Opposition does not directly address any of these arguments.

The OCC also argued that because there is no specific chartering authority in the National Bank Act for credit card banks, the legality of which CSBS does not dispute, CSBS cannot sustain its theory that special purpose charters require specific statutory authority.  OCC Mem. at 35 n.6.  CSBS's response is simply that credit card banks are different—characterizing them as "narrow focus" banks rather than a form of "special-purpose" banks as defined in the OCC's Licensing Manual—and that they typically engage in limited deposit-taking.  Opp. at 42-43.

---

[5] Similarly, CSBS does not identify any authority where a court relied upon provisions of the Federal Deposit Insurance Act to interpret terms in the National Bank Act.  *Cf. In re Cmty. Bank of N. Va.*, 418 F.3d 277, 295 (3d Cir. 2005) (reading provisions of the FDIA with the aid of the National Bank Act, not the other way around); *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 822 (1st Cir. 1992) (doing the same).

CSBS does not identify any National Bank Act requirement that credit card banks take deposits and therefore does not identify how its statutory interpretation argument is supported by the practice.

      b.  <u>CSBS Misreads 12 U.S.C. § 22(Second), Which Simply Requires a New National Bank to Identify Where It Will Perform Certain Activities</u>

CSBS's argument relying on 12 U.S.C. § 22(Second) is also unpersuasive.  CSBS attempts to transform a notification requirement for the content of a bank's organization certificate into an affirmative requirement that a bank must take deposits.  Opp. at 34, 38.  Part of the process of forming a new national bank includes the execution of an "organization certificate" by the bank's organizers.  The certificate recites basic information (such as the name of the bank, its location, the amount of stock, and the names of initial shareholders).  *See* 12 U.S.C. §§ 21-23.  The location provision requires the certificate to include "the place where its operations of discount and deposit are to be carried on."  *Id.* at § 22(Second).  Historically, the reference to operations of "discount" and "deposit" would have fixed the city where these two activities, traditionally requiring repeated retail contact with bank customers, would take place.  Thus, the provision does not mandate the performance of these two activities, but rather only requires the identification of the place where these activities would be conducted if a particular bank engages in them.[6]  If CSBS's contrary view were accurate, national banks would be required to discount notes, an activity that banks have not undertaken in the modern era.

---

[6] CSBS cites 12 U.S.C. § 378, which makes it unlawful for an entity not chartered as a bank to take deposits.  The statute does not establish the converse, i.e., that a bank must take deposits.

c. CSBS Misconstrues the Import of 12 U.S.C. § 222's "Insured Bank"
Reference

CSBS improperly relies on provisions of the Federal Reserve Act ("FRA") and the FDIA

when it argues that all nationally chartered banks must also have deposit insurance and therefore,

by extension, must accept deposits.  Opp. at 29-30.  Specifically, CSBS points to the text of

Section 222, which states that a national bank "shall, upon commencing business . . . become a

member of the Federal Reserve System . . . and shall thereupon be an insured bank under the

[FDIA]."  12 U.S.C. § 222.  CSBS emphasizes this text because, it contends, the text

demonstrates the necessity of taking deposits.

The text of Section 222 does not operate in the manner that CSBS suggests.  The

provision has a descriptive, rather than prescriptive, function and purpose.  The text states that

upon becoming a member bank of the Federal Reserve, a national bank "shall thereupon be an

insured bank" under the FDIA.  *Id.*  The most natural reading of Section 222 is that it confers the

designation of "insured bank" upon an institution by operation of law.  Equally apparent is that

Section 222 says nothing about whether an "insured bank" under this section is required to take

deposits or that a national bank must accept deposits in order to be considered engaged in "the

business of banking."  The Court should conclude that CSBS's arguments misconstrue the

import of 12 U.S.C. § 222's reference to "insured banks."

