# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONFERENCE OF STATE BANK SUPERVISORS,<br><br>*Plaintiff*,<br><br>v.<br><br>OFFICE OF THE COMPTROLLER OF THE CURRENCY, *et al.*,<br><br>*Defendants*. | Civil Action No. 17-0763 (DLF) |

## MEMORANDUM OPINION

Before the Court is the Defendants' Motion to Dismiss. Dkt. 9. For the reasons that follow, the Court will grant the motion.

## I. BACKGROUND

In this action, the Conference of State Bank Supervisors (CSBS) challenges the purported Nonbank Charter Decision of the Office of the Comptroller of the Currency and the Comptroller[1] (collectively, the OCC). CSBS is a nationwide organization of state banking and financial services regulators from all fifty U.S. states, the District of Columbia, Guam, Puerto Rico, the U.S. Virgin Islands, and American Samoa. Compl. ¶ 13, Dkt. 1. The OCC is a bureau of the U.S. Department of the Treasury and functions as the primary supervisor of banks with national charters. *Id.* ¶ 16; *see also* 12 U.S.C. §§ 1, 26–27 (establishing the OCC and empowering it to grant national bank charters to entities that carry on "the business of banking").

---

[1] This case was originally brought against Thomas J. Curry in his official capacity as Comptroller of the Currency. When the current Comptroller, Joseph M. Otting, was sworn in on November 27, 2017, Otting was automatically substituted as a defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

Financial regulation in the United States is shared between federal and state governments. Compl. ¶ 27. As a general matter, a bank may choose to pursue a state or national charter, and the bank will then be regulated primarily by the corresponding authority. *Id.* ¶ 21. Through the challenged Nonbank Charter Decision, the OCC allegedly decided to move forward with a process for considering national bank charter applications from companies that provide bank-like services but do not accept deposits, which have historically been regulated by the states. *See id.* ¶¶ 1, 3, 5, 26. Such firms have experienced "explosive growth" in recent years. *Id.* ¶ 4. Many of them are financial technology companies, or Fintechs, that provide technology-driven financial services. *Id.* ¶¶ 2–4. For example, a Fintech might develop new ways to provide traditional services like payment processing, or a Fintech might develop cutting-edge services like crowd funding and digital currencies. *Id.* ¶ 2. The OCC estimates that there are now more than 4,000 Fintechs in the United States and the United Kingdom, fueled by worldwide investment that has increased from $1.8 billion to $24 billion in the last five years. *Id.* ¶ 4.

The National Bank Act governs any decision to grant national bank charters to Fintechs or other firms that do not accept deposits. Under the Act, "the Comptroller shall examine into the condition" of charter applicants and determine whether each applicant's condition "entitle[s] it to engage in the business of banking." 12 U.S.C. § 26. If a charter applicant "is lawfully entitled to commence the business of banking," the OCC shall issue a national charter. *Id.* § 27. Also, the OCC is authorized to prescribe rules and regulations to carry out its chartering responsibilities. *Id.* § 93a. National charters apply a uniform set of requirements to national charter recipients and exempt recipients from uneven state regulatory landscapes. Compl. ¶ 23. Historically, the OCC has granted national charters only to banks that receive deposits or other special purpose banks specifically authorized by statute. *See* 12 U.S.C. § 27; 12 U.S.C.

§ 1841(c)(2)(D), (F) (authorizing trust banks, banker's banks, and credit card banks); Compl. ¶¶ 38–46. Indeed, CSBS does not allege that a single national charter has been granted to an entity that does not receive deposits, and the OCC confirms the same. *See* Defs.' Mem. at 14, Dkt. 9-2.

In 2003, the OCC promulgated a rule interpreting its chartering authority to include the power to charter a special purpose bank that limits its activities to "any . . . activities within the business of banking," provided that the special purpose bank conducts "at least one of the following three core banking functions: Receiving deposits; paying checks; or lending money." 12 C.F.R. § 5.20(e)(1); *see* Rules, Policies, and Procedures for Corporate Activities; Bank Activities and Operations; Real Estate Lending and Appraisals, 68 Fed. Reg. 70122 (Dec. 17, 2003); Compl. ¶ 55. Under the rule, the OCC could charter a special purpose bank that does not receive deposits, so long as the bank pays checks or lends money. That may open the door (assuming other requirements are met) for a Fintech that does not accept deposits to acquire a national charter.