4. *Independent Bankers Association of America v. Conover Is Defunct*

CSBS acknowledges that the district court opinion in *Independent Bankers Ass'n of*

*America v. Conover*, 1985 U.S. Dist. Lexis 22529 (M.D. Fla. Feb. 15, 1985), was vacated before

final judgment, but insists that its reasoning should persuade this Court.  Opp. at 40-42.  To the

contrary, as the OCC argued, OCC Mem. at 38-39, the reasoning in *Conover* interpreting the

"business of banking" is contrary to the reasoning of the Supreme Court in *NationsBank* and to

24

that of the D.C. Circuit in *ICBA v. FRB*.  CSBS's only response is to reiterate its conclusory

attempts to distinguish those cases.  Opp. at 41-42.

**B.  Under *Chevron* Step Two, the OCC Reasonably Consulted the "Core Activities" that Define a "Branch" and "the General Business of Each National Banking Association" as the Minimum Activities to Qualify for the "Business of Banking"**

In *Clarke v. Securities Industry Ass'n*, 479 U.S. 388 (1987) ("*Clarke v. SIA*"), the

Supreme Court endorsed the OCC's interpretation of the ambiguous term "the general business

of each national banking association" in the locational restrictions of 12 U.S.C. § 81 to mean

only "core banking functions" and to define those core banking functions by reference to the

definition of a "branch" in 12 U.S.C. § 36—"a place at which deposits are received, or checks

paid, or money lent."  479 U.S. at 409.  In promulgating Section 5.20(e)(1), the OCC reasonably

consulted the same source, Section 36, to inform its determination of the minimum "core

activities" that satisfy "the business of banking" for chartering purposes.  *See* OCC Mem. at 30-

32.

CSBS's attack upon this analysis misstates the OCC's position in multiple ways.  Opp.

46-49.  The OCC does not equate a branch with a main office and does not equate those core

activities or the "general business" of each national bank with the full expression of the term

"business of banking."  The OCC's analysis upheld in *Clarke v. SIA* was to the contrary.  Rather,

those core activities represent a subset common to both the "general business of each national

bank" and to "the business of banking."  In determining what should be treated as "core

activities" for purposes of its chartering regulation, the OCC reasonably looked to a National

Bank Act formulation of banking activities with legal significance for a different but related

purpose.  CSBS is correct that the branching requirements represent, in part, a federal limit on

the OCC's discretion to permit national bank branching.  Opp. at 48-49.  What CSBS does not

acknowledge is that the "core activities" identified in Section 36 reflect a congressional judgment that the conduct of any one of such activities would carry the threat of competitive harm to state-chartered institutions that is the basis for the branching restrictions.  It was reasonable for the OCC to conclude, particularly in light of the Supreme Court's deference to analogous OCC reasoning in *Clarke v. SIA*, that an activity that rose to the level of statutorily-recognized potential competitive banking harm would fall within "the business of banking."  *See* OCC Mem. at 30-32.

### C.  CSBS Cannot Establish That History Controls the Meaning of the National Bank Act Chartering Provisions

The historical sources cited by CSBS do not validate the position that a bank by definition must take deposits and, therefore, that National Bank Act chartering authority must be interpreted as being limited to deposit-taking entities.  For example, the 1913 treatise cited by CSBS states that an institution that has "any one or all of the[] elements and powers" of deposit taking, loaning money or discounting notes or securities, or issuing notes and circulating the same as money can be termed a bank.  *See* H.W. Magee, B.L., *A Treatise on the Law of National and State Banks*, 23 (2d Ed. 1913).  Consistent with this, Section 5.20(e)(1) plainly provides that deposit-taking is a core banking function.  Equally consistent, Section 5.20(e)(1) requires a national bank to undertake a core banking function, but not all three.  Contrary to its argument, the multiple sources CSBS cites acknowledge that while deposit taking is correctly understood as part of the business of banking broadly, this is not the same as understanding the deposit-taking function to be indispensable or mandatory in order for a single institution to be considered a bank and engaged in the business of banking.