That particular aspect of the 2003 rule lay dormant for more than a decade. But in March 2016, the OCC announced through a white paper that it had begun to study the regulatory impacts of innovations in financial technology. Compl. ¶ 47 (citing Office of the Comptroller of the Currency, Supporting Responsible Innovation in the Federal Banking System: An OCC Perspective (Mar. 2016), www.occ.gov/publications/publications-by-type/other-publications-reports/pub-responsible-innovation-banking-system-occ-perspective.pdf). In a December 2016 speech, then-Comptroller Curry said that "the OCC *will* move forward with chartering financial technology companies that offer bank products and services and meet our high standards and chartering requirements." Thomas J. Curry, Special Purpose National Bank Charters for Fintech

3

Companies (Dec. 2, 2016), Dkt. 1-2 at 4 (emphasis in remarks as published on the OCC's website). According to Curry, "I have asked staff to develop and implement a formal agency policy for evaluating applications for fintech charters. The policy, informed by the comments we receive on our [forthcoming] white paper, will articulate specific criteria for approval as well as issues that we should consider and conditions that should be met before granting such charters." *Id.* at 6.

Soon after, the OCC published a white paper that outlined general "baseline" supervisory requirements for charter holders. Office of the Comptroller of the Currency, Exploring Special Purpose National Bank Charters for Fintech Companies (Dec. 2016), Dkt. 1-3; *see also* Compl. ¶ 56–57. This white paper solicited public feedback, and many parties registered objections. Compl. ¶¶ 58–66. CSBS itself raised a variety of concerns relating to the lawfulness and wisdom of granting national charters to Fintechs. Letter from CSBS to Comptroller Curry (Jan. 13, 2017), Dkt. 1-4; *see also* Compl. ¶ 65. The OCC published a response to these concerns on March 15, 2017. Office of the Comptroller of the Currency, OCC Summary of Comments and Explanatory Statement: Special Purpose National Bank Charters for Financial Technology Companies (2017), Dkt. 1-6.

On the same day, the OCC published a draft supplement to the Comptroller's Licensing Manual. *See* Office of the Comptroller of the Currency, Evaluating Charter Applications from Financial Technology Companies (Mar. 2017), Dkt 1-5; *see also* Compl. ¶ 67. The draft supplement pointed to 12 C.F.R. § 5.20(e)(1) to suggest that Fintechs that do not take deposits eventually may be allowed to apply for national charters if the OCC finalizes the language in the draft. Compl. ¶¶ 67–68. In addition, the draft supplement invited public feedback. *Id.* ¶ 74. Many parties again registered concerns and objections. *Id.* ¶¶ 74–75.

The OCC did not respond to these concerns and did not change the draft status of the supplement between March 15 and April 26, 2017, *see id.* ¶ 76, on which date CSBS filed this challenge to the OCC's purported decision to move forward with chartering national banks that do not accept deposits, *i.e.*, the Nonbank Charter Decision, *see id.* at 31, ¶ 12.  CSBS asserts five claims:  (1) the OCC does not have statutory authority for the Nonbank Charter Decision; (2) the OCC does not have statutory authority for a corresponding regulation; (3) the Nonbank Charter Decision failed to follow the appropriate rulemaking procedures; (4) the Nonbank Charter Decision was arbitrary and capricious; and (5) the Nonbank Charter Decision violated the Tenth Amendment.  *See id.* ¶¶ 99–121.

Since CSBS filed its complaint, a number of developments have occurred.  The OCC has undergone two leadership changes along with the changing presidential administrations, so Curry is no longer Comptroller:  he was succeeded in May 2017 by Acting Comptroller Keith A. Noreika, who was then succeeded by the current Senate-confirmed Comptroller Joseph M. Otting.  The OCC's new leadership suggested that, even if a Fintech attempted to apply, the OCC may not accept the application.   In July 2017, for example, Acting Comptroller Noreika stated:

> [A]t this point the OCC has not determined whether it will actually accept or act upon applications from nondepository fintech companies for special purpose national bank charters that rely upon [12 C.F.R. 5.20(e)(1)].  And, to be clear, we have not received, nor are we evaluating, any such applications from nondepository fintech companies.  The OCC will continue to hold discussions with interested companies while we evaluate our options. These meetings have been very informative and provide insight into the financial landscape and the companies providing traditional banking services as they continue to evolve.