First, the legislative history cited by CSBS does not advance its arguments.  None of the cited passages from the 1864 congressional debates regarding the National Bank Act addresses

whether deposit-taking is necessary for a financial institution to be chartered as a national bank or to be deemed a bank generally.  *See* Cong. Globe, 38th Cong., 1st Sess. 1350-51 (1864) (identifying the Bank of Commerce of New York, a state bank, as "a bank of deposit and discount" and not "of circulation" and debating a failed proposed amendment that would have prevented national banks from being banks of circulation); *id.* at 1868 (indicating that when Congress debated an amendment designed to facilitate the Bank of Commerce of New York's entry into the national banking system, a senator described a St. Louis state bank that does not issue circulation as being "a bank of deposit, doing all sorts of banking business, but without issuing paper"); *id.* at 1870 (senator describing his concept of an ideal national financial system as one in which the only paper currency should be legal-tender Treasury notes and in which state banks should be "banks of discount and deposit, but not of circulation"); *id.* at 1990 (noting that while the legislation focused on the establishment of national banks of circulation, it also permitted other types of institutions to commence business under the act, including banks of savings, banks for paying and selling bills of exchange, and banks for receiving money on deposit).  These debates reflect that the establishment of a national currency through national banks of issue to facilitate payments was what motivated Congress to pass the 1864 Act.  *Id.* The other debate passages CSBS cites concern the 1864 Revenue Act's imposition of a tax on banks.  This legislative history likewise expresses no view on the need for banks generally, or for national banks in particular, to take deposits.  *See id.* at 2662 (revealing that when debating an exception for savings banks, one senator compared the practices of Western banks, which invest deposits in bills of exchange and remain liable to depositors, and savings banks, whose depositors can experience losses); *id.* at 2736-38 (specifying that while debating the same

exception, senators reviewed the amount of deposits held by savings banks as compared to banks of circulation and banks of discount and deposit in different states).

Second, although CSBS cites a Second Circuit case for the view that Congress would have incorporated the meaning of previously used statutory terms and their judicial interpretation in subsequent legislation using the same terms, CSBS cites no statutory use or judicial interpretation of the term "business of banking" that both predates 1864 and makes the practice of deposit-taking indispensable for an institution to be a bank. Indeed, the two cases it cites that predate enactment of the National Bank Act do not, as CSBS asserts, classify deposit taking as indispensable or paramount over other functions, such as issuing notes. *See Bank of Augusta v. Earle*, 38 U.S. 519, 530 (1839) ("What is legitimate banking business? It consists of three things. First, discounting notes. Second, receiving money on deposit. Third, issuing notes or bills to be circulated as money. . . . Issuing a note to be put into circulation as money may, perhaps, be evidence of itself of an act of banking; and this may be the most important power which a bank possesses."); *Curtis v. Leavitt*, 15 N.Y. 9, 53 (1857) ("[T]he borrowing of money . . . is asserted as the *incident and result* of two of its most important operations: *those of issuing* [circulating notes] *and receiving deposits*.").

The cases CSBS cites that postdate the National Bank Act, when quoted in full and considered in context, are similarly unavailing because while they confirm that deposit taking is a banking power, they do not state that deposit taking is mandatory in order for a given institution to be considered a bank. *See Mercantile Nat'l Bank of N.Y. v. Mayor*, 121 U.S. 138, 156 (1887) ("The business of banking, as defined by law and custom, consists in the issue of notes payable on demand, intended to circulate as money where the banks are banks of issue; in receiving deposits payable on demand; in discounting commercial paper; making loans of money

on collateral security; buying and selling bills of exchange; negotiating loans, and dealing in negotiable securities . . . . These are the operations in which the capital invested in national banks is employed . . . .'"); *Selden v. Equitable Trust Co.*, 94 U.S. 419, 420, 423 (1876) (holding that a company that "invest[ed] its own capital in mortgage securities on real estate, and s[old] such mortgage securities" was not a "banker, as defined by the revenue laws"); *Warren v. Shook,* 91 U.S. 704, 710 (1875) (describing as "sa[]tisfactory" the definition of "banker" contained in 1864 Revenue Act, which lists three core banking functions *disjunctively*).[7]