Keith A. Noreika, Public Remarks before the Exchequer Club (July 19, 2017), Dkt. 9-3 at 10.

Also in the time since the complaint was filed, a similar lawsuit was filed against the OCC in the Southern District of New York by Maria Vullo, Superintendent of the New York State

Department of Financial Services. *Vullo v. OCC*, No. 17-cv-3574, 2017 WL 6512245 (S.D.N.Y. Dec. 12, 2017). The Southern District recently dismissed that case, concluding that the plaintiff lacked standing and that the dispute was not ripe. *Id.* at *8–10.

The OCC now moves to dismiss this action under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. 9.

## II. LEGAL STANDARD

The U.S. Constitution limits the federal courts to deciding cases or controversies, U.S. Const. art. III, § 2, and it is "presumed that a cause lies outside this limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017). To present a justiciable case or controversy, the party invoking federal jurisdiction must demonstrate standing and ripeness, among other requirements. *Kokkonen*, 511 U.S. at 377; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Pub. Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1289 (D.C. Cir. 2007).

A motion to dismiss for lack of standing proceeds under Rule 12(b)(1) because "the defect of standing is a defect in subject matter jurisdiction." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). Similarly, motions to dismiss on ripeness grounds consistently proceed under Rule 12(b)(1) because "[t]he question of ripeness goes to . . . subject matter jurisdiction." *Exxon Mobil Corp. v. FERC*, 501 F.3d 204, 207 (D.C. Cir. 2007) (quoting *Duke City Lumber Co. v. Butz*, 539 F.2d 220, 221 n.2 (D.C. Cir. 1976)); *see also Venetian Casino Resort, LLC v. EEOC*, 409 F.3d 359, 366 (D.C. Cir. 2005); *Beach TV Props., Inc. v. Solomon*, 254 F. Supp. 3d 118, 131 (D.D.C. 2017); *Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 153 F. Supp. 3d 319, 330

(D.D.C. 2016), *aff'd*, 851 F.3d 1 (D.C. Cir. 2017); *Belmont Abbey Coll. v. Sebelius*, 878 F. Supp. 2d 25, 32 (D.D.C. 2012).[2]

When evaluating a Rule 12(b)(1) motion, "the court must treat the plaintiff's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Jeong Seon Han v. Lynch*, 223 F. Supp. 3d 95, 103 (D.D.C. 2016) (quotation marks and citation omitted). The court, however, "must scrutinize the plaintiff's allegations more closely when considering a motion to dismiss pursuant to Rule 12(b)(1) than it would under a motion to dismiss pursuant to Rule 12(b)(6)." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011). Also, unlike the Rule 12(b)(6) context, a court may consider documents outside the pleadings to evaluate whether it has jurisdiction; for example, the court may consider the complaint supplemented by undisputed facts evidenced by the record. *See Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *Venetian Casino*, 409 F.3d at 366; *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). If the court determines that it lacks jurisdiction, the court must dismiss the action. U.S. Const. art. III, § 2; Fed. R. Civ. P. 12(b)(1), 12(h)(3).

---

[2] It is true that "not every justiciability concern is one of subject matter jurisdiction" and "the D.C. Circuit recently clarified that certain justiciability questions are governed by Rule 12(b)(6), rather than Rule 12(b)(1), while at the same time acknowledging that it 'has not always been consistent in maintaining' the 'distinction between a claim that is not justiciable and a claim over which the court lacks subject matter jurisdiction.'" *Goldstein*, 153 F. Supp. 3d at 331 n.9 (alterations omitted) (quoting *Sierra Club v. Jackson*, 648 F.3d 848, 853 (D.C. Cir. 2011)).