In a case that addresses the necessity of deposit taking for an individual bank, the Supreme Court explicitly stated that an institution is a bank "in the strictest commercial sense" if it engages in only *one* of the three functions of deposit taking, discounting, or circulation. *Oulton v. German Sav. & Loan Soc.*, 84 U.S. 109, 119 (1872); *see also* OCC Mem. at 40. As *Oulton* implicitly recognizes, banking functions such as lending and facilitation of payments can, as a practical matter, be carried out through the intermediation of money in ways other than deposit taking. CSBS cites a 1915 opinion of the Attorney General that noted that receiving deposits is "indispensable to the conduct of the business of banking" and determined that national banks must be permitted to enter guaranty contracts to insure deposits. It would be error to do as CSBS urges and read a 102-year-old opinion, which postdates the National Bank Act by half a century, to create a limit to the OCC's chartering authority where Congress has not legislated one. While deposit-taking is certainly a core banking function that national banks generally undertake, none of the authorities CSBS relies on, including the Attorney General

---

[7] Congress defined the term "bank" in the Internal Revenue Act of 1866, ch. 184, 14 Stat. 98, 115 (1866), to include entities that do not take deposits (in addition to the term "banker," which was also contained in the Internal Revenue Act of 1864, ch. 173, 13 Stat. 223, 251 (1864)). *See* OCC Mem. at 39-40.

29

opinion, supports the view that deposit-taking is essential for a single specific institution to be deemed a bank generally or a national bank in particular.

### D.  CSBS's Tenth Amendment Claim Fails

CSBS's Tenth Amendment argument is derivative of its argument that the OCC is acting outside the scope of its federal authority and in a way that trenches on authority reserved to the states.  If, as CSBS argues, the OCC were attempting, not to charter a national bank, but to supersede traditional state bank corporate chartering authority, such a claim might be plausible. *See supra* pp. 4-5, 7-8.  But, because the OCC proposal simply envisions a federal charter to co-exist with state-chartered institutions, the proposal is completely consistent with the existing dual banking system.  Established case law holds that the OCC is acting within the authority of the Commerce Clause and the Necessary and Proper Clause.  *See Watters v. Wachovia Bank, N. A.*, 550 U.S. 1, 22 (2007).

## **CONCLUSION**

For the reasons stated above, the OCC asks the Court to dismiss the Complaint on all counts for lack of jurisdiction and, in the alternative, for failure to state a claim upon which relief may be granted.

Date:  October 4, 2017                                           Respectfully submitted,


                                                      /s/Douglas B. Jordan
                                                     AMY S. FRIEND
                                                     CHARLES M. STEELE
                                                     KAREN SOLOMON
                                                     GREGORY F. TAYLOR
                                                     DOUGLAS B. JORDAN
                                                     PETER C. KOCH
                                                     ASHLEY W. WALKER
                                                     GABRIEL A. HINDIN
                                                     MICHAEL K. MORELLI
                                                     Office of the Comptroller of the
                                                       Currency
                                                     400 7th Street S.W.
                                                     Washington, D.C. 20219
                                                     (202) 649-6300 – phone
                                                     (202) 649-5709 – fax
                                                     gregory.taylor@occ.treas.gov
                                                     douglas.jordan@occ.treas.gov
                                                     peter.koch@occ.treas.gov
                                                     ashley.walker@occ.treas.gov
                                                     gabriel.hindin@occ.treas.gov
                                                     michael.morelli@occ.treas.gov

                                                     *Attorneys for Defendants*