Therefore, even though numerous ripeness cases proceed under Rule 12(b)(1), it is possible that a motion to dismiss a claim that is prudentially unripe, but not constitutionally unripe, should proceed under Rule 12(b)(6). *See id.*; *Horne v. U.S. Dep't of Agric.*, 569 U.S. 513, 526 (2013) (noting that prudential ripeness "is not, strictly speaking, jurisdictional"). Regardless, the Court need not resolve the issue at this time because the defendants moved to dismiss under both rules, *see* Dkt. 9, and an analysis under Rule 12(b)(6) would not change the Court's ripeness conclusion.

7

## III. ANALYSIS

### A. Standing

The doctrine of standing limits federal courts to "the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009). To establish constitutional standing, a plaintiff must demonstrate a concrete injury-in-fact that is fairly traceable to the defendant's action and capable of being redressed by a favorable judicial decision. *Id.* at 493. Absent an actual or imminently threatened injury, the court may not "step[] where the Constitution forb[ids] it to tread" by addressing the merits. *Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 513 (D.C. Cir. 2016).

An organization like CSBS "can have standing on its own behalf . . . or on behalf of its members." *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006) (internal citations omitted). The former —"organizational standing"— requires an organization to show that the organization itself was injured. *Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) (internal quotations omitted). The latter—"associational standing"—allows an organization to sue on behalf of its members to protect their interests. *Common Purpose USA, Inc. v. Obama*, 227 F. Supp. 3d 21, 26–27 (D.D.C. 2016).

CSBS seeks entry into the federal courts through the latter path. To establish associational standing, CSBS must show that (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food & Commercial Workers Union Local 751 v.*

*Brown Grp.*, 517 U.S. 544, 553 (1996) (quotation marks omitted); *see Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (applying test).

CSBS's members do not have standing to sue in their own right. Standing's "irreducible constitutional minimum" contains three requirements. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–03 (1998). First, a plaintiff must plead an injury that is "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Id.* (internal quotations omitted). "Second, there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co.*, 523 U.S. at 103. "And third, there must be redressability—a likelihood that the requested relief will redress the alleged injury." *Id.* "This triad of injury in fact, causation and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Id.* at 103–04 (quoting *Lujan*, 504 U.S. at 560).

The Court only needs to reach the first requirement—injury in fact—to resolve this case. The U.S. Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (internal quotation marks and citation omitted). And it has rejected standards that would allow for possible future injuries or future injuries with merely an "objectively reasonable likelihood" of occurring. *Id.* (rejecting Second Circuit test using that language). In a limited set of cases, the U.S. Supreme Court has "found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs

9

to mitigate or avoid that harm." *Clapper*, 568 U.S. at 414 n.5; *see Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014). The "substantial risk" test does not replace the "certainly impending" test, but rather provides an alternate standard that looks for costs incurred "to mitigate or avoid that harm." *Clapper*, 568 U.S. at 414 n.5; *see Attias*, 865 F.3d at 625–27. Although the two tests may involve similar inquires, they remain separate tests. *See Attias*, 865 F.3d at 626–27; *id.* at 627 ("Under our precedent, the proper way to analyze an increased-risk-of-harm claim is to consider the ultimate alleged harm . . . as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently imminent for standing purposes." (internal quotation marks omitted)). Under either standard, "standing is 'substantially more difficult to establish' where the parties invoking federal jurisdiction are not 'the object of the government action or inaction' they challenge." *Pub. Citizen, Inc.*, 489 F.3d at 1289–90 (quoting *Lujan*, 504 U.S. at 562).

CSBS fails to plead an injury that is "certainly impending" or that exposes its members to a "substantial risk." The complaint identifies several potential injuries:

- "The Nonbank Charter Decision triggers significant risks to traditional areas of state concern . . . ." Compl. ¶ 92.

- "The Nonbank Charter Decision threatens to disrupt this system" of dual bank enforcement." *Id.* ¶ 93.

- "[C]ompanies facing or at risk of state enforcement actions could escape state enforcement authority by obtaining a national charter." *Id.* ¶ 94.

- "[T]he OCC's actions impede the states' ability to continue their existing regulation of financial services companies within their borders . . . . This also creates difficulties for the states in detecting unlicensed activity within their borders." *Id.*

10

- "[O]ne reason that nonbank companies may seek a special purpose national charter from the OCC would be to avoid compliance with existing state laws." *Id.* ¶ 95.

- The decision "threatens to preempt state sovereign interests." *Id.* ¶ 96.

This list is filled with speculative and conclusive language like "significant risks"; "threatens to disrupt"; "could escape"; and "may seek." The Court accepts as true the complaint's factual assertions, including that the OCC's chartering of a Fintech would diminish a state's "ability to continue [its] existing regulation" and will make it marginally more difficult to detect "unlicensed activity." And regulatory interference with a state is indeed a concrete and particularized injury. *See Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441 (D.C. Cir. 1989).

But each of those harms is contingent on whether the OCC charters a Fintech. As the Southern District of New York explained when reaching the same conclusion with respect to similar alleged harms, "none of [the] alleged injuries will actually occur if the OCC never . . . [charters] a [F]intech." *Vullo*, 2017 WL 6512245, at *7–8. Several contingent and speculative events must occur before the OCC charters a Fintech: (1) the OCC must decide to finalize a procedure for handling those applications; (2) a Fintech company must choose to apply for a charter; (3) the particular Fintech must substantively satisfy regulatory requirements; and (4) the OCC must decide to grant the charter to the particular Fintech. When the complaint was filed, not even the first step—finalized procedures—had occurred. *See Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012) ("[S]tanding is assessed at the time of filing."). The draft supplement was a draft "issue[d] for public comment" and it "explain[ed] how the OCC *would* evaluate applications from fintech companies" in an "*envisioned* application process." Office of the Comptroller of the Currency, Summary of Comments and Explanatory Statement: Special Purpose National Bank Charters for Financial Technology Companies (Mar. 2017), Dkt. 1-6 at

11

3–4, 17 (emphasis added). And the second step—a Fintech's electing to apply—had not occurred, let alone the third or fourth. In fact, an aspiring Fintech that does not accept deposits plausibly could have attempted to apply for a charter anytime since the 2003 regulations took effect. And yet in the almost fifteen years between those regulations and the complaint, the OCC posits—and CSBS does not plead otherwise—that not one Fintech of the type described by the complaint has attempted to apply for a national charter. *See* Defs.' Mem. at 14.

This chain of speculative events that must take place before a CSBS member is injured fails to clear the bar posed by either the "certainly impending" test or the "substantial risk" test. The possibility of future injury is too attenuated and uncertain to be "certainly impending." And CSBS does not allege in more than a conclusory fashion that its members suffer an injury from a "substantial risk" of harm, and CSBS certainly does not allege that any such risk "may prompt [its members] to reasonably incur costs to mitigate or avoid that harm." *Clapper*, 568 U.S. at 414 n.5. Indeed, CSBS does not point to any expenditures or any other efforts taken by a member state to mitigate or avoid the alleged harm. *See* Compl. ¶¶ 92–96. Furthermore, the present case is unlike the U.S. Supreme Court's recent application of the "substantial risk" test in *Susan B. Anthony List*, 134 S. Ct. 2334. That case dealt with pre-enforcement review of a state statute prohibiting false statements during elections, not speculative infringement upon state regulations. *Id.* at 2347. Moreover, the injury in that case was much less attenuated; the Court noted that the applicable commission likely "handle[d] about 20 to 80 false statement complaints per year." *Id.* at 2345 (quotation marks omitted). If the OCC had received 20 to 80 Fintech charter applications, then CSBS would have a much stronger argument for standing. But not a single Fintech has ever applied for a charter. Because it is not "certainly impending" that this

chain of events will take place and the present situation does not expose CSBS to a "substantial risk" of harm, CSBS fails to establish injury in fact.

To resist this conclusion, CSBS seeks refuge in several cases that allow states to show regulatory injuries. Pl.'s Opp'n at 21–24, Dkt. 14. Ultimately, this effort is not persuasive because it cannot cure CSBS's lack of an imminent injury. CSBS argues that a state may sue the federal government when it alleges "a judicially cognizable interest in the preservation of its own sovereignty, and a diminishment of that sovereignty by the alleged [federal] interference." *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 51 n.17 (1986) (internal quotations marks omitted). Indeed, the D.C. Circuit has allowed states to challenge the "preemptive effect" of federal law. *Alaska*, 868 F.2d at 443 n.1, 444. Other circuits have reached similar conclusions. *See Texas v. EEOC*, 827 F.3d 372, 378, 379 (5th Cir. 2016), *withdrawn on other grounds*, 838 F.3d 511 (5th Cir. 2016); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236 (10th Cir. 2008); *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228 (6th Cir. 1985).

Unlike the state in *Alaska*, however, CSBS does not allege federal preemption. That is, CSBS does not assert that any state law has been preempted by the OCC's preliminary activities respecting Fintech charters. CSBS also does not allege that any Fintech can freely ignore state law because of the OCC's statements. Nor does it argue that any particular state will face increased regulatory costs and is an object of the regulatory action. *See Texas*, 827 F.3d at 378–80 (allowing Texas to challenge EPA guidance because Texas was an object of the guidance and was forced to incur significant costs or change its policies). Finally, there is no direct conflict between federal and state laws as in *Wyoming*. *See* 539 F.3d 1236 (10th Cir. 2008) (challenging

13

interpretation of federal law that Wyoming residents could be prosecuted for gun ownership after they had used a state process to expunge their state criminal records).

The OCC's national bank chartering program does not conflict with state law until a charter has been issued. The Court thus agrees with the Southern District of New York that "[a]ny allegation of preemption at this point relies on speculation about the OCC's future actions." *Vullo*, 2017 WL 6512245, at *7–8. There is no doubt that *if* the OCC were to charter a Fintech, then that national charter would preempt conflicting state laws—even the OCC concedes as much. Defs.' Reply, at 14, Dkt. 15. At that point, the impacted state surely may allege an injury in fact. *Alaska*, 868 F.2d at 443 n.1, 444. But no such charter has been issued. And, as above, CSBS has failed to allege that the OCC will issue a charter imminently or that the OCC's preliminary activities expose its members to a substantial risk of harm.

Nor does the "special solicitude" afforded to states confer standing on CSBS. *See Massachusetts v. EPA*, 549 U.S. 497, 518–20 (2007). In *Massachusetts*, the U.S. Supreme Court took pains to identify an injury in fact: environmental changes had "already inflicted significant harms," including "rising seas" that "ha[d] already begun to swallow Massachusetts' coastal land" and harmed the state as a landowner. *Id.* at 521–22. Indeed, the "special solicitude [described in *Massachusetts v. EPA*] does not eliminate the state petitioner's obligation to establish a concrete injury, as [the Court's] opinion amply indicates." *Del. Dep't of Natural Res. & Envtl. Control v. FERC*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009). Massachusetts had already suffered an injury, but CSBS's members have not.

Even if the OCC were sufficiently likely to issue a charter to some particular Fintech, the complaint would remain inadequate for another reason. CSBS raises standing on behalf of its members. To do so, CSBS must plead an imminent injury to some particular member.

14

*Summers*, 555 U.S. at 499. "In part because of the difficulty of verifying the facts upon which such probabilistic standing depends," a plaintiff organization must "*identify* members who have suffered the requisite harm—surely not a difficult task here, when so many . . . are alleged to have been harmed." *Summers*, 555 U.S. at 499 (emphasis added). "When a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured. Rather the petitioner must specifically 'identify members who have suffered the requisite harm.'" *Chamber of Commerce v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (quoting *Summers*, 555 U.S. at 499). And at least three courts in this district have required an associational plaintiff to identify an injured member *by name* at the motion to dismiss stage. *See Western Wood Preservers Inst. v. McHugh*, 925 F. Supp. 2d 63, 69–70 (D.D.C. 2013); *Californians for Renewable Energy v. U.S. Dep't of Energy*, 860 F. Supp. 2d 44, 48 (D.D.C. 2012); *Common Cause v. Biden*, 909 F. Supp. 2d 9, 21 n.6 (D.D.C. 2012); *see also Am. Ass'n of Cosmetology Schs. v. Devos*, 258 F. Supp. 3d 50, 66–69 (D.D.C. 2017) (describing disagreements among lower courts as to whether a plaintiff association must identify the injured member by name or identify the member to some lesser degree).

CSBS fails to identify in its complaint which particular member of the organization has been harmed. Nor do any of the briefs remedy this concern. *Compare* Pl.'s Opp'n at 7–8 n.1, *with* Defs.' Reply at 10 n.1. In this way, the complaint runs afoul of the baseline requirement to identify a particular member of the organization that was injured. As in *Summers*, identifying a particular member is "surely not a difficult task" when the harms are alleged to apply to nearly every member of the organization. 555 U.S. at 499. And here the identification requirement serves an important gatekeeping role. It highlights the challenge of determining whether any particular state will be injured before a particular Fintech, if any, receives a charter. A national

charter could injure Indiana without injuring Alaska, or vice versa. As it stands, the complaint does not equip the Court to decide which state to consider when evaluating standing, what role the CSBS member has in that state's regulatory system, or whether there are any Fintech companies within that state that are likely to receive a national charter. And the identification requirement ensures that the Court considers the likelihood of injury to individual members of the organization, thus preventing the organization from gaining standing by combining several alleged injuries that are inadequate separately.

In conclusion, a plaintiff must demonstrate that it has standing to survive a Rule 12(b)(1) motion. *Lujan*, 504 U.S. at 561. CSBS does not carry its burden because it fails to plead an injury in fact and it does not identify an injured member.

**B.    Ripeness**

In addition, this dispute is not constitutionally or prudentially ripe for determination. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hospitality Ass'n v. U.S. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–149 (1967)). Constitutional ripeness is "subsumed" by standing's injury-in-fact requirement. *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012). This case is constitutionally unripe because the CSBS has not established injury in fact, as explained in Section III.A.

This case is also prudentially unripe. As a preliminary matter, CSBS argues that the Court should not apply the prudential ripeness doctrine because the U.S. Supreme Court "cast doubt" on the doctrine in *Susan B. Anthony List*, 134 S. Ct. 2334. Pl.'s Opp'n at 19. The

16

prudential ripeness doctrine is indeed in tension with the "virtual unflagging" obligation of a federal court to hear cases within its jurisdiction. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014). Even so, the U.S. Supreme Court applied the doctrine in *Susan B. Anthony List* and explicitly declined to decide whether prudential ripeness was still good law. 134 S. Ct. at 2347. The D.C. Circuit continues to apply the prudential ripeness doctrine. *See Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 632–33 (D.C. Cir. 2017).

The prudential ripeness doctrine asks whether a federal court "*should* decide a case." *Am. Petroleum Inst.*, 683 F.3d at 386 (emphasis added). Even if a case is "constitutionally ripe," there may also be "prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 808; *Goldstein*, 153 F. Supp. 3d at 337 (stating that prudential ripeness "may provide an independent basis for a court not to exercise its jurisdiction" (quotation marks omitted)). The prudential ripeness doctrine asks two questions: (1) whether the issues are fit for judicial decision; and (2) whether "withholding a decision will cause 'hardship to the parties.'" *Am. Petroleum Inst.*, 683 F.3d at 387 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

The first question protects "the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999) (internal quotation mark omitted). The fitness of an issue "depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (internal quotation marks omitted).

This dispute would benefit from a more concrete setting and additional percolation. In particular, this dispute will be sharpened if the OCC charters a particular Fintech—or decides to do so imminently. CSBS admits that Fintechs "encompass any of a very broad array of technology-driven financial services providers . . . that range from start-up ventures to well-established conglomerates." Compl. ¶ 2. The term can include an "almost unimaginably wide variety of services, from the traditional (*e.g.*, payment processing) to the more cutting edge (*e.g.*, crowd funding and digital currencies, such as bitcoins)." *Id.* To address whether the OCC can issue Fintech charters may require the Court to imagine the "unimaginably wide" range of possible Fintechs, and to draw distinctions between them. Courts are ill-equipped to prospectively draw lines as to which hypothetical Fintechs, if any, may be chartered. While a court could readily consider the legality of awarding a charter to a particular Fintech, the current dispute does not present that question.

Moreover, CSBS asks the Court to review the agency's procedures. But, as discussed in Section III.A, any procedures that may lead to issuing a Fintech charter have not yet been finalized. Based on the record before the Court, the OCC's supplement to the chartering manual remains in draft form, awaiting subsequent updates. *See* Office of the Comptroller of the Currency, Evaluating Charter Applications from Financial Technology Companies (Mar. 2017), Dkt 1-5; *see also* Compl. ¶¶ 67, 76. And there are many other procedural hurdles to overcome before a charter could be granted. *See* Defs.' Mem. at 12–13 (explaining briefly some chartering procedures, such as application, public comment, analysis, and a conditional approval process, which are set forth in 12 C.F.R. Part 5). Any procedural review at this point would be piecemeal, potentially involving a new legal challenge every time the OCC takes a step towards a result disfavored by a trade organization. In light of the recent leadership changes at the OCC,

it is particularly speculative to guess whether the OCC will continue down paths considered by a previous Comptroller. The OCC may pursue similar ends through different regulatory means, or the OCC may choose not to move forward with a national charter program for Fintechs. Indeed, then-Acting Comptroller Noreika stated in July 2017 that "the OCC has not determined whether it will actually accept or act upon applications from nondepository fintech companies" and the OCC "will continue to hold discussions with interested companies while we evaluate our options." Keith A. Noreika, Public Remarks before the Exchequer Club (July 19, 2017), Dkt. 9-3 at 10; *see also Wheaton Coll.*, 703 F.3d at 552 (assessing ripeness based in part on events that occurred after the filing of the complaint). As a result, the agency's actions are not yet sufficiently settled to be fit for review.

In addition, while purely legal issues are "presumptively reviewable," even "purely legal issues may be unfit for review." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005) (quotation omitted). This dispute presents legal issues that are unfit for review. In particular, the dispute involves the interpretation of statutes entrusted to the OCC, and both parties brief the issue of *Chevron* deference. And for that reason "[i]t is more consistent with the conservation of judicial resources to make that deference-bound review after the agency has finalized its *application* of the relevant statutory text." *Am. Petroleum Inst.*, 683 F.3d at 389 (emphasis added). If the OCC elects to adopt and apply a regulatory scheme to a particular Fintech charter, then the agency action will become sufficiently settled and courts will have a more concrete setting to resolve the legal disputes. In these ways, the dispute is not yet fit for judicial decision. *See Am. Petroleum Inst.*, 683 F.3d at 387.

The second question asked by the prudential ripeness doctrine is whether withholding a decision will cause hardship to the parties. *See id.* While the D.C. Circuit "has frequently

suggested that hardship is not a *sine qua non* of ripeness," *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1310 (D.C. Cir. 2010) (collecting cases), it remains a consideration. The "institutional interests in the deferral of review" are outweighed when the hardship caused by deferral would be "immediate and significant." *Am. Petroleum Inst.*, 683 F.3d at 389. CSBS makes no attempt to offer a reason why delay would cause it hardship, let alone that any hardship would be "immediate and significant." *Id.* Instead, CSBS argues that it need not provide any reasons. *See* Pl.'s Opp'n at 20–21 ("[A]bsent institutional interests favoring postponement of review, a petitioner need not show that delay would impose individual hardship to show ripeness." (quoting *Sabre, Inc. v. U.S. Dep't of Transp.*, 429 F.3d 1113, 119–20 (D.C. Cir. 2005)). This argument is not persuasive when considered against the hardship to the OCC if each minor step towards a potential agency policy were litigated one-by-one as the policy becomes more settled.

For these reasons, the prudential ripeness doctrine counsels in favor of allowing time to sharpen this dispute before deciding it. Indeed, there may ultimately be no case to decide at all if the OCC does not charter a Fintech. Therefore, even if CSBS had successfully alleged an injury in fact, this case is prudentially unripe. *See Vullo*, 2017 WL 6512245, at *8–10 (reaching same conclusion under similar Second Circuit precedent).

## CONCLUSION

For the foregoing reasons, the Court grants the Defendants' Motion to Dismiss. Dkt. 9. A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

Date: April 30, 2